1  **KAPLAN, FOX & KILSHEIMER, LLP**  FILED
   Laurence D. King (SBN 206423)
2  Linda M. Fong (SBN 124232)       NOV 27 AM 11:33
   350 Sansome Street, Suite 400
3  San Francisco, CA 94104
   Telephone: (415) 772-4700
4  Fax: (415) 772-4707
   Email: lking@kaplanfox.com
5       lfong@kaplanfox.com

6  **KAPLAN, FOX & KILSHEIMER, LLP**
   Robert J. Kaplan
7  Linda P. Nussbaum
   850 Third Avenue, 14th Floor
8  New York, NY 10022
   Telephone: (212) 687-1980
9  Fax: (212) 687-7714
   Email: rkaplan@kaplanfox.com
10      lnussbaum@kaplanfox.com'

11 **Attorneys for Plaintiffs**

12 [Additional Counsel Appear on Signature Page]

13

14                    UNITED STATES DISTRICT COURT

15                    NORTHERN DISTRICT OF CALIFORNIA

16 MEIJER, INC. and MEIJER                 Case No.:
   DISTRIBUTION, INC., on behalf of
17 themselves and all others similarly situated,   **CLASS ACTION COMPLAINT EDL**

18
                     Plaintiffs,            JURY TRIAL DEMANDED
19              v.

20 ABBOTT LABORATORIES,

21                   Defendant.

22

23                    **NATURE OF THE ACTION**

24         Plaintiffs Meijer, Inc. and Meijer Distribution, Inc. bring this class action on behalf of

25 itself and all others similarly situated challenging defendant Abbott Laboratories' unlawful

26 monopolization of the market for boosted protease inhibitors, a class of drugs used to treat

27 medical disorders caused by the human immunodeficiency virus, or HIV.  Defendant Abbott

28

Laboratories ("Abbott" or "Defendant") has unlawfully leveraged its monopoly position as the sole provider of Norvir, a protease inhibitor ("PI") that is used to boost the therapeutic effects of other protease inhibitors, in order to disadvantage its competitors and restrict competition in the closely related boosted PI market.  This unlawful scheme has resulted in a suppression of competition in the boosted PI market and has caused Plaintiffs and other purchasers to pay supracompetitive prices for the relevant drugs.

## PARTIES

1.    Plaintiffs Meijer, Inc. and Meijer Distribution, Inc. (collectively, "Meijer" or "Plaintiffs") are corporations organized under the laws of the State of Michigan, with their principal place of business located at 2929 Walker Avenue, NW, Grand Rapids, Michigan 49544.  During the period of time covered by this Complaint, Plaintiff purchased Norvir and Kaletra directly from Defendant and suffered antitrust injury as a result of Defendant's anticompetitive conduct.

2.    Defendant Abbott is a corporation organized and existing under the laws of the State of Illinois and having its headquarters and principal place of business located at 100 Abbott Park Road, Abbott Park, Illinois 60064-3500.  Abbott is engaged in the development, manufacture and sale of pharmaceutical and nutritional products.  Abbott has facilities in 14 states, including at least three facilities located in the Northern District of California.

## JURISDICTION AND VENUE

3.    This action arises under section 2 of the Sherman Act, 15 U.S.C. § 2, and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  The Court has subject-matter jurisdiction pursuant to 28 U.S.C. 1331 and 1337(a).

4.    Venue is proper in this Court pursuant to section 12 of the Clayton Act, 15 U.S.C. § 22, because Abbott is an inhabitant of this District or is found or transacts business there.  Venue is also proper pursuant to 28 U.S.C. § 1391.

## TRADE AND COMMERCE

5.    The pharmaceutical products at issue in this case are sold in interstate commerce, and the unlawful activities alleged in this Complaint have occurred in, and have had

1   a substantial effect upon, interstate commerce.

2   **FACTUAL BACKGROUND**

3       6.      PIs are considered the most powerful treatment in the medical battle against HIV

4   and the disorders it causes, including acquired immune deficiency syndrome (AIDS).  These

5   drugs work by blocking the action of protease, an enzyme needed for HIV to reproduce and

6   infect other cells.

7       7.      Although PIs present an effective treatment, they have several impediments,

8   including: pill burden, dietary requirements, and severe side effects.  Each PI presents different

9   degrees of impediment and efficacy.  In addition, patients develop resistance to certain PIs — a

10  significant challenge to the treatment of HIV — as the disease progresses.

11      8.      There are several PIs currently on the market, including Norvir, manufactured

12  by Abbott and introduced in 1996, and Kaletra, also manufactured by Abbott and introduced in

13  2000.  Kaletra is a combination drug consisting of Norvir and another Abbott PI, whose

14  chemical or generic name is lopinavir.  As explained below, while Norvir was introduced as a

15  stand-alone treatment, its principal use today is to boost the therapeutic effects (and reduced the

16  required dosage) of other PIs.

17      9.      Abbott developed Norvir with the assistance of a National Institute of Health

18  grant and spent only about $15 million of its own funds on pre-approval clinical trials for the

19  drug.  By the end of 2001, Norvir had generated cumulative sales for Abbott of more than $1

20  billion.

21      10.     After Norvir's release, it was discovered that, when used in small quantities with

22  another PI, Norvir would boost the anti-viral effects of the other PI.  Not only did a small dose

23  of Norvir make other PIs more effective and decrease side effects associated with high doses,

24  but it also slowed down the rate at which HIV developed resistance to the effects of PIs.

25  Norvir is the only PI known to have such properties and, as a result, for such "boosting"

26  purposes, there is no substitute for Norvir.  In addition to its direct therapeutic benefits, a

27  regimen consisting of a PI boosted by Norvir improves convenience for patients in comparison

28  to an unboosted regimen by reducing the required dosage of the PI and lessening food

1  restrictions, both important factors in ensuring adherence to HIV antiviral therapy.

2       11.  Recent research has also shown significant benefits from the use of boosted PI

3  regimens, especially for patients who experience failure of treatment regimens combining PIs

4  with other anti-HIV drugs.  Such treatment failures are marked by the emergence of drug-

5  resistant mutations that limit the benefits of other drugs in the future, because of cross-

6  resistance among HIV medications.  When patients experience failure of initial boosted PI

7  regimens, there is no evidence of PI resistance and, moreover, there is less resistance to other

8  drugs in the regimen.  Hence, by using Norvir as a booster, physicians can maximize the

9  treatment options remaining for the patients experiencing treatment failure.

10       12.  Prior to the conduct alleged herein, Abbott never before sought to use its

11  intellectual property to prevent other manufacturers from creating and selling PIs for

12  administration with Norvir.  Instead, Abbott licensed – both explicitly and implicitly –

13  competitors the right to market PIs to be co-administered with Norvir.  Based on Abbott's

14  course of conduct, Abbott knowingly created the conditions for Norvir to become the *de facto*

15  standard boosting agent.

16       13.  As noted above, Abbott also markets Kaletra, which consists of Norvir and

17  another Abbott PI, lopinavir, combined in a single pill, *i.e.*, Kaletra is lopinavir boosted by

18  Norvir.  Although effective and widely used, Kaletra has significant side effects, including

19  hyperlipidemia, which renders patients more vulnerable to heart attacks and strokes.

20       14.  Thus, in the "Boosting Market," Norvir is the only product available, while in

21  the "Boosted Market," Kaletra competes with other PIs, each of which is prescribed, dispensed

22  and taken in conjunction with Norvir.  This creates a situation in which the same firm

23  participates in two closely related markets, with the product sold in one of the two markets

24  being an input or component of the product sold in the other market.  If such a firm lacks

25  competition in the market for sales of the input or component product, it may be able to use its

26  monopoly position in that market to disadvantage its competitors in the related market and

27  monopolize or attempt to monopolize the related market.  That is exactly what Abbott has done

28  here.

## ABBOTT'S ANTICOMPETITIVE CONDUCT

15.    Prescriptions for Kaletra rose steadily from its introduction in September 2000 through mid-2003, at which point it enjoyed approximately a 75% share of the boosted PI market. However, Kaletra's dominance of the boosted market was about to be threatened.

16.    In June 2003, Bristol-Myers Squibb introduced Reyataz, a PI designed to be boosted by Norvir. In October 2003, GlaxoSmithKline introduced Lexiva, another PI designed to be boosted by Norvir. Studies showed that, when boosted with Norvir, the new PIs were as effective as Kaletra, and were more convenient. As a result, Kaletra's share of the boosted market began to decline. The average daily dose of Norvir also fell. Before the release of Reyataz, the most common boosting dose of Norvir ranged from 200 milligrams to 400 milligrams per day. However, clinical trials showed that a Norvir dose of only 100 milligrams a day effectively boosted Reyataz.

17.    Beginning in the second half of 2003, both Reyataz and Lexiva began to make steady inroads into Kaletra's share of the boosted PI market.

18.    Abbott was well aware of the competitive threat posed by Reyataz and Lexiva and acted quickly to suppress it. Overnight, on December 3, 2003, as part of the monopolization scheme alleged herein, Abbott raised the wholesale price of Norvir by approximately 400%, from $205.74 to $1,028.71 for a 120-count bottle of 100 mg capsules. However, Abbott did not raise the price of Kaletra, which incorporates Norvir. In effect, Abbott raised the price of Norvir only when it is used to boost a non-Abbott PI. By instituting this enormous price hike, Abbott drastically increased the cost of regimens using Norvir to boost competing PIs. The annual cost of Norvir needed in such a regimen increased by $6,258 per year for PIs such as Lexiva requiring twice-daily dose of Norvir. For Aptivus (tipranavir), a new PI marketed by Boehringer Ingelheim, the optimal Norvir booster dose increased by more than $12,000 per year.

19.    Faced with the prospect of new competitors to Abbott's boosted PI, Kaletra — *i.e.*, two new PIs from GSK (Lexiva) and BMS (Reyataz) — Abbott's executives declined to engage in legal and procompetitive, but potentially ineffective, approaches to defending against

1  a loss of market share. Instead, its executives formulated an anticompetitive monopolization

2  scheme using Abbott's control of Norvir as leverage to maintain and/or enhance Kaletra's

3  dominant market position. Abbott executives were well-aware that Abbott had facilitated the

4  use of Norvir as a booster and caused its competitors to rely on the availability of Norvir –

5  through Abbott's past course of conduct and formally through licensing its competitors to

6  promote their PIs with Norvir. Abbott executives realized that if Abbott could make Norvir

7  unavailable or less desirable when paired with its competitors' PIs — by actually pulling it

8  from the market or by manipulating its price — then its competitors' products in the boosted

9  market, which by that time almost always relied on Norvir for boosting due to Abbott's prior

10 conduct, would never become a significant competitive threat to Kaletra's market dominance.

11      20.    As reported in THE WALL STREET JOURNAL, internal Abbott documents reveal,

12 among other things, that: (a) Abbott understood the illegal nature of the price-increase scheme

13 and contemplated other strategies, like ceasing sales of Norvir, to "minimize any federal

14 investigations regarding price increases in the US;" (b) Abbott understood the adverse

15 consequences of the scheme, including that it would "tarnish" the reputation of Abbott's CEO,

16 "[p]osition [Abbott] as [a] big, bad, greedy pharmaceutical company," "[f]uel[] perception[s]

17 regarding lack of Abbott commitment to HIV," and create a "[b]acklash from [the] advocacy

18 community, legislators, [and] physicians;" and (c) Abbott floated pretextual rationales for the

19 price increase, but worried about its "[e]xposure on price if forced to open [its] books."

20      21.    According to internal Abbott e mails and other documents released by THE

21 WALL STREET JOURNAL, one Abbott executive explained Abbott's concern in the following

22 manner: Abbott could not "continue to trade a prescription of Kaletra for a prescription of

23 Norvir at 100 mg." Rather than rely on any competitive advantage in the medicinal

24 characteristics of Kaletra, or even on lowering Kaletra's price so that it was more attractive to

25 patients, this executive outlined alternative anticompetitive plans that had been discussed

26 among Abbott management and warned other senior Abbott employees not to be "stunned by

27 the outcome of the thought process."

28      22.    But the e mails *are* stunning. First, they outlined two potential scenarios for

1   increasing the price of Norvir in an effort artificially to decrease demand for its competitors'
2   PIs. In both scenarios, they suggested leaving the price of Kaletra unchanged, thus giving
3   Abbott a huge price advantage for PIs boosted by Norvir. They outlined a "rationale" for the
4   proposed Norvir price increase, suggesting that Abbott mislead the public into believing that "it
5   is no longer feasible for Abbott to provide a production line of Norvir capsules at the current
6   price." The e mails, however, frankly admit the "weakness" of this "rationale" — its falsity.

7       23.     Even more cynically, the Abbott emails suggested an alternative approach to the
8   price increase: withdraw Norvir capsules from the market entirely, leaving HIV patients only
9   with a liquid form of Norvir that Abbott's own executives admit "taste[s] like someone else's
10  vomit." Other materials reveal that Abbott planned to make up a justification for this
11  withdrawal. Executives considered misleading the public into believing that Abbott was
12  diverting the capsules for humanitarian efforts in "the developing world (*i.e.* Africa)."

13      24.     An Abbott slide presentation created around the time of these e mails further
14  illustrates the anticompetitive and illegitimate motives behind Abbott's price hike. The
15  presentation reveals, for example, that Abbott sought to "[p]osition Kaletra as a more
16  economical option for boosted ARV [*anti-retroviral*] therapy." Abbott acknowledged the
17  illegitimacy of its plan, but Abbott still found it easier to mislead the public regarding an
18  anticompetitive price increase than to try to explain a complete withdrawal of Norvir capsules
19  from the market.

20      25.     Abbott further attempted to manage the fallout from its Norvir price increase by
21  publishing misleading comparisons of PI prices. In promotional and informational materials
22  about Norvir after the price increase, Abbott represented that Norvir was the lowest-priced PI
23  on the market.

24      26.     The Department of Health & Human Services ("DHHS") responded with a
25  Warning Letter to Abbott about such materials, calling Abbott's price comparison chart "false
26  or misleading in violation of section 502(a) of the Federal Food, Drug, and Cosmetic Act (Act)
27  (21 U.S.C. 352(a))." Specifically, DHHS stated that the price chart was misleading because it
28  compared a "subtherapeutic dose of Norvir (100 mg once daily) to the labeled dosing regimens

1  of other antiretroviral agents" and it "implies that Norvir may be used other than in
2  combination therapy, when it is not labeled for such use." Abbott did not contest the FDA
3  letter, choosing instead to send a letter to healthcare providers retracting and "clarifying" its
4  false statements.

5     27.    On information and belief, internal Abbott documents state Abbott's intentions:
6  the huge price increase for Norvir would create the "[p]otential for increased market share for
7  Kaletra." Abbott's December 3, 2003 price increase was an attempt to leverage its monopoly
8  position in the boosting market in order to disadvantage competitors and maintain its dominant
9  position in the boosted market. The attempt succeeded.

10    28.    Abbott's leveraging scheme effectively halted the decline in market share of
11  Kaletra. By 2006, Kaletra's share of the boosted PI market had risen to approximately 75%,
12  the same share it held prior to the introduction of Reyataz. This change of course was due
13  entirely to the competitive disadvantage imposed on non-Abbott PIs by the December 2003
14  price increase.

15    29.    As a direct and proximate result of Abbott's unlawful conduct, plaintiff Meijer
16  and other similarly situated direct purchasers have been deprived of the benefit of free and open
17  competition in the boosted PI market and have been injured in their business and property by
18  paying more for the relevant Abbott drugs than they would have paid in the absence of
19  Abbott's unlawful, anticompetitive conduct.

20                              **RELEVANT MARKETS**

21    30.    There are two product markets relevant to Plaintiffs' antitrust claims: the
22  "Boosting Market," which consists of Norvir alone, and the "Boosted Market," which consists
23  of Kaletra and a number of non-Abbott PIs, each of which is prescribed, dispensed and used in
24  conjunction with Norvir. The relevant geographic market is the United States. With respect to
25  both product markets, a firm that was the only seller of such products in the United States
26  would have the ability to profitably sell those products at a price substantially above the
27  competitive level without losing significant sales.

28    31.    At all relevant times, Abbott has had a 100% share of the Boosting Market and a

1  dominant share of the Boosted Market.  At all relevant times, Abbott possessed monopoly

2  power — the ability to profitably raise prices significantly above a competitive level without

3  losing significant sales—in both relevant markets.

4          32.     There are substantial barriers to entry in both the market for PI boosters and the

5  market for boosted PIs.  The products in these markets require millions of dollars and years to

6  design, develop and distribute.  Compounding these barriers to entry, both markets require

7  government approvals to enter and may be covered by patents and other forms of intellectual

8  property.  Thus, competitors or potential market entrants lack the capacity to increase output in

9  the short run.

10         33.     The unlawful actions alleged above were taken for the purpose of maintaining

11 Abbott's dominant share of the Boosted Market.

12                          **CLASS ACTION ALLEGATIONS**

13         34.     Plaintiffs bring this action on their own behalf and under Fed. R. Civ. P. 23(a)

14 and 23(b)(3), as representatives of a class (the "Class") defined as follows:

15                 All persons or entities in the United States that purchased Norvir
                   and/or Kaletra directly from Abbott or any of its divisions,
16                 subsidiaries, predecessors, or affiliates during the period from
                   December 3, 2003 through such time as the effects of Abbott's
17                 illegal conduct have ceased, and excluding federal governmental
                   entities, Abbott, and Abbott's divisions, subsidiaries, predecessors,
18                 and affiliates.

19
           35.     On information and belief, hundreds of entities in the United States have
20
   purchased Norvir and/or Kaletra directly from Abbott.  Thus, members of the Class are so
21
   numerous that joinder is impracticable.
22
           36.     Plaintiffs' claims are typical of the Class.
23
           37.     Plaintiffs and all members of the Class were damaged by the same conduct of
24
   the Defendant.
25
           38.     Plaintiffs will fairly and adequately protect and represent the interests of the
26
   Class.  The interests of the Plaintiffs are not antagonistic to the Class.
27
           39.     Plaintiffs are represented by counsel who are experienced and competent in the
28

1  prosecution of complex class action antitrust litigation.

2      40.    Questions of law and fact common to the members of the Class predominate

3  over questions, if any, that may affect only individual members because Defendant has acted

4  and refused to act on grounds generally applicable to the entire Class. Such generally

5  applicable conduct is inherent in the Defendant's exclusionary and anticompetitive conduct in

6  monopolizing and attempting to monopolize the boosted PI market, as more fully alleged

7  herein.

8      41.    Questions of law and fact common to the Class include:

9          a.    whether the Defendant intentionally and unlawfully excluded

10 competitors from the Boosted Market;

11         b.    whether Abbott unlawfully attempted to monopolize the Boosted Market

12 during the Class Period;

13         c.    whether Abbott engaged in anticompetitive conduct in order to leverage

14 its monopoly in the Boosting Market to obtain, maintain, or extend monopoly power in the

15 Boosted Market;

16         d.    whether the geographic market for both protease inhibitor boosters and

17 boosted protease inhibitors is the United States;

18         e.    whether Abbott has monopoly power in a relevant market defined as the

19 Boosting Market;

20         f.    whether Abbott intended to monopolize the Boosted Market or to

21 maintain or extend an existing monopoly on the Boosted Market, and in fact maintained or

22 extended monopoly power in the Boosted Market;

23         g.    whether there was and is a dangerous probability that Abbott would

24 succeed in monopolizing the Boosted Market;

25         h.    whether Abbott had pro-competitive reasons for its conduct;

26         i.    the effects of Abbott's attempted monopolization on prices of boosted

27 protease inhibitors; and

28         j.    whether Plaintiffs and other members of the Class have been damaged

Page 10 – CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1   by paying more for the relevant drugs as a result of Defendant's unlawful behavior; and

2               k.     the proper measure of damages.

3        42.    Class action treatment is a superior method for the fair and efficient adjudication

4   of the controversy, in that, among other things, such treatment will permit a large number of

5   similarly situated persons to prosecute their common claims in a single forum simultaneously,

6   efficiently, and without the unnecessary duplication of effort and expense that numerous

7   individual actions would engender.  The benefits of proceeding through the class mechanism,

8   including providing injured persons or entities with a method for obtaining redress for claims

9   that might not be practicable for them to pursue individually, substantially outweigh any

10   difficulties that may arise in management of this class action.

11        43.    Plaintiffs know of no difficulty to be encountered in the maintenance of this

12   action as a class action.

13   **FIRST CAUSE OF ACTION**

14   **Monopolization (15 U.S.C. § 2)**

15        44.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1

16   through 43 above.

17        45.    At all relevant times, Abbott has had monopoly power in both the Boosting

18   Market and the Boosted Market.

19        46.    Abbott has willfully maintained its monopoly power in the Boosted Market

20   through exclusionary and anticompetitive means.  As described in more detail above, Abbott

21   induced competitors in the Boosted Market to rely upon Norvir, then raised the price of Norvir

22   by approximately 400% in December 2003, having maintained that inflated price to the present

23   day.  Norvir is sold at a much lower price when used as one component of Abbott's own

24   boosted PI, Kaletra.  By engaging in this conduct, and instituting such a price increase, Abbott

25   has used its monopoly position in the Boosting Market to gain an artificial competitive

26   advantage and unfairly disadvantaged its competitors in the Boosted Market.  The purpose and

27   effect of Abbott's conduct have been to suppress rather than promote competition on the

28   merits.

1    47.    There is no procompetitive justification for Abbott's conduct.

2    48.    Plaintiffs have been injured in their business and property by reason of Abbott's

3  unlawful monopolization. Plaintiffs' injury consists of paying higher prices to purchase the

4  relevant products than they would have paid absent Abbott's conduct. This injury to Plaintiffs'

5  business and property is injury of the type the antitrust laws were designed to prevent and flows

6  from that which makes Abbott's conduct unlawful.

7                    **SECOND CAUSE OF ACTION**

8                    **Attempt to Monopolize (15 U.S.C. § 2)**

9    49.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1

10  through 43 above.

11    50.    At all relevant times, Abbott has had monopoly power in the Boosting Market

12  and, in the alternative, a dangerous probability of achieving monopoly power in the Boosted

13  Market.

14    51.    Abbott has attempted to monopolize the Boosted Market through exclusionary

15  and anticompetitive means. As described in more detail above, Abbott induced competitors in

16  the Boosted Market to rely upon Norvir, then overnight raised the price of Norvir by

17  approximately 400% in December 2003, and maintained that inflated price to the present day.

18  Norvir is sold at a much lower price when used as one component of Abbott's own boosted PI,

19  Kaletra. By engaging in this conduct, and instituting such a price increase, Abbott has used its

20  monopoly position in the Boosting Market to gain an artificial competitive advantage and

21  unfairly disadvantage its competitors in the Boosted Market. The purpose and effect of

22  Abbott's conduct have been to suppress rather than promote competition on the merits.

23    52.    At all relevant times, Abbott has had the specific intent to monopolize the

24  Boosted Market.

25    53.    There is no procompetitive justification for Abbott's conduct.

26    54.    Plaintiffs have been injured in their business and property by reason of Abbott's

27  unlawful attempted monopolization. Plaintiffs' injury consists of paying higher prices to

28  purchase the relevant products than they would have paid absent Abbott's conduct. This injury

1    to Plaintiffs' business and property is injury of the type the antitrust laws were designed to

2    prevent and flows from that which makes Abbott's conduct unlawful.

3          55.    Abbott's unlawful conduct threatens continuing loss and damage to Plaintiffs

4    and the Class if not enjoined by this Court.

5    **PETITION FOR RELIEF**

6          WHEREFORE, Plaintiffs petition that:

7

8          (a)    The Court determine that this action may be maintained as a class action

9    pursuant to Fed. R. Civ. P. 23, that Plaintiffs be appointed class representative and that

10    Plaintiffs' counsel be appointed a counsel for the Class;

11          (b)    The conduct alleged herein be declared, adjudged and/or decreed to be unlawful

12    under Section 2 of the Sherman Act, 15 U.S.C. § 2;

13          (c)    Plaintiffs and the Class recover their overcharge damages, trebled, and the costs

14    of the suit, including reasonable attorneys' fees as provided by law; and

15

16          (d)    Plaintiffs and the Class be granted such other, further, and different relief as the

17    nature of the case may require or as may be determined to be just, equitable and proper by this

18    Court.

19    //

20    //

21    //

22    //

23    //

24    //

25    //

26    //

27    //

28

1

## JURY TRIAL DEMAND

2        Plaintiffs demand a trial by jury of all issues so triable.

3   Dated: November 27, 2007

4                              Respectfully submitted,

5                              **KAPLAN FOX & KILSHEIMER LLP**

6                              By: _____

7                              Laurence D. King (SBN 206423)
                               Linda M. Fong (SBN 124232)
8                              350 Sansome Street, Suite 400
                               San Francisco, CA 94104
9                              Telephone: (415) 772-4700
                               Fax: (415) 772-4707
10                             Email: lking@kaplanfox.com
11                                    lfong@kaplanfox.com

12                             **KAPLAN FOX & KILSHEIMER LLP**
                               Robert N. Kaplan
13                             Linda P. Nussbaum
14                             850 Third Avenue, 14th Floor
                               New York, NY 10022
15                             Telephone: (212) 687-1980
                               Fax: (212) 687-7714
16                             Email: rkaplan@kaplanfox.com
17                                    lnussbaum@kaplanfox.com
                                      garenson@kaplanfox.com
18
                               Joseph M. Vanek
19                             David P. Germaine
                               **VANEK, VICKERS & MASINI, P.C.**
20                             111 South Wacker Drive, Suite 4050
                               Chicago, IL 60606
21                             Telephone: (312) 224-1500
                               Fax: (312) 224-1510
22                             Emails: jvanek@vaneklaw.com
23                                     dgermaine@vaneklaw.com

24                             Paul E. Slater
                               **SPERLING & SLATER**
25                             55 West Monroe Street, Suite 3200
26                             Chicago, Illinois 60603
                               Telephone: (312) 641-3200
27                             Fax: (312) 641-6492
                               E mail: pes@sperling-law.com
28