1  Joseph R. Saveri (SBN 130064)
   *jsaveri@lchb.com*
2  Eric B. Fastiff (SBN 182260)
   *efastiff@lchb.com*
3  Lieff, Cabraser, Heimann & Bernstein, LLP
   Embarcadero Center West
4  275 Battery Street, 30th Floor
   San Francisco, CA  94111-3339
5  Telephone:  (415) 956-1000
   Facsimile:  (415) 956-1008
6
   *Attorneys for Individual and Representative Plaintiff*
7  *Rochester Drug Co-Operative, Inc.*

8  Charles M. Kagay (SBN 73377)
   cmk@slksf.com
9  Wayne M. Liao (SBN 66591)
   wml@slksf.com
10 SPIEGEL LIAO & KAGAY, LLP
   388 Market Street, Suite 900
11 San Francisco, California 94111
   Telephone:     (415) 956-5959
12 Facsimile:     (415) 962-1431

13 *Attorneys for Individual and Representative Plaintiff*
   *Louisiana Wholesale Drug Co, Inc.*
14
   [Additional Attorneys and Plaintiffs on Signature Page]
15

16                 UNITED STATES DISTRICT COURT
17              NORTHERN DISTRICT OF CALIFORNIA
18                      (OAKLAND DIVISION)
19

20
21 MEIJER, INC. & MEIJER                    Case No. C 07-5985 CW
   DISTRIBUTION, INC., on behalf of
22 themselves and all others similarly      **CONSOLIDATED AMENDED COMPLAINT**
   situated,
23                                          **JURY TRIAL DEMAND**
                    Plaintiffs,
24
   v.
25
   ABBOTT LABORATORIES,
26
                    Defendant.
27
   --[caption continues next page]--
28

739233.1                                   CONSOLIDATED AMENDED COMPLAINT

1

2    ROCHESTER DRUG CO-
     OPERATIVE, INC., on behalf of itself        Case No. C 07-6010 CW
3    and all others similarly situated,
                                                 **CONSOLIDATED AMENDED COMPLAINT**
4                    Plaintiff,
                                                 **JURY TRIAL DEMAND**
5            v.

6    ABBOTT LABORATORIES,

7                    Defendant.

8
     LOUISIANA WHOLESALE DRUG           Case No. C 07-6118 CW
9    COMPANY, INC., on behalf of itself
     and all others similarly situated,         **CONSOLIDATED AMENDED COMPLAINT**
10
                     Plaintiff,                  **JURY TRIAL DEMAND**
11
             v.
12
     ABBOTT LABORATORIES,
13
                     Defendant.
14

15
                          **NATURE OF THE ACTION**
16
                    Plaintiffs Meijer, Inc., Meijer Distribution, Inc., Rochester Drug Cooperative, Inc.,
17
     and Louisiana Wholesale Drug Co., Inc. (collectively "Plaintiffs") bring this class action on
18
     behalf of themselves and all others similarly situated challenging defendant Abbott Laboratories'
19
     unlawful monopolization of the markets for Boosting and Boosted protease inhibitors, drugs used
20
     to treat medical disorders caused by the human immunodeficiency virus ("HIV").  Defendant
21
     Abbott Laboratories ("Abbott" or "Defendant") has unlawfully leveraged its monopoly position
22
     as the sole provider of Norvir, a protease inhibitor ("PI") that is used to boost the therapeutic
23
     effects of other protease inhibitors, in order to disadvantage its competitors and restrict
24
     competition in the closely related Boosted Market.  Abbott's anticompetitive scheme has resulted
25
     in a suppression of competition in the Boosted Market and the Boosting Market and has caused
26
     Plaintiffs and other direct purchasers to pay artificially inflated prices for the relevant drugs.
27

28

1

**PARTIES**

2      1.      Plaintiffs Meijer, Inc. and Meijer Distribution, Inc. (collectively, "Meijer")

3   are a pharmaceutical retailer and wholesaler, respectively.  They are corporations organized under

4   the laws of the State of Michigan, with their principal place of business located at 2929 Walker

5   Avenue, NW, Grand Rapids, Michigan 49544.  Meijer is the assignee of the claims of the Frank

6   W. Kerr Co., which, during the class period, as defined below, purchased Norvir and Kaletra

7   directly from Abbott and suffered antitrust injury as a result of Abbott's anticompetitive conduct

8   alleged herein.

9      2.      Plaintiff Rochester Drug Cooperative, Inc. ("RDC") is a pharmaceutical

10  wholesaler located at 50 Jet View Drive, Rochester, New York, 14624.  During the relevant

11  period, Plaintiff purchased Norvir and Kaletra directly from Abbott, and was injured as a result of

12  Defendant's anti-competitive conduct alleged herein.

13     3.      Plaintiff Louisiana Wholesale Drug Company, Inc. ("LWD") is a

14  pharmaceutical wholesaler and corporation organized under the laws of the State of Louisiana and

15  is located at 20851-49 South Service Road, in Sunset, Louisiana 70584. During the relevant

16  period, LWD purchased Norvir and Kaletra directly from Abbott, and suffered antitrust injury as

17  a result of the anti-competitive conduct alleged herein.

18     4.      Defendant Abbott is a corporation organized and existing under the laws of

19  the State of Illinois and having its headquarters and principal place of business located at 100

20  Abbott Park Road, Abbott Park, Illinois.  Abbott is engaged in the development, manufacture and

21  sale of pharmaceutical and nutritional products.  Abbott has facilities in at least 14 states,

22  including at least 3 in this District.

23

**JURISDICTION AND VENUE**

24     5.      This action arises under section 2 of the Sherman Act, 15 U.S.C. § 2, and

25  sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  The Court has subject-matter

26  jurisdiction pursuant to 28 U.S.C. 1331 and 1337(a).

27     6.      Venue is proper in this Court pursuant to section 12 of the Clayton Act, 15

28  U.S.C. § 22, and Local Rules of the United States District Court for the Northern District of

1    California 3-2 because Abbott is an inhabitant of this District or is found or transacts business

2    there and because a substantial part of the events giving rise to Plaintiff's claims occurred in this

3    District.  Venue is also proper pursuant to 28 U.S.C. § 1391.

4            7.      Intradistrict assignment is proper in the San Francisco/Oakland Division,

5    pursuant to L.R. 3-2( c) & (d), because a substantial part of the events which give rise to the claim

6    occurred in Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Napa, San

7    Francisco, San Mateo and Sonoma counties.

8                           **TRADE AND COMMERCE**

9            8.      The pharmaceutical products at issue in this case are sold in interstate

10   commerce, and the unlawful activities alleged in this Complaint have occurred in, and have had a

11   substantial effect upon, interstate commerce.

12                          **FACTUAL BACKGROUND**

13           9.      PIs are considered the most powerful treatment in the medical battle

14   against HIV and the disorders it causes, including acquired immune deficiency syndrome

15   ("AIDS").  These drugs work by blocking the action of protease, an enzyme needed for HIV to

16   reproduce and infect other cells.

17           10.     Although PIs present an effective treatment, they have several

18   impediments, including: pill burden, dietary requirements, and severe side effects.  Each PI

19   presents different degrees of impediment and efficacy.  In addition, patients develop resistance to

20   certain PIs—a significant challenge to the treatment of HIV—as the disease progresses

21           11.     There are several PIs currently on the market, including Norvir (a Boosting

22   drug), manufactured by Abbott and introduced in 1996, and Kaletra, also manufactured by Abbott

23   and introduced in 2000.  Kaletra is a combination drug consisting of Norvir and another Abbott

24   PI, whose chemical or generic name is lopinavir (a Boosted drug).  As explained below, while

25   Norvir was introduced as a stand-alone treatment, its principal use today is to boost the

26   therapeutic effects (and reduce the required dosage) of other PIs.

27           12.     Abbott developed Norvir with the assistance of a National Institute of

28   Health grant and spent only about $15 million of its own funds on pre-approval clinical trials for

1    the drug.  By the end of 2001, Norvir had generated cumulative sales for Abbott of more than $1

2    billion.

3          13.    After Norvir's release, it was discovered that, when used in small quantities

4    with another PI, Norvir would boost the anti-viral effects of the other PI.  Not only did a small

5    dose of Norvir make other PIs more effective and decrease side effects associated with high

6    doses, but it also slowed down the rate at which HIV developed resistance to the effects of PIs.

7    Norvir is the only PI known to have such properties and, as a result, for such "boosting" purposes,

8    there is no substitute for Norvir.  In addition to its direct therapeutic benefits, a regimen

9    consisting of a PI boosted by Norvir improves convenience for patients in comparison to an

10   unboosted regimen by reducing the required dosage of the PI and lessening food restrictions, both

11   important factors in ensuring adherence to HIV antiviral therapy.

12         14.    Recent research has also shown significant benefits from the use of

13   Boosted-PI regimens, especially for patients who experience failure of treatment regimens

14   combining PIs with other anti-HIV drugs.  Such treatment failures are marked by the emergence

15   of drug-resistant mutations that limit the benefits of other drugs in the future, because of cross-

16   resistance among HIV medications.

17         15.    Abbott has never sought to use its intellectual property to prevent other

18   manufacturers from creating and selling Boosted-PIs that rely on Norvir's use.  Indeed, Abbott

19   has disclaimed such a use from the exclusionary scope of its patent rights. *See In Re Abbott*

20   *Laboratories Norvir Antitrust Litigation,* 442 F. Supp.2d 800, 807-810 (N.D. Cal. 2007).   Abbott

21   profited by licensing competitors the right to market PIs to be co-administered with Norvir.

22   Abbott licensed—both explicitly and implicitly—competitors the right to market PIs to be co-

23   administered with Norvir.  Based on Abbott's course of conduct, Abbott knowingly created the

24   conditions for Norvir to become the *de facto* standard boosting agent.

25         16.    As noted above, Abbott also markets Kaletra, which consists of Norvir and

26   another Abbott PI, lopinavir, combined in a single pill, *i.e.*, Kaletra is lopinavir boosted by

27   Norvir.  Although effective and widely used, Kaletra has significant side effects, including

28   hyperlipidemia, which renders patients more vulnerable to heart attacks and strokes.

17.     Thus, in the "Boosting Market," Norvir is the only product available, while in the "Boosted Market," Kaletra competes with other PIs, each of which is prescribed, dispensed and taken in conjunction with Norvir.  This creates a situation in which the same firm participates in two closely related markets, with the product sold in one of the two markets being an input or component of the product sold in the other market.  If such a firm lacks competition in the market for sales of the input or component product, it may be able to use its monopoly position in that market to disadvantage its competitors in the related market and monopolize or attempt to monopolize the related market.  That is exactly what Abbott has done here.

18.     Abbott's anticompetitive conduct involves both of these markets.  First, Abbott has leveraged its monopoly position (100% dominance) in the Boosting Market to impede rivals to Abbott's Kaletra product in the Boosted Market.  And, second, by improperly impeding the development of potential rivals to Norvir (and/or by delaying the development of technologies that would have permitted Norvir to be used as a PI-Boosting drug in substantially lesser amounts far earlier and thus effectively brought lower prices to purchasers earlier) in the Boosting Market, Abbott artificially maintained and/or enhanced and exploited Norvir's monopoly position in the Boosting Market.

## ABBOTT'S ANTICOMPETITIVE CONDUCT

19.     Prescriptions for Kaletra rose steadily from its introduction in September 2000 through mid-2003, at which point Kaletra enjoyed over three-quarters of the Boosted Market.  However, Kaletra's dominance of the Boosted Market was about to be threatened.

20.     On information and belief, in 2001 (or earlier), Abbott came to realize that Kaletra's domination of the Boosted Market would soon be challenged by new Boosted-PIs that were then expected to be coming to market imminently.

21.     On information and belief, during 2002 (or earlier), Abbott became increasingly concerned about the competitive threat to Kaletra posed by soon-to-be-introduced Boosted-PIs, and began to formulate plans to thwart the impact on Kaletra of those new products.  Abbott considered various strategies for leveraging its Norvir dominance to impair Kaletra's rivals, including, *e.g.*: (a) removing Norvir from the market as a stand-along product, and (b)

1    raising Norvir's price substantially in order to make it prohibitively expensive for patients to use

2    rivals' Boosted-PI products.

3            22.    In June 2003, Bristol-Myers Squibb Co. ("BSM") introduced Reyataz, a PI

4    designed to be boosted by Norvir.  In October 2003, GlaxoSmithKline ("GSK") introduced

5    Lexiva, another PI designed to be boosted by Norvir.  Studies showed that, when boosted with

6    Norvir, the new PIs were as effective as Kaletra, and were more convenient.  On information and

7    belief this caused concern at Abbott that Kaletra's market share would be threatened by these new

8    Boosted-PI competitors.  And, in fact, Kaletra's share of the Boosted Market began to decline.

9            23.    Beginning in the second half of 2003, both Reyataz and Lexiva began to

10   make steady inroads into Kaletra's share of the Boosted Market.

11           24.    Abbott was well aware of the competitive threat posed by Reyataz and

12   Lexiva and acted quickly to suppress it.  Overnight, on December 3, 2003, as part of the

13   monopolization scheme alleged herein, Abbott raised the wholesale price of Norvir by

14   approximately 400%, from $205.74 to $1,028.71 for a 120-count bottle of 100 mg capsules.

15   However, Abbott did not raise the price of Kaletra, which incorporates Norvir.  In effect, Abbott

16   raised the price of Norvir only when it is used to boost a non-Abbott PI.  By instituting this

17   enormous price hike, Abbott drastically increased the cost of regimens using Norvir to boost

18   competing PIs.  The annual cost of Norvir needed in such a regimen increased by $6,258 per year

19   for PIs such as Lexiva requiring twice-daily dose of Norvir.  For Aptivus (tipranavir), a new PI

20   marketed by Boehringer Ingelheim, the optimal Norvir boosting dose increased by more than

21   $12,000 per year.

22           25.    Faced with the prospect of new competitors to Abbott's Boosted-PI,

23   Kaletra—*i.e.*, two new PIs from GSK (Lexiva) and BMS (Reyataz)—Abbott's executives

24   declined to engage in legal and procompetitive, but potentially ineffective, approaches to

25   defending against a loss of market share.  Instead, its executives formulated an anticompetitive

26   monopolization scheme using Abbott's control of the Boosting Market (Norvir) as leverage to

27   impede rivals of Kaletra in the Boosted Market, and thereby artificially insulate Kaletra from

28   competition.  Abbott executives were well-aware that Abbott had facilitated the use of Norvir as a

1    boosting drug and caused its competitors to rely on the availability of Norvir – through Abbott's

2    past course of conduct and formally through licensing its competitors to promote their PIs with

3    Norvir.  Abbott executives realized that if Abbott could make Norvir unavailable or less desirable

4    when paired with its competitors' PIs—by actually pulling it from the market or by manipulating

5    its price—then its competitors' products in the Boosted Market, which by that time almost always

6    relied on Norvir for boosting due to Abbott's prior conduct, would be impaired, and could not

7    become a significant competitive threat to Kaletra's market share.

8            26.    As reported in the Wall Street Journal, internal Abbott documents reveal,

9    among other things, that: (a) Abbott understood the illegal nature of the price-increase scheme

10   and contemplated other strategies, like ceasing sales of Norvir, to "minimize any federal

11   investigations regarding price increases in the US"; (b) Abbott understood the adverse

12   consequences of the scheme, including that it would "tarnish" the reputation of Abbott's CEO,

13   "[p]osition [Abbott] as [a] big, bad, greedy pharmaceutical company," "[f]uel[] perception[s]

14   regarding lack of Abbott commitment to HIV," and create a "[b]acklash from [the] advocacy

15   community, legislators, [and] physicians"; and (c) Abbott floated pretextual rationales for the

16   price increase but worried about its "[e]xposure on price if forced to open [its] books."

17   Furthermore, removing Norvir from the U.S. market entirely would potentially expose Abbott to

18   the significant financial risk that the NIH would use its "march-in" rights under the Bayh-Dole

19   Act to grant licenses to numerous competitors to allow rivals to manufacture ritonavir and/or to

20   co-formulate their Boosted-PIs with ritonavir in a single pill or capsule.

21           27.    According to internal Abbott emails and other documents released by the

22   Wall Street Journal, one Abbott executive explained Abbott's concern in the following manner:

23   Abbott could not "continue to trade a prescription of Kaletra for a prescription of Norvir at 100

24   mg."  Rather than rely on any competitive advantage in the medicinal characteristics of Kaletra,

25   or even on lowering Kaletra's price so that it was more attractive to patients, this executive

26   outlined alternative anticompetitive plans that had been discussed among Abbott management and

27   warned other senior Abbott employees not to be "stunned by the outcome of the thought process."

28

28.     But the emails are stunning.  First, they outlined two potential scenarios for increasing the price of Norvir in an effort artificially to decrease demand for its competitors' PIs.  In both scenarios, they suggested leaving the price of Kaletra unchanged, thus giving Abbott a huge price advantage for PIs boosted by Norvir.  They outlined a "rationale" for the proposed Norvir price increase, suggesting that Abbott mislead the public into believing that "it is no longer feasible for Abbott to provide a production line of Norvir capsules at the current price."  The emails, however, frankly admit the "weakness" of this "rationale"—its falsity.

29.     Even more cynically, the Abbott emails suggested an alternative approach to the price increase: withdraw Norvir capsules from the market entirely, leaving HIV patients only with a liquid form of Norvir that Abbott's own executives admit "taste[s] like someone else's vomit."  Other materials reveal that Abbott planned to make up a justification for this withdrawal.  Executives considered misleading the public into believing that Abbott was diverting the capsules for humanitarian efforts in "the developing world (i.e. Africa)."

30.     An Abbott slide presentation created around the time of these emails further illustrates the anticompetitive and illegitimate motives behind Abbott's price hike.  The presentation reveals, for example, that Abbott sought to "[p]osition Kaletra as a more economical option for boosted ARV [anti-retroviral] therapy."  Abbott acknowledged the illegitimacy of its plan, but Abbott still found it easier to mislead the public regarding an anticompetitive price increase than to try to explain a complete withdrawal of Norvir capsules from the market.

31.     Abbott further attempted to manage the fallout from its Norvir price increase by publishing misleading comparisons of PI prices.  In promotional and informational materials about Norvir after the price increase, Abbott represented that Norvir was the lowest-priced PI on the market.

32.     The Department of Health & Human Services ("DHHS") responded with a Warning Letter to Abbott about such materials, calling Abbott's price comparison chart "false or misleading in violation of section 502(a) of the Federal Food, Drug, and Cosmetic Act (Act) (21 U.S.C. 352(a))."  Specifically, DHHS stated that the price chart was misleading because it compared a "subtherapeutic dose of Norvir (100 mg once daily) to the labeled dosing regimens of

1    other antiretroviral agents" and it "implies that Norvir may be used other than in combination

2    therapy, when it is not labeled for such use." Abbott did not contest the FDA letter, choosing

3    instead to send a letter to healthcare providers retracting and "clarifying" its false statements.

4         33.    On information and belief, internal Abbott documents state Abbott's

5    intentions: the huge price increase for the PI-Boosting drug, Norvir, could be effectively

6    leveraged to insulate Kaletra from competition in the separate Boosted Market. Abbott's

7    December 3, 2003 price increase was an attempt to leverage its monopoly position in the

8    Boosting Market in order to disadvantage competitors and maintain its dominant position in the

9    Boosted Market. The attempt succeeded.

10        34.    At the very same time that Abbott was planning to limit Norvir's

11   availability (by either physically removing it from the market or raising its price to make it

12   effectively unavailable), Abbott was approaching BMS, GSK, and other actual and potential

13   Boosted-PI competitors to induce them to take licenses from Abbott for the right to label and

14   market their PIs to be boosted by, or co-administered with, Norvir. In 2001, Abbott approached

15   GSK to demand that GSK secure a license from Abbott to allow GSK to promote GSK's existing

16   PIs, as well as PIs it had under development, with Norvir. Abbott and GSK continued to

17   negotiate over such a license during 2001 and 2002 until GSK ultimately acquiesced to this

18   demand, procuring a license from Abbott in December 2002. Under the license, GSK paid

19   substantial sums of money and other valuable consideration in exchange for the right to promote

20   the use and administration of its PIs with Norvir.

21        35.    Abbott negotiated the Norvir licenses with GSK and other competitors

22   during 2001 and 2002 at the very same time that it was secretly considering limiting Norvir's

23   availability. Abbott never disclosed to GSK and other licensees and potential licensees that

24   Abbott might either remove Norvir from the market or raise its price to make it financially

25   unavailable to many patients. When GSK entered into the Norvir license with Abbott in

26   December 2002, GSK relied on Abbott's good faith not to materially deviate from its prior course

27   of conduct with regard to selling and pricing Norvir. Up until that point, Abbott had never

28   increased Norvir's price by more than 4% per year. The largest price increase in HIV therapies

1   had been a 10.4% increase for the price for Combivir and Trizivir in January 2002. Abbott's

2   overnight 400% price increase for Norvir was unprecedented and—especially when considering

3   Abbott's prior conduct of encouraging and facilitating licensing of Norvir for use in the Boosted

4   Market—totally unexpected.

5           36.    On information and belief, in reliance on the expectation that Abbott would

6   act in good-faith, and because Abbott concealed its strategy to reduce Norvir's availability and/or

7   dramatically raise its prices, GSK and other PI manufacturers materially delayed developing,

8   testing, and/or launching other potential Boosted-PIs that could be effective with substantially

9   less Norvir (and thus be less susceptible to impairment by a Norvir price increase) or could be

10  used with another PI-Boosting drug entirely, *i.e.*, not Norvir. As a result of Abbott's conduct, no

11  currently available PI has been approved for co-administration with any other PI-Boosting drug

12  besides Norvir.

13          37.    Had GSK and other competitors known that Abbott was planning to

14  substantially reduce Norvir's availability (either by raising its prices to prohibitive levels or

15  pulling it from the market entirely), GSK and other competitors would not have delayed or

16  postponed efforts to develop alternative Boosted-PI drugs that did not depend upon using 200 mg

17  of the Norvir product as a PI-Boosting drug. For example, due to Abbott's misconduct as

18  described above, GSK was delayed in receiving FDA labeling approval for the use of its Boosted-

19  PI Lexiva with only 100 mg of Norvir per day, rather than 200 mg of Norvir per day to achieve

20  the same clinical results. Lexvia with only 100 mg of Norvir per day entered the market,

21  belatedly, in October 2007. A result of this new FDA approval for use of Lexiva with only 100

22  mg of Norvir is that the cost to purchasers of boosting Lexiva with Norvir dropped by one-half.

23  Because GSK (and potentially others) delayed development, testing and FDA-approval of

24  Boosted-PIs that would be effective with lower amounts of Norvir: (a) purchasers in the Boosted

25  Market paid more for Norvir than they otherwise would have; and (b) GSK's rival Boosted-PI

26  products were rendered more expensive (and therefore less of a competitive threat to Kaletra).

27          38.    Abbott's exclusionary conduct has unlawfully caused the Boosted Market

28  to standardize on Norvir for boosting purposes and has significantly retarded the advent of

1  alternatives to Norvir in the United States, thereby enabling Abbott to sell Norvir at artificially

2  inflated prices.  But for Abbott's illegal conduct, multiple other avenues for providing, or

3  obviating the need for, boosting functionality would have been invested in, or pursued, resulting

4  in a much lower demand, and therefore profitably sustainable price, for Norvir.

5           39.    Abbott's leveraging scheme effectively halted the decline in market share

6  of Kaletra.  By 2006, Kaletra's share of the Boosted Market had risen to approximately the same

7  dominant share it had held prior to the introduction of Reyataz.  This change was due to the

8  competitive disadvantage imposed on non-Abbott PIs by the December 2003 price increase on

9  Norvir.

10          40.    By leveraging its monopoly power in the Boosting Market to impair rivals

11  in the Boosted Market, Abbott's 400% Norvir price increase not only impeded competition by

12  inflating the costs of using rivals' Boosted-PI products, but also caused its Boosted-PI

13  competitors to forego responding to Abbott's conduct by lowering price.  After December 2003,

14  Abbott's Boosted-PI competitors knew that any price reductions they took could immediately be

15  undercut by further Norvir price *increases*.  In other words, by leveraging its monopoly in the

16  Boosting Market, Abbott could react to price cuts by its Boosted-PI rivals not with price

17  reductions of its own on its Boosted-PI product as one would expect in a competitive market, but

18  rather with price increases on a different product.  In this way, Abbott's Boosted-PI rivals had

19  little incentive to get into a competitive battle with Abbott in the Boosted Market given that

20  Abbott controlled the Boosting Market.  By undermining competitors' incentives to price

21  compete, Abbott's conduct reduced price competition as a whole in the Boosted Market.

22  Consequently, the December 2003 Norvir price increase not only raised the costs of using rivals'

23  products, but also reduced the overall degree of price competition in the Boosted Market, thereby

24  further reducing competitive pressure on Abbott to reduce Kaletra's prices.

25          41.    The following allegations are sufficient, but not necessary, to state a claim.

26  On information and belief: (a) if the penalty a purchaser would pay on the required dosage of

27  Norvir for buying a Boosted-PI from a supplier other than Abbott were subtracted from the

28  imputed price of the Boosted-PI portion of Kaletra, then the resulting price would be below

1  Abbott's average variable costs relating to the Boosted-PI portion of Kaletra; and (b) if Abbott

2  had to pay its own market price for the ritonavir/Norvir that goes into Kaletra, Abbott's selling

3  Kaletra at its current market price would not be profitable.

4          42.     As a direct and proximate result of Abbott's unlawful conduct, Plaintiffs

5  and other similarly situated direct purchasers have been deprived of the benefit of free and open

6  competition in both the Boosting and Boosted Markets and have been injured in their businesses

7  and properties by paying more for the relevant Abbott drugs than they would have in the absence

8  of Abbott's unlawful, anticompetitive conduct.

9                                  **RELEVANT MARKETS**

10          43.     There are two product markets relevant to Plaintiffs' antitrust claims: the

11  Boosting Market, which consists of Norvir alone, and the Boosted Market, which consists of

12  Kaletra and a number of non-Abbott PIs, each of which is prescribed, dispensed and used in

13  conjunction with Norvir.  The relevant geographic market is the United States.  With respect to

14  both product markets, a firm that was the only seller of such products in the United States would

15  have the ability to profitably sell those products at a price substantially above the competitive

16  level without losing significant sales.

17          44.     At all relevant times, Abbott has had a 100% share of the Boosting Market

18  and has had a dominant share of the Boosted Market.  At all relevant times, Abbott possessed

19  monopoly power—the ability to profitably raise price significantly above competitive level

20  without losing significant sales—in both relevant markets.

21          45.     There are barriers to entry in both the Boosted and Boosting Markets.  The

22  products in these markets require millions of dollars and years to design, develop, and distribute.

23  Compounding these barriers to entry, both markets require government approvals to enter and are

24  or may be covered by patents and other forms of intellectual property.  Thus, competitors or

25  potential market entrants lack the capacity to increase output in the short run.

26          46.     The unlawful actions alleged above were taken for the purpose of

27  maintaining Abbott's dominant share of the Boosted Market.

28

1    **CLASS ACTION ALLEGATIONS**

2    47.    Plaintiffs bring this action on their own behalf and under Fed. R. Civ. P.

3    23(a) & (b)(3), as representatives of a class (the "Class") defined as follows:

4    All persons or entities in the United States that purchased Norvir
     and/or Kaletra directly from Abbott or any of its divisions,
5    subsidiaries, predecessors, or affiliates during the period from
     December 3, 2003 through such time as the effects of Abbott's
6    illegal conduct have ceased, and excluding federal governmental
     entities, Abbott, and Abbott's divisions, subsidiaries, predecessors,
7    and affiliates.

8    48.    On information and belief, hundreds of entities in the United States have

9    purchased Norvir and/or Kaletra directly from Abbott.  Thus, members of the Class are so

10   numerous that joinder is impracticable.

11   49.    Plaintiffs' claims are typical of those of the Class.

12   50.    Plaintiffs and all members of the Class were damaged by the same conduct

13   of the Defendant.

14   51.    Plaintiffs will fairly and adequately protect and represent the interests of

15   the Class. The interests of the Plaintiffs are not antagonistic to the Class.

16   52.    Plaintiffs are represented by counsel who are experienced and competent in

17   the prosecution of complex class action antitrust litigation.

18   53.    Questions of law and fact common to the members of the Class

19   predominate over questions, if any, that may affect only individual members because Defendant

20   has acted and refused to act on grounds generally applicable to the entire Class.  Such generally

21   applicable conduct is inherent in the Defendant's exclusionary and anticompetitive conduct in

22   monopolizing and attempting to monopolize the Boosted Market and in monopolizing the

23   Boosting Market, as more fully alleged herein.

24   54.    Questions of law and fact common to the Class include:

25   a.    whether the Defendant intentionally and unlawfully impaired or

26   impeded competitors the Boosting and/or Boosted Markets;

27   b.    whether Abbott unlawfully attempted to monopolize the Boosting

28   and/or Boosted Market during the Class Period;

c.      whether Abbott engaged in anticompetitive conduct in order to leverage its monopoly in the Boosting Market to obtain, maintain, or extend monopoly power in the Boosted Market;

d.      whether the geographic market for both PI-Boosting drugs and Boosted-PIs is the United States;

e.      whether Abbott has monopoly power in a relevant market defined as the Boosting Market;

f.      whether Abbott intended to monopolize the Boosted Market or to maintain or extend an existing monopoly on the Boosted Market, and in fact maintained or extended monopoly power in the Boosted Market;

g.      whether there was and is a dangerous probability that Abbott would succeed in monopolizing the Boosted Market;

h.      whether Abbott had pro-competitive reasons for its conduct;

i.      the effects of Abbott's attempted monopolization on prices of Boosted-PIs;

j.      whether Plaintiff and other members of the Class have been damaged by paying more for the relevant drugs as a result of Defendant's unlawful behavior; and,

k.      the proper measure of damages.

55.      Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

56.      Plaintiffs know of no difficulty to be encountered in the maintenance of this action as a class action.

**FIRST CAUSE OF ACTION**
**Monopolization of the Boosted Market (15 U.S.C. § 2)**

57.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 56 above.

58.    At all relevant times, Abbott has had monopoly power in both the Boosting Market and the Boosted Market.

59.    Abbott has willfully maintained its monopoly power in the Boosted Market through exclusionary and anticompetitive means.  As described in more detail above, Abbott induced competitors in the Boosted Market to rely upon Norvir, then overnight raised the price of Norvir by approximately 400% in December 2003, and maintained that inflated price to the present day.  Norvir is sold at a much lower price when used as one component of Abbott's own Boosted-PI, Kaletra.  By engaging in this conduct, and instituting such a price increase, Abbott has improperly leveraged its monopoly position in the Boosting Market to gain an artificial competitive advantage and unfairly impede and impair its competitors in the Boosted Market. The purpose and effect of Abbott's conduct have been to suppress rather than promote competition on the merits.

60.    There is no procompetitive justification for Abbott's conduct.

61.    Plaintiffs have been injured in their businesses and properties by reason of Abbott's unlawful monopolization.  Plaintiffs' injuries consist of paying higher prices to purchase the relevant products than they would have paid absent Abbott's conduct.  Plaintiffs' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Abbott's conduct unlawful.

**SECOND CAUSE OF ACTION**
**Attempt to Monopolize the Boosted Market (15 U.S.C. § 2)**

62.    Plaintiffs incorporates by reference the allegations contained in paragraphs 1 through 61 above.

63.     At all relevant times, Abbott has had monopoly power in the Boosting Market and, in the alternative, a dangerous probability of achieving monopoly power in the Boosted Market.

64.     Abbott has attempted to monopolize the Boosted Market through exclusionary and anticompetitive means.  As described in more detail above, Abbott induced competitors in the Boosted Market to rely upon Norvir, then overnight raised the price of Norvir by approximately 400% in December 2003, and maintained that inflated price to the present day. Norvir is sold at a much lower price when used as one component of Abbott's own Boosted-PI, Kaletra.  By engaging in this conduct, and instituting such a price increase, Abbott has improperly leveraged its monopoly position in the Boosting Market to gain an artificial competitive advantage and unfairly impede and impair its competitors in the Boosted Market.  The purpose and effect of Abbott's conduct have been to suppress rather than promote competition on the merits.

65.     At all relevant times, Abbott has had the specific intent to monopolize the Boosted Market.

66.     There is no procompetitive justification for Abbott's conduct.

67.     Plaintiffs have been injured in their businesses and properties by reason of Abbott's unlawful attempt to monopolize.  Plaintiffs' injuries consist of paying higher prices to purchase the relevant products than they would have paid absent Abbott's conduct.  Plaintiffs' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Abbott's conduct unlawful.

### THIRD CAUSE OF ACTION
### Monopolization of the Boosting Market (15 U.S.C. § 2)

68.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 67 above.

69.     Abbott has willfully enhanced and maintained its monopoly power in the Boosting Market through exclusionary and anticompetitive means. As described in more detail above, Abbott deceptively induced rivals to forego developmental alternatives and instead

1   standardize around the use of Norvir for boosting purposes. Given that competitors were induced

2   to lock in to using Norvir, Abbott exercised its monopoly power in the Boosting Market by

3   raising the price of Norvir approximately 400% in December 2003. Abbott has maintained that

4   inflated price to the present day. The purpose and effect of Abbott's conduct has been to suppress

5   rather than promote competition on the merits.

6        70.    There is no pro competitive justification for Abbott's conduct.

7        71.    Plaintiffs and the Class have been injured in their businesses and properties

8   by reason of Abbott's unlawful monopolization. Plaintiffs' injuries consist of paying higher prices

9   to purchase the relevant products than they would have paid absent Abbott's conduct. These

10  injuries to Plaintiffs' businesses and properties are of the type the antitrust laws were designed to

11  prevent and flow from that which makes Abbott's conduct unlawful.

12                        **PETITION FOR RELIEF**

13       WHEREFORE, Plaintiffs petition that:

14       a.    The Court determine that this action may be maintained as a class

15  action pursuant to Fed. R. Civ. P. 23, that Plaintiffs be appointed class representatives, and that

16  Plaintiffs' counsel be appointed as counsel for the Class;

17       b.    The conduct alleged herein be declared, adjudged and/or decreed to

18  be unlawful under Section 2 of the Sherman Act, 15 U.S.C. § 2;

19       c.    Plaintiffs and the Class recover their overcharge damages, trebled,

20  and the costs of the suit, including reasonable attorneys' fees as provided by law; and

21       d.    Plaintiffs and the Class be granted such other, further, and different

22  relief as the nature of the case may require or as may be determined to be just, equitable and

23  proper by this Court.

24  ///

25  ///

26  ///

27  ///

28  ///

1

## JURY TRIAL DEMAND

2          Plaintiffs demand a trial by jury of all issues so triable.

3     Dated: January 11, 2008.

4                                        SPIEGEL LIAO & KAGAY, LLP

5                                        By: /s/ Charles M. Kagay
                                         Charles M. Kagay (State Bar No. 73377)
6                                        cmk@slksf.com
                                         Wayne M. Liao (State Bar No. 66591)
7                                        wml@slksf.com
                                         388 Market Street, Suite 900
8                                        San Francisco, California 94111
                                         Telephone:    (415) 956-5959
9                                        Facsimile:    (415) 962-1431

10                                       *Local Counsel for Plaintiff Louisiana Wholesale
                                         Drug, Co. Inc.*
11
                                         LIEFF, CABRASER, HEIMANN &
12                                       BERNSTEIN, LLP

13                                       Joseph R. Saveri (State Bar No. 130064)
                                         jsaveri@lchb.com
14                                       Embarcadero Center West
                                         275 Battery Street, 30th Floor
15                                       San Francisco, CA 94111-3339
                                         Telephone:    (415) 956-1000
16                                       Facsimile:    (415) 956-1008

17                                       *Local Counsel for Rochester Drug Cooperative, Inc.*

18                                       KAPLAN FOX & KILSHEIMER LLP

19                                       Laurence D. King (SBN 206423)
                                         Linda M. Fong (SBN 124232)
20                                       350 Sansome Street, Suite 400
                                         San Francisco, CA 94104
21                                       Telephone:    (415) 772-4700
                                         Facsimile:    (415) 772-4707
22                                       Email: lking@kaplanfox.com
                                                   lfong@kaplanfox.com
23
                                         Robert N. Kaplan, *Pro Hac Vice*
24                                       Linda P. Nussbaum, *Pro Hac Vice*
                                         850 Third Avenue, 14th Floor
25                                       New York, NY 10022
                                         Telephone:    (212) 687-1980
26                                       Facsimile:    (212) 687-7714
                                         Email: rkaplan@kaplanfox.com
27                                                 lnussbaum@kaplanfox.com
                                         *Lead Counsel for Meijer, Inc. and Meijer
28                                       Distribution, Inc.*

1

2          BERGER & MONTAGUE, P.C.
           Daniel Berger
3          *danberger@bm.net*
           Eric L. Cramer, *Pro Hac Vice*
           *ecramer@bm.net*
4          David F. Sorensen
           *dsorensen@bm.net*
5          1622 Locust Street
           Philadelphia, PA 19103
6          Telephone:     (215) 875-3000
           Facsimile:      (215) 875-4604
7
           *Lead Counsel for Rochester Drug Cooperative, Inc.*
8

9          GARWIN GERSTEIN & FISHER, LLP
           Bruce E. Gerstein, *Pro Hac Vice*
10         bgerstein@garwingerstein.com
           nsilverman@garwingerstein.com
11         Noah H. Silverman, *Pro Hac Vice*
           1501 Broadway, Suite 1416
12         New York, New York 10036
           Tel: (212) 398-0055
13         Fax: (212) 764-6620

14         *Lead Counsel for Louisiana Wholesale Drug Co.,*
           *Inc.*
15

16         ***Additional Counsel for Plaintiffs:***

17         ODOM & DES ROCHES, LLP
           John Gregory Odom, *Pro Hac Vice*
18         Stuart E. Des Roches, *Pro Hac Vice*
           John Alden Meade, *Pro Hac Vice*
19         Suite 2020, Poydras Center
           650 Poydras Street
20         New Orleans, LA 70130
           Tel: (504) 522-0077
21         Fax: (504) 522-0078
           Email: greg@odrlaw.com
22                 stuart@odrlaw.com
                   jmeade@odrlaw.com.
23
           PERCY SMITH & FOOTE, LLP
24         David P. Smith, *Pro Hac Vice*
           dpsmith@psfllp.com
25         W. Ross Foote, *Pro Hac Vice*
           rfoote@psfllp.com
26         720 Murray Street
           P.O. Box 1632
27         Alexandria, LA 71309
           Tel: (318) 445-4480
28         Fax: (318) 487-1741

739233.1                        - 20 -              CONSOLIDATED AMENDED COMPLAINT

1

2    KOZYAK TROPIN & THROCKMORTON
     Tucker Ronzetti, *Pro Hac Vice*
     tr@kttlaw.com
3    Adam Moskowitz, *Pro Hac Vice*
     amm@kttlaw.com
4    2800 Wachovia Financial Center
     200 South Biscayne Boulevard
5    Miami, Florida 33131-2335
     Telephone: (305) 372-1800
6    Telecopier: (305) 372-3508

7    AUBERTINE DRAPER ROSE, LLP
     Andrew E. Aubertine, *Pro Hac Vice*
8    aa@adr-portland.com
     1211 SW Sixth Avenue
9    Portland, Oregon 97204
     Telephone:    (503) 221-4570
10   Facsimile:    (503) 221-4590

11   LAW OFFICES OF JOSHUA P. DAVIS
     Joshua P. Davis (State Bar No. 193254)
12   davisj@usfca.edu
     437A Valley Street
13   San Francisco, CA 94131
     Telephone:    (415) 422-6223
14
     VANEK, VICKERS & MASINI, P.C.
15   Joseph M. Vanek,  *Pro Hac Vice*
     David P. Germaine, *Pro Hac Vice*
16   111 South Wacker Drive, Suite 4050
     Chicago, IL 60606
17   Telephone:    (312) 224-1500
     Facsimile:    (312) 224-1510
18   Emails:jvanek@vaneklaw.com
              dgermaine@vaneklaw.com
19
     SPERLING & SLATER
20   Paul E. Slater, *Pro Hac Vice*
     55 West Monroe Street, Suite 3200
21   Chicago, Illinois 60603
     Telephone:    (312) 641-3200
22   Facsimile:    (312) 641-6492
     Email: pes@sperling-law.com
23

24

25

26

27

28