SHEET 1

**Page 1**

```
                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
           BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE

JOHN DOE 1 AND JOHN DOE 2,     )
ON BEHALF OF THEMSELVES        )
AND ALL OTHER PERSONS          )
SIMILARLY SITUATED,            )   PAGES 1 - 31
                               )
         PLAINTIFFS,           )
                               )
VS.                            )   NO. C 04-1511 CW
                               )
ABBOTT LABORATORIES,           )
                               )
         DEFENDANT.            )   OAKLAND, CALIFORNIA
                               )   FRIDAY, SEPTEMBER 17, 2004


                    TRANSCRIPT OF PROCEEDINGS
APPEARANCES:

FOR PLAINTIFFS:      BERMAN DEVALERIO PEASE TABACCO BURT &
                     PUCILLO
                     425 CALIFORNIA STREET, 21ST FLOOR
                     SAN FRANCISCO, CALIFORNIA 94104
                 BY: MICHAEL W. STOCKER
                     JOSEPH J. TABACCO, JR.,
                     ATTORNEYS AT LAW

FOR DEFENDANT:       WINSTON & STRAWN
                     101 CALIFORNIA STREET, SUITE 3900
                     SAN FRANCISCO, CALIFORNIA 94111
                 BY: GAIL S. GREENWOOD
                     GEORGE C. LOMBARDI


REPORTED BY:         RAYNEE H. MERCADO, CSR NO. 8258
```

**Page 2**

1  FRIDAY, SEPTEMBER 17, 2004            10:26 A.M.
2          PROCEEDINGS
3          THE CLERK: CALLING THE MATTER OF DOE ONE VERSUS
4  ABBOTT LABORATORIES, CIVIL ACTION NO. C04-1511.
5          COUNSEL, PLEASE COME FORWARD, STATE YOUR APPEARANCES
6  FOR THE RECORD.
7          MR. TABACCO: MORNING, YOUR HONOR. JOSEPH TABACCO
8  AND MICHAEL STOCKER FOR THE JOHN DOE PLAINTIFFS.
9          MR. LOMBARDI: MORNING, YOUR HONOR. GEORGE LOMBARDI
10 AND GAIL GREENWOOD FOR ABBOTT LABORATORIES.
11         THE COURT: GOOD MORNING.
12         LET'S SEE. IT'S DEFENDANTS MOTION TO DISMISS. HOW
13 DO THIS -- HOW DOES THE NORVIR WORK WHEN IT'S USED BY OTHER
14 COMPANIES? DO THEY BUY IT AND INCORPORATE IT INTO THEIR PILL,
15 INTO ONE PILL, OR DO THEY HAVE A SEPARATE PILL AND THE DOCTOR
16 PRESCRIBES NORVIR ALONG WITH IT AND THE PERSON TAKES TWO
17 SEPARATE PILLS?
18         MR. LOMBARDI: THE LATTER, YOUR HONOR, IS MY
19 UNDERSTANDING OF HOW IT WORKS. WHEN NORVIR IS USED BY OTHER
20 COMPANIES, AND AS YOU'VE PROBABLY PICKED UP FROM THE PAPERS,
21 WHEN ABBOTT LABORATORIES SELLS ITS COMBINATION PRODUCT, IT IS
22 ONE PILL THAT'S CALLED KALETRA.
23         THE COURT: RIGHT. THAT I GOT.
24         SO THESE OTHER COMPANIES AREN'T ACTUALLY BUYING
25 NORVIR AND SELLING IT -- RESELLING IT. THEY'RE JUST SELLING

**Page 3**

1  THEIR OWN DRUG, AND THE PATIENT HAS TO GO OUT AND BUY NORVIR
2  UNDER A SEPARATE PRESCRIPTION.
3          MR. LOMBARDI: THAT'S MY UNDERSTANDING, YOUR HONOR.
4          THE COURT: OKAY.
5          MR. LOMBARDI: THIS IS OUR MOTION TO DISMISS, AS YOU
6  MENTIONED, YOUR HONOR. THIS ALL ARISES, AS YOU KNOW, OUT OF
7  THE PRICE INCREASE FOR NORVIR THAT ABBOTT INSTITUTED LATE LAST
8  YEAR. ABBOTT DEVELOPED NORVIR FIRST AS WHAT'S CALLED --
9          THE COURT: RIGHT. I'M FAMILIAR WITH ALL THE FACTS.
10 I'VE READ ALL THE BRIEFS.
11         YOUR ARGUMENT THAT THEY -- THAT NORVIR HAS OR THAT
12 ABBOTT HAS PATENTED THE USE IN COMBINATION, HOW CAN THAT BE? I
13 MEAN, IF YOU SELL NORVIR, YOU CAN'T PATENT THE FACT THAT
14 SOMEONE'S GOING TO TAKE IT AND THEY'RE GOING TO TAKE ANOTHER
15 DRUG, TOO.
16         MR. LOMBARDI: WELL, THEY HAVE, YOUR HONOR, AND IT'S
17 THIS -- IT'S A METHOD-OF-USE PATENT, AND SO ANYBODY --
18         THE COURT: SO ALL THESE AIDS PATIENTS ARE
19 INFRINGING THE PATENT BY TAKING TWO DRUGS AT THE SAME TIME?
20         MR. LOMBARDI: AS A TECHNICAL MATTER.
21         NOW, OBVIOUSLY, ABBOTT HASN'T BROUGHT INFRINGEMENT
22 LAWSUITS AGAINST THEM, BUT THAT IS -- A METHOD-OF-USE PATENT
23 DOES ENABLE YOU TO PATENT A METHOD OF TREATING SOMEBODY.
24         IN THIS CASE, THE METHOD WOULD BE NORVIR IN
25 COMBINATION WITH OTHER PROTEASE INHIBITORS. SO YES, THERE IS A

**Page 4**

1  PATENT THAT DOES COVER NORVIR USED IN COMBINATION WITH OTHER
2  PROTEASE INHIBITORS.
3          THE COURT: WHO'S THE INFRINGER, THE DOCTOR WHO
4  PRESCRIBES THE TWO DRUGS? THE PATIENT WHO TAKES THE TWO
5  DRUGS --
6          MR. LOMBARDI: I MEAN, THEY COULD ALL -- THEY COULD
7  ALL BE -- THEY COULD ALL BE INFRINGERS POTENTIALLY, YOUR HONOR,
8  UNDER INDUCEMENT THEORIES, UNDER -- UNDER CONTRIBUTORY
9  INFRINGEMENT THEORIES, THEY COULD ALL BE INFRINGERS.
10 OBVIOUSLY, ABBOTT IS NOT SUING THOSE PEOPLE, BUT THEY DO HAVE A
11 PATENT THAT COVERS -- THAT COVERS THAT USE OF THE DRUG.
12         SO, YOUR HONOR, THE -- THE EXISTENCE OF THE PATENTS
13 IS WHAT MAKES THIS CASE DIFFERENT. AN ANTITRUST CASE,
14 OBVIOUSLY, BECOMES A VERY DIFFERENT THING WHEN YOU HAVE PATENTS
15 INVOLVED. AND THE CASES WILL TELL YOU THAT, THE SHEET METALS
16 CASE, FOR INSTANCE, SAYS SPECIFICALLY THAT IT CHANGES THE
17 ENTIRE ANALYSIS WHEN YOU HAVE A PATENT INVOLVED.
18         AND -- AND THERE ARE THREE SPECIFIC WAYS THAT THIS
19 CASE IS DIFFERENT, YOUR HONOR, AND THAT REQUIRE, WE THINK, THAT
20 THE CASE BE DISMISSED AS IT'S STATED UNDER THE ANTITRUST LAWS
21 RIGHT NOW.
22         AND THE FIRST WAY RELATES TO THE HARM THAT THE
23 PLAINTIFF SAYS THAT THEY ARE SEEKING TO ADDRESS HERE. THEY
24 HAVE SAID TO YOU AND THEY'VE SAID IN THEIR COMPLAINT,
25 PARAGRAPH 46, THAT THE HARM HERE IS THE HIGH PRICE OF NORVIR,

**Page 5**

1  THE HIGHER PRICE OF NORVIR. ABBOTT RAISED ITS PRICE. THEY SAY
2  THAT'S WHEN THEY SUFFERED HARM.
3       BUT YOU CAN'T HAVE AN ANTITRUST CLAIM FOR RAISING
4  THE PRICE OF A PATENTED DRUG, AND THERE'S NO DISPUTE, YOUR
5  HONOR, THAT NORVIR ITSELF IS PATENTED. THEY ADMIT THAT MUCH IN
6  THEIR PAPERS, AND THEY PLEAD IT IN THEIR COMPLAINT. BUT THEY
7  SAY THAT THE HARM HERE IS THAT WE RAISED THE PRICE OF NORVIR.
8  BUT UNDER THE PATENT LAWS, YOU ARE ENTITLED TO NOT SELL THE
9  DRUG AT ALL, TO PREVENT OTHERS FROM SELLING THE DRUG, TO GET AS
10 HIGH A LICENSE FEE AS YOU POSSIBLY CAN, OR TO GET -- TO CHARGE
11 AS HIGH AS YOU CAN -- YOU CAN IN THE MARKETPLACE, AS HIGH AS
12 THE MARKET WILL BEAR FOR NORVIR.
13      AND THAT'S WHAT'S HAPPENED HERE, AND YOU CAN'T GET
14 AROUND THE FACT THAT THE PATENT GIVES US THE RIGHT TO DO THAT.
15      THE HARM THAT THEY'RE SEEKING TO ADDRESS CAN'T BE
16 ADDRESSED UNDER THE ANTITRUST LAWS GIVEN THE EXISTENCE OF THE
17 PATENT THAT THEY ADMIT IS THERE.
18      THAT'S -- THAT'S POINT ONE, AND THAT IN ITSELF IS
19 SUFFICIENT TO DEFEAT THE COMPLAINT HERE, YOUR HONOR.
20      POINT TWO IS A STANDING QUESTION. UNDER THE
21 ANTITRUST LAWS, IN ORDER TO HAVE -- IN ORDER TO HAVE AN
22 ANTITRUST CLAIM, YOU HAVE TO HAVE AN ANTITRUST INJURY, AND THAT
23 MEANS IT HAS TO BE AN INJURY THAT FLOWS FROM THE HARM TO
24 COMPETITION FROM THE ANTITRUST ACTIVITY.
25      THEY'VE ALREADY SAID THAT THEIR INJURY WAS RAISING

**Page 6**

1  THE PRICE OF NORVIR. WHAT DO THEY SAY THE ANTITRUST --
2       THE COURT: WELL, WHAT THEY SAY THEIR INJURY IS IS
3  RAISING THE PRICE OF NORVIR ALONE AND LEAVING THE -- BUT
4  SELLING A BOOSTED DRUG THAT IS SOLD WITH NORVIR IN WHICH THE
5  NORVIR IS MUCH LESS EXPENSIVE BUT THE BOOSTED DRUG IS LESS
6  FAVORABLE AND THUS THEY'RE FINANCIALLY FORCED TO BUY A DRUG
7  THAT HAS WORSE SIDE EFFECTS BECAUSE OF THE -- WHAT ONE MIGHT
8  ARGUE IS PREDATORY PRICING ON THE PEOPLE WHO WANT TO USE IT
9  WITH A DIFFERENT DRUG.
10      MR. LOMBARDI: BUT SIGNIFICANTLY, JUDGE, THEY DON'T
11 ALLEGE PREDATORY PRICING. THEY DON'T ALLEGE PREDATORY PRICING
12 IN THIS CASE.
13      THE COURT: OR TYING.
14      MR. LOMBARDI: OR TYING. THEY DON'T ALLEGE THAT
15 EITHER. ALL WE HAVE HERE IS A MONOPOLIZATION CLAIM, AND SO I'M
16 ADDRESSING THE MONOPOLIZATION CLAIM, AND I THINK YOUR HONOR HAS
17 THE ALLEGATION, I THINK, CORRECT.
18      WHAT THEY'RE SAYING IS THAT ABBOTT RAISED THE PRICE
19 OF NORVIR, THAT OTHER PROTEASE INHIBITORS COMBINED WITH NORVIR
20 BECAME MORE EXPENSIVE BECAUSE OF THE RAISED PRICE. THEY DON'T
21 SAY THAT'S THE ANTI-COMPETITIVE CONDUCT. THE NEXT THING IS
22 WHAT THEY SAY IS THE ANTI-COMPETITIVE CONDUCT. THEY SAID THE
23 ANTI-COMPETITIVE CONDUCT IS THAT ABBOTT DIDN'T RAISE THE PRICE
24 OF ITS OWN NORVIR COMBINATION DRUG. THEY SAY WE SHOULD HAVE
25 RAISED THE PRICE OF KALETRA. THEY SAY THAT IN THEIR BRIEF AT

**Page 7**

1  PAGE 13.
2       THEY DIRECTLY SAY THAT THE ANTITRUST CONDUCT HERE IS
3  A FAILURE TO RAISE THE PRICE, WHICH IS A VERY UNUSUAL ANTITRUST
4  CLAIM, YOUR HONOR, BECAUSE UNLESS THERE'S PREDATORY CONDUCT, AS
5  YOUR HONOR MENTIONED, AND THERE'S NONE ALLEGE HERE, LOWER
6  PRICES IS A GOOD THING.
7       BUT -- BUT FOR STANDING PURPOSES -- FOR STANDING
8  PURPOSES, THAT ANTITRUST CONDUCT DID NOT LEAD TO THE INJURY
9  HERE. THE ANTITRUST CONDUCT THAT ABBOTT DIDN'T RAISE THE PRICE
10 OF ITS COMBINATION DRUG, THAT -- THAT DIDN'T CAUSE THE INJURY
11 WHICH WAS THE HIGHER PRICE OF NORVIR.
12      IN FACT, THE KALETRA IS A LOWER PRICE, CAUSED NO
13 HARM, AND THEY CAN'T EVEN -- YOU CAN'T EVEN ALLEGE THAT
14 LOWERING THE PRICE, ABSENT PREDATORY CONDUCT, CAUSES HARM, YOUR
15 HONOR. SO THEY DON'T HAVE STANDING TO ASSERT THE CLAIMS THAT
16 THEY'RE TALKING ABOUT HERE.
17      THE COURT: WELL, THEY WOULD -- TO HAVE STANDING AS
18 CONSUMERS, THEY WOULD HAVE TO ALLEGE THAT THEIR JURY WAS THE
19 SAME INJURY AS THE INJURY CAUSED TO THE COMPETITORS.
20      MR. LOMBARDI: THEY WOULD AND -- WELL, IT'S NOT. IT
21 DOESN'T. IT IS NOT THE SAME INJURY AS -- BECAUSE THESE
22 CONSUMERS -- ACTUALLY, STEP BACK. THESE CONSUMERS HAVEN'T EVEN
23 ALLEGED THAT THEY PURCHASED KALETRA, THE ABBOTT DRUG. THEIR
24 HARM HAS TO STEM FROM THAT ANTI-COMPETITIVE CONDUCT. THEY HAVE
25 TO SAY WE WERE HARMED BY ABBOTT FAILING TO RAISE THE PRICE OF

**Page 8**

1  KALETRA, AND THEY HAVEN'T ALLEGED THAT, AND THEY CAN'T ALLEGE
2  IT BECAUSE, YOUR HONOR, IT'S JUST CONTRARY TO COMMON SENSE TO
3  SAY THAT THEY WERE HARMED BY KEEPING A PRICE LOWER AND MAKING
4  THE PRODUCT CHEAPER ON THE MARKET.
5       THE COURT: I DON'T KNOW IF YOU WANT TO TALK NOW
6  ABOUT PREDATORY -- I DON'T KNOW WHY THEY HAVEN'T RAISED
7  PREDATORY PRICING OR TYING, AND I DON'T KNOW IF YOU WANT TO
8  TALK ABOUT IT IN ADVANCE JUST IN CASE.
9       MR. LOMBARDI: WELL, I CAN TELL YOU THAT PREDATORY
10 PRICING WON'T WORK BECAUSE THE FACT IS PREDATORY PRICING WOULD
11 BE THAT WE -- I GUESS THEORETICALLY THAT THEY PRICED NORVIR SO
12 HIGH THAT IT MEANT THAT THESE OTHER PROTEASE INHIBITORS IN
13 COMBINATION COULDN'T BE COMPETITIVE.
14      THE COURT: NO, YOU PRICED IT SO LOW IN COMBINATION
15 WITH KALETRA THAT YOU'RE GOING TO DRIVE ALL THE OTHER PROTEASE
16 INHIBITORS OFF THE MARKET AND THEN YOU'RE GOING TO COME BACK
17 AND SAY, "AHA, NOW THAT WE'RE THE ONLY ONE" --
18      MR. LOMBARDI: NO, FAIR ENOUGH, JUDGE. FAIR ENOUGH.
19 I GUESS IT COULD BE EITHER TOO HIGH IN ONE INSTANCE OR TOO LOW
20 IN THE OTHER, AND I UNDERSTAND YOUR POINT. BUT THE FACT IS OUT
21 IN THE MARKET, KALETRA HAS A FALLING MARKET SHARE. THE
22 SUPPOSEDLY --
23      THE COURT: 'CAUSE IT'S GOT COMPETITION. AND
24 BECAUSE IT'S A WORSE DRUG. BUT ONCE IT DRIVES ALL THE
25 COMPETITION OUT --

**9**

MR. LOMBARDI: EVER SINCE THE PRICE INCREASE, JUDGE, AS A FACTUAL MATTER -- AS A FACTUAL MATTER, SINCE THE PRICE INCREASE, THE COMPETITION HAS NOT GONE AWAY. NOBODY'S BEEN DRIVEN FROM THE MARKET, AND KALETRA'S MARKET SHARE HAS GONE DOWN. AND THAT'S WHY I THINK THERE'S NOT A PREDATORY PRICING CLAIM.

I THINK, IN ADDITION, YOUR HONOR, ALL THE FOCUS IS ON NORVIR'S PRICE GOING UP. BUT SAY MANUFACTURER X HAS A PROTEASE INHIBITOR. WHAT'S REALLY GOING ON HERE IS YEAH, NORVIR'S PRICE WENT UP BECAUSE IT BECAME MORE VALUABLE BASED ON ITS IMPROVED USE ON THE GREATER VALUE TO THE PATIENT. ITS PRICE WENT UP. ABBOTT'S COMBINATION PRODUCT IS BRINGING THE PRICE OF THE COMBINED PROTEASE INHIBITOR DOWN.

OTHER COMPETITORS COULD DO THE SAME THING. THEY COULD BRING THEIR PRICE OF THE PROTEASE INHIBITOR DOWN. THEY'LL HAVE PLENTY OF ROOM TO MAKES PROFITS AND SO FORTH. THERE'S JUST NO PREDATORY CONDUCT HERE.

AND THERE'S NO TYING, YOUR HONOR. THERE'S NO TYING ARRANGEMENT BECAUSE IF -- IF -- A FUNDAMENTAL TO TYING IS A FORCING. YOU KNOW, YOU'RE FORCING SOMEBODY TO CHOOSE ANOTHER PRODUCT THAT THEY WOULDN'T OTHERWISE HAVE CHOSE -- CHOSEN BASED ON SOME ANTI-COMPETITIVE CONDUCT. THERE HAS BEEN NO FORCING HERE. AND YOU CAN'T ALLEGE THAT THERE'S BEEN FORCING BECAUSE THE WAY THE MARKET HAS BEHAVED. KALETRA HAS GONE DOWN IN PRICE. THEY CAN'T EVER --

**10**

THE COURT: GONE DOWN IN MARKET SHARE, YOU MEAN.

MR. LOMBARDI: I APOLOGIZE, YOUR HONOR, THAT'S CORRECT. DOWN IN MARKET SHARE, SO THEREFORE YOU CANNOT SAY THAT THERE HAS BEEN A FORCING THAT HAS CAUSED PEOPLE TO GO TO KALETRA, SO THERE IS NO POSSIBLE TYING ARRANGEMENT HERE.

THE COURT: I'M SORRY. REPEAT THAT LAST SENTENCE FOR ME.

MR. LOMBARDI: BECAUSE KALETRA HAS GONE DOWN IN MARKET SHARE, YOU CAN'T MAKE THE ALLEGATION IN GOOD FAITH THAT THERE'S A TYING ARRANGEMENT THAT FORCED PEOPLE TO KALETRA. IT HASN'T HAPPENED. IT JUST -- IT'S JUST CONTRARY TO THE EXISTING FACTS.

THE COURT: HOW WOULD YOU COMPARE YOUR CASE TO BLUE SHIELD VS. MCCREADY?

MR. LOMBARDI: IT'S DIFFERENT. IT'S DIFFERENT. AND MCCREADY WAS A CASE WHERE THE ANTITRUST INJURY RESULTED DIRECTLY FROM THE ANTITRUST SCHEME AS IT WERE, YOUR HONOR.

IN THAT CASE, THE INSURANCE COMPANY WAS REIMBURSING FOR GOING TO A PSYCHIATRIST BUT NOT GOING TO A PSYCHOLOGIST. OUT OF THAT SCHEME, THE PLAINTIFF WAS INJURED BECAUSE WHEN THEY WERE FORCED TO GO TO THE PSYCH -- WHEN THEY WENT TO THE PSYCHOLOGIST, WHICH WAS THEIR CHOICE, THEY HAD TO PAY. THEY WEREN'T REIMBURSED. THAT'S MONEY -- THAT'S MONEY OUT OF THEIR POCKET.

HERE, THE INJURY THAT THEY'VE ALLEGED, THE

**11**

ANTI-COMPETITIVE CONDUCT, THAT THEY --

THE COURT: WHY WAS THERE AN ANTITRUST INJURY IN THAT CASE?

MR. LOMBARDI: IT WAS AN ANTITRUST INJURY BECAUSE THEY PAID MORE MONEY BECAUSE THE MARKET WASN'T -- THAT THE MARKET WAS ANTI-COMPETITIVE AS TO THE PSYCHOLOGIST VERSUS PSYCHIATRIST. IT FORCED PEOPLE TO PSYCHIATRISTS AND DIDN'T ALLOW THEM TO GO TO PSYCHOLOGISTS. THAT WAS THE ANTITRUST INJURY RESULTING DIRECTLY FROM THAT, WAS THE FACT THAT AN INSURANCE COMPANY WOULDN'T REIMBURSE IF YOU WENT TO THE PSYCHOLOGIST. SO THAT'S AN INJURY DIRECTLY TO THE PLAINTIFF IN THAT CASE.

IN THIS CASE ---

THE COURT: BUT WAS THE -- WAS BLUE SHIELD GAINING SOME ADVANTAGE IF THE PERSON WENT TO A PSYCHIATRIST?

MR. LOMBARDI: YOUR HONOR, I DON'T KNOW THE REASONS FOR THE -- THE SCHEME, AND I DON'T BELIEVE THAT THAT WAS IMPORTANT TO THE COURT'S DECISION. I -- SO I CAN'T RESPOND TO YOU DIRECTLY AS TO THE REASON FOR BLUE CROSS ENTERING INTO THAT SCHEME, BUT -- OR I SHOULD -- THAT ALLEGED SCHEME IS WHAT I SHOULD SAY, YOUR HONOR. BUT -- BUT IT'S DIFFERENT FROM THIS CASE.

IN THIS CASE, THEY HAVE TOLD YOU WHAT THE ANTI-COMPETITIVE CONDUCT WAS AND THAT WAS ABBOTT DID NOT RAISE THE PRICE OF KALETRA. THESE PLAINTIFFS -- THESE PLAINTIFFS --

**12**

MAYBE THERE'S A PLAINTIFF OUT THERE SOMEWHERE THAT COULD, BUT THESE PLAINTIFFS CLEARLY CAN'T ALLEGE THAT THEY HAVE BEEN INJURED BY THAT INCREASE -- BY THE FAILURE TO INCREASE THE PRICE OF THE COMBINATION PRODUCT KALETRA.

AND THE LAST POINT, YOUR HONOR, WHICH, YOU KNOW, I DON'T MEAN TO -- TO MAKE IT SOUND LIKE LESS IMPORTANT BECAUSE IT'S THE LAST ONE BECAUSE IT IS NOT TRIVIAL. IT'S THE MARKET POWER ALLEGATION. THEY HAVE NOT SUFFICIENTLY ALLEGED MARKET POWER. THESE ARE MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION CLAIMS. WHEN YOU CLAIM EITHER --

THE COURT: IF THAT WERE TRUE, I WOULD NEED TO GRANT LEAVE TO AMEND, I PRESUME. WHAT THEY SAY IS THAT IT WAS 75 PERCENT AND THEN IT STARTED DROPPING, BUT IF IT ONLY DROPPED TO 70 PERCENT --

MR. LOMBARDI: WELL, AGAIN, IF THAT WAS WHAT YOUR HONOR DECIDED TO DO, I WOULD UNDERSTAND THAT. I'LL TELL YOU NOW THAT THEY CAN'T MAKE THE ALLEGATION BECAUSE THEY MAKE AN ALLEGATION AS TO KALETRA'S MARKET SHARE IN JUNE OF 2003 BEING 75 PERCENT, I THINK IS THE NUMBER. THE PRICE INCREASE TOOK PLACE IN DECEMBER OF 2003. IN BETWEEN THOSE TIMES, THEY ALLEGE IN THEIR COMPLAINT, AND IT'S TRUE, KALETRA'S MARKET SHARE DROPPED PRECIPITOUSLY.

NOW, IF TO MAKE -- THE MAGIC NUMBER FOR MARKET POWER PURPOSES FOR MONOPOLY PURPOSES IS 65 PERCENT. AND I CAN TELL YOU THAT IF YOU WERE TO GRANT THEM LEAVE TO AMEND THE

                                                              13
1  COMPLAINT, THEY WILL NEVER BE ABLE TO ALLEGE THAT KALETRA HAS
2  65 PERCENT OF THE MARKET. IT HAS LESS THAN 30 PERCENT OF THE
3  MARKET, YOUR HONOR.
4          THEY WON'T BE ABLE TO MAKE THIS ALLEGATION, AND
5  THAT'S WHY I THINK THE COMPLAINT WAS PLED THE WAY IT WAS,
6  BECAUSE THEY COULDN'T MAKE THAT ALLEGATION. BUT THEY HAD AN
7  OBLIGATION TO MAKE THE ALLEGATION THAT WE HAD MARKET POWER AT
8  THE TIME THAT WE ENGAGED IN THE ANTI-COMPETITIVE ACTIVITY AND
9  THAT WE'VE CONTINUED IN THAT IN THE CASE OF THE ATTEMPTED
10 MONOPOLIZATION, BUT THEY HAVEN'T MADE THAT ALLEGATION, AND THEY
11 CAN'T MAKE THAT ALLEGATION.
12         THE COURT: OKAY. DID YOU WANT TO RESPOND?
13         MR. TABACCO: YOUR HONOR, MR. STOCKER IS GOING TO
14 HANDLE THE ARGUMENT FOR US.
15         MR. STOCKER: THANK YOU, YOUR HONOR.
16         YOUR HONOR CLEARLY HAS AN INTEREST IN THE PATENTS AT
17 ISSUE IN THIS CASE, AND I THOUGHT I MIGHT JUST PAUSE BRIEFLY ON
18 ABBOTT'S REQUEST FOR JUDICIAL NOTICE OF THE PATENT IN
19 PARTICULAR IN THE BOOSTED MARKET, WHICH IS TO SAY THE MARKET
20 FOR PROTEASE INHIBITORS WHEN THEY ARE BOOSTED BY NORVIR,
21 BECAUSE THAT PATENT IS REALLY AT THE HEART OF ABBOTT'S MOTION
22 TO DISMISS THE ANTITRUST CLAIMS IN THIS CASE.
23         THE COURT: IS HE RIGHT, THAT THE WAY IT WORKS IS
24 PATIENTS ARE PRESCRIBED NORVIR SEPARATELY BY THEIR DOCTORS AND
25 THEN THEY'RE PRESCRIBED A PROTEASE INHIBITOR FROM SOME OTHER

                                                              14
1  COMPANY SEPARATELY, AND THE PATIENT JUST TAKES TWO DIFFERENT
2  PILLS, ONE ADMINISTERED BY ABBOTT AND THE OTHER MANUFACTURED BY
3  SOME OTHER COMPANY?
4          MR. STOCKER: THAT'S CORRECT, YOUR HONOR. IT'S
5  WORTH NOTING, YOUR HONOR, THAT BOTH PROTEASE INHIBITORS THAT
6  ARE CURRENTLY IN DEVELOPMENT AND PROTEASE INHIBITORS THAT ARE
7  NOW BOOSTED ARE SO ROUTINELY BOOSTED THAT IT'S BOTH A PART OF
8  THE PRODUCT DESCRIPTIONS FOR THOSE PROTEASE INHIBITORS, AND
9  IT'S PART OF THE RESEARCH TRIALS THAT'S CONDUCTED FOR NEW
10 PROTEASE INHIBITORS THAT ARE ABOUT TO COME ON TO THE MARKET.
11         THE COURT: RIGHT. BUT EVERYONE WHO DOES HAS TO GO
12 OUT AND BUY NORVIR FROM ABBOTT.
13         MR. STOCKER: THAT'S ABSOLUTELY CORRECT, YOUR HONOR.
14         THE COURT: IT'S NOT LIKE A DRUG COMPANY, BUY IT IN
15 BULK AND PUT IT INTO THEIR LITTLE COMBINATION PILL OR
16 SOMETHING.
17         MR. STOCKER: THAT'S ABSOLUTELY RIGHT, YOUR HONOR.
18         SO BRIEFLY I CAN SEE YOUR HONOR CLEARLY IS AT WORK
19 AT A MARKMAN HEARING PERHAPS.
20         THE COURT: PATENT TRIAL.
21         MR. STOCKER: PATENT TRIAL. SORRY. I THINK ONE
22 PROBLEM WITH ABBOTT'S ARGUMENT IN THAT, IN ASKING THE COURT TO
23 TAKE NOTICE OF ITS PATENT IN THE BOOSTED MARKET, WHAT THEY'RE
24 GOING TO WIND UP HAVING THE COURT DO IS CONSTRUE THE SCOPE AND
25 THE NATURE OF THE CLAIMS OF THAT PATENT.

                                                              15
1          AND WHILE ABBOTT IS CORRECT THAT THIS IS A QUESTION
2  OF LAW THAT THE COURT CAN UNDERTAKE, WHAT ABBOTT IS TRYING TO
3  DO IS IMPORT A MARKMAN HEARING INTO A MOTION TO DISMISS. AND
4  PERHAPS MORE IMPORTANTLY, EVEN IF THE COURT WERE TO TAKE
5  JUDICIAL NOTICE OF THE PATENT THAT ABBOTT ASSERTS OFFERS IT
6  PROTECTION IN THE BOOSTED MARKET, THIS CIRCUIT HAS PROVIDED
7  GUIDANCE TO THE COURT ABOUT WHAT EXACTLY CAN BE DONE WITH A
8  PATENT IN THAT CIRCUMSTANCE.
9          AND WHAT THE NINTH CIRCUIT HELD IN IMAGE TECHNOLOGY
10 VS. KODAK WAS THAT IF A DEFENDANT IN AN ANTITRUST CASE WANTS TO
11 FALL BACK ON THE PROTECTIONS AFFORDED TO THE DEFENDANT BY A
12 PATENT, THAT THE COURT HAS TO UNDERTAKE A TWO-STEP ANALYSIS.
13 AND FIRST, THE COURT IS TO CONSTRUE THE SCOPE OF THE PATENT
14 CLAIMS UNDER INTELLECTUAL PROPERTY LAW, AND THEN THE COURT IS
15 TO LOOK AT THE RELEVANT ANTITRUST MARKET, WHICH IS A
16 FACT-INTENSIVE QUESTION, AND THEN, TO THE EXTENT THE SCOPE OF
17 THE PATENT CLAIMS AND THE SCOPE OF THE RELEVANT ANTITRUST
18 MARKET ARE CO-EXTENSIVE, ONLY THEN, THE COURT IS TO PROVIDE
19 DEFENDANTS WITH A REBUTTABLE PRESUMPTION THAT THEIR CONDUCT WAS
20 ACTUALLY PRO-COMPETITIVE AND NOT ANTI-COMPETITIVE.
21         AND EVEN ON THE FACE OF OUR COMPLAINT, I THINK
22 THERE'S AMPLE SUGGESTION AT LEAST THAT WHAT ABBOTT HAS DONE IS
23 ANTI-COMPETITIVE. ONE OF THE POINTS THAT'S SORT OF GLOSSED
24 OVER BY ABBOTT'S COUNSEL IN HIS ARGUMENT, THAT -- IS THAT THIS
25 ACTION TAKEN BY ABBOTT, RAISING THE PRICE OF NORVIR BY

                                                              16
1  478 PERCENT, CAME ABOUT 5 WEEKS AFTER COMPETITORS TO ABBOTT'S
2  BOOSTER PRODUCT KALETRA ENTERED THE MARKET AND 7 YEARS AFTER
3  NORVIR HAD BEEN ON THE MARKET.
4          SO AT A MINIMUM, THERE'S A PRETTY STRONG INFERENCE
5  THAT ABBOTT WAS OUT TO PROTECT ITS PATENTS. AND SO I GUESS THE
6  POINT I WOULD WANT TO MAKE WITH REGARD TO THE PATENTS IS THAT,
7  FIRST OF ALL, THERE'S NOT MUCH GROUND FOR THE COURT TO TAKE
8  NOTICE OF THE SCOPE OF THOSE PATENTS. THE COURT COULD
9  CERTAINLY TAKE NOTICE OF THEIR EXISTENCE, AND IF THE COURT
10 LOOKS AT THE CASES CITED BY ABBOTT IN SUPPORT OF ITS
11 PROPOSITION THAT THE COURT CAN JUDICIALLY NOTICE PATENTS AND
12 THEN USE THEM, ONLY ONE OF THOSE CASES EVEN INVOLVES NOTICE OF
13 A PATENT AND EVEN IN THAT CASE, WHAT THE COURT DID WITH THAT
14 NOTICE WAS MERELY TO DETERMINE THAT THE PATENT PROVIDED FOR
15 CERTAIN ASSIGNMENT RIGHTS. IT DIDN'T ATTEMPT TO CONSTRUE THE
16 SCOPE OF THE PATENT CLAIMS. AND THE REST OF CASES CITED BY
17 ABBOTT DON'T EVEN INVOLVE PATENTS.
18         THE COURT: THEORETICALLY ONE COULD TAKE JUDICIAL
19 NOTICE OF A PATENT AS A PUBLIC DOCUMENT, AND THEORETICALLY ONE
20 CAN CONSTRUE ITS CLAIMS AND ITS VALIDITY IF THERE WERE NO
21 FACTUAL DISPUTES. BUT PERHAPS WHAT YOU NEED TO DO IS POINT OUT
22 THAT THERE ARE FACTUAL DISPUTES WITH RESPECT TO THE
23 CONSTRUCTION OF THE CLAIMS AND THE VALIDITY OF THE PATENT.
24         MR. STOCKER: THAT'S ABSOLUTELY CORRECT, YOUR HONOR.
25 AND THE -- I GUESS THAT THE KEY POINT THAT I WOULD GET AT HERE,

**17**

1  IS THAT EVEN UNDER THE PUBLIC RECORD EXCEPTION, IT'S NOT MERELY
2  THAT IT'S A PUBLIC RECORD BUT IT'S A PUBLIC RECORD WHICH IS NOT
3  SUBJECT TO REASONABLE DISPUTE. AND I THINK THAT THE -- THE
4  DIFFICULTY FOR ABBOTT IS THAT FIRST OF ALL, PLAINTIFFS' CLAIMS
5  IN THIS CASE IN NO WAY DEPEND ON EITHER THE EXISTENCE OR THE
6  NON-EXISTENCE OF A PATENT IN THE RELEVANT MARKET.
7      ALL PLAINTIFFS ARE OBLIGED TO DO UNDER ANTITRUST LAW
8  IS SHOW THEIR INJURY, ALLEGE THE ELEMENTS OF AN ANTITRUST
9  CLAIM, AND -- AND ASK FOR RELIEF.
10      AND WHAT ABBOTT IS ATTEMPTING TO ARGUE IS THAT
11  PLAINTIFFS HAVE SOME KIND OF AFFIRMATIVE DUTY TO PLEAD NOT ONLY
12  THOSE ELEMENTS OF ANTITRUST CLAIM BUT, FURTHER, THAT AN
13  ANTITRUST DEFENDANT HAS EXCEEDED THE SCOPE OF ANY RELEVANT
14  PATENT THE ANTITRUST DEFENDANT MIGHT HAVE IN THE RELEVANT
15  ANTITRUST MARKET. AND THAT'S SIMPLY NOT THE LAW. IT'S NOT THE
16  ANTITRUST LAW.
17      ALTHOUGH THE COURT'S POINT IS WELL TAKEN ABOUT
18  NEEDING TO DISPUTE THE CONTENTS OF A PATENT, I THINK THAT THE
19  PRINCIPAL ISSUE HERE IS THE FACT THAT AT -- THIS IS A PLEADING
20  STAGE. THIS IS A 12(B)(6) MOTION AND PLAINTIFFS HERE SIMPLY
21  HAVE NO DUTY TO GO BEYOND THAT ANTITRUST ALLEGATIONS THAT
22  THEY'VE MADE IN THEIR COMPLAINT.
23      THE COURT: WELL, YOU HAVE TO PLEAD SOMETHING THAT
24  ISN'T OBVIOUSLY COVERED BY A PATENT MONOPOLY.
25      MR. STOCKER: THAT IS CORRECT, YOUR HONOR, BUT --

**18**

1      THE COURT: YOU COULDN'T JUST COME IN AND SAY
2  ANTITRUST, THEY'RE RAISING THE PRICE ON NORVIR WHEN THEY HAVE A
3  PATENT ON IT. THAT ALONE WOULD CLEARLY BE PART OF THE PATENT
4  MONOPOLY, AND YOU COULDN'T --
5      MR. STOCKER: THAT IS CORRECT, YOUR HONOR. AND I
6  THINK AN INTERESTING POINT ON THAT SCORE IS THE FACT THAT
7  ABBOTT HAS BEEN UNABLE TO POINT TO A SINGLE CASE FOR ANY
8  JURISDICTION EVER IN WHICH A COURT DISMISSED AN ANTITRUST CASE
9  BECAUSE OF PATENTS DEFENDANTS ASSERT THAT THEY HAD IN THE
10  RELEVANT ANTITRUST MARKET. THE ONLY CASE, IN FACT, THAT ABBOTT
11  HAS IDENTIFIED WAS THE SHEET METAL CASE WHICH THEY SUBSEQUENTLY
12  ABANDONED.
13      THE COURT: OKAY. SO TELL ME WHAT ARE THE -- THE
14  WAY TO DISTINGUISH SHEET METAL OR WHATEVER IT'S CALLED IS TO
15  ALLEGE SOME SORT OF ANTITRUST BEHAVIOR THAT IS BEYOND THE SCOPE
16  OF THE PATENT MONOPOLY IN NORVIR. SO WHAT HAVE YOU ALLEGED IS
17  ANTITRUST BEHAVIOR THAT'S BEYOND THE SCOPE OF THEIR LEGITIMATE
18  MONOPOLY IN NORVIR?
19      MR. STOCKER: YOUR HONOR, PLAINTIFFS IN THIS CASE
20  ARE ALLEGING MONOPOLISTIC LEVERAGING, AND THE MONOPOLISTIC
21  LEVERAGING, AS THE COURT IS FAMILIAR, IS ALWAYS GOING TO
22  INVOLVE TWO MARKETS, SO THIS ISN'T A QUESTION OF RAISING THE
23  PRICE OF NORVIR IN THE BOOSTER MARKET. IT'S A QUESTION OF
24  ABBOTT USING THE POWER IT HAS AS A NATURAL MONOPOLIST IN THE
25  NORVIR MARKET TO TRY TO OBTAIN A LARGER MARKET SHARE OR TO

**19**

1  RETAIN THE LARGE MARKET SHARE THAT IT HAD IN THE BOOSTED
2  MARKET, WHICH IS THE -- FOR PROTEASE INHIBITORS BOOSTED BY
3  NORVIR. AND SO --
4      THE COURT: WHAT'S THE DIFFERENCE BETWEEN THAT AND
5  TYING?
6      MR. STOCKER: TYING, YOUR HONOR, IS -- GENERALLY
7  INVOLVES WHEN YOU MUST BUY THE PRODUCT FROM THE SECONDARY
8  MARKET TOGETHER WITH THE PRODUCT IN THE FIRST MARKET. AND SO
9  FOR EXAMPLE --
10     THE COURT: SO IN OTHER WORDS, YOU CAN'T ALLEGE
11  TYING HERE.
12     MR. STOCKER: YEAH, WE CAN'T ALLEGE TYING HERE, BUT
13  WE CERTAINLY CAN ALLEGE MONOPOLISTIC LEVERAGING, AND IMAGE
14  TECHNOLOGY IS A VERY GOOD PRECEDENT FOR THE PLAINTIFFS ON THAT
15  SCORE, BECAUSE ALL YOU HAVE TO SHOW FOR A MONOPOLISTIC
16  LEVERAGING CASE IS THE EXISTENCE OF A MONOPOLY IN THE FIRST
17  MARKET, WHICH WE HAVE. NORVIR HAS A 100 PERCENT HOLD ON --
18  THE BOOSTER MARKET. THERE ARE NO OTHER --
19     THE COURT: RIGHT, BUT FULLY LEGAL.
20     MR. STOCKER: BUT FULLY LEGAL, AND PLAINTIFFS
21  ACKNOWLEDGE THAT THAT MARKET IS FULLY LEGAL.
22     HOWEVER, ABBOTT IS USING THE POWER THAT THEY HAVE IN
23  THAT MARKET IN ORDER TO SECURE KALETRA A LARGER SHARE ON THE
24  BOOSTED MARKET. AND THAT IS PATENTLY ILLEGAL UNDER THIS
25  CIRCUIT'S ANTITRUST LAW TO MONOPOLISTIC LEVERAGING, AND THIS

**20**

1  ISN'T EVEN THE ONLY CIRCUIT THAT HAS MONOPOLISTIC LEVERAGING
2  CASES. OBVIOUSLY THE SECOND AND THE SIXTH HAVE THOSE CASES AS
3  WELL.
4      I'D ALSO LIKE TO REVISIT A COUPLE MORE OF THE CLAIMS
5  THAT ABBOTT WAS MAKING IN HIS ARGUMENT. FIRST, AS TO THE
6  NATURE OF THE HARM, WHAT ABBOTT KEEPS RETURNING TO IS THE
7  NOTION --
8      THE COURT: LET ME ASK, WHAT ABOUT PREDATORY
9  PRICING? CAN YOU ALLEGE PREDATORY PRICING?
10     MR. STOCKER: YOUR HONOR, WE'RE NOT ALLEGING
11  PREDATORY PRICING HERE. IF IT WAS A PREDATORY PRICING CASE, I
12  GUESS WHAT IT WOULD LOOK LIKE IS IT WOULD BE A CASE IN WHICH WE
13  WOULD SAY KALETRA IS PRICED SO SLOW THAT IT'S BELOW THE COST TO
14  THE MANUFACTURER, WHICH WOULD BE ABBOTT.
15     AND I THINK THAT THE PROBLEM WITH THE PREDATORY
16  PRICING CLAIM IS THAT SINCE ABBOTT MAKES NORVIR, IT WOULD
17  ACTUALLY BE RATHER DIFFICULT TO SHOW THAT KALETRA IS BEING
18  PRICED BELOW ABBOTT'S COSTS BECAUSE IT'S ABBOTT'S OWN DRUG.
19  ABBOTT CAN CHARGE ITSELF WHATEVER IT WANTS TO CHARGE FOR THE
20  NORVIR USED TO BOOST KALETRA, TO BOOST THE PI IN KALETRA, AND
21  THAT'S WHY A PREDATORY PRICING CLAIM WOULD BE PRETTY DIFFICULT.
22     BUT ONCE AGAIN AS TO THE NATURE OF THE HARM, WHAT
23  ABBOTT KEEPS RETURNING TO IS THIS NOTION THAT SIMPLY BECAUSE
24  THE NORVIR HAS INCREASED BY 478 PERCENT, PLAINTIFFS ARE
25  BRINGING THIS CASE.

21

1    THIS IS NOT A -- A COMPLAINT ABOUT THE HIGH PRICE OF
2  PRESCRIPTION DRUGS. THIS IS A COMPLAINT THAT NORVIR USED ITS
3  MONOPOLY IN ORDER TO OBTAIN A LARGER MARKET SHARE IN A DISTINCT
4  MARKET. AND SO YOU CAN'T COMPARTMENTALIZE THE INJURY IN ONE
5  MARKET, THE 478 PERCENT INCREASE, FROM THE FACT THAT NORVIR
6  WAS -- WAS NOT -- WAS ONLY IMPOSING THE INCREASE ON ITS RIVALS
7  IN AN EFFORT TO SECURE KALETRA A LARGER SHARE OF THE BOOSTED
8  MARKET.
9    SECOND, ABBOTT ALSO ASSERTS THAT PLAINTIFFS IN
10 ANTITRUST CASES MUST ALLEGE THE SAME INJURY AS THAT CAUSED TO
11 COMPETITORS.
12   NOW, PLAINTIFFS HERE ARE FORTUNATE IN THAT THIS VERY
13 ISSUE WAS INDEED ADDRESSED BY MCCREADY AND, IN FACT, THIS
14 CIRCUIT, THE NINTH CIRCUIT, MENTION THIS IN ITS AMERICAN AD
15 CASE WHERE IT POINTS OUT THAT WHILE THAT SAME MARKET
16 REQUIREMENT IS A GENERAL REQUIREMENT FOR -- FOR ANTITRUST
17 INJURY STANDING, THAT THERE'S AN EXCEPTION AND THAT THAT
18 EXCEPTION IS FOR CASES LIKE MCCREADY. AND THE POINT OF
19 MCCREADY WAS THAT MCCREADY INVOLVED A -- A SCHEME BETWEEN
20 BLUE CROSS, BLUE SHIELD AND PSYCHIATRISTS TO EXCLUDE
21 PSYCHOLOGISTS FROM THE MARKET. SO THE TARGET OF THE
22 ANTI-COMPETITIVE BEHAVIOR IN MCCREADY WAS THE PSYCHOLOGISTS.
23   NOW, THE PLAINTIFF IN MCCREADY WAS NOT A
24 PSYCHOLOGIST. THE PLAINTIFF WAS A CONSUMER WHO WAS FORCED TO
25 PAY A HIGHER PREMIUM OR HIGHER PRICE OUT OF HER OWN POCKET FOR

22

1  THE SERVICES OF THE PSYCHOLOGIST.
2    AND SO THE KEY THING THAT THE COURT SHOULD DRAW OUT
3  OF MCCREADY IS THAT THE SUPREME COURT HAS HELD THAT PLAINTIFFS
4  WHO ARE INJURED BY THE MEANS THAT AN ANTITRUST DEFENDANT USES
5  IN ORDER ACCOMPLISH AN ANTI-COMPETITIVE END, ARE -- HAVE
6  STANDING TO SUE UNDER THE CLAYTON ACT. THEY NEED NOT BE THE
7  TARGET OF THE ANTI-COMPETITIVE SCHEME, AND THE PLAINTIFFS IN
8  THIS CASE, JOHN DOE 1 AND JOHN DOE 2, PURCHASED NORVIR, AND THE
9  PREMIUM THAT THEY PAID FOR THAT NORVIR WAS TO FUND ABBOTT'S
10 EFFORTS TO SECURE KALETRA A LARGER SHARE IN A DISTINCT MARKET.
11 THAT IS AN INJURY WHICH IS INEXTRICABLY INTERTWINED WITH
12 ABBOTT'S ANTI-COMPETITIVE PURPOSES. AND SO IT WOULD FALL UNDER
13 MCCREADY, AND SO THEY DO, INDEED, HAVE STANDING.
14
15   THE COURT: IT'S NOT PRECLUDED BY ILLINOIS BRICK?
16   MR. STOCKER: NO. BECAUSE -- IT'S NOT PRECLUDED BY
17 ILLINOIS BRICK, YOUR HONOR, BECAUSE ILLINOIS BRICK WOULD ONLY
18 APPLY IF PLAINTIFFS HERE WERE SEEKING MONETARY DAMAGES FOR
19 THEIR FEDERAL ANTITRUST CLAIM, AND THEY ARE NOT.
20   SO A COUPLE OTHER POINTS, YOUR HONOR.
21   THE COURT: YOU NEED TO ADDRESS THE MARKET SHARE
22 POINT.
23   MR. STOCKER: SURE. ON MARKET SHARE, YOUR HONOR, AS
24 THE COURT IS WELL AWARE, MARKET SHARE IS ALWAYS KIND OF A
25 MOVING TARGET. AND ANY TIME AN ANTITRUST COMPLAINT IS FILED,

23

1  IF A NEW COMPLAINT IS FILED EVEN SIX MONTHS LATER, THERE'S
2  GOING TO BE A DIFFERENT MARKET SHARE BECAUSE MARKET SHARES ARE
3  NEVER STILL.
4    AND WHAT PLAINTIFFS HAVE ALLEGED IN THIS CASE, WHICH
5  WAS FILED JUST IN APRIL OF THIS YEAR, WAS THAT IN JUNE OF 2003,
6  ABBOTT HAD A 75 PERCENT SHARE OF THE -- OF THE BOOSTED MARKET.
7  AND THIS IS AN IMPORTANT POINT FOR THE COURT TO FOCUS ON.
8  PLAINTIFFS DID NOT ALLEGE AND -- THAT ABBOTT'S MARKET SHARE
9  DECREASED PRECIPITOUSLY. WHAT PLAINTIFFS ALLEGE IN PARAGRAPHS
10 18 AND 19 OF THEIR FIRST AMENDED COMPLAINT IS MERELY THAT FIRST
11 OF ALL, THAT KALETRA'S SHARE OF NEW PRESCRIPTIONS BEING WRITTEN
12 BEGAN TO DECLINE. THIS WAS A SIGNAL TO ABBOTT THAT KALETRA'S
13 HOLD ON THE MARKET WAS BEGINNING TO SLIP, NOT THAT IT'S
14 75 PERCENT SHARE HAS PRECIPITOUSLY DROPPED.
15   BUT PERHAPS EVEN MORE IMPORTANTLY, WHAT FOLLOWS IN
16 PARAGRAPH 19 OF THE FIRST AMENDED COMPLAINT IS THAT PLAINTIFFS
17 ALLEGE THAT ABBOTT ACTED QUICKLY TO STANCH THIS DECLINE. AND
18 IN PARAGRAPH 21, PLAINTIFFS ASSERT THAT AS A RESULT OF ABBOTT'S
19 478 PERCENT PRICE INCREASE, ABBOTT, IN FACT, EXTENDED --
20 MAINTAINED OR EXTENDED THE DOMINANT SHARE THAT IT HAD IN THE
21 MARKET.
22   NOW, THAT APPLIES --
23   THE COURT: DOES THE COMPLAINT SAY THAT?
24   MR. STOCKER: YES, INDEED IT DOES, YOUR HONOR. IT'S
25 IN PARAGRAPH 21 OF THE FIRST AMENDED COMPLAINT. I CAN GIVE THE

24

1  COURT A COPY IF YOU'D LIKE TO TAKE A LOOK AT IT.
2    THE COURT: NO, I HAVE THE COMPLAINT.
3    MR. STOCKER: OKAY. OKAY.
4    SO -- THE POINT HERE IS THAT THE COMPLAINT, FAIRLY
5  READ, DOES SAY WHAT THAT AS OF DECEMBER 2003, ABBOTT'S
6  75 PERCENT MARKET SHARE THAT IT MAINTAINED IN JUNE OF 2003,
7  ALTHOUGH IT WAS THREATENED, WAS MAINTAINED OR EVEN EXTENDED.
8  THEIR DOMINANT MARKET SHARE WAS MAINTAINED OR EVEN EXTENDED.
9    IF IT'S NOT IN PARAGRAPH 21, I'M SURE I COULD FIND
10 IT SOMEWHERE ELSE IN THE COMPLAINT. I'M POSITIVE IT'S IN
11 THERE.
12   AND SO WHAT ABBOTT WINDS UP COMPLAINING, IF THE
13 COURT LOOKS AT ITS REPLY BRIEF, IS THAT A YEAR LATER IN JUNE
14 2004 -- WE'RE NOW A YEAR FROM THE MARKET SHARE ALLEGATIONS THAT
15 PLAINTIFF SET OUT IN THEIR FIRST AMENDED COMPLAINT.
16   WELL, FIRST OF ALL, THE COMPLAINT WAS FILED IN
17 APRIL, AND IT WOULD BE A REMARKABLY PRESCIENT PLAINTIFF WHO
18 WOULD BE ABLE TO ANTICIPATE WHAT THE MARKET SHARE WOULD BE IN
19 JUNE. BUT EVEN LEAVING THAT ASIDE, THE DIFFERENCE IS ONLY
20 BETWEEN THE MARKET SHARE IN DECEMBER OR, AT WORST, AT JUNE AND
21 APRIL. AND ABBOTT IS UNABLE TO POINT TO ANY CASE SUGGESTING
22 THAT A MATTER OF, SAY, SEVEN MONTHS, MUCH LESS FOUR MONTHS, IS
23 SO GREAT THAT MARKET SHARE DATA BECOMES STALE IN THAT SHORT OF
24 TIME.
25   THE ONLY CASE ABBOTT DOES CITE WHICH DISCUSSES SORT

**25**

1  CURRENCY OF MARKET SHARE IS KELLAM. AND IN KELLAM, WHAT THE
2  COURT NOTICES IS SIMPLY THAT MARKET SHARES ARE A MOVING TARGET.
3  AND SO IT'S IMPORTANT THAT MARKET SHARES BE CURRENT BECAUSE
4  THEY CHANGE FROM YEAR TO YEAR.
5       NOW, THIS ISN'T A QUESTION OF MARKET SHARE DATA THAT
6  ARE YEARS OLD. THIS IS MARKET SHARE DATA FROM DECEMBER OR, AT
7  WORST, JUNE OF 2003.
8       SO UNLESS THE COURT HAS ANY OTHER SPECIFIC
9  QUESTIONS, I WANTED TO CONCLUDE NOTING THAT, FIRST OF ALL, ONE
10 POINT THAT ABBOTT KEEPS RETURNING TO IS THIS NOTION THAT THEY
11 ONLY HAVE 30 PERCENT OF THE PI MARKET. OBVIOUSLY, THIS IS A
12 FACTUAL DISPUTE.
13      THAT'S NOT APPROPRIATE ON A MOTION TO DISMISS, BUT
14 WHAT'S CRITICAL HERE IS THAT ABBOTT IS CONFUSING THE WHOLE PI
15 MARKET WHICH WOULD CONSIST BOTH OF PRESCRIPTIONS FOR PI'S THAT
16 ARE OUT THERE BY THEMSELVES THAT ARE NOT ACCOMPANIED BY
17 PRESCRIPTIONS FOR NORVIR AND PRESCRIPTIONS FOR PI'S THAT ARE
18 BOOSTED BY NORVIR. AND THESE ARE TWO DISTINCT MARKETS. THE
19 DRUG INDUSTRY RECOGNIZES THEMSELVES AS TWO DISTINCT MARKETS.
20 AND SO IT'S NOT ONLY A CONTESTABLE FACTUAL ASSERTION, THEY'RE
21 SIMPLY WRONG ABOUT THE MARKET SHARE.
22      THE COURT: THERE IS SOME MENTION IN YOUR COMPLAINT
23 ABOUT TITLE 15, SECTION 15 --
24      (SIMULTANEOUS COLLOQUY.)
25      MR. STOCKER: -- MONETARY DAMAGES SO THAT SHOULD NOT

**26**

1  BE IN THERE. SO IF THE COURT WISHES, IT COULD STRIKE THAT FROM
2  THE COMPLAINT.
3       UNLESS THERE'S ANY FURTHER QUESTIONS, THAT'S IT FOR
4  ME, YOUR HONOR.
5       THE COURT: YOU WANT TO REPLY BRIEFLY?
6       MR. LOMBARDI: YES. THANK YOU, YOUR HONOR.
7       ON THE PATENT POINT, THERE ARE TWO PATENTS OR TWO
8  TYPES OF PATENTS -- THERE ARE ACTUALLY MULTIPLE PATENTS THAT
9  COVER THESE TWO USES OF NORVIR. FIRST, THE PLAINTIFFS HAVE
10 ADMITTED THAT THE FIRST PATENT EXISTS, THAT IT'S OUT THERE.
11      THE COURT: THE PATENT ON NORVIR ALONE.
12      MR. LOMBARDI: ON NORVIR, YES.
13      THE COURT: SURE. THAT'S NO PROBLEM.
14      MR. LOMBARDI: OKAY. AND THEY ACTUALLY SAY THAT
15 IT'S THAT PATENT ON NORVIR THAT GIVES IT -- GIVES ABBOTT A
16 VIRTUAL LOCK ON THE BOOSTED MARKET AT PAGE 10.
17      THE COURT: BOOSTER.
18      MR. LOMBARDI: BOOSTED MARKET IS WHAT THEY SAY -- IS
19 WHAT THEY SAY.
20      THE COURT: OH.
21      MR. LOMBARDI: NOW, AS TO THE SECOND PATENT -- AS TO
22 THE SECOND PATENT, IT'S THERE. IT'S ATTACHED TO -- TO OUR
23 MOTION FOR JUDICIAL NOTICE.
24      YOU ASKED PLAINTIFF IF THEY HAD ANY ISSUE WITH
25 SAYING THAT THAT COVERS THE BOOSTED MARKET, AND THERE WAS NO

**27**

1  RESPONSE. YOU ASKED WHETHER THEY HAD ANY ISSUE WITH WHETHER IT
2  WAS VALID OR NOT. THEY'VE CERTAINLY MADE NO ALLEGATIONS IN
3  THAT REGARD.
4       I'VE NEVER HEARD ANYBODY QUESTION THAT ABBOTT HAS A
5  MARKET -- HAS A PATENT ON BOTH OF THOSE MARKETS, BUT, JUDGE, IF
6  WE'RE COMING DOWN TO THIS POINT AND YOU REJECT MY OTHER REASONS
7  FOR A MOTION TO DISMISS, MAYBE THIS IS A FAST WAY THROUGH THIS
8  CASE. BECAUSE I'M VERY CONFIDENT I CAN SHOW YOU THAT ABBOTT
9  HAS A PATENT THAT COVERS BOTH OF THOSE MARKETS THAT ARE AT
10 ISSUE HERE.
11      BUT BEYOND THAT --
12      THE COURT: I'M SURE YOU DO ON ITS FACE, BUT I THINK
13 PLAINTIFF IS RIGHT, THAT I CAN HARDLY SORT OF LEAP OVER CLAIM
14 CONSTRUCTION AND VALIDITY BY SAYING, "OH, LOOKS GOOD TO ME" --
15      MR. LOMBARDI: WELL, I UNDERSTAND THAT JUDGE, BUT
16 IT --
17      THE COURT: IT ACTUALLY DOESN'T LOOK GOOD TO ME.
18 IT'S HARD FOR ME TO IMAGINE THAT YOU COULD HAVE A PATENT THAT
19 WOULD PREVENT A PATIENT FROM TAKING TWO DIFFERENT DRUGS --
20      MR. LOMBARDI: IT'S A METHOD-OF-USE PATENT. YOU
21 HARDLY EVER SEE THEM ENFORCED AGAINST PATIENTS FOR OBVIOUS
22 REASONS.
23      THE COURT: YEAH.
24      MR. LOMBARDI: OBVIOUS REASONS.
25      THE COURT: OR A DOCTOR.

**28**

1       MR. LOMBARDI: BUT YOU COULD SEE THEM ENFORCED
2  AGAINST ANOTHER COMPANY THAT MIGHT MARKET ITS DRUGS FOR USE
3  WITH SOMEBODY ELSE'S DRUG. THAT'S A WAY THAT IT COULD HAPPEN.
4  BUT YOU'RE RIGHT, IT DOESN'T HAPPEN VERY OFTEN. BUT THE PATENT
5  DOES EXIST.
6       MY POINT IS THAT THEY SHOULD BE TELLING YOU THAT
7  THEY DON'T THINK WE HAVE THAT PATENT OR THAT THEY THINK IT'S
8  INVALID. THEY SHOULD BE MAKING THAT ALLEGATION, AND THEY
9  HAVEN'T MADE THAT ALLEGATION.
10      BUT THE WHOLE THING COMES BACK TO WHAT THEY HAVE
11 CLAIMED IS THE HARM HERE, JUDGE, AND THEY HAVE CLAIMED THAT THE
12 HARM IS THE HIGH PRICE OF NORVIR. THAT'S AT PAGE 46 -- EXCUSE
13 ME -- PARAGRAPH 46 OF THEIR COMPLAINT. THE INJURY CONSISTS OF
14 BEING FORCED TO PAY HIGHER PRICES FOR NORVIR. THAT FALLS UNDER
15 THE FIRST PATENT, THE PATENT THAT THEY ADMIT IS THERE, THE
16 PATENT THAT COVERS NORVIR --
17      THE COURT: RIGHT, BUT THEY'RE ARGUING THIS
18 LEVERAGING THEORY, THAT IT SO HAPPENS THAT THEIR HARM IS IN
19 HAVING TO PAY THE HIGH PRICE IS THE SAME HARM THAT IS FELT BY
20 THE COMPETITORS WHO ARE BEING DRIVEN OUT OF THE MARKET BY -- BY
21 THIS PATENT LEVERAGING.
22      MR. LOMBARDI: WELL, THEY ARE MAKING THAT ARGUMENT
23 ON THAT POINT, BUT, JUDGE, ON THE POINT OF WHAT THEIR HARM
24 IS -- WHAT THESE PLAINTIFFS' HARM IS, THEY SAY IT'S MERELY THE
25 PRICE INCREASE IN NORVIR. THAT IS COVERED BY THE SINGLE

**Page 29**

1  PATENT.
2      THERE IS NO LEVERAGING THEORY NECESSARY FOR THAT.
3  THAT'S COVERED BY THE SINGLE PATENT, AND THE SINGLE PATENT
4  MAKES THAT LEGITIMATE, AND THEY ADMIT THAT THAT SINGLE
5  PATENT -- THAT THE PATENT ON NORVIR EXISTS.
6      ON THE INJURY, JUDGE, I THINK THAT THERE WAS SOME
7  QUESTION ON THE -- THE INJURY. ACTUALLY I'M NOT SURE WHAT MY
8  NOTE WAS ON THAT, JUDGE, SO I WILL SKIP THAT.
9      BUT ON THE MARKET SHARE, JUDGE, JUST SO THE RECORD
10 IS COMPLETELY CLEAR, PARAGRAPH 18 OF THE COMPLAINT SAYS THAT
11 KALETRA'S SHARE OF NEW PI PRESCRIPTIONS BEGAN A PRECIPITOUS
12 DECLINE IN 2003. THE NEXT SENTENCE SAYS FURTHERMORE, KALETRA
13 PRESCRIPTIONS AS A PROPORTION OF THE BOOSTED MARKET BEGAN TO
14 PLUMMET IN THE TWO MONTHS FOLLOWING THE INTRODUCTION OF
15 REYATAZ, SO WHAT THEY'VE ALLEGED FOR YOU IS A MARKET SHARE FROM
16 JUNE OF 2003, THE FACT THAT THAT MARKET SHARE IS PLUMMETING --
17     THE COURT: BEGAN TO PLUMMET.
18     MR. LOMBARDI: BEGAN TO PLUMMET.
19     THE COURT: DIDN'T SAY IT PLUMMETED ALL THAT FAR.
20     MR. LOMBARDI: IT PLUMMETED DRASTICALLY, BUT WHAT --
21 YOU DON'T HAVE TO TAKE MY WORD FOR THAT. BUT THEY SHOULD BE
22 MAKING AN ALLEGATION ON WHERE IT WAS, JUDGE. AND THEY DIDN'T
23 DO THAT.
24     ON THE MCCREADY POINT, THEY STILL HAVE TO HAVE --
25 THEY STILL HAVE TO HAVE THE ANTITRUST CONDUCT LEADING TO THE

**Page 30**

1  INJURY TO THE CONSUMER. THE ANTITRUST CONDUCT THAT THEY PUT AT
2  ISSUE HERE IS THEY SAY AT -- AT PAGE 13 OF THEIR BRIEF,
3  PLAINTIFFS' ANTITRUST CLAIMS ARISE BECAUSE ABBOTT FAILED TO
4  PASS THE PRICE HIKE ON TO ITS OWN NORVIR-BOOSTED PRODUCT
5  KALETRA IN THE BOOSTED MARKET. THAT'S THEIR STATEMENT OF THE
6  ANTITRUST CONDUCT.
7      THEY HAVE TO ALLEGE THAT THESE PLAINTIFFS WERE
8  HARMED BY THAT CONDUCT. IT HAS TO DIRECTLY FLOW. AND IT
9  DOESN'T DIRECTLY FLOW. THESE PLAINTIFFS CAN'T HAVE BEEN HURT
10 BY THE FACT THAT KALETRA DIDN'T COST AS MUCH AS OTHERS. IT WAS
11 CHEAPER. THAT'S NOT AN ANTI-COMPETITIVE INJURY.
12     AND, YOUR HONOR, I THANK YOUR HONOR FOR RAISING THE
13 ILLINOIS BRICK POINT. I'D MEANT TO POINT THAT OUT. BUT IT IS
14 OUR POSITION, AND I THINK PLAINTIFF AGREES, THAT THERE CAN BE
15 NO DAMAGES UNDER THE SHERMAN ANTITRUST ACT.
16     THE COURT: RIGHT. I FORGOT -- WAS JUST ABOUT
17 DAMAGES.
18     MR. LOMBARDI: IF YOU HAVE ANY FURTHER QUESTIONS,
19 I'M HAPPY TO RESPOND.
20     THE COURT: I'M GOING TO TAKE IT UNDER SUBMISSION,
21 BUT I WILL TELL YOU THAT I'M INCLINED TO DENY THE MOTION TO
22 DISMISS JUST SO THAT YOU'LL KNOW THAT WE PROBABLY WILL HAVE OUR
23 CASE MANAGEMENT CONFERENCE ON OCTOBER 22ND. IF I DO GRANT IT,
24 I WOULD PROBABLY HAVE TO GRANT WITH LEAVE TO AMEND SINCE IT
25 MIGHT WELL BE BASED ON THE MARKET SHARE SITUATION, IN WHICH

**Page 31**

1  CASE THE CASE WOULDN'T BE OVER ANYWAY.
2      IF I GRANT IT WITH LEAVE TO AMEND, THEN MAYBE I
3  WOULD MOVE THE CASE MANAGEMENT CONFERENCE TILL SOME LATER DATE.
4  BUT IF YOU DON'T HEAR ANYTHING, JUST ASSUME WE'LL HAVE THE CASE
5  MANAGEMENT CONFERENCE ON OCTOBER 22ND AND TAKE IT FROM THERE.
6      MR. TABACCO: THANK YOU, YOUR HONOR.
7      THE COURT: THANK YOU.
8      (PROCEEDINGS WERE CONCLUDED AT 11:04 A.M.)
9           --oOo--

CERTIFICATE OF REPORTER

I, RAYNEE H. MERCADO, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C04-1511CW, DOE V. ABBOTT, ET AL., WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR

THURSDAY, OCTOBER 14, 2004