# EXHIBIT 2

Michael A. Sweet (SBN: 184345)
George C. Lombardi (*Admitted Pro Hac Vice*)
James F. Hurst (*Admitted Pro Hac Vice*)
David J. Doyle (*Admitted Pro Hac Vice*)
Samuel S. Park (*Admitted Pro Hac Vice*)
WINSTON & STRAWN LLP
101 California Street, Suite 3900
San Francisco, CA  94111-5894
Telephone:     415-591-1000
Facsimile:      415-591-1400
Email:  msweet@winston.com;
glombardi@winston.com, jhurst@winston.com;
ddoyle@winston.com; spark@winston.com

Attorneys for Defendant
ABBOTT LABORATORIES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE ABBOTT LABS NORVIR ANTITRUST LITIGATION<br><br>This Document Relates To: All Actions | Case Nos. C-04-1511 CW and<br>C-04-4203 CW<br><br>**NOTICE OF MOTION AND RENEWED MOTION OF ABBOTT LABORATORIES' FOR SUMMARY JUDGMENT**<br><br>DATE:     March 24, 2006<br>TIME:     10:00 a.m.<br>DEPT:     2<br><br>**The Honorable Judge Wilken** |

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

**NOT OF MOT. & RENEWED MOT. OF ABBOTT LABORATORIES FOR SUMMARY JUDGMENT**

directly contradicts the notion that Norvir's price increase made those competing drugs "too expensive." Under these circumstances, there is no basis to conclude that Abbott has monopoly power or is dangerously close to obtaining monopoly power.

In granting Plaintiffs' Rule 56(f) motion, this Court noted that "a market share as low as forty-four percent is sufficient to establish a triable issue of fact regarding market power for an attempted monopolization claim." *In re Abbott Labs. Norvir Anti-Trust Litig.*, Nos. C 04-1511 CW, C 04-4203 CW, 2005 U.S. Dist. LEXIS 24238, *7 (N.D. Cal. Sept. 12, 2005) (citing *Rebel Oil*, 51 F.3d at 1438). As the Court noted, the Ninth Circuit has held that the "minimum showing of market share required in an *attempt case* is a lower quantum than the minimum showing required in an actual monopolization case." *Rebel Oil*, 51 F.3d at 1438 (emphasis added).

But in *Rebel Oil*, the defendant's market share had *increased* due to its alleged monopolistic strategies, *unlike here where Abbott's market share has decreased* since the alleged monopolistic pricing decision. The Ninth Circuit noted that, during the relevant period, the defendant had "forced 37 competitors out of the Las Vegas gasoline market" and drove the plaintiffs' market share from "30 percent in 1982 to less than 10% in 1990." *Id.* at 143. Here, in sharp contrast, Abbott's market share has dropped from 77% to about 47% in just three years because new, powerful competitors are rapidly taking market share. (Devlin Decl. ¶ 21). That drop promises to continue as new competitors hit the market. (*Id.* ¶ 26).

Moreover, the Ninth Circuit in *Rebel Oil* held only that the defendant's "market share of 44 percent is sufficient as a matter of law to support a finding of market power, *if* entry barriers are high and competitors are unable to expand their output in response to supracompetitive pricing." *Rebel Oil*, 51 F.3d at 1438 (emphasis added). Here, Plaintiffs have never alleged – and have no facts to prove – that there are barriers to entry in the Boosted Market, that Abbott is charging supracompetitive prices, or that competitors have been unable to expand their output in response to Abbott's re-pricing of Norvir.

Indeed, despite getting several additional months to obtain evidence on the issue of monopoly power, Plaintiffs have failed to uncover any facts remotely suggesting that there is a triable issue of fact. Far from establishing barriers to entry, the undisputed facts show that one new

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

competitor recently has entered the Boosted Market, and at least two others are on the way. (Devlin Decl. ¶ 26). Rather than destroying competition, Norvir is doing just the opposite. Because of its boosting ability, Norvir is paving the way for competitors to develop new AIDS medications that could not succeed without Norvir's boost. As Abbott's former marketing director explained, there will be a "whole new class of [AIDS] drugs" coming to market, and all of them will be "boosted with 100 milligrams of Norvir." (Park Decl. Ex. H (J. Leal Dep. (10/14/05) at 36:7-13)). Moreover, Abbott's competitors have not "lack[ed] the ability to expand their output to challenge [Abbott's] high prices." *Kodak*, 125 F.3d at 1208. To the contrary, competitors have expanded their output and succeeded in stealing market share away from Kaletra while, at the same time, raising the prices of their own PIs. (Devlin Decl. ¶¶ 23-24).

In the end, Kaletra's falling market share, which now stands at 47% – in combination with competitors' ability to enter the Boosted Market, raise their prices, increase their output and steal market share – irrefutably establishes that Abbott does not have monopoly power or a dangerous possibility of obtaining monopoly power in the Boosted Market.

**2.    Kaletra's Falling Market Share Establishes A Lack Of Anticompetitive Conduct.**

Even if it had monopoly power – which it clearly does not – Abbott has not engaged in "anticompetitive conduct" as a matter of law. Anticompetitive conduct is "behavior that not only 1) tends to impair opportunities of rivals, but also 2) either does not further competition on the merits or does so in an unnecessarily restrictive way." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985). A critical factor in this analysis is whether the conduct is justified by a "normal business purpose," which would not be present when a company abandons short-term profits in the interest of restricting competition. *Id.* at 608.

Market realities preclude any such showing in this case. Plaintiffs have no evidence whatsoever that Abbott's price increase "impair[ed] opportunities of rivals" and did so "in an unnecessarily restrictive way." *Id.* On the contrary, competitive opportunities hardly have been impaired considering that no competitor has left the market, competitors' market shares have dramatically increased (despite the fact that they increased their prices), and a brand new PI just hit the market. That is the opposite of impaired opportunities and restricted competition. Moreover,

Abbott's "normal business purpose" for a price increase is readily apparent – increasing its profits – which is the goal of every publicly traded company in the United States.

And even if its competitors were losing market share to Kaletra (which they are not) Abbott still would be entitled to summary judgment because Plaintiffs' theory of "anticompetitive conduct" is wholly illogical. Plaintiffs are not relying on any recognized anticompetitive conduct, such as predatory pricing or pricing agreements. Instead, they have created the unprecedented and unsupported theory that Abbott engaged in anticompetitive conduct by charging "too much" for a patented product.

This is nonsense. A patent creates "the right to exclude others from profiting by the patented invention." *Schering-Plough Corp. v. FTC*, 402 F.3d 1056, 1065 (11th Cir. 2005) (quoting *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 215 (1980)). Yet, Plaintiffs want this Court to conclude just the opposite – that Abbott had a duty keep Norvir's price low so that competitors could profit from that invention's ability to improve their products. Of course, if they felt it was necessary to remain competitive, Abbott's competitors easily could charge less than $20 and $30 per day for their products or, at a minimum, refrain from increasing their prices. Nonetheless, Plaintiffs contend that it was somehow "anticompetitive" for Abbott to decline to give its competitors a free ride on Norvir's old price of $1.71 per day.

Common sense alone refutes that theory. It obviously is not "anticompetitive" for a monopolist (such as a patent owner) to charge prices that they believe are fair, even if they qualify as "monopoly prices." As the Supreme Court has explained:

> The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices—at least for a short period—is what attracts "business acumen" in the first place; it induces risk taking that produces innovation and economic growth.

*Verizon*, 540 U.S. at 407. Nor is it "anticompetitive" for a company to decline to voluntarily help its competitors through low prices for a patented product. Standard "antitrust principles" simply impose "no duty to aid competitors." *Id.*

Under these circumstances – particularly where the Norvir price increase was followed by an *increase* in both competitors' market shares *and* their prices – there is no possible basis for concluding that Abbott's decision to raise Norvir's price was "anticompetitive."

### 3. Kaletra's Falling Market Share Establishes A Lack Of Antitrust Injury.

Market realities also prove that Plaintiffs have not suffered any "antitrust injury." Antitrust injury is not merely an "injury causally linked to an illegal presence in the market." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Rather, "[t]o show antitrust injury, a plaintiff must prove that his loss flows from an anticompetitive aspect or effect of the defendant's behavior." *Rebel Oil*, 51 F.3d at 1433. If the alleged injury "flows" from conduct that is either "beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal *per se*." *Id.*

Thus, even if Plaintiffs have shown a valid antitrust violation (which they have not), this Court still must dismiss their claim because they have suffered no antitrust injury. Plaintiffs – both consumers and third-party insurers – are alleging injury based on their being forced to pay more for Norvir simply because Abbott has pricing power through its patents, not because Abbott restricted competition. That, however, is a complaint about a price increase, not a complaint about an alleged "antitrust injury." When faced with this very same issue, the Seventh Circuit held that "a consumer may suffer antitrust injury when higher prices result from some unlawful monopolistic conduct," but that paying more money simply because of a price increase would not qualify as an "antitrust injury." *Endsley v. City of Chicago*, 230 F.3d 276, 283 (7th Cir. 2000). Because Plaintiffs are alleging the very same thing – being forced to pay more because of a price increase (not because the elimination of competition has enabled Abbott to charge higher prices) – they cannot establish that they suffered an "antitrust injury" as a matter of law.

This is simple common sense. Paying more because of a patent owner's pricing power is simply not an "antitrust" injury. Recently, the Second Circuit rejected a similarly flawed theory, holding that the plaintiffs failed to "allege facts sufficient to prove that [they] suffered antitrust injury." *In re Tamoxifen Citrate Antitrust Litig.*, 429 F.3d 370, 403 (2d Cir. 2005). In that case, class action consumers brought antitrust claims alleging, among other things, that they had

suffered injury by paying an "artificially high price" for a cancer drug, Tamoxifen, when defendants Zeneca and Barr Labs settled a patent infringement action. *Id.* at 380-81. The Second Circuit explained, however, that any alleged injury suffered by the consumers did not result from the alleged anticompetitive conduct (the agreement between Zeneca and Barr) but "from Zeneca's valid patent and from the inability of other generic manufacturers to establish that the patent was either invalid or not infringed." *Id.* at 403. Accordingly, the court held that their injuries, if any, were not "the type the antitrust laws were intended to prevent." *Id.*

Similarly, Plaintiffs' injuries here, if any, for paying an allegedly inflated price for Norvir are not the type the antitrust laws were intended to prevent. Although Plaintiffs allege that they are forced into a "Hobson's Choice," neither of their choices would result in an antitrust injury. First, paying a high price for Norvir, by itself, clearly does not cause an antitrust injury. *Id.* If a higher price is possible only because the defendant already eliminated competition – such as through predatory pricing – then paying more might amount to an antitrust injury. But that is not what Plaintiffs are alleging. They are alleging only that they are paying more because of Abbott's unilateral decision to raise the price of a patented product. *Id.*

Second, even if Plaintiffs *had* been forced to purchase Kaletra (which they have not alleged), that supposed "injury" is not the result of any loss in competition. Consumers are not forced to purchase Kaletra because other PIs have been pulled from the market or are unavailable as a result of Abbott's actions. *Id.* Thus, Plaintiffs' failure to even allege that they suffered an antitrust injury compels summary judgment in Abbott's favor.

**B.    Abbott's Patents Provide Immunity From Plaintiffs' Antitrust Claims.**

In addition to the market realities discussed above, Abbott's patents independently defeat Plaintiffs' case. A patent, of course, is a government-sanctioned monopoly. "Engrafted into patent law is the notion that a patent grant bestows 'the right to exclude others from profiting by the patented invention.'" *Schering-Plough*, 402 F.3d at 1065.

Thus, an antitrust action requires proof that the patentee engaged in conduct "beyond the limits of what Congress intended to give in the patent laws." *Atari Games Corp. v. Nintendo of Am. Inc.*, 897 F.2d 1572, 1576 (Fed. Cir. 1990). As the Ninth Circuit has explained, patent holders

are allowed to operate free from antitrust liability "as far as the patent laws go." *Kodak*, 125 F.3d at 1215. Accordingly, "where a patent has been lawfully acquired, subsequent conduct permissible under the patent laws cannot trigger any liability under the antitrust laws." *Id.*; *see also In re Independent Servs. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1327-28 (Fed. Cir. 2000) (holding that a patentee's conduct within the scope of its patents is "free from liability under the antitrust laws").

Here, there is no question that Abbott's decision to raise Norvir's price was conduct "permissible under the patent laws." First, because Abbott has patent rights to *both* of Plaintiffs' defined markets, it cannot be liable for monopolizing or attempting to monopolize *either* of them. Second, even if this Court somehow were to conclude that Abbott's patents do not cover the Boosted Market – even though Plaintiffs never have contested this issue – Abbott still is entitled to a summary judgment, because its pricing decision was not a pretext to monopolize the Boosted Market, but rather a perfectly lawful attempt to receive what it believes is a fair return on Norvir.[2]

### 1. Under the Ninth Circuit's Holding In *Kodak*, Abbott Is Entitled To Summary Judgment Because Its Patents Cover *Both* Alleged Markets.

Abbott is entitled to summary judgment on Plaintiffs' Sherman Act claim because its patents cover both of Plaintiffs' alleged markets. As this Court previously held, the antitrust laws are implicated only when a patent owner "extends its monopoly beyond the scope of the patent."

---

[2] Plaintiffs essentially have conceded that Abbott prevails as a matter of law under the Federal Circuit's decision in *Independent Services*, which rejected *Kodak's* oft-criticized monopoly-leveraging theory. Abbott continues to maintain that Federal Circuit law controls "whether or not the patentee enjoys antitrust immunity under the patent laws." *Unitherm Food Sys. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1355 (Fed. Cir. 2004). The Ninth Circuit has never expressly addressed this choice-of-law issue, and there is no reason to believe that the Ninth Circuit will decline to follow the Federal Circuit's thorough and well-reasoned analysis of that issue in *Unitherm*, where the Court held that all circuits must follow Federal Circuit law on patent-immunity issues. Thus, as it has argued in the past, Abbott respectfully contends that the Court should follow *Independent Services* and reject the Ninth Circuit's approach in *Kodak*. Abbott understands that this Court already rejected this argument when ruling on Plaintiffs' Rule 56(f) motion. Abbott respectfully asks, however, that the Court reconsider that decision. While it is true that the *Kodak* court applied Ninth Circuit law, nobody had even suggested in that case that Federal Circuit law applies. Thus, the Ninth Circuit did not address the issue. Moreover, *Kodak* (1997) was decided before both *Independent Services* (2000) and *Unitherm* (2004) and, therefore, there was no possible way for the Ninth Circuit to have considered whether it was bound to follow *Independent Services*. Respectfully, this Court cannot be not bound to follow *Kodak* when the Ninth Circuit never resolved a critical threshold issue that remains a completely open issue in this circuit, *i.e.*, whether Federal Circuit law controls all patent-immunity questions.

(10/21/04 Doe Order at 4). Here, however, Abbott is accused of "monopolizing" a market over which it *has* patent protection.

Plaintiffs are alleging that a price increase on a patented product (Norvir) was an attempt to monopolize another *patented* combination market (for Norvir plus another protease inhibitor). This is nothing like *Kodak*, where the plaintiffs alleged that a refusal to sell a patented product (photocopier parts) was an attempt to monopolize an *unpatented* service (repairing photocopiers). *Kodak*, 125 F.3d at 1217. In other words, unlike here, the *Kodak* defendant had patent rights over only *one* of the relevant markets. *Id.* Abbott, in contrast, has numerous patents that cover Norvir *and* Norvir's use as a booster with another PI.

Determining whether any alleged impact on the Boosted Market is beyond the scope of Abbott's patents depends on the proper construction of those patents. That issue is perfectly suited for summary judgment because "claim construction is a matter of law" and, thus, it is not open to any possible factual dispute. *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1359 (Fed. Cir. 2004). The "construction of a patent, including terms of art within its claims," is a matter of law "exclusively within the province of the court." *Markman v. Westview Instruments*, 517 U.S. 370, 372 (1996); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).

Abbott's Norvir patents plainly cover the Boosted Market. The '157 patent, for example, claims a "method for improving" the efficacy of another protease inhibitor by administering a "therapeutically effective amount of a combination of said drug . . . and ritonavir," which is Norvir's active ingredient. (Park Decl., Ex. C, at Col. 13, lines 42-48). Abbott is aware of no conceivable dispute about the meaning of this simple language, which plainly covers the co-administration of Norvir with any other PI (including those made by competitors). This is *precisely* how Plaintiffs define the Boosted Market. (Doe Am. Compl. ¶¶ 14, 27; SEIU Compl. ¶¶ 28-29). There is simply no question that Abbott's patents cover that entire market, and Plaintiffs never have contended otherwise.

When denying Abbott's motions to dismiss, this Court declined to address the scope of Abbott's booster patents, stating that it was "not willing, at this early juncture in the litigation, to rule that [Abbott] can patent a procedure in which HIV patients take a drug manufactured and sold

have failed to allege that Defendant's business practices were fraudulent in any way. Plaintiffs' complaint does not allege any facts that could support a fraud claim." (10/21/04 Doe Order at 12). Thus, Plaintiffs cannot recover under any of the unfair competition prongs set forth in section 17200.

### 2.    Plaintiffs Cannot Recover On Their Claim For Unjust Enrichment (Count III).

Plaintiffs cannot recover on their unjust enrichment claim for precisely the same reason they cannot recover under section 17200 – Abbott's conduct was perfectly proper. To state a claim for unjust enrichment, a plaintiff must show that "the defendant received unjust benefit at the expense of the plaintiff." *Sebastian Int'l, Inc. v. Russolillo*, 186 F. Supp. 2d 1055, 1074 (C.D. Cal. 2000). In doing so, the plaintiff must show that the acquisition of property was the result of wrongful conduct. *Cruz v. United States*, 219 F. Supp. 2d 1027, 1042 (N.D. Cal. 2002). The wrongful conduct may include "fraud, accident, mistake, undue influence, the violation of a trust or other wrongful act." *In re National Mortg. Equity Corp. Mortg. Pool Certificates Securities Litig.*, 636 F. Supp. 1138, 1173 (C.D. Cal. 1986).

Here, Plaintiffs rely completely on their allegations of antitrust violations to establish a claim of unjust enrichment. This is flawed. It is fundamental that when there is no unlawful conduct or "wrongful retention," the defendant cannot be unjustly enriched. *Weststeyn Dairy 2 v. Eades Commodities Co.*, 280 F. Supp. 2d 1044, 1084 (E.D. Cal. 2003) (denying finding of unjust enrichment). Therefore, Plaintiffs cannot possibly prove their claim for unjust enrichment, and Abbott is entitled to judgment as a matter of law.

Dated: January 9, 2006                WINSTON & STRAWN LLP


By:    /s/ Samuel S. Park
       Samuel S. Park (Admitted *Pro Hac Vice*)

       One of Attorneys for Defendant
       ABBOTT LABORATORIES