

Nicole M. Norris (SBN 222785)
WINSTON & STRAWN LLP
101 California Street, Suite 3900
San Francisco, CA 94111-5894
Telephone: 415-591-1000
Facsimile: 415-591-1400
Email: nnorris@winston.com

James F. Hurst (*Admitted Pro Hac Vice*)
David J. Doyle (*Admitted Pro Hac Vice*)
Samuel S. Park (*Admitted Pro Hac Vice*)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Telephone: 312-558-5600
Facsimile: 312-558-5700
Email: jhurst@winston.com; ddoyle@winston.com; spark@winston.com

Charles B. Klein (*Admitted Pro Hac Vice*)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20007
Telephone: 202-282-5000
Facsimile: 202-282-5100
Email: cklein@winston.com

Attorneys for Defendant
ABBOTT LABORATORIES

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND**

MEIJER, INC. & MEIJER DISTRIBUTION, INC., on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

ABBOTT LABORATORIES,

Defendant.

[caption continues next page]

**Case No. C 07-5985 CW**

*Related by Order to:*

*Case No. C 04-1511 CW*

**DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES' MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND INTERROGATORY RESPONSES**

The Honorable Judge Wilken



Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

ROCHESTER DRUG CO-OPERATIVE, INC., on behalf of itself and all others similarly situated,

Plaintiffs,

vs.

ABBOTT LABORATORIES,

Defendant.

**Case No. C 07-6010 CW**

*Related by Order to:*

*Case No. C 04-1511 CW*

**DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES' MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND INTERROGATORY RESPONSES**

The Honorable Judge Wilken

LOUISIANA WHOLESALE DRUG COMPANY, INC., on behalf of itself and all others similarly situated,

Plaintiffs,

vs.

ABBOTT LABORATORIES,

Defendant.

**Case No. C 07-6118 CW**

*Related by Order to:*

*Case No. C 04-1511 CW*

**DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES' MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND INTERROGATORY RESPONSES**

The Honorable Judge Wilken

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

# I. Introduction

## A. Qualifications

1. I am an Associate Professor and Founding Chair of the Department of Pharmaceutical Economics and Policy at the University of Southern California (USC). Our faculty in the School of Pharmacy constitutes the largest and most prominent academic group in the United States focused specifically on pharmaceutical economics. I also have a joint appointment in the USC Department of Economics. I specialize in the fields of pharmaceutical economics and health economics.

2. I have published more than 100 peer-reviewed scientific articles and numerous other reports and reviews in the fields of pharmaceutical economics and health economics. I am a founding Executive Board member of the International Society for Pharmacoeconomics and Outcomes Research and Founding Editor of its scientific peer-reviewed journal, *Value in Health*. *Value in Health* is the leading scientific journal in pharmaceutical economics, health policy and health services research according to the ISI Journal Citation Report. I am a member of the Executive Board of the American Society of Health Economists. I am also a Scientific Advisory Board member for the Disease Management Association of America and for the International Society for Pharmacoeconomics and Outcomes Research.

3. I earned my B.A. summa cum laude in economics from Amherst College in 1974, and my M.A., M.Phil. and Ph.D. in economics from Yale University between 1976 and 1980. I have taught at Stanford University, University of California at Santa Barbara, University of Connecticut, and Yale University, and have been a tenured faculty member at USC since 1992.

4. I have provided expert consultation on pharmaceutical economics and health economics to the U.S. Health Care Financing Administration (now the Center for Medicare and Medicaid Services), the U.S. Agency for Health Care Research and Quality, the U.S. Centers for Disease Control and Prevention, the U.S. Public Health Service, the U.S. Food and Drug Administration, the U.S. Environmental Protection Agency, the Government of Hungary, the Hong Kong Centre for Economic Research, the Hong Kong Medical Executives Association, the World Bank, the California AIDS Commission, the California Medi-Cal Drug Advisory Board, the County of San Diego Medically Indigent Adult program, and the County of Sacramento Homeless Program.

I have also provided expert reports in several cases relating to pharmaceutical and medical issues. A complete list of my current and past positions as well as a list of my prior experience as an expert within the preceding four years is contained in my curriculum vitae (attached hereto as Appendix A).

**B. Assignment**

5. Plaintiffs Meijer, Inc., Rochester Drug Cooperative, Inc., and Louisiana Wholesale Drug Company (collectively "plaintiffs") allege that Abbott Laboratories ("Abbott") has violated the antitrust laws by raising the price of one of its patented HIV drugs, Norvir (which is the brand name for ritonavir).[1] Norvir is used primarily to "boost" the effects of other HIV drugs called protease inhibitors ("PIs"). According to plaintiffs, because Norvir is the only drug used to "boost" other PIs, Abbott has a monopoly in a market consisting of PI boosters (the claimed "Boosting Market").[2] Plaintiffs allege that Abbott has tried to "leverage" its monopoly power in the "Boosting Market" to monopolize a market consisting of PIs boosted by Norvir (the claimed "Boosted Market").[3] In particular, plaintiffs claim that Abbott has raised the price of Norvir, but initially kept constant the price of Kaletra, Abbott's own combination HIV drug that contains ritonavir and another PI (lopinavir), in order to competitively disadvantage suppliers of other PIs that are prescribed with Norvir as a booster.[4] This had the effect, according to plaintiffs, of reducing price competition in the "Boosted Market."[5] Plaintiffs also allege that Abbott impeded the development of potential rivals to Norvir by licensing to competitors the right to promote the use of Norvir as a booster to their PIs. This purportedly had the effect of making Norvir the "*de facto* standard boosting agent."[6] According to plaintiffs, this "enabl[ed] Abbott to sell Norvir at artificially inflated prices."[7]

6. Plaintiffs bring this case on behalf of a purported class consisting of "[a]ll persons or entities in the United States that purchased Norvir and/or Kaletra directly from Abbott or any of its

---

[1] *Meijer, Inc. et al on behalf of Themselves and All Other Persons Similarly Situated, v. Abbott Laboratories*, Consolidated Amended Complaint, ("Complaint").
[2] Complaint, p. 5.
[3] Complaint, pp. 5-6.
[4] Complaint, p. 10.
[5] Complaint, p. 12.
[6] Complaint, pp. 5-6, 10.
[7] Complaint, p. 11.



Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

divisions, subsidiaries, predecessors, or affiliates….”[8] Plaintiffs claim that, as a result of Abbott's alleged anticompetitive conduct, members of the proposed class paid supracompetitive prices in their purchases of both Norvir and Kaletra.[9]

7. I have been asked by counsel for Abbott to analyze whether certain economic issues arising from plaintiffs' antitrust allegations could be assessed on a class wide-basis, including, among other things, whether there are fundamental conflicts of interest among members of the proposed class. In this declaration, I address (a) the likelihood that at least some of the purported class members have actually profited from the challenged conduct and therefore have separate, antagonistic interests from the named plaintiffs; and (b) what further information would be needed to determine the precise nature and extent of that conflict.

8. I accept for purposes of this declaration the allegations made by the named plaintiffs. In particular, I assume that the challenged conduct has led to anticompetitively high prices for Norvir and Kaletra, and assess whether all members of the purported class would have been harmed or whether some would have profited from such higher prices. As I describe below, the impact on direct purchasers from the challenged conduct is likely to vary widely. In fact, some wholesalers, including the large national wholesalers, likely have *benefited* from the alleged higher price of Norvir and Kaletra. This indicates that the interests of some members of the purported class may not be economically aligned with the interests of the plaintiffs who seek to serve as class representatives.

## II. There Likely Are Fundamental Conflicts of Interest Among Members of the Purported Class Because Some Members Have Profited from the Challenged Conduct.

9. The impact of the Norvir and Kaletra price increases on a particular wholesaler depends on (1) the effect of the higher prices on the wholesaler's profit margin on the sale of Norvir and Kaletra, and (2) the effect of the higher prices on the wholesaler's sales quantity of Norvir and Kaletra. In Section II.A below, I address the likely effect of the price increases on wholesalers' profit margin. In particular, I explain that because some wholesalers are likely to use "cost-plus" pricing and to profit from the "float" on their sales of pharmaceutical products, the profit margins of

---

[8] *Meijer, Inc. et al on behalf of Themselves and All Other Persons Similarly Situated, v. Abbott Laboratories*, Direct Purchaser Class Plaintiffs' Notice of Motion and Motion for Class Certification, ("Class Certification Motion"), p. 1. *See also*, Complaint, p. 14.

[9] *See* Class Certification Motion, pp. 22-23.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

such retailers increased as a result of the higher Norvir and Kaletra prices. In Section II.B below, I explain that the increase in the prices of Norvir and Kaletra are unlikely to have reduced the quantity of Norvir and Kaletra sold by most wholesalers because the demand for Norvir and Kaletra is very inelastic. Finally, in Section II.C below, I explain that because wholesalers that use "cost-plus" pricing and/or can profit from the "float" received a net economic benefit from the higher prices of Norvir and Kaletra, there is very likely to be a fundamental conflict within the proposed class.

**A. Some wholesalers sell Norvir and Kaletra on a cost-plus basis and therefore have received a net economic benefit from higher Norvir and Kaletra prices.**

10. Wholesalers purchase branded drugs at a price referred to as the wholesale acquisition cost ("WAC") or some discount from the WAC (which may include volume discounts and prompt payment discounts).[10] Wholesalers sell drugs to pharmacies and other retailers at a price called the actual acquisition cost ("AAC"). The AAC is the final cost of the drug to the pharmacy or other retailer after all discounts are subtracted. The difference between the WAC and the AAC is the wholesaler's profit margin, which is often expressed in percentage terms.

11. The effect of the Norvir and Kaletra price increases on the profit margin of wholesalers depends on the pricing strategy employed by the wholesaler and on competitive conditions affecting the wholesaler. Some wholesalers sell drugs to pharmacies and other retailers on a "cost-plus" basis.[11] Cost-plus pricing means that wholesalers charge pharmacies or other retailers their WAC plus a set percentage mark-up. For example, a wholesaler that prices on a 10 percent cost-plus basis will charge $11 to a pharmacy for a drug with a WAC of $10.

12. Under cost-plus pricing, a wholesaler's profit margin on sales of a particular drug increases proportionately with the acquisition cost of the drug. For instance, in the hypothetical example above, if the manufacturer implemented a 100 percent increase in its WAC (from $10 to $20), the wholesaler's price to its customers would increase from $11 to $22 (assuming, as above, 10

---

[10] *See, e.g.*, Follow The Pill: Understanding the U.S. Commercial Pharmaceutical Supply Chain, The Kaiser Family Foundation, March 2005, p. 18. The WAC does not typically reflect all discounts received by the wholesaler or its customers. The average price paid by wholesalers to manufacturers after all discounts is referred to as the average manufacturers price ("AMP").

[11] *See, e.g.*, A Guide to Understanding Common Prescription Drug Pricing Terms, Academy of Managed Care Pharmacy, Appendix B, p. 1; Allen Dunehew, "Changing dynamics in the pharmaceutical supply chain: A GPO perspective," American Journal of Health-System Pharmacy, 2005, p. 527.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

percent cost-plus pricing). The wholesaler's margin of $1 before the price increase therefore becomes $2 after the price increase (from $20 to $22), an increase of 100 percent in the wholesaler's margin. Thus, the profit margin of the wholesaler increases proportionately with the increase in the wholesaler's acquisition costs.[12]

13. The fact that some wholesalers determine their prices based on cost-plus formulas is corroborated by plaintiffs' economic expert in the *Doe v. Abbott* and *SEIU v. Abbott* litigation.[13] Prof. Douglas Greer states that wholesalers "practice markup pricing," citing a textbook describing that "[t]he resale price is determined by a more or less standard markup over the invoice cost."[14]

14. The largest drug wholesalers, which make up the vast majority of direct purchases of Norvir and Kaletra from Abbott, use cost-plus or equivalent pricing strategies and therefore have profited from the higher prices of Norvir and Kaletra. Cardinal Health ("Cardinal"), McKesson Corporation ("McKesson"), and AmerisourceBergen, the "Big 3" drug wholesalers, accounted for 83.7 percent of Norvir purchases and 84.9 percent of Kaletra purchases between 2004 and 2007.[15] Publicly available information indicates that these large national wholesalers set prices to pharmacies and other retailers on a cost-plus or equivalent (*e.g.* list-less) basis. For example, a contract between Cardinal and CVS pharmacies filed with the Securities and Exchange Commission (SEC) states that:

> CVS will pay a Cost of Goods for Merchandise in an amount equal to *"Cardinal's Cost"* plus the percentage set forth in the Section 3(a) Disclosure Schedule. The term *"CARDINAL'S COST"* as used herein means the manufacturer's published wholesale

---

[12] An alternative to pricing on a cost-plus basis is setting price on a "list-less" basis. A "list-less" price is a mark-down from a suggested list price that the wholesaler charges pharmacies and other retailers, called the average wholesale price ("AWP"). Pharmacies and other retailers pay the AWP minus some percentage discount from that list price. Because the AWP typically is a proportionate mark-up over WAC, the cost-plus and list-less pricing approaches by wholesalers essentially yield the same result -- the wholesaler's profit margin increases proportionately with the acquisition cost of a particular drug.

[13] *John Doe 1 and John Doe 2, on behalf of Themselves and All Other Persons Similarly Situated, v. Abbott Laboratories*, First Amended Class Action Complaint; *Service Employees International Union Health And Welfare Fund, on Behalf of Itself and All Other Similarly Situated, vs. Abbott Laboratories*, Class Action Complaint.

[14] Expert Report of Douglas F. Greer, Ph.D., pp. 73-74, citing Robert G. Harris and Lawrence A. Sullivan, "Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis," *University of Pennsylvania Law Review*, December 1979, p. 304.

[15] Source: Abbott sales data. Estimates exclude opt-outs from the purported class and government entities.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

> acquisition cost for Merchandise at the date of Cardinal's invoice to CVS, adjusted to reflect any then-applicable contract pricing, but without reduction for cash discounts. Manufacturer off-invoice quantity discounts and promotional allowances which are intended by the manufacturer to be passed through to Cardinal's retail national chain accounts will be made available to CVS.[16]

Cardinal is one of the largest pharmaceutical wholesaler and the largest purchaser of Norvir and Kaletra. CVS is one of the largest pharmacy chains in the U.S.[17]

15. In contrast, the proposed class representatives, Meijer, Inc., Rochester Drug Cooperative, Inc., and Louisiana Wholesale Drug Company, Inc. are small regional wholesalers. The named plaintiffs *collectively* comprised only about 0.6 percent of Norvir purchases and 0.5 percent of Kaletra purchases by purported class members.[18] The purported class includes other regional wholesalers and specialized wholesalers. Some of these smaller wholesalers likely have different pricing strategies. Their pricing may depend on various factors such as differentiation with other wholesalers (*e.g.* because of service, location, brand name), local competitive conditions, and the wholesaler's competitive strategy.

16. Moreover, the purported class of direct purchasers includes many entities that are not wholesalers. Plaintiffs define a class consisting of "all persons or entities in the United States that purchased Norvir and/or Kaletra directly from Abbott." But direct purchasers include entities that are not wholesalers. According to Abbott's sales data, direct purchasers of Norvir and Kaletra include national and regional pharmacy chains (*e.g.* Duane Reade), single-store pharmacies (*e.g.* Arrow Pharmacy, Garden Grove Pharmacy, and Carewell Pharmacy), Internet/mail-order pharmacies (*e.g.*, Medco), and hospitals (*e.g.* Parkland Memorial Hospital). These entities operate at a different, downstream level in the vertical chain than wholesalers -- *i.e.* they are retailers that supply drugs directly to patients. Drug retailers are likely to face very different competitive conditions, and very different abilities to pass-through drug price increases, in their downstream

---

[16] Cardinal Wholesale Supply Agreement with CVS Pharmacies, August 2000, available at http://www.sec.gov/Archives/edgar/data/721371/000095015200006483/l83475aex10-30.txt.
[17] *See, e.g.*, http://www.cvs.com/corpInfo/about/index.html.
[18] Source: Abbott sales data. Estimates exclude opt-outs from the purported class and government entities.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

markets than wholesalers. (I include as Appendix B a list of direct purchasers of Norvir and Kaletra categorized according to type of purchaser.)

17. In addition, some wholesalers profit from higher drug prices in other ways. One way in which higher drug prices may benefit certain wholesalers is from the "float." The float is the interest a firm earns on the difference between its accounts receivable from its buyers and accounts payable to its suppliers. Specifically, when the wholesaler receives payment from its buyer before the wholesaler has to pay the drug manufacturer, the wholesaler can earn interest on the payment from the buyer until payment is due to the manufacturer.[19] Large pharmaceutical wholesalers, which are sophisticated in managing their accounts payable and accounts receivables, earn substantial profit from the float.

18. The value of the float increases with increased dollar sales volume. Because a wholesaler's sales volume increases with higher drug prices, profits from the float also increase with higher drug prices. Certain high-volume wholesalers therefore generate more profit from the "float" when the price of a particular drug increases. The increases in the prices of Norvir and Kaletra, therefore, likely led to higher profits from the float for certain wholesalers.

**B. Because the demand for HIV drugs is very inelastic, the increase in the wholesalers' profit margins is unlikely to be offset by decreased sales.**

19. It is unlikely that the Norvir and Kaletra price increases led to a reduction in the sales volume of Norvir and Kaletra that would offset the increased profit margins of certain wholesalers. The demand for Norvir and Kaletra, as for other HIV drugs, is not responsive to price changes. In economic terms, this is referred to as inelastic demand.

20. Price is not a primary factor in the decisions of doctors and patients because HIV drugs differ significantly in terms of efficacy, toxicity, drug interactions, side effects, pill burden, dosing frequency, and many other characteristics. Doctors and patients therefore choose drug treatment regimens based on medical considerations, rather than price. Moreover, price is not a significant factor in the decisions of doctors and patients because the vast majority of HIV patients have health plan coverage which charges only a fixed co-payment per prescription from their

[19] *See*, *e.g.*, Allen Dunehew, "Changing dynamics in the pharmaceutical supply chain: A GPO perspective," American Journal Health-Systems Pharmacy (2005), pp. 527-529.

beneficiaries, regardless of the price of the HIV medication. For these health plans, any increase in the price of a drug is covered by the third-party, and is not a concern for either the patient or the prescribing doctor. In addition, it is my understanding that no health plans have classified Norvir or Kaletra as non-preferred drugs, which would increase the co-payment charged to patients for such drugs.[20].

21. The lack of price sensitivity is indicated by the fact that sales of Norvir kept increasing after the Norvir price increase. Specifically, Norvir prescriptions increased from 23,953 in December 2003 to 39,836 in December 2004, an increase of more than 66 percent.[21] Thus, the Norvir and Kaletra price increases are unlikely to have resulted in a decrease in the sales volume of Norvir and Kaletra.[22]

22. Because there is no offsetting quantity effect, wholesalers that price on a cost-plus or equivalent basis therefore received a net economic benefit from the Norvir price increase. For instance, Cardinal bought about $100 million worth of Norvir in 2004. At a hypothetical cost-plus mark-up of 5 percent, Cardinal would have earned about $5 million in gross profits from the sale of Norvir. Without a Norvir price increase in December 2003, Cardinal's purchases would have cost $20 million (assuming no effect on Cardinal's sales of Norvir). At a cost-plus formula of 5 percent, Cardinal would have made only $1 million. Thus, in this hypothetical example, Cardinal would have received a $4 million benefit from the Norvir price increase in 2004 alone. Between 2004 and 2007, Cardinal had purchases of about $454 million. Using the same (hypothetical) numbers, Cardinal profited by over $18 million from the Norvir price increase. Using similar calculations, AmerisourceBergen and McKesson each profited by over $11 from the Norvir price increase between 2004 and 2007. Of course, actual estimates can only be determined from data and/or

[20] Letter from John Leonard (Abbott Laboratories Vice President of Global Pharmaceutical Development) to Care Providers, January 12, 2004.

[21] Source: TRX Data.

[22] In fact, plaintiffs' claims imply that sales of Norvir may have increased as a result of the challenged conduct. Specifically, plaintiffs allege that Abbott's conduct delayed the development of boosted PIs that "did not depend on using 200 mg" of Norvir. Complaint, p. 11. In particular, plaintiffs claim that Abbott's conduct had the effect of delaying GlaxoSmithKline from receiving FDA approval for the use of its boosted PI, Lexiva, with only 100mg of Norvir rather than 200mg, and therefore induced patients to purchase more Norvir than they otherwise would have. Complaint, p. 11. However, to the extent that plaintiffs claims are correct, such conduct would have had the effect of *increasing* a wholesaler's sales of Norvir.



Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

documents from direct purchasers of Norvir and Kaletra, including unnamed purported class members such as Cardinal, AmerisourceBergen, and McKesson.

23. Similarly, wholesalers that manage their accounts payables and receivable to profit from the float also likely received a significant net economic benefit from the Norvir and Kaletra price increases because of the lack of offsetting quantity effects from these price increases. A simple calculation indicates that large drug wholesalers, such as Cardinal, can earn significant profits from the float, and that higher drug prices can considerably impact these profits. The profit that a wholesaler can earn from the float depends on the time interval between its accounts receivable and accounts payable and on the wholesaler's "internal" interest rate. Assuming that the wholesaler receives payment from its buyer one month before the wholesaler has to pay Abbott, the float on Norvir is equal to the monthly interest rate earned on the wholesaler's Norvir purchases.

24. The most common measure of a firm's internal interest rate is the weighted average cost of capital (WACC).[23] Cardinal's WACC was 8.4 percent in 2005.[24] At an annual WACC of 8.4 percent, the monthly internal interest rate is about 0.8 percent. Between 2004 and 2007, Cardinal purchased about $454 million worth of Norvir, and therefore would have earned about $3.6 million on the float. Without a Norvir price increase in December 2003, Cardinal's purchases would have been worth about $91 million (assuming no effect on Cardinal's sales of Norvir), and Cardinal would have earned about $0.7 million on the float. Thus, Cardinal may have received a net benefit on the float of $2.9 million from the Norvir price increase in December 2003. This is in addition to the $18 million that Cardinal could have earned from increased profit margins on the sale of Norvir.

[23] The WACC is the average cost of that a firm pays to finance its assets, an therefore also is the minimum return that a company must earn on its existing assets to be profitable. The WACC commonly is used internally by firms to determine the economic profitability of particular projects.
[24] Bloomberg Financial Data (2008).

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

**C. Because some wholesalers likely have benefited from the challenged conduct, fundamental conflicts of interest exist between members of the purported class.**

25. Because some direct purchasers, including the large national wholesalers, likely have received significant financial benefits from the higher prices of Norvir and Kaletra, there is a fundamental conflict of interest between members of the purported class. Specifically, the economic interests of these members of the purported class may not be economically aligned with the economic interests of the plaintiffs who seek to serve as class representatives. This is because wholesalers that profit from higher drug prices may suffer financial harm if the Court were to grant the relief requested by the purported class representative plaintiffs.

26. The fundamental conflict of interest between the proposed class is evident from the two methods suggested by plaintiffs' economic expert, Dr. Hal Singer, for computing the "overcharges" allegedly paid by direct purchasers. The first method proposed by Dr. Singer compares the prices that direct purchasers actually paid for those drugs to the price that they would have paid—*i.e.* the "but-for" price—if "Abbott does not impose the 400 percent price increase in December 2003, but instead maintains the same price for Norvir."[25] The second method compares the actual prices paid to prices they would have paid in "a but-for world in which Abbott imposes a price increase on Norvir, but only up to the level that would be allowed under the *Cascade* standard."[26]

27. If liability were ever established, the ultimate determination of the proper measure of damages would not only determine the size of the damages award in this case, but also may determine Abbott's pricing of Norvir and Kaletra going forward. The *Cascade* standard proposed by Dr. Singer would yield a Norvir price that is higher than the pre-December 2003 price regardless of the cost measure used. Indeed, if it were established that the imputed price of lopinavir is below some measure of cost, Abbott could in principle comply with the *Cascade* standard by either lowering the price of Norvir or raising the price of Kaletra. Therefore, wholesalers that profit from higher Norvir and Kaletra prices would prefer a remedy based on the *Cascade* standard rather than one that causes Abbott to roll back the price of Norvir to pre-December 2003 levels. Other members

[25] Class Certification Declaration of Hal Singer, Ph.D., p. 5.
[26] *Id.*

of the purported class may prefer a roll-back of the Norvir price increase. Because there are divergent economic interests among members of the proposed class with respect to the fundamental issues in this case, the plaintiffs who seek to serve as class representatives may not adequately represent the interests of all members of the purported class.

**III. Discovery on Downstream Sales of Purported Class Members Is Necessary to Assess the Fundamental Economic Conflict Between Purported Class Members.**

28. Discovery on "downstream" sales of purported class members would aid in assessing more precisely the fundamental economic conflict between purported class members. Specifically, the issue of whether wholesalers received a net benefit or loss as a result of the Norvir and Kaletra price increases could be directly analyzed using data on the sales prices received by some members of the proposed class. This could consist of transaction-level sales data for Norvir and Kaletra (for the years 2002 through 2007) or, alternatively, of actual sales invoices. Financial documents showing gross profit margins on the sale of Norvir and Kaletra (for the years 2002 to 2007) also could be used to determine the effect of the Norvir and Kaletra price increases on the profitability of purported class members. Additionally, documents that describe the pricing strategies or pricing formulas used by direct purchasers to determine sales prices of Norvir and Kaletra could provide information as to whether the purchaser sets prices for antiretroviral drugs in a way that in which it would profit from an increase in the acquisition costs of Norvir and Kaletra.

29. Information from both the named plaintiffs and a sampling of other members of the purported class would demonstrate the varying degrees to which putative class members benefited (or failed to benefit) from the price increases for Norvir and Kaletra. As I describe above, the named plaintiffs are small regional wholesalers, which collectively comprised only about 0.6 percent and 0.5 percent of Norvir and Kaletra purchases, respectively, by purported class members.[27] The named plaintiffs likely have different pricing strategies, face different competitive pressures, and have different ability to pass-through price increases than other members of the purported class, including the Big 3 wholesalers, Cardinal, McKesson, and AmerisourceBergen (which made up 83.7 percent and 84.9 percent of Norvir and Kaletra purchases, respectively). Moreover, the purported class of

[27] *Supra* note 18.



Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

direct purchasers includes many entities that are not wholesalers, including pharmacy chains, single-store pharmacies, Internet/mail-order pharmacies, and hospitals. These entities operate at a different, downstream level in the vertical chain than wholesalers and therefore also are likely to face very different competitive conditions and very different abilities to pass-through drug price increases than the named plaintiffs. The economic conflict between members of the purported class can be more accurately evaluated based on discovery from a sampling of purported class members from each of these types of direct purchasers.

* * *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Joel Hay

Joel Hay

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

DC:557204.1