# TAB B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE K-DUR ANTITRUST LITIGATION ) | |
| ) | Civil Action No. 01-1652 (JAG) |
| ) | (Consolidated Cases) |
| This Document Relates To: ) | |
| ) | |
| All Actions ) | MDL Docket No. 1419 |
| ) | |

**SPECIAL MASTER'S REPORT AND RECOMMENDATION ON THE
DIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

ORLOFSKY, SPECIAL MASTER

**INTRODUCTION**

This consolidated antitrust action has been transferred to the District of New Jersey by

the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407. Pursuant to Rule 53

of the Federal Rules of Civil Procedure[1] and by consent of all parties in the above-captioned

action, I have been appointed by order of this Court, dated April 12, 2006, to preside as a Special

Master to review and decide all currently pending and future motions directed to Judge Joseph A.

Greenaway, Jr. and Magistrate Judge Madeline Cox Arleo including, but not limited to discovery

disputes, class certification and summary judgment (the "Appointment Order") (Doc. No. 316).

The Appointment Order provides that the decision of the Special Master on any matter before the

---

[1]     **(a) Appointment.**

      **(1)** Unless a statute provides otherwise, a court may appoint a master only to:

        **(A)** perform duties consented to by the parties;

*     *     *

      **(C)** address pretrial and post-trial matters that cannot be addressed effectively and timely by an

available district judge or magistrate judge of the district.

Special Master will conclusively resolve that matter unless an appropriate objection is filed pursuant to Fed. R. Civ. P. 53(g).

This Report and Recommendation addresses the Direct Purchaser Plaintiffs' ("DP Plaintiffs") Motion for Class Certification. After consideration of the parties' voluminous memoranda of law and accompanying exhibits in support of, and in opposition to, this Motion,[2] as well as the oral argument of counsel heard on November 30, 2007, and based upon the analysis that follows, I conclude that the class, as proposed by the DP Plaintiffs and modified herein, satisfies the requirements of Fed. R. Civ. P. 23. Accordingly, the DP Plaintiffs' Amended Motion for Class Certification will be granted.

## BACKGROUND

The factual background of this consolidated action and the underlying motions have been set forth in detail in Judge Greenaway's decision in this case, *see In re K-Dur Antitrust Litig.*, 338 F.Supp.2d 517 (D.N.J. 2004), and my Report and Recommendation on: (1) Defendants Schering-Plough Corporation, Key Pharmaceuticals, Inc. and Upsher-Smith Laboratories, Inc.'s Motion for Sanctions against Plaintiff Commonwealth of Pennsylvania; (2) Plaintiff

---

[2]  In support of their Motion for Class Certification, the DP Plaintiffs submitted an opening Memorandum of Law ("Pl. Br."), a Reply Memorandum of Law ("Pl. Reply"), a Reply to Defendants' Sur-Reply Regarding Class Certification ("Pl. Sur-Rebuttal"), and a Notice of Supplemental Authority (Pl. Suppl. Br.), as well as numerous exhibits, including expert reports and declarations regarding class certification issues and damages. Similarly, in opposition to the Motion, Defendants submitted a Response Brief ("Def. Resp.") and a Sur-Reply Brief ("Def. Sur-Reply"), also accompanied by voluminous exhibits and expert reports. The expert materials submitted by the parties in connection with this Motion include the following, which are cited herein as indicated:  (For DP Plaintiffs) Declaration of Jeffrey J. Leitzinger, Ph.D. ("Dr. Leitzinger") dated May 27, 2005 (attached as Exh. 1 to Pl. Br.) ("Leitzinger 5/27/04 Decl."), Expert Report of Dr. Leitzinger, Ph.D. dated Aug. 2, 2007 (attached as Exh. 24 to 11/2/07 Pearlman Decl.) ("Leitzinger 8/2/07 Rep."), Class Certification Rebuttal Declaration of Dr. Leitzinger dated Nov. 2, 2007 (attached as Exh. 31 to 11/2/07 Pearlman Decl.) ("Leitzinger 11/2/07 Decl."), and Supplemental Class Declaration of Dr. Leitzinger dated Dec. 14, 2007 (attached as Exh. to Pl. Sur-Rebuttal) ("Leitzinger 12/14/07 Decl."); and (For Defendants) Expert Report of Daniel L. Rubinfeld ("Dr. Rubinfeld") Regarding Certification of Proposed Class of Direct Purchasers dated Aug. 9, 2007 (attached as Exh. 1 to 8/9/07 O'Shaughnessy Decl.) ("Rubinfeld 8/9/07 Rep.") and Sur-Rebuttal Report of Dr. Rubinfeld Regarding Certification of the Proposed Class of Direct Purchasers dated Nov. 20, 2007 (attached as Exh. 4 to Def. Sur-Reply) ("Rubinfeld 11/20/07 Rep."). Finally, on April 9, 2008, Defendants submitted a letter Brief addressing the recent decision issued by Third Circuit Court of Appeals in *Am. Seed Co., Inc. v. Monsanto Co.*, No. 07-1265, 2008 WL 857532 (3d Cir. April 1, 2008). On April 11, 2008, the DP Plaintiffs submitted a responsive letter Brief attaching a class certification order issued in the matter of *Louisiana Wholesale Drug Co, Inc. v. Sanofi-Aventis,* No. 07 CIV 7343 (S.D.N.Y. April 8, 2008).

Commonwealth of Pennsylvania's Cross-Motion to Dismiss; and (3) Motion of James Morgan to

Intervene as Class Representative (Docket No. 328). Familiarity with that factual background is

presumed and will not be repeated in this Report and Recommendation except where necessary

to resolve these motions.

## DISCUSSION

### I.    THE DP PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

In the Motion before me, putative class representative Louisiana Wholesale Drug Co

("LWD") requests certification of the following class:

> All persons or entities who have purchased K-Dur 20 directly from
> Schering at any time during the period November 20, 1998,
> through September 1, 2001.

*See* DP Plaintiffs' Amended Complaint ("Am. Compl." at ¶ 11; Pl. Br. at 4-5.) Excluded

from the proposed class are:

> Defendants and their officers, directors, management and
> employees, subsidiaries and affiliates, as well as federal
> government entities. Also excluded are persons or entities who
> have neither purchased generic versions of K-Dur 20, nor obtained
> increased discounts on brand name K-Dur 20, after the
> introduction of generic versions of K-Dur 20.

*Id.*

### II.    LEGAL STANDARD GOVERNING CLASS CERTIFICATION

Federal Rule of Civil Procedure 23 prescribes the framework for determination of a

motion seeking class certification. In order to certify a class, I must conclude that the Plaintiffs

have satisfied all of the prerequisites of Fed. R. Civ. P. 23(a) and one of the requirements of Fed.

R. Civ. P. 23(b). *See, e.g., Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 624 (3d Cir. 1996),

*aff'd,* 521 U.S. 591 (1997); *Baby Neal v. Casey,* 43 F.3d 48, 55 (3d Cir. 1994). Plaintiffs bear

the burden of showing that the putative class should be certified. *Weisfeld v. Sun Chemical*

3

*Corp.,* 210 F.R.D. 136, 139 (D.N.J. 2002) (citing *Morisky v Public Serv. Elec. & Gas Co.,* 111 F.

Supp. 2d 493, 499 (D.N.J. 2000)).

A class may be certified only if the court "is satisfied, after a rigorous analysis, that the

prerequisites of [Rule 23] have been satisfied." *Gen. Tel. Co. of the Southwest v. Falcon,* 457

U.S. 147, 161 (1982). As the Court in *Falcon* observed, "'the class determination generally

involves considerations that are enmeshed in the factual and legal issues comprising the

plaintiff's cause of action.'" *Id.* at 160 (quoting *Coopers & Lybrand v. Livesay,* 437 U.S. 463

(1978) (internal quotations omitted)). As a result, "it may be necessary for the court to probe

beyond the pleadings before coming to rest on the certification question." *Id.* at 160. The

foregoing approach is reflected in the Third Circuit's class certification jurisprudence, which

recognizes that "'[b]efore deciding whether to allow a case to proceed as a class action, . . .

[courts] should make whatever factual and legal inquiries are necessary under Rule 23.'"

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 166 (3d Cir. 2001)

(quoting *Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 676 (7th Cir. 2001)). Thus, "a

preliminary inquiry into the merits is sometimes necessary to determine whether the alleged

claims can be properly resolved as a class action." *Newton,* 259 F.3d at 168.

In conducting the required rigorous analysis, however, I may not credit one party's

evidence or evaluate the merits of the parties' legal or factual claims. *See, e.g., Weisfeld v. Sun*

*Chem. Corp.,* 210 F.R.D. 136, 139 (D.N.J. 2002); *In re Ford Motor Co. Ignition Switch Prods.*

*Liab. Litig.,* 174 F.R.D 332, 339 (D.N.J. 1997); *In re Pressure Sensitive Labelstock Antitrust*

*Litig.,* MDL No. 1556, 2007 WL 4150666 (M.D. Pa. Nov. 19, 2007). Guided by these standards,

I turn to the requirements of Rule 23.

4

### III.    APPLICATION OF RULE 23 TO THE DP PLAINTIFFS' MOTION

#### A.    Rule 23(a) Requirements

A putative class representative seeking certification of a class must satisfy the four

general prerequisites of Fed. R. Civ. P. 23(a) and establish that:

> (1) the class is so numerous that joinder of all members is
> impracticable; (2) there are questions of law or fact common to the
> class; (3) the claims or defenses of the representative parties are
> typical of the claims or defenses of the class; and (4) the
> representative parties will fairly and adequately protect the
> interests of the class.

Fed. R. Civ. P. 23(a).  "The requirements of Rule 23(a) are meant to assure both that class action

treatment is necessary and efficient and that it is fair to absentees under the particular

circumstances." *Baby Neal,* 43 F.3d at 55.

#### 1.    Numerosity

Rule 23(a)(1) requires that the class be so numerous that joinder of its members is

impracticable.  No threshold number is required to satisfy the numerosity requirement, and the

most important factor is whether joinder of all the parties would be impracticable for any reason.

*See, e.g., Stewart v. Abraham,* 275 F.3d 220, 227-28 (3d Cir. 2001) (noting that there is no

minimum number to satisfy numerosity and observing that, generally, if the potential number of

plaintiffs exceeds 40, the numerosity requirement has been met); *J.B.D.L. Corp. v. Wyeth-Ayerst

Laboratories, Inc.,* 225 F.R.D. 208, 213 (S.D. Ohio 2003) ("The numerosity requirement does

not impose an absolute numerical limitation."); *In re Terazosin Hydrochloride Antitrust Litig.,*

220 F.R.D. 672, 684 (S.D. Fla. 2004) ("The numerosity requirement is met when it would be

inconvenient or difficult to join all of the class members, and may be satisfied with as few as 25-

30 class members.").  Numerosity is not determined solely by  the size of the class; the

geographic location of class members is also considered in determining whether joinder would be impracticable.[3] *See, e.g., Mardsen v. Select Medical Corp.,* 246 F.R.D. 480, 484 (E.D. Pa. 2007); *In re J.B.D.L.,* 225 F.R.D. at 213; *In re Terazosin,* 220 F.R.D. at 685.

It is undisputed that the proposed class of DP Plaintiffs consists of more than 40 members. *See, e.g.,* Def. Sur-Reply at 3-4 and n. 5 (referring to putative class of 45-47 members); Rubinfeld 8/9/07 Rep. at 10-12 and Exh. 3 (opining that class has 45 members); Leitzinger 11/2/07 Rep. at 6 and Exh. 3 (identifying class of 47 members). Indeed, Defendants Briefs do not expressly contest the numerosity requirement of Rule 23(a)(1) but, rather, refer to the size of the proposed class only in the context of their arguments regarding the superiority requirement of Rule 23(b)(3). *See* Def. Resp. at 1, 14-15; Def. Sur-Reply at 3-4.[4]

Notably, other courts have certified classes similar in size and composition to the one proposed here. *See In re Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd. ("Ovcon"),* No. 05-2195, 2007 WL 3257015, *10 (D.D.C. Oct. 22, 2007) (certifying class of approximately 30

---

[3] Although the parties' briefs do not address the geographic location of the putative class members, the record suggests that they are likely dispersed. *See* Rubinfeld 8/9/07 Rep. at Exh. 3 (listing 45 proposed class members including, *inter alia,* numerous regional wholesalers).

[4] At the November 30, 2007 oral argument, Defendants' counsel suggested, for the first time, that the proposed Class may not satisfy the numerosity requirement. *See* 11/30/07 Tr. at 63-67. According to Defendants, the proposed Class of 47 members identified by Dr. Leitzinger should be reduced by the nine members who, according to Dr. Rubinfeld, have no injury. *See* 11/30/07 Tr. at 66; Rubinfeld 11/20/07 Rep. Defendants contend that joinder of all members is not impractical as to the resulting Class of 38 members and argued: "If these people can identify 38 class members and if there are 38 who really want to participate in the litigation, they can identify them individually and then we're entitled to litigate our defenses against them." *See* 11/30/07 Tr. at 66. In my view, Defendants' arguments do not defeat numerosity. First, the question of whether nine proposed Class members suffered injury is a disputed merits issue which I decline to resolve at this time. *See* Leitzinger 12/14/07 Decl. (disputing Dr. Rubinfeld's analysis regarding the nine proposed class members and opining that it is based on a misapplication of Dr. Leitzinger's aggregate damages model). *See also In re Pressure Sensitive Labelstock Antitrust Litig.,* MDL No. 1556, 2007 WL 415066, *7 (M.D. Pa. Nov. 19, 2007) ("'To the extent that [class certification] involves a battle of experts, it [is] not appropriate for the Court to determine which expert is more credible at this time.'") (quoting *In re Linerboard Antitrust Litig.,* 203 F.R.D. 197, 217 n. 13 (E.D. Pa. 2001)). Second, even if the proposed Class consisted of only 38 members, that fact, alone, would not defeat numerosity, particularly where the members appear to be dispersed geographically and the interests of judicial economy would be served by resolving the common issues raised in this case in a single action, rather than 38 individual ones. *See In re Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.,* No. 05-2195, 2007 WL 3257015, *10 (D.D.C. Oct. 22, 2007).

6

members represented by LWD, among others) (citing *EEOC v. Printing Indus. of Metro. Washington, D.C., Inc.,* 92 F.R.D. 51, 53 (D.D.C. 1996) ("as few as 25-30 class members should raise a presumption that joinder would be impracticable, and thus, the class should be certified"); *Riordan v. Smith Barney,* 113 F.R.D. 60, 62 (N.D. Ill. 1986) (certifying class of 29 members and citing cases certifying classes of 10-23 members); *Town of New Castle v. Yonkers Contracting Corp.,* 131 F.R.D. 38, 40-41 (S.D.N.Y. 1990); *Alvarado Partners, L.P. v. Mehta,* 130 F.R.D. 673, 675 (D. Colo. 1990) (certifying class of 33 members)). *See also In re Nifedipine Antitrust Litig.,* 246 F.R.D. 365, 368-69 (D.D.C. 2007); *In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 297, 303 (E.D. Mich. 2001); *In re Busirone Patent Litig.,* 210 F.R.D. 43, 57 (S.D.N.Y. 2002).

In my view, the proposed DP Plaintiff class is sufficiently large and, presumably, geographically dispersed, to render joinder of all members impracticable and satisfy the numerosity requirement of Rule 23(a)(1).

### 2. Commonality

Rule 23(a)(2) requires plaintiffs to demonstrate that there are questions of law or fact common to the class. A single common issue will satisfy the commonality requirement. *See Johnston v. HBO Film Mgmt., Inc.,* 265 F.3d 178, 184 (3d Cir. 2001). As the Third Circuit observed in *Baby Neal,*

> The commonality requirement will be satisfied if the named plaintiffs share at least one common question of fact or law with the grievances of the prospective class. [citation omitted] Because the requirement may be satisfied by a single common issue, it is easily met, as at least one treatise has noted. *See* H. Newberg & A. Conte, 1 Newberg on Class Actions § 3.10, at 3-50 (1992). Furthermore, class members can assert such a single common complaint even if they have not all suffered actual injury; demonstrating that all class members are *subject* to the same harm will suffice. [citations omitted]

7

*Baby Neal,* 43 F.3d at 56 (italics in original; underlining added).   Courts routinely find commonality among antitrust class members alleging conspiracy to fix prices, as well as monopolization.[5]  *See, e.g., Jerry Enterprises of Gloucester County, Inc. v. Allied Beverage Group, L.L.C.,* 178 F.R.D. 437,  (D.N.J. 1998) (Orlofsky, J.) (noting that in a price-fixing antitrust case, "the existence, scope, duration, effect, and ultimately, the illegality, of the alleged conspiracy would appear, at this point, to be the overwhelming centerpiece of this litigation"); *Ovcon,* 2007 WL 3257015, at * 5 (noting that numerous courts have found commonality satisfied by allegations concerning the existence, scope and efficacy of an alleged antitrust conspiracy); *In re Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. at 686 (in antitrust cases, courts "have consistently held that allegations of price-fixing, monopolization and conspiracy by their very nature involve common questions of law or fact"); *In re Bulk [Extruded] Graphite Prods. Antitrust Litig.,* No. 02-6030, 2006 WL 891362, *5 (D.N.J. April 4, 2006) (existence, scope and efficacy of conspiracy to fix or stabilize prices satisfied requirement of Rule 23(a)(2)); *In re OSB Antitrust Litig.,* No. 06-826, 2007 WL 2253418, *3 (E.D. Pa. Aug. 3, 2007) (common issues included, *inter alia,* whether defendants engaged in conspiracy, the conspiracy's duration and extent).

In this case, DP Plaintiffs' claims raise several common issues of fact and law, including, *inter alia,* (1) whether Defendants' agreements violate Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) whether the agreements delayed the entry of generic versions of K-Dur 20; and (3) whether Defendants' alleged conduct caused the DP Plaintiffs to pay more for K-Dur 20 than they would have absent the alleged conduct. *See* Pl. Br. at 14; Pl. Reply at 12-19.  Defendants have not

---

[5] As a practical matter, the commonality requirement "rarely has resulted in the denial of class certification in an antitrust action."  Antitrust Law Developments 3d at 314.  In fact, some courts have opined that because most class actions are brought pursuant to Rule 23(b)(3), that subsection's predominance requirement (discussed *infra*) has rendered the commonality requirement of Rule 23(a)(2) almost superfluous. *See e.g., Martino v. McDonald's Sys.,* 81 F.R.D. 81, 85 (N.D. Ill. 1979).

contested the DP Plaintiffs' showing of commonality under Rule23(a),[6] and I agree that the proposed class satisfies the commonality requirement.

### 3. Typicality

The Third Circuit has described the typicality requirement as "intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." *Baby Neal,* 43 F.3d at 57 (citing 3B Moore & Kennedy, ¶ 23.06-02; 1 Newberg & Conte § 3.13. As the Court in *Baby Neal* further explained:

> The typicality criterion is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees by requiring that the common claims are comparably central to the claims of the named plaintiffs as to the claims of the absentees.

*Id.* (citing *Weiss v. York Hosp.,* 745 F.2d 786, 810 (3d Cir. 1984)). Like adequacy of representation, typicality "evaluates the sufficiency of the named plaintiff." *Hassine v. Jeffes,* 846 F.2d 169, 177 n.4 (3d Cir. 1988).

To evaluate typicality, the court asks "whether the named plaintiffs' claims are typical, in common sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *Baby Neal,* 43 F.3d at 55. Cases alleging that the same unlawful conduct affects both the named plaintiffs and the absent class members usually satisfy the typicality requirement despite individual fact patterns underlying the individual claims. *Baby Neal,* 43 F.3d at 58 (citing 1 Newberg & Conte § 3.13). "If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." *Newton,* 259 F.3d at 183-84. *See also Baby Neal,* 43 F.3d at 58 ("'Factual differences will not render a claim atypical if the claim arises from the same event

---

[6] *See* Def. Resp.; Def. Sur-Reply; 11/30/07 Tr. at 22-23, 68.

9

or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory.") (quoting *Hoxworth v. Blinder, Robinson & Co.,* 980 F.2d 912, 923 (3d Cir. 1992));

"To satisfy typicality, plaintiffs must show that the class representatives have legal interests such that pursuit of their own goals will benefit the entire class. Even if there are 'pronounced factual differences' among the plaintiffs, typicality is satisfied as long as there is a strong similarity of legal theories and the named plaintiff does not have any unique circumstances." *In re Microcrystalline Cellulose Antitrust Litig.,* 218 F.R.D. 79, 84 (E.D. Pa. 2003). *See also In re Mercedez-Benz Antitrust Litig.,* 213 F.R.D. 180, (D.N.J. 2003) ("[W]hile the Court must ensure that the interests of the plaintiffs are congruent, the Court will not reject the plaintiffs' claim of typicality on speculation regarding conflicts that may arise in the future.").

The DP Plaintiffs assert that typicality is satisfied because the claims of LWD and absent Class members rely on the same legal theories and arise from the same "core pattern" of alleged conduct by the Defendants, namely, "Defendants' agreements that delayed the market entry of generic versions of K-Dur 20." *See* Pl. Br. at 15; Pl. Reply at 20. According to DP Plaintiffs, "[t]he delay in generic entry blocked *all* Class members from purchasing less expensive, generic potassium chloride 20." *See* Pl. Br. at 15 (italics in original).

In their opposition to the DP Plaintiffs' Motion, Defendants challenge typicality as an adjunct to their argument that the adequacy requirement of Rule 23(a)(4) is not satisfied due to alleged conflicts within the proposed Class. *See* Def. Resp. at 39 n. 26 (arguing that alleged conflicts mean the proposed Class also fails the typicality requirement of Rule 23(a)(3)).

10

Accordingly, I will address Defendants' arguments regarding alleged class conflicts in my analysis of the adequacy requirement, *infra*.

At the November 30, 2007 argument, Defendants' counsel also suggested that because Defendants intend to assert legal and factual defenses as to some Class members, typicality is defeated. *See* 11/30/07 Tr. at 68. I disagree. "[T]he 'presence of a unique defense will not . . . destroy typicality [unless] it will skew the focus of the litigation and create a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'" *Ovcon*, 2007 WL 3257015, at *7 (emphasis added) (quoting *In re Cardizem*, 200 F.R.D. at 304-05 (internal quotations omitted)).

As a threshold matter, Defendants have not argued that the putative class representative, LWD, is subject to the individualized defenses alluded to by counsel at oral argument.[7] *See* 11/30/07 Tr. at 68. Thus, there do not appear to be any unique defenses with which LWD could be preoccupied to the detriment of absent class members. Moreover, to the extent that some individualized defenses may exist as to other Class members, I conclude that they can be resolved without skewing the focus of the litigation and, thus, do not pose a barrier to class certification. *See Ovcon*, 2007 WL 3257015, at * 7 (citing *In re Cardizem*, 200 F.R.D. at 305). *See also In re Busiprone*, 210 F.R.D. at 58-59 (rejecting argument that because Big Three allegedly could not establish injury, their claims were not "typical," and reasoning that "differences in the particular injuries faced by particular member of the class . . . are insufficient to defeat a motion for class certification").

---

[7] According to Defendants' counsel, examples of the allegedly individual defenses "are the assignments and cost-plus contracts." *See* 11/30/07 Tr. at 68. These defenses appear to relate only to the big three national wholesalers, McKesson Corp. ("McKesson"), Cardinal Health, Inc. ("Cardinal") and AmeriSource Bergen Corp. ("ABC") (collectively, the "Big Three"), none of which is a representative of the proposed Class. *See* Def. Resp. at 18-22. Counsel also indicated that Defendants intend to contest injury and damages as to nine of the absent class members. *See* 11/30/07 Tr. at 68.

In sum, Defendants have not demonstrated that LWD's claims are atypical of those of the

proposed Class. *See In re Bulk [Extruded] Graphite Prods. Antitrust Litig.,* No. 02-6030, 2006

WL 891362, *6 (D.N.J. April 4, 2006). On the contrary, the DP Plaintiffs allege that all putative

class members suffered injury as a result of Defendants' alleged anticompetitive conduct.

Although individual damages may differ, LWD's claims are based on the same legal theory as

the class. *In re OSB Antitrust Litig.,* 2007 WL 2253418, at *3. Accordingly, I conclude that the

DP Plaintiffs have satisfied the typicality requirement of Rule 23(a)(3).

### 4.      Adequacy of Representation

Under Rule 23(a)(4), both the class representatives and their attorneys must "fairly and

adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). *See also Weisfeld,* 210

F.R.D. at 140; *Bogosian v. Gulf Oil Co.,* 561 F.2d 434, 449 (3d Cir. 1977). As the Third Circuit

explained in *Bogosian*:

> This prerequisite embodies concerns which fall into two
> categories:  that the representatives and their attorneys will
> competently, responsibly and vigorously prosecute the suit, and
> that the relationship of the representative parties' interests to those
> of the class are such that there is not likely to be divergence in
> viewpoint or goals in the conduct of suit.

*Bogosian,* 561 F2d at 449.

With respect to class counsel, courts typically consider counsel's experience in litigating

antitrust cases to be a key factor in assessing the adequacy of class counsel. *See In re NASDAQ*

*Market Makers Antitrust Litig.,* 169 F.R.D. 493, 515 (S.D.N.Y. 1996); *In re Pressure Sensitive*

*Labelstock,* 2007 WL 4150666, at *11; *In re Microcrystalline Cellulose Antitrust Litig.,* 218

F.R.D. 79, 84 (E.D. Pa. 2003).

With respect to the class representatives, the adequacy requirement essentially seeks to

prevent conflicts of interest among the class, and it is generally satisfied as long as the plaintiff

12

"posses[es] the same interest and suffer[s] the same injury as class members." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625-26 (1997) (internal quotation omitted). "The Supreme Court has counseled that [the adequacy] element 'serves to uncover conflicts of interest between named parties and the class they seek to represent.'" *Newton,* 259 F.3d at 185 (quoting *Amchem,* 521 U.S. at 625).

As a preliminary matter, Defendants do not dispute that counsel for the proposed DP Plaintiff Class have extensive experience and expertise in antitrust, class action and complex civil litigation, including actions similar to the one at bar. *See* Pl. Br. at 25. I am likewise amply satisfied that counsel for the proposed Class have vigorously and capably prosecuted this action, conducting appropriate discovery and presenting detailed analyses in memoranda, expert declarations and oral argument.[8] *See, e.g., In re OSB Antitrust Litig.,* 2007 WL 2253418, at *4; *In re Microcrystalline,* 218 F.R.D. at 84. Accordingly, I find that the adequacy requirement of Rule 23(a)(4) is satisfied with respect to Class counsel.

As is discussed in more detail below, the disputed issues here concern the adequacy of the Class representative, specifically, Defendants' assertion that alleged conflicts between LWD and certain other Class members preclude certification.

a.    **Class Members Who Allegedly Benefitted From Delayed Generic Entry**

Defendants assert that a conflict exists between Class members who benefit from earlier generic entry and those whose business is allegedly harmed by generic entry. *See* Def. Resp. at 39-42. According to Defendants, generic entry harms the Big Three wholesalers because: (1)

---

[8] I further note that the District Court previously approved of the Berger & Montague and Garwin, Gerstein firms as co-lead counsel for the proposed DP Plaintiff Class. *See* Doc. Nos. 57 and 127. The District Court also granted preliminary and final approval of the DP Plaintiffs' settlement with Defendant Wyeth (f/k/a American Home Products) and, thus, necessarily determined that counsel satisfied the adequacy requirement of rule 23(a)(4). *See* Doc. Nos. 176 and 226.

they lose sales volume when some of their customers switch to buying generic drugs directly from the manufacturer (referred to as "generic bypass"); (2) to the extent they resell drugs based on a percentage of the price under "cost-plus" contracts, they make less money on lower cost generics; (3) they realize a smaller profit on repackaging less expensive generic drugs; and (4) "forward buying" – *i.e.,* buying large quantities just before a manufacturer price increase, then reselling at the higher price in effect at the time of resale – is not profitable with generic drugs, the prices of which tend to decrease after generic entry.[9] *Id.* at 41.

Defendants' arguments against certification based on the foregoing alleged conflicts between the proposed Class and the Big Three fail for two primary reasons. First, Defendants' argument is based primarily on the reasoning of the Eleventh Circuit Court of Appeals in *Valley Drug Co. v. Geneva Pharm., Inc,* 350 F.3d 1181 (11th Cir. 2003), which I previously considered and rejected.[10] *See* Jan. 2, 2007 Report.

In *Valley Drug,* the Eleventh Circuit concluded that the proposed named plaintiffs could not adequately represent the interests of a direct purchaser class that included the Big Three, because the Big Three "appear to benefit from the effects of the conduct alleged to be wrongful by the named plaintiffs because their net economic situation is better off when the branded drugs dominate the market." *Valley Drug,* 350 F.3d at 1191. According to the court in *Valley Drug,* "this economic reality would lead the national wholesalers and other similarly situated class

---

[9] Defendants also speculate that pharmacy benefit management ("PBM") companies that are members of the proposed DP Plaintiff class may be harmed by generic entry, to the extent that they receive rebates from Schering on brand name K-Dur 20 large enough to offset the price differential between the branded drug and the generic and do not pass all rebates on to their insurer customers. *See* Def. Resp. at 40 n. 28. Thus, according to Defendants, "[i]t is possible that some PBMs are financially better off with branded K-Dur. . . ." *Id.* As is noted, *infra,* such speculative and hypothetical conflicts are insufficient to defeat adequacy. *See, e.g., In re Cardizem,* 200 F.R.D. at 306 ("To defeat certification, 'the conflict must be more than merely speculative or hypothetical.'") (quoting 5 *Moore's Federal Practice,* § 23.25(4)(b)(ii)).

[10] Defendants raised essentially identical arguments in connection with their appeal of Magistrate Judge Haneke's March 24, 2005 Order denying Defendants' Motion for downstream discovery from the DP Plaintiffs. In my Report and Recommendation dated January 2, 2007 (the "Jan. 2, 2007 Report"), I declined to follow *Valley Drug* and recommended that Judge Hanake's March 24, 2005 Order be affirmed. *See* Jan. 2, 2007 Report.

14

members to have divergent interests and objectives from the named representatives with respect to the fundamental issues in controversy in this litigation." *Id.* at 1193.

In my Jan. 2, 2007 Report, I noted my disagreement with *Valley Drug,* and determined, as have other courts, that the Eleventh Circuit's conclusion in that case is inconsistent with the Supreme Court's decisions in *Hanover Shoe v. United Shoe Machinery Corp.,* 392 U.S. 481 (1968) and *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977). *See* Jan. 2, 2007 Report. *See also Ovcon,* 2007 WL 3257015, *8 (disagreeing with *Valley Drug* because it conflicts with *Hanover Shoe* and *Illinois Brick*); *In re Hypodermic Product Direct Purchaser Antitrust Litig.,* No. 05-CV-4465, 2006 U.S. Dist. LEXIS 89353, *17-20 (D.N.J. Sept. 7, 2006) (rejecting *Valley Drug* as inconsistent with Third Circuit precedent).

Under *Hanover Shoe* and *Illinois Brick,* "[a]ntitrust injury is considered complete when the direct purchaser pays an illegal overcharge and whether he is able to pass through the overcharge theory of damages is irrelevant to the inquiry." *J.B.D.L. Corp.,* 225 F.R.D. at 216. Moreover, "under the *Hanover Shoe* rule, 'direct purchasers are not only spared the burden of litigating the intricacies of pass-on but are also permitted to recover *the full amount of the overcharge.*'"[11] *Ovcon,* 2007 WL 3257015, at *8 (quoting *Illinois Brick,* 431 U.S. at 745-46).

---

[11] In *Valley Drug,* the Eleventh Circuit acknowledged that pursuant to the Supreme Court's holding in *Hanover Shoe,* an antitrust defendant generally cannot assert a "pass-on" defense against a direct purchaser. *Valley Drug,* 350 F.3d at 1192. The *Valley Drug* court also did not dispute that a "direct purchaser who passes on overcharges to his customers nevertheless suffers cognizable antitrust injury and may sue to recover damages regardless of whether he actually profited from the defendants' conduct." *Id.* The court reasoned, however, that the issues of a direct purchaser's standing and damages are distinct from "the issue of whether class certification is appropriate where a fundamental conflict exists among the named and unnamed members of the class." *Id.* Based on this analysis, the court narrowly construed *Hanover Shoe* and concluded that it directs "a court to overlook the potential net gain, or conversely the potential absence of a net loss, that a direct purchaser may in fact have experienced for purposes of providing the direct purchaser with standing to sue and a means for calculating damages in antitrust violation litigation.," but "does not hold that this net economic gain must be ignored or overlooked . . . when determining whether Rule 23 has been satisfied." *Id.* at 1193. I respectfully disagree with the reasoning of *Valley Drug* and concur in the *Ovcon* court's observation that "the Eleventh Circuit's holding fails to appreciate the true import of the *Hanover Shoe* rule that a direct purchaser may recover the full amount of the overcharge, even if he otherwise benefitted, because the antitrust 'injury occurs and is complete when the defendant sells at the illegally high price.'" *Ovcon,* 2007 WL 3257015, at *9 (quoting *In re Cardizem,* 200 F.R.D. at 313).

Thus, as I concluded in the Jan. 2, 2007 Report:

> Based on the Supreme Court's decisions in *Hanover Shoe* and
> *Illinois Brick,* if the [DP Plaintiffs] incurred an overcharge based
> upon the Defendants' alleged actions, they would be deemed to
> have suffered an antitrust injury and would be entitled to recover
> the full amount of the overcharge, regardless of whether they may
> have benefited in other ways from Defendants' alleged actions.

> \* \* \*

> Because all members of the putative class in this case will be
> entitled to the same measure of damages if successful – the amount
> of the overcharge – there can be no conflict within the class on the
> issue of damages.

*See* Jan. 2, 2007 Report at 21-22. The same analysis applies equally here. Defendants'

arguments that the Big Three otherwise benefited from the delayed entry of a generic version of

K-Dur 20 "are irrelevant as a matter of law, and cannot serve to demonstrate that a conflict exists

between the Plaintiffs' interests and those of the Big Three with respect to this litigation."

*Ovcon,* 2007 WL 3257015, at \*9 (rejecting argument that conflicts precluded class certification

because Big Three allegedly benefited from delayed generic entry due generic bypass and cost-

plus contracts). *See also J.B.D.L. Corp.,* 225 F.R.D. at 216 (certifying direct purchaser class and

rejecting argument that conflict existed because some class members allegedly benefited from

delayed generic entry through forward buying of brand name drug).

Second, the alleged class conflicts Defendants identify are speculative and are

undermined by the record in this case. As one court in this District has noted:

> [C]ourts are generally skeptical of defenses to class certification
> based on conflicts between the proposed class members. "The
> mere fact that a representative plaintiff stands in a different factual
> posture is not sufficient to refuse certification . . . [t]he atypicality
> or conflict must be clear and must be such that the interests of the
> class are placed in significant jeopardy." Courts have "generally
> declined to consider conflicts, particularly as they regard damages,
> sufficient to defeat class action status at the outset unless the

16

> conflict is apparent, imminent, and on an issue at the very heart of
> the suit."

*In re Bulk [Extruded] Graphite Prods.*, 2006 WL 891362, at \*8 (quoting *Hedges Enters., Inc. v.*

*Continental Group, Inc.,* 81 F.R.D. 461, 466 (E.D. Pa. 1979), and *In re NASDAQ Market-Makers*

*Antitrust Litig.,* 169 F.R.D. 493, 514 (S.D.N.Y. 1996)). *See also In re Cardizem,* 200 F.R.D. at

306 ("To defeat certification, 'the conflict must be more than merely speculative or

hypothetical.'") (quoting 5 *Moore's Federal Practice*, § 23.25(4)(b)(ii)); *In re Visa*

*Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 145 (2d Cir. 2001) ("The conflict that will

prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental, and

speculative conflict should be disregarded at the class certification stage.") (internal quotations

and citations omitted), *overruled on other grounds by In re Initial Pub. Offering Sec. Litig.,* 471

F.3d 24 (2d Cir. 2006).

Defendants' argument essentially asks me to presume that either the Big Three or the

other Class members (consisting of regional wholesalers like LWD, direct purchasing retailers

and other direct purchasers) will be disadvantaged by the other's presence in the class. I decline

to employ such a presumption where both the named Class Plaintiff and representatives of the

Big Three have expressly disavowed any Class conflict. Specifically, in their Brief in support of

class certification, the DP Plaintiffs state:

> There are no conflicts between [LWD] and the members of the
> proposed class, which includes regional wholesalers like [LWD];
> larger "national" wholesalers; direct purchasing retailers; and other
> direct purchasers. [citation omitted] All share a common interest
> with [LWD] in proving Defendants' liability and recovering
> overcharge damages.

*See* Pl. Br. at 16-17 (citing Leitzinger 5/27/05 Decl. at 28 n. 40). Moreover, I note that

authorized representatives of each of the Big Three have submitted declarations stating, *inter*

*alia,* that each company "has decided, in its considered best judgment, that: (a) its interests are

17

best served by this action proceeding as a Class Action with [the company] as part of the class; and (b) the Named Plaintiff and its counsel are fully capable of representing the interests of [the company] for purposes of the Class Action." *See* 11/2/07 Pearlman Decl. at Exh. 2 (3/6/07 Aff. of Brian Jones, ABC Vice President, Generic Pharmaceuticals Product Development (the "Jones Aff.") ¶ 7-8), Exh. 3 (Aff. of Saul D. Factor, McKesson Senior Vice President, Product Managment (the "Factor Aff.") ¶ 7-8), and Exh. 4 (Aff. of Michael Kauffman, Cardinal Executive Vice President Supply Chain Services (the "Kauffman Aff.") ¶ 5-6).[12]

Under these circumstances, where both the named Plaintiff and the Big Three have disavowed any potential disadvantage from participating in the same proposed Class, I find no basis to conclude that the inclusion of the Big Three will create an imminent or fundamental conflict within the class. *See Ovcon,* 2007 WL 3257015, at *9.

### b.    Alleged Conflicts Regarding Legal Theories and Strategy

Defendants also argue that conflicts may exist within the Class regarding which legal theory and litigation strategies to pursue. *See* Def. Resp. at 41-45. Specifically, Defendants contend that retailer Class members <u>may prefer</u> "generic bypass," "cost-plus" or "lost profits" theories rather than the overcharge theory being pursued by LWD. *See* Def. Resp. at 43-45. In addition, Defendants suggest that <u>potential</u> conflicts may exist within the proposed Class with respect to the "business interests" of Class members. *See* Def. Resp. at 41-42. Defendants then speculate that "[l]itigants who benefit from the challenged conduct <u>probably</u> will adopt different litigation strategies than litigants who suffer from the challenged practice." *Id.*

---

[12] The representatives of the Big Three also have affirmatively and expressly (1) stated that there is no "antagonism or conflict" between the interests of LWD in pursuing overcharge damages and the "overall economic and legal interests" of the Big Three; and (2) waived any potential conflict between the Big Three and LWD, should the Court find that one may exist. *See* Jones Aff. at ¶ 9-10; Factor Aff. at ¶ 9-10; Kauffman Aff. at 7-9.

062038.00617/21682027v.1

In my view, the foregoing alleged conflicts are purely hypothetical and, thus, insufficient to defeat class certification. *See, e.g.,In re Bulk [Extruded] Graphite Prods.*, 2006 WL 891362, at \*8. *See also In re Cardizem,* 200 F.R.D. at 306 ("To defeat certification, 'the conflict must be more than merely speculative or hypothetical.'") (quoting 5 *Moore's Federal Practice*, § 23.25(4)(b)(ii)); *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 145 (2d Cir. 2001). Moreover, <u>if</u> any actual, fundamental conflict should arise, the opt-out provision of Rule 23(c)(2)(B) is available to Class members whose interests may be affected. This provision "is an important method for determining whether alleged conflicts are real or speculative. It avoids class certification denial for conflicts that are merely conjectural and, if conflicts do exist, resolves them by allowing dissident class members to exclude themselves from the action." 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 3.30 (4th ed. 2002).

In sum, based on the foregoing analysis, I find that the proposed DP Plaintiff class satisfies the adequacy requirement of Rule 23(a)(4).

**B.    Rule 23(b)(3) Requirements**

Having met the requirements of Rule 23(a), the DP Plaintiffs must additionally show that the proposed class action is maintainable under one of the three subsections of Fed. R. Civ. P. 23(b). In this case, the DP Plaintiffs are seeking certification pursuant to Fed. R. Civ. P. 23(b)(3), which requires a finding that:

> [Q]uestions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

19

(D) the difficulties likely to be encountered in the management of a
class action.

Fed. R. Civ. P. 23(b)(3).[13]  At its essence, Rule 23(b)(3) requires that "'[i]ssues common to the

class must predominate over individual issues, and the class action device must be superior to

other means of handling the litigation.'" *Newton*, 259 F.3d at 186-87 (quoting *In re Prudential*

*Ins. Co. Am. Sales Practice Litig.*, 148 F.3d 283, 313-14 (3d Cir. 1998)).

### 1.    **Predominance**

"Predominance measures whether the class is sufficiently cohesive to warrant

certification." *Newton*, 259 F.3d at 187 (citing *Amchem*, 521 U.S. at 623).  "Unlike

commonality, predominance is significantly more demanding, requiring more than a common

claim." *Id.* (citing *Amchem*, 521 U.S. at 623-24).  While the commonality requirement of Rule

23(a) can be satisfied by a single issue common to the class, "[p]redominance requires that

common issues be both numerically and qualitatively substantial in relation to the issues peculiar

to individual class members." *In re Mercedez-Benz Antitrust Litig.*, 213 F.R.D. 180, 186 (D.N.J.

2003).  The existence of individual issues does not necessarily defeat certification, as long as the

individualized issues have less overall significance than the issues common to the class and they

are manageable in a single class action. *Weisfeld*, 210 F.R.D. at 141.

A plaintiff seeking certification of an antitrust class action must show that common or

class-wide proof will predominate with respect to the three essential elements of its claim:  (1)

---

[13]  The Advisory Committee notes to Rule 23 state that the requirements of Rule 23(b)(3) were adopted to
"encompass[] those cases in which a class action would achieve economies of time, effort, and expense, and
promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing
about other undesirable results." *See* Fed. R. Civ. P. 23, Advisory Committee Notes, 1966 Amendment, Subdivision
(b)(3). *See also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).  Providing examples of the application
of Rule 23(b)3), the Advisory Committee explains that a case involving fraud "perpetrated on numerous persons by
the use of similar representations" could be suitable for certification, even if damages had to be determined
separately.  *Id.*  In contrast, a "mass accident" involving significant individual questions of liability, defenses and
damages ordinarily would be unsuitable for class treatment.  *Id.*  With respect to proposed antitrust class actions, the
Advisory Committee Notes state that "[p]rivate damage claims by numerous individuals arising out of concerted
antitrust violations may or may not involve predominating common questions."  *Id.*

20

violation of the applicable antitrust law, here, Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) fact of injury or impact;[14] and (3) the amount of damages.[15] *See Danny Kresky Enter. Corp. v. Magid,* 716 F.2d 206, 209-210 (3d Cir. 1983); *In re Linerboard Antitrust Litig.,* 305 F.3d 145, 156 (3d Cir. 2002) ("*Linerboard II*"). At the class certification stage, "[p]laintiffs need not actually prove these elements; rather, they must offer a valid and detailed method by which they will do so at trial." *In re OSB Antitrust Litig.,* 2007 WL 2253425, at *6. I address the above elements in turn.

### a.    Violation of Antitrust Law

Courts routinely find that proof of a violation of the antitrust law focuses on the defendants' conduct and not on the conduct of individual class members. *See, e.g., Bogosian,* 561 F.2d at 454 (district court correctly held that question of the existence of conspiracy was common to the class); *Weisfeld,* 210 F.R.D. at 141 (conspiracy to restrain trade subject to common proof); *In re OSB Antitrust Litig.,* 2007 WL 2253425, at *6 (noting defendants' concession that proof of antitrust conspiracy was common to the class); *In re Mercedez-Benz,* 213 F.R.D. at 186-86 (common issues predominated on issue of alleged antitrust violation).

---

[14] The fact of injury element is referred to interchangeably as "injury-in-fact," "impact" and "fact of damage." *See, e.g.,* ABA Section of Antitrust Law, *Antitrust Law Developments* (5th ed. 2002) at 839; *Rossi v. Standard Roofing, Inc.,* 156 F.3d 452, 483 (3d Cir. 1998). Fact of injury is often analyzed in conjunction with the related concept of "antitrust injury." Fact of injury focuses on whether the plaintiff sustained injury to his business or property by reason of anything forbidden in the antitrust laws. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977). The concept of "antitrust injury" focuses on whether the "injury [is] of the type the antitrust laws were intended to prevent and . . . flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of the anticompetitive acts made possible by the violation." *Id. See also City of Pittsburgh v. West Penn Power Co.,* 147 F.3d 256 (3d Cir. 1998) (discussing "antitrust standing" and "antitrust injury").

[15] I note that once a plaintiff has established the fact of injury element of an antitrust claim, the standard of proof required with respect to the amount of damages is less stringent and is satisfied by a reasonable approximation. *See, e.g., J. Truett Payne,* 451 U.S. 557, 566-67 (1981). The relatively relaxed standard of proof for the amount of damages recognizes the principle that "it does not 'come with very good grace' for the wrongdoer to insist upon specific proof of the injury which it has itself inflicted." *Id.* at 567 (quoting *Hetzel v. Baltimore & Ohio R. Co.,* 169 U.S. 26 (1898).

21

In their Briefs in opposition to class certification, Defendants do not contest the DP

Plaintiffs' assertion that all of the proofs relative to Defendants' alleged antitrust violation are

common to the class. *See* Pl. Br. at 27-28; Pl. Reply at 27-28; Def. Resp. at 25-38 (challenging

predominance only as to LWD'S theories of impact and damages). The common nature of the

proof of Defendants' alleged antitrust violation has been noted above in connection with my

analysis under Rule 23(a)(2), and it appears undisputed that common issues of fact and law will

predominate on this element of the DP Plaintiffs' case. *See also* Pl. Proposed Trial Plan at 2-6

(attached as Exh. 12 to the 11/2/07 Pearlman Decl.) (describing common evidence of antitrust

violation). Accordingly, I find that common issues predominate with respect to whether

Defendants violated antitrust law.

### b.    Fact of Injury

The critical disputed issue here concerns whether common questions predominate with

respect to antitrust impact. As noted above, "impact" or fact of injury is an essential element of

an antitrust claim for damages. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100,

114 n. 9 (1969). The injury-in-fact requirement exists to assure that litigants have a 'personal

stake' in the litigation." *Danvers Motor Co., Inc. v. Ford Motor Co.,* 432 F.3d 286, 291 (3d Cir.

2005) (quoting *The Pitt News v. Fisher,* 215 F.3d 354, 360 (3d Cir. 2000)). A plaintiff seeking

damages for an antitrust violation "must allege a distinct and palpable injury *to himself,* even it if

is an injury shared by a large class of other possible litigants." *Warth v. Seldin,* 422 U.S. 490,

500 (1975) (italics added). As the Third Circuit Court of Appeals explained in *Danvers*:

> A "legally and judicially cognizable" injury-in-fact must be
> "distinct and palpable," not "abstract or conjectural or
> hypothetical." *Raines v. Byrd,* 521 U.S. 811, 819, 117 S.Ct. 2312,
> 138 L.Ed.2d 849 (1997); *Allen v. Wright,* 468 U.S. 737, 751, 104
> S.Ct. 3315, 82 L.Ed.2d 556 (1984) (internal quotations omitted)
> (quoting *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45
> L.Ed.2d 343 (1975), and *Los Angeles v. Lyons,* 461 U.S. 95, 101-

22

> 02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). While it is difficult to
> reduce injury-in-fact to a simple formula, economic injury is one
> of its paradigmatic forms.

*Id.* at 291.

A plaintiff's "burden of proving the fact of damage . . . is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damages." *Zenith Radio Corp.,* 395 U.S. at 114, n. 9. "The fact of injury may be established by inference or circumstantial evidence." ABA Section of Antitrust Law, *Antitrust Law Developments* (5th ed. 2002) at 870 (citing, *e.g., Zenith Radio Corp.,* 395 U.S. at 125; *Callahan v. A.E.V., Inc.,* 182 F.3d 237, 250-60 (3d Cir. 1999)).

At the class certification stage, the Court's concern "is not whether Plaintiffs can or will establish class-wide impact, 'but whether class-wide impact may be proven by evidence common to all class members.'" *In re Pressure Sensitive Labelstock,* 2007 WL 4150666, at *13 (quoting *In re Bulk [Extruded] Graphite Prods.,* 2006 WL 891362, at *10). "Plaintiffs are not required to show that they currently possess all of the common evidence to prove impact, but need 'only make a threshold showing that the element of impact will predominantly involve generalized issues of proof, rather than questions which are particular to each member of the plaintiff class.'" *Id.* (quoting *In re Linerboard Antitrust Litig.,* 203 F.R.D. 197, 220 (E.D.Pa. 2001) ("*Linerboard I*")). "Whether or not fact of damage can be proven on a common basis therefore depends upon the circumstances of each case." *Id. See also Weisfeld,* 210 F.R.D. at 142 (citing *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 454 (3d Cir. 1977)). "If the facts [of a case] are such that a court must determine antitrust injury for each plaintiff separately, this determination may overwhelm common issues in the litigation." *In re Microcrystalline,* 218 F.R.D. at 85 (citing *Windham v. Am. Brands, Inc.,* 565 F.2d 59, 68 (4th Cir. 1977)).

23

The Third Circuit has held that "when an antitrust violation impacts upon a class of
persons who do have standing, there is no reason in doctrine why proof of impact cannot be
made on a common basis, so long as the common proof adequately demonstrates some damage
to each individual." *Bogosian,* 561 F.2d at 454. *See also Linerboard II,* 305 F.3d at 151; *Am.
Seed Co, Inc. v. Monsanto Co.,* No. 07-1265, 2008 WL 857532, *2-3 (3d Cir. April 1, 2008)
(reaffirming *Bogosian* and *Linerboard II*). As the Court explained in *Bogosian*:

> If, in this case, a nationwide conspiracy is proven, the result of
> which was to increase prices to a class of plaintiffs beyond the
> prices which would obtain in a competitive regime, an individual
> plaintiff could prove fact of damage simply by proving that the
> free market prices would be lower than the prices paid and that he
> made some purchases at the higher price. If the price structure in
> the industry is such that nationwide the conspiratorially affected
> prices at the wholesale level fluctuated within a range which,
> though different in different regions, was higher in all regions than
> the range which would have existed in all regions under
> competitive conditions, it would be clear that all members of the
> class suffered some damage, notwithstanding that there would be
> variations among all dealers as to the extent of their damage.

*Bogosian,* 561 F.2d at 454. "This presumption of class-wide injury through the use of
common proof is now referred to as the '*Bogosian* short cut.'" *Am. Seed Co.,* 2008 WL 857532,
at *2 (quoting *Linerboard II,* 305 F.3d at 151).

24

In *Am. Seed Co.*,[16] the Third Circuit recently explained its affirmance of class certification in *Linerboard II*, "based on [the Third Circuit's] determination that the district court had used a 'belt and suspenders rationale to support its conclusion that the putative class had met its burden of showing impact. In addition to relying on the *Bogosian* short cut, it credited the testimony of plaintiffs' experts, opinions that were supported by charts, studies and articles from leading trade publications.'" *Id.* at 2-3 (quoting *Linerboard II*, 305 F.3d at 153). Reaffirming the belt and suspenders approach to establishing impact approved in *Linerboard II*, the Court noted in *Am. Seed Co.*:

> [W]e "found it important that plaintiffs' expert witnesses had utilized supporting data to conduct analyses that authenticated their professional opinions." For that reason, we held that "this was not a case where plaintiffs relied solely on presumed impact and damages." Thus, post-*Linerboard [II]* it is important that a putative class's presumption of impact under *Bogosian* be supported by some additional amount of empirical evidence.

*Id.* (quoting *Linerboard II*, 305 F.3d at 155).

With the foregoing analytical framework in mind, I will address the parties' respective arguments regarding the impact element of the DP Plaintiffs' claim.

---

[16] In *Am. Seed Co.*, the Third Circuit affirmed the district court's decision denying certification of a class of purchasers of genetically engineered corn seed on the ground that the proposed class failed to satisfy the predominance requirement *See Am. Seed Co.*, 2008 WL 857532. Although I am guided by the Court's reaffirmance of *Bogosian* and *Linerboard II* in *Am. Seed Co.*, the case is factually inapposite in two fundamental respects. First, as the district court noted in *Am Seed Co.*, the "'market for [genetically modified] seeds is highly individualized depending on geographic location, growing conditions, consumer preference and other factors.'" *Am. Seed Co. v. Monsanto Co.*, 238 F.R.D 394, 400 (D. Del. 2006) ("*Am. Seed Co. I*") (quoting *Sample v. Monsanto Co.*, 218 F.R.D. 644 (E.D. Mo. 2003). Second, in contrast to the DP Plaintiffs' expert in this case, the plaintiffs' expert in *Am. Seed Co.* failed "to provide[] any actual data for the court's review as to the 'factual setting of the case'"; failed to cite any "factual authority in his declaration in support of his theory of common impact"; failed to conduct a "preliminary study of the market"; failed to independently analyze the documents produced during class discovery"; and did not "study the pricing and/or pricing variability" of the products at issued in that case. *Am. Seed Co.*, 2008 WL 857352, at *3 (quoting *Am. Seed Co. I*, 238 F.R.D. at 400-01).

25

### (i)    *Plaintiffs' Evidence of Impact*

As LWD acknowledges, its "theory of antitrust impact (and damage) is an overcharge, based primarily on the undisputed, substantial difference in price between brand name K-Dur 20, and its bioequivalent generic."[17] *See* Pl. Reply at 28. LWD contends that but for Defendants' alleged anticompetitive conduct, which Plaintiffs assert delayed the market entry of an the AB-rated generic version of K-Dur until September 2001,[18] Class members would have paid less for potassium chloride 20, principally by substituting some amount of the cheaper generic for the brand. *Id.* Thus, Plaintiffs argue, "[t]o demonstrate antitrust impact at trial, Plaintiffs need prove only that class members would have purchases *some amount* of a cheaper, generic version of K-Dur 20 had it been available during the class period of November 1998 through September 2001." *See* Pl. Br. at 28 (citing *Bogosian,* 561 F2d at 455) (italics in original); *See* Pl. Reply at 28.

Plaintiffs propose to prove this alleged antitrust impact through the following common proof, discussed in more detail in the declarations and report of their expert, Dr. Leitzinger: (1)

---

[17] According to the DP Plaintiffs' expert, Dr. Leitzinger, overcharges of Class members occurred in one or more of three ways: (1) brand-generic overcharge, represented by the difference between the price paid by Class members for branded K-Dur 20 and the (lower) price they would have paid for the generic; (2) generic-generic overcharge, representing the difference between the prices paid for generics and the (lower) price Class members would have paid if generic entry, and subsequent additional generic competition, had occurred earlier; and (3) brand-brand overcharge, representing the higher amounts Class members paid by reason of being deprived of discounts or price reductions on branded K-Dur they may have received had generic entry occurred earlier. *See* Leitzinger 5/27/04 Decl. at 15-17. Although Dr. Leitzinger opined in his initial class certification Declaration that each type of overcharge can be demonstrated with the common proof discussed *infra*, it is clear that his conclusions regarding class-wide impact focus on brand-generic overcharges to Class members who purchased branded K-Dur 20 during the Class period and who also purchased generic versions of K-Dur 20. *See* Leitzinger 11/2/07 Decl. at 15 (stating that "the role played by potential but-for branded K-Dur 20 price reductions in my conclusions is simply to recognize as a possibility that one mechanism through which AB-rated generic entry can create (and, in fact, has created) competitive benefits is through changes in WAC [wholesale acquisition cost] prices or increased discounts from WAC offered by the brand (either generally or to selected customers) in order to retain business in the fact of a generic option); and 17 (stating that his damages calculation does not include any generic-generic damages).

[18] The DP Plaintiffs allege that but for Defendants' alleged anticompetitive conduct, an AB-rated generic would have entered the market no later than November 20, 1998, the date Defendant Upsher received final FDA approval to market its generic version of K-Dur 20. *See* Am. Compl. at ¶¶ 101-102.

26

governmental and academic studies relating to the effects of generic entry and competition in pharmaceutical markets and concluding that AB-rated generic drugs (a) enter the market at substantially lower prices than their brand counterparts, and (b) capture a significant share of the combined product (brand and generic) unit sales;[19] (2) Defendants' internal analyses and projections predicting significant generic penetration and substantially lower prices for potassium chloride products after generic entry;[20] and (3) sales data from Schering, Upsher and other manufacturers of generic potassium chloride showing the class-wide substitution and pricing impact of actual generic entry.[21]  Based on his analysis of the foregoing evidence, Dr. Leitzinger concludes that "the alleged delay in generic entry would give rise to antitrust injury on the part of all (or virtually all) members of the proposed class." *See* Letizinger 8/2/07 Rep. at 9, 51-53. *See also* Leitzinger 5/27/04 Decl. at 34; Leitzinger 11/2/07 Decl. at 3-4, 9-10.

Before addressing Defendants' arguments, I note that the types of evidence relied upon by Dr. Leitzinger "are precisely the types of evidence that have been found sufficient to satisfy the predominance requirement with respect to proof of impact in other cases alleging delayed generic entry." *Ovcon,* 2007 WL 3257015, at *13 (citing *In re Cardizem,* 200 F.R.D. at 208; *In re Relafen Antitrust Litig.,* 218 F.R.D. 337, 343-44 (D. Mass. 2003); *J.D.B.L.,* 225 F.R.D. at 217-18).  Moreover, Dr. Leitzinger's report and declarations reflect that his opinions regarding class-wide impact (and damages) are based on his review of extensive materials relevant to this case, including deposition testimony, pleadings, studies of the pharmaceutical industry, documents and data produced by Schering, Upsher and other drug manufacturers, sales data from IMS Health,

---

[19] *See* Pl. Br. at 30-31; Leitzinger 5/2704 Decl. at 17-23; Leitzinger 8/7/07 Rep. at 28-34.

[20] *See* Pl. Br. at 31-32; Leitzinger 5/2704 Decl. at 23-25; Leitzinger 8/7/07 Rep. at 34-38.

[21] *See* Pl. Br. at 32-33; Leitzinger 5/2704 Decl. at 25-27; Leitzinger 8/7/07 Rep. at 39.

27

Inc., and data from entities that are pursuing individual actions against the Defendants. *See,*
Leitzinger 8/2/07 Rep. at 8 and Exh. 8; Leitzinger 5/27/04 Decl. at 5-6 and Exh. 2.

### (ii)    *Defendants' Arguments Regarding Impact*

Defendants contend that impact cannot be established by class-wide evidence but, rather,
requires individualized inquiries.  First, Defendants argue that any assessment of brand-generic
impact must consider whether and to what extent particular class members would have switched
to a generic version of K-Dur 20 and whether generic bypass negates or diminishes the injury of
individual class members. *See* Def. Resp. at 29-30.  I respectfully disagree.

It is undisputed that the vast majority of the proposed Class purchased some quantity of
the generic version of K-Dur 20 after it became available. *See, e.g.,* Rubinfeld 8/9/07 Rep. at ¶
31-33 and Exh. 3; Leitzinger 11/2/07 Decl. at 6-7.  Evidence that all (or virtually all) class
members substituted a lower priced generic for some of their K-Dur 20 purchases gives rise to
the inference that they would have similarly done so in the but-for world. *See In re Cardizem,*
200 F.R.D. at 320.  This fact combined with the common evidence discussed above regarding the
effect of generic entry on pricing and substitution suffices to establish class-wide impact under
the belt and suspenders approach approved by the Third Circuit in *Linerboard II* and reaffirmed
in *Am. Seed Co.*

Moreover, because Defendants concede that 45 of the proposed Class members
purchased some amount of generic K-Dur, they cannot contend that these Class members were
entirely bypassed.  Under the DP Plaintiffs brand-generic ("BG") theory of overcharge, Class
members suffered antitrust injury as long as they would have purchased some generic K-Dur
earlier in the Class period had it been available. *Ovcon,* 2007 WL 3257015, at *14.  Thus,
Defendants' arguments regarding the effects of generic bypass relate to the quantum of damages,
rather than the fact of injury. *See Zenith Radio Corp.,* 395 U.S. at 114, n. 9. (the "burden of

proving the fact of damage . . . is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damages"). *See also* Leitzinger 5/27/04 Decl. at 32-34.

Second, Defendants argue that individual inquires are necessary to determine "whether branded and generic K-Dur are economically identical such that only their price differential matters." *See* Def. Resp. at 31-33. According to Defendants and their expert, Dr. Rubinfeld, branded drugs have unique economic value to consumers that is not shared by their AB-rated generic counterparts and, thus, the price difference between the brand and generic is, at least in part, not an overcharge. *Id. See also* Rubinfeld 8/9/07 Rep. at ¶45-51. This argument is meritless. As I previously concluded in the Jan. 2, 2007 Report, "the only economic differences between branded and generic K-Dur that are relevant to this case are the prices charged for the initial purchase of the products." *See* Jan. 2, 2007 Report at 25. The court in *In re Cardizem* rejected a similar argument and reasoned:

> Defendants' strained attempts to distinguish the facts of this case from other price-fixing cases are to no avail. Cardizem CD and its AB-rated generics are identical in all material respects. AB-rated generics are freely substitutable and interchangeable with their brand name counterparts. Industry experts describe them as perfect substitutes for the brand name drug. . . . In the pharmaceutical industry, there is a government-assured complete interchangeability of drug products. This is why pharmacies are allowed to substitute the lower-priced generic versions of brand name drug products that have been demonstrated to the FDA to be therapeutically equivalent. Market behavior, which shows generics capturing a significant percentage of the branded drug market soon after they are introduced, likewise supports the conclusion that the brand and generic drugs are essentially fungible and interchangeable. Cardizem and its generic bioequivalents are two interchangeable versions (one less costly than the other) of the same drug product. Antitrust law requires only that the two products at issue be close substitutes for each other. Cardizem CD and its generic bioequivalents meet this requirement.

29

*In re Cardizem,* 200 F.R.D. at 310-11 (internal citations omitted). *See also* Leitzinger 11/2/07

Decl. at 19-20. The *Cardizem* court's reasoning applies equally to K-Dur 20 and its AB-rated

generic equivalents.

Third, Defendants contend that the experience of Class members refutes class-wide

impact because, according to Dr. Rubinfeld, nine putative Class members were not injured by the

delay in generic entry. *See* Def. Resp. at 33; Rubinfeld 8/9/07 Rep. at ¶ 61; Def. Sur-Reply at 2-

3; Rubinfeld 11/20/07 Rep. at ¶ 6-20. Plaintiffs and Dr. Leitzinger largely dispute Dr.

Rubinfeld's conclusions on the ground that they are based on a misapplication of Dr.

Leitzinger's aggregate damage model to individual Class members.[22] *See* Pl. Sur-Rebuttal at 5-

7; Leitzinger 12/14/07 Decl. Specifically, Dr. Leitzinger states that his "model for the

calculation, or quantification, of aggregate damages is not designed to calculate damages, or, for

that matter, identify antitrust injury, in the individualized manner that Dr. Rubinfeld uses it." *See*

Leitzinger 12/14/07 Decl. at 8.

Dr. Leitzinger further notes that seven of the Class members identified by Dr. Rubinfeld

purchased both branded and generic K-Dur 20. *See* Leitzinger 12/14/07 Decl. at 4. As to five of

those Class members, Dr. Leitzinger specifically disagrees with Dr. Rubinfeld's application of

the aggregate damage model and with his conclusion that because one Class member did not

purchase any generic K-Dur in March 2002 and four did not purchase generics until after March

2002, they have no injury. *Id.* at 4-7. According to Dr. Leitzinger, "[t]he issue is whether a

Class member would have purchased at least some generic units in the but-for world in place of

the higher priced brand. If so, that Class member was overcharged by virtue of any delay in

---

[22] Dr. Rubinfeld and Dr. Leitzinger apparently agree, after further review of data, that one proposed Class member, Longs, either did not purchase any generic or did not purchase it directly and, thus, was initially erroneously included in the proposed Class. *See* Leitzinger 12/14/07 Decl. at 7; Rubinfeld 11/20/07 Rep. at ¶ 9. Because Longs does not fall within the Class definition, any injury it may have suffered due to delayed generic entry is irrelevant to the issue of class certification.

30

generic entry and, at least to that extent, suffered antitrust injury." *See* Leitzinger 11/2/07 Decl. at 21-22.

According to Defendants and Dr. Rubinfeld, another proposed Class member, Prescription Solutions, may have paid more for generic K-Dur than for the branded drug. *See* Rubinfeld 8/9/07 Rep. at ¶ 61 and Exh. 2; Rubinfeld 11/20/07 Rep. at ¶ 7-8. Although Plaintiffs and Dr. Leitzinger do not expressly contest Dr. Rubinfeld's opinion regarding the brand and generic prices paid by Prescrption Solutions, neither do they concede that Prescription Solutions suffered no overcharges as a result of Defendants' alleged conduct. Moreover, Plaintiffs expressly argue that even assuming, *arguendo*, that Dr. Rubinfeld is correct that one Class member did not pay less for generic K-Dur, it does not preclude a finding that common issues of impact predominate. *See* Pl. Sur-Rebuttal at 7.

Finally, Defendants argue that Plaintiffs cannot establish fact of injury with respect to two proposed Class members, Gerould's Pharmacy and Darby Drug, who apparently were included in the Class because, according to Dr. Leitzinger, although they did not purchase generic K-Dur, they may have received "increased discounts" on branded K-Dur. *See* Pl. Sur-Rebuttal at 7 n. 5; Leitzinger 12/14/07 Decl. at 9; Def. Sur-Reply at 2-3; Rubinfeld 11/20/07 Rep. at ¶ 14-18. Defendants further contend that no class-wide proof of "increased discounts," or brand-brand overcharge exists, and that the price of K-Dur did not decline after generic entry. *See* Def. Resp. at 26-28; Rubinfeld 8/9/07 Report at ¶ 70-79; Rubinfeld 11/20/07 Report at ¶ 14-18. In a related argument, Defendants contend that the proposed Class definition is inadequate because it requires a detailed individual inquiry to determine whether or not particular direct purchasers received "increased discounts."

31

In their Reply Brief, Plaintiffs argued that "Schering did, in fact, 'increase discounts' on K-Dur 20 after generic entry." *See* Pl. Reply at 39. *See also* Leitzinger 11/2/07 Decl. at 16-17 (opining that Schering sold branded K-Dur to direct purchasers at some percentage below its established WAC price and stating that the calculation of such discounts has been done on a class-wide basis). However, Plaintiffs appear to have conceded that the two proposed Class members whose impact, if any, arises solely by virtue of "increased discounts" were identified through an individualized analysis of the data applicable to those two entities. *See* Pl. Reply at 40; Pl. Sur-Rebuttal at 7 n.5.

After reviewing the parties' arguments and the opinions of their respective experts, I am satisfied that the DP Plaintiffs have satisfied their burden of adducing "sufficient evidence and a plausible theory" to convince me that impact may be proven by evidence common to all class members. *In re Mercedez-Benz,* 213 F.R.D. at 190. *See also In re Bulk [Extruded] Graphite Prods.,* 2006 WL 891362, at *14; *In re Cardizem,* 200 F.R.D. at 320. In my view, Defendants' argument that impact is not class-wide involves merits-based disputes that should not be resolved at the class certification stage. *See, e.g, In re Cardizem,* 200 F.R.D. at 311 (at the class certification stage, "the Court should not delve into the merits of an expert's opinion or indulge 'dueling' between opposing experts"); *In re Bulk [Extruded] Graphite Prods.,* 2006 WL 891362, at *14 ("the Court is not in a position at the class certification stage to weigh the arguments of the plaintiffs' expert and the defendants' expert").

Moreover, as several courts have held, the possibility that Plaintiffs ultimately may be unable to show fact of injury as to a few class members does not defeat certification where the Plaintiffs can show widespread injury to the class. *See In re Cardizem,* 200 F.R.D. at 321 (citing *In re NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. at 523); *Ovcon,* 2007 WL 3257015,

32

at *14; *J.B.D.L*, 225 F.R.D. at 218. *See also In re Pressure Sensitive Labelstock,* 2007 WL

4150666, at *13 ("The Court's concern at this stage is not whether Plaintiffs can or will establish

class-wide impact, 'but whether class-wide impact may be proven by evidence common to all

class members.'") (quoting *In re Bulk [Extruded] Graphite Prods.,* 2006 WL 891362, at *10).

However, with respect to the Class definition and the issue of "increased discounts,"

Defendants' arguments have some merit. I see no difficulty with the balance of the DP

Plaintiffs' proposed Class definition, as the Report and Declarations of Dr. Leitzinger adequately

demonstrate a methodology to identify the proposed Class members who purchased K-Dur 20

during the Class period and also purchased generic versions of K-Dur 20.[23] *See* Leitzinger

8/2/07 Rep. at 55-56. With respect to proposed Class members who obtained "increased

discounts," however, Dr. Leitzinger merely states that "[t]hose potential Class members that did

not purchase any generic were included in the Class if they received increased discounts off of

their brand purchases after generic entry." *Id.* at 56. Dr. Leitzinger does not provide any class-

wide methodology for identifying the direct purchasers whose only basis for Class membership

is the purported receipt of such discounts. In short, including the amorphous concept of

"increased discounts" in the Class definition would potentially undermine both the ability to

ascertain the Class and to establish fact of injury on a Class-wide basis through common proof.

Accordingly, I will modify the proposed Class definition to exclude persons or entities whose

claims are based solely on their alleged receipt of "increased discounts" on K-Dur 20 after

generic entry. *See* Fed. R. Civ. P. 23(c)(1). *See also Chiang v. Veneman,* 385 F.3d 256, 268 (3d

Cir. 2004) (modifying class definition to eliminate ambiguity); *In re OSB Antitrust Litig.,* 2007

---

[23] Dr. Leitzinger's Report states that he identified Class members through analysis of Schering's and the generic
manufacturer's transaction data. *See* Leitzinger 8/2/07 Rep. at 55-56.

WL 2253418, at *9 (modifying class definition to exclude plaintiff who lacked direct purchaser standing).

In summary, based on the analysis set forth above, I find that the DP Plaintiffs have satisfied the predominance requirement with respect to impact as to Class members who purchased K-Dur 20 during the Class period and who also purchased generic versions of K-Dur 20.

c.    **Damages**

In addition to challenging predominance with respect to impact, Defendants also argue that individualized damage questions will overwhelm any common issues. *See* Def. Resp. at 37. Specifically, Defendants contend that neither LWD nor Dr. Leitzinger has offered a "single objective formula" that can be applied to each Class member's transactions. *Id.* Defendants' argument, however, would require LWD to prove more than is necessary at the class certification stage. Rather, "in determining whether a feasible method exists to compute class-wide damages, '[n]o precise damage formula is needed at the certification stage of an antitrust action; the court's inquiry is limited to whether the proposed methods are so insubstantial as to amount to no method at all.'" *In re Pressure Sensitive Labelstock,* 2007 WL 4150666, at * 19 (quoting *In re Carbon Black Antitrust Litig.,* MDL No. 1543, 2005 WL 102966, * 19 (D. Mass Jan. 18, 2005) (internal quotations omitted). *See also Ovcon,* 2007 WL 3257015, at *15.

The DP Plaintiffs assert that "damages here can be reliably estimated in the aggregate for the class as a whole, using the same types of common evidence that can be employed to demonstrate the fact of antitrust injury." *See* Pl. Br. at 33; Leitzinger 5/27/04 Decl. at 28-34. Under Dr. Leitzinger's methodology, the first step in estimating aggregate damages involves "development of a benchmark for market performance – the 'but-for world' – reflecting the

34

world as it would have been had generic entry occurred sooner (as Plaintiffs allege)." *See* Leitzinger 5/27/04 Decl. at 31. Dr. Leitzinger explains that in this case, he developed the but-for world benchmark using a "before/after" method, which "uses the market experience before and/or after the alleged misconduct period to provide the basis for estimating prices and quantities that would have existed in the period but for the behavior in question." *See* Leitzinger 8/2/07 Rep. at 62-63. After determining the benchmark, "the rest is mostly arithmetic . . . [and] involves a sum, in the aggregate, of: (1) the difference between the generic price and the brand price multiplied by the volume of generic substitution by the Class that was forestalled by the delay in generic entry; (2) the inflated amounts paid by the Class for the branded volumes it did purchase (and still would have purchased even if generic entry had occurred earlier) attributable to the delay in generic price competition; and (3) the inflated amounts paid by the Class for generic volumes attributable, again, to the delay in price competition." *See* Leitzinger 5/27/04 Report at 32.

Defendants do not dispute that the "before and after" methodology proposed by Dr. Leitzinger is "judicially recognized and commonly accepted." *See In re Cardizem,* 200 F.R.D. at 321. Rather, Defendants argue that the proposed aggregate damages model fails to account for individual issues concerning, *inter alia,* the extent to which each Class member would have switched to a generic in the but-for world; the extent of any generic bypass and generic upgrading; the extent to which Class members may have benefited from delayed generic entry; and whether Class members' purchases were resold under cost-plus contracts for which Defendants have a pass-on defense. *Id.*

I have previously considered and rejected the foregoing arguments in my analysis of the adequacy requirement and will not repeat that analysis here. Moreover, I note, as did the *Ovcon*

35

court, that "a number of courts have been satisfied that a common methodology exists in actions alleging delayed or impeded entry of generic pharmaceuticals, notwithstanding challenges similar to Defendants' arguments in the instant case." *Ovcon,* 2007 WL 3257015, at * 16 (citing *In re Cardizem,* 200 F.R.D. at 321-25; *In re Busiprone Patent Litig.,* 210 F.R.D. 43, 58 (S.D.N.Y. 2002); *J.B.D.L.,* 225 F.R.D. at 217-219). Finally, to the extent that individual issues regarding damage amounts may arise, the Third Circuit has opined that "because separate proceedings can, if necessary, be held on individualized issues such as damages . . . such individual questions do not ordinarily preclude the use of the class action device." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 817 (3d Cir. 1995). *See also Bogosian,* 561 F.2d at 456 ("[I]t has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate.").

Accordingly, I conclude that the DP Plaintiffs have sufficiently demonstrated that common proof exists such that LWD can establish each element of its antitrust claim on a simultaneous, class-wide basis. Thus, I find that the predominance requirement of Rule 23(b)(3) is satisfied.

### 2.    Superiority

Finally, I turn to the superiority requirement of Rule 23(b)(3). As noted above, the factors pertinent to the superiority requirement include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3).

36

Defendants argue that a class action is not a superior means of adjudicating this case because, they contend, the Class is relatively small and comprised largely of sophisticated purchasers who are able to prosecute their claims independently, and the damages sought be Plaintiffs are large enough to justify individual suits. I disagree. As other courts have noted, Rule 23(b)(3) "'does not exclude from certification cases in which individual damages run high.'" *Ovcon*, 2007 WL 3257015, at *18 (quoting *Amchem*, 521 U.S. at 617). *See also In re Cardizem*, 200 F.R.D. at 325-26. Moreover, as in the *Ovcon* case, it is not clear in this case that individual damages actually "run high," and "Defendants do not suggest that all putative class members are large wholesalers with large claims." *Ovcon, supra.*

Defendants further argue that there are extensive conflicts among the Class, and they speculate that the fact that nine entities have chosen not to participate in the Class somehow indicates that the parties who remain in the proposed Class have a strong "interest in individual prosecution of claims." In my view, the fact that the opt outs have exhibited an interest in controlling their claims sheds no light on whether Class members who have not chosen to opt out have the same interest. Defendants' argument in this regard, and their speculation regarding Class conflict is further undermined by the declarations of representatives of the Big Three affirming that those companies wish to participate in the Class. *See Ovcon*, 2007 WL at 3257015, at *18. *See also In re Bulk [Extruded] Graphite Prods.*, 2006 WL 891362, at *16 (noting the absence of any indication that large class member preferred to prosecute its claims individually).

I likewise reject Defendants various and related arguments that a Class action will be inefficient and unduly burdensome to the parties and the Court. As I have already determined, this case presents common issues of law and fact regarding Defendants' alleged antitrust

violation, fact of injury and damages. In my view, resolution of these common issues in single action is a more efficient use of the Court's and the parties' resources than the alternative of potentially numerous additional individual actions. In this regard, I note that several other courts have likewise found a class action to be efficient and superior in cases similar to this one. *See, e.g., Ovcon,* 2007 WL 3257015, at *18; *In re Nifedipine Antitrust Litig,* 246 F.R.D. 365, 372 (D.D.C. 2007); *J.B.D.L.,* 225 F.R.D. at 220; *In re Cardizem,* 200 F.R.D. at 325-26; *In re Pressure Sensitive Labelstock,* 2007 WL 4150666, at *22.

## CONCLUSION

Accordingly, for the reasons set forth above, I conclude that the Direct Purchaser Plaintiffs' Motion for Class Certification should be granted, subject to modification of the proposed Class definition for the reasons discussed above.  As modified, the Class to be certified shall consist of:

> All persons or entities who have purchased K-Dur 20 directly from Schering at any time during the period November 20, 1998, through September 1, 2001.

Excluded from the proposed class shall be:

> Defendants and their officers, directors, management and employees, subsidiaries and affiliates, as well as federal government entities.  Also excluded are persons or entities who have not purchased generic versions of K-Dur 20 after the introduction of generic versions of K-Dur 20.

**As provided in the Order entered by Magistrate Judge Arleo in this matter, the Special Master's decision on any motion can be appealed to Judge Greenaway in the manner, and subject to the standards of review set forth in Rule 53 of the Federal Rules of Civil Procedure and applicable Local Rules.**

ENTERED this
14th day of April, 2008

STEPHEN M. ORLOFSKY
SPECIAL MASTER

062038.00617/21682027v.1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| IN RE K-DUR ANTITRUST LITIGATION | ) ) ) | Civil Action No. 01-1652 (JAG) (Consolidated Cases) |
| This Document Relates To: | ) ) | |
| All Actions | ) ) ) ) | MDL Docket No. 1419 |

## ORDER

The Special Master having considered the Direct Purchaser Plaintiffs' Motion for Class Certification, the briefs filed by all parties in support of and in opposition to the Motion, as well as the oral argument of counsel, for the reasons set forth in the foregoing Report and Recommendation;

**IT IS HEREBY ORDERED**, this 14th day of April, 2008, that:

(1)    The Direct Purchaser Plaintiffs' Motion for Class Certification is hereby **GRANTED**;

(2)    Pursuant to Fed. R. Civ.P. 23(c)(1)(B), the following Class is certified pursuant to Fed. R. Civ. P. 23(a) and (b)(3):

> All persons or entities who have purchased K-Dur 20 directly from Schering at any time during the period November 20, 1998, through September 1, 2001.

> Excluded from the proposed class shall be:

> Defendants and their officers, directors, management and employees, subsidiaries and affiliates, as well as federal government entities. Also excluded are persons or entities who have not purchased generic versions of K-Dur 20 after the introduction of generic versions of K-Dur 20.

(3)    Pursuant to Fed. R. Civ. P. 23(c)(1)(B), the Special Master identifies the following Class claims and issues:

(a)    Whether Defendants engaged in a contract, combination or conspiracy to fix, raise, maintain or stabilize prices of K-Dur 20;

(b)    Whether the alleged contract, combination or conspiracy was an unreasonable restraint on trade;

(c)    Whether the alleged contract, combination or conspiracy affected interstate commerce;

(d)    Whether Defendants engaged in conduct that violated Section 1 of the Sherman Act;

(e)    Whether the alleged conduct of Defendants caused injury to the business or property of Plaintiff Louisiana Wholesale Drug Co. ("LWD") and the Class;

(f)    The appropriate measure of damages sustained by LWD and the Class.

(4)    Pursuant to Fed. R. Civ. P. 23(c)(1)(B), the following law firms are appointed as co-lead Class Counsel:  Berger & Montague, P.C. and Garwin, Gerstein & Fisher, LLP

(5)    By **May 15, 2008,** the Parties shall jointly submit to the Special Master a Class notice program and proposed forms of notice to the Class.  If the Parties are unable to agree on the form of notice to the class, the Parties shall submit to the Special Master and serve upon all counsel proposed notice programs and forms of notice, accompanied by a memorandum in support of that Party's position. Each Party shall submit to the Special Master and serve upon all counsel its response to the other's proposed notice programs and forms of notice no later than **May 30, 2008**.  Following the receipt of the parties' submissions, the Special Master shall

2

schedule argument at a mutually convenient time to resolve any disputes regarding the notice to the class.

ENTERED this
14th day of April, 2008

STEPHEN M. ORLOFSKY
SPECIAL MASTER

062038.00617/21682027v.1