# Exhibit 13

# WINSTON & STRAWN LLP

**Electronic
Letterhead**

100 North Tryon Street, Charlotte NC 28202-4018
Telephone: 704-350-7700    Facsimile: 704-350-7800

| 35 W. Wacker Drive | 200 Park Avenue | 1700 K Street, N.W. | 333 South Grand Avenue | 101 California Street | 43 Rue du Rhône | 25 Avenue Marceau | 99 Gresham Street |
|---|---|---|---|---|---|---|---|
| Chicago, IL 60601 | New York, NY 10166 | Washington, DC 20006 | Los Angeles, CA 90071 | San Francisco, CA 94111 | 1204 Geneva, Switzerland | 75116 Paris, France | London, United Kingdom EC2V 7NG |
| 312-558-5600 | 212-294-6700 | 202-282-5000 | 213-615-1700 | 415-591-1000 | 41-22-317-75-75 | 33-1-53-64-82-82 | 44-020-7105-0000 |

WRITER'S DIRECT DIAL
(202) 282-5640
MBHARGAVA@WINSTON.COM

May 14, 2008

McKesson Corporation
One Post Street
San Francisco, CA 94104

> **Re:    Subpoena in *Meijer v. Abbott Laboratories*, No. 07-5985 (N.D. Cal.)**

Dear To Whom It May Concern:

Please find enclosed a subpoena issued in a putative class action filed by Meijer, Inc., Rochester Drug Co-Operative, Inc., and Louisiana Wholesale Drug Company (on behalf of themselves and all others similarly situated) against Abbott Laboratories.  The case is currently pending in the Northern District of California, Oakland Division.  Enclosed for your convenience is the Consolidated Amended Complaint in the case.

The subpoena requires you to produce copies of the documents listed in Exhibit A by May 28, 2008.  Please call me directly at the number above with any questions you may have.

Respectfully yours,

Michael Bhargava

AO 88 (Rev. 12/07) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEIJER, INC. & MEIJER DISTRIBUTION, INC., on behalf of themselves and all others similarly situated, | )  **Case No. C 07-5985 CW**<br>)<br>)<br>) |
| Plaintiffs, | )<br>)  **SUBPOENA IN A CIVIL CASE** |
| vs. | )<br>) |
| ABBOTT LABORATORIES, | )<br>) |
| Defendant. | )<br>)<br>)<br>) |
| ROCHESTER DRUG CO-OPERATIVE, INC., on behalf of itself and all others similarly situated, | )  **Case No. C 07-6010 CW**<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| vs. | )<br>) |
| ABBOTT LABORATORIES, | )<br>) |
| Defendant. | )<br>)<br>) |
| LOUISIANA WHOLESALE DRUG COMPANY, INC., on behalf of itself and all others similarly situated, | )  **Case No. C 07-6118 CW**<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| vs. | )<br>) |
| ABBOTT LABORATORIES, | )<br>) |
| Defendant. | )<br>) |

**TO:    McKesson Corporation**
**One Post Street**
**San Francisco, CA 94104**

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |
| | |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):    **See EXHIBIT A.**

| PLACE<br>Nicole M. Norris, Winston & Strawn LLP,<br>101 California Street, San Francisco, CA 94111 | DATE AND TIME<br>May 28, 2008 at 9 a.m. |
|---|---|

☐ YOU ARE COMMANDED to produce and permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| Issuing Officer Signature and Title (Indicate if attorney for Plaintiff or Defendant) | Date |
|---|---|
| *S. McCallum*                      Attorney for Defendant | May 14, 2008 |

Issuing Officer's Name, Address, and Phone Number:
Stephanie S. McCallum, Winston & Strawn LLP
35 W. Wacker Drive, Chicago, IL 60601-9703, (312) 558-7958

(See Rule 45, Federal Rules of Civil Procedure Parts C & D on Reverse)

- 2 -

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on

_____
DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

## Federal Rule of Civil Procedure 45 (c), (d), and (e), as amended on December 1, 2007:

**(c) PROTECTING A PERSON SUBJECT TO A SUBPOENA.**
(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.
(2) Command to Produce Materials or Permit Inspection.
  (A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  (B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested.
The objection must be served before the earlier of the time specified for compliance or 14 days
after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.
(3) Quashing or Modifying a Subpoena.
  (A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:
    (i) fails to allow a reasonable time to comply;
    (ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  (B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:
    (i) disclosing a trade secret or other confidential research, development, or commercial information;
    (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or
    (iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.
  (C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order

appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.
**(d) DUTIES IN RESPONDING TO A SUBPOENA.**
(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:
  (A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  (B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  (C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
  (D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
(2) Claiming Privilege or Protection.
  (A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  (B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
**(e) CONTEMPT.**
The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

- 3 -

## EXHIBIT A

## GENERAL DEFINITIONS

1.     "Antiretroviral Drugs" or "ARV Drugs" shall include, but are not limited to, Non-Nucleoside Reverse Transcriptase Inhibitors, Nucleoside/Nucleotide Reverse Transcriptase Inhibitors, Protease Inhibitors, and Entry Inhibitors.

2.     The "National Drug Code product identifier number" or "NDC number" shall mean the unique, three-segment number required under 21 U.S.C. § 360(e) as a universal product identifier for human drugs.

3.     The terms "you" or "your" shall mean AmerisourceBergen Corporation and (a) any of its divisions, departments, subsidiaries, or other organizational or operational units; (b) all predecessor, successor, or assignee entities; (c) all member companies, corporations, partnerships, associations, or other business entities; and (d) present or former officers, directors, employees, agents, consultants, accountants, attorneys, or other representatives (in their individual or representative capacities).

4.     The term "communication" shall mean or refer to all inquiries, discussions, conversations, negotiations, agreements, understandings, meetings, telephone conversations, e-mails, instant messages, letters, notes, telegrams, text messages, advertisements, or other forms of information exchanged, whether oral, electronic, or written.

5.     The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), including, without limitation, electronic or computerized data compilations.   A draft or non-identical copy is a separate document within the meaning of this term.

6.     The term "including" shall mean "including without limitation."

7.     The terms "discussing," "identifying," "reflecting," "referring," "concerning," "relating to," or any derivation thereof shall mean, without limitation, consisting of, constituting, containing, mentioning, describing, summarizing, evidencing, listing, indicating, analyzing, explaining, supporting,

- 4 -

undermining, contradicting, concerning, pertaining to, prepared in connection with, used in preparation for, or being in any way legally, logically, or factually connected with the matter discussed.

8.    All words and phrases shall be construed in accordance with normal custom and usage in the industries or field of commerce to which they apply.

9.    Unless otherwise defined, all words and phrases used in this subpoena shall be accorded their usual meaning as defined by Webster's New Universal Unabridged Dictionary:  Fully Revised and Updated (2003).

10.    The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope.

## INSTRUCTIONS

1.    Each request for production below seeks the production of each responsive document in its entirety, without abbreviation or redaction with all non-identical copies and drafts thereof, including any document appended to, included therewith, incorporated by or referred to in the document and all file folders in which any such document is contained.

2.    If you at any time had possession or control of a document or thing requested herein and if such document or thing has been lost, destroyed, purged, or is not presently in your possession or control, identify the document, the date of its loss, destruction, purge or separation from your possession or control, and the circumstances surrounding its loss, destruction, purge or separation from your possession or control.

3.    Should your refuse, on the grounds of attorney-client privilege, work product immunity, or any other applicable privilege or immunity, to produce any document or tangible thing, provide at the time of making said refusal a list or log of all such non-produced documents or things.  With respect to any such document or thing that is being withheld, state the following: (1) the nature of the privilege or immunity being claimed; (2) the number of the request calling for its production; (3) the date of the

document; (3) the name of each person who signed and/or prepared the document; (4) the name of each addressee and person to whom the document or copies thereof were given or sent; (5) a description of the general subject matter of the document; (6) an identification of any document or other material transmitted with or attached to the document; and (7) the nature or character of the document or thing, as well as the number of pages of the document.

4.      This subpoena seeks production of every version of the documents and things requested, including, but not limited to, copies of the documents with marginalia, additional attachments, additional handwritten or typed notes, indications of carbon copies, blind carbon copies, or distribution lists, and drafts and revisions of the document.

5.      Electronic data should be produced in comma delimited text files.

6.      If any of the requested documents cannot be produced in full, produce them to the extent possible, specifying the reasons for your inability to produce the remainder.

7.      Unless the request specifically states otherwise, references to the singular shall include the plural and vice versa; references to one gender shall include the other gender; references to the past include the present and vice versa; and disjunctive terms include the conjunctive and vice versa.

8.      Unless otherwise indicated, the relevant time period for this subpoena is January 2002 until the present.

## REQUESTS FOR PRODUCTION

1.      Financial documents showing your gross profit margins on your sales of Norvir®, Kaletra®, Reyataz®, and Lexiva®, by drug and by month for the calendar years 2002 through 2007.

2.      All transaction-level sales and sales adjustment data relating to your sales of Norvir®, Kaletra®, Reyataz®, and Lexiva® for the calendar years 2002 through 2007, identifying for each sale and/or other transaction (including returns and error corrections) the following:

        a.      the date thereof;

b.    the identity of the particular product, the National Drug Code ("NDC") product identifier number, package sizes in extended units per package, and any and all other unique codes or other identifiers;

c.    the number of packages sold, returned or otherwise affected by the transaction;

d.    any price or unit adjustments—whether monthly, quarterly or at any other periodicity—involving or relating to the sale or transaction;

e.    the transaction price in dollars per package for each sale or other transaction;

f.    the net extended amount in dollars for each transaction;

g.    the amount of the chargeback, rebate, discount, and/or consideration given and/or accrued, the contract or other bases upon which the chargeback, rebate, discount, and/or consideration is calculated, the date thereof, and any and all codes relating to transaction types; and

h.    the sales, or group of sales, upon which the chargeback, rebate, discount, and/or other consideration is based, including the identity of the particular product, the NDC number, package size in extended units per package, the number of packages sold, the date(s) of the sales, or group of sales, and the invoice amount in dollars for the sale(s) or group of sales.

3.    All transactional-level sales and sales adjustment data relating to your purchases of Reyataz®, and Lexiva® for the calendar years 2002 through 2007, identifying for each sale and/or other transaction (including returns and error corrections) the following:

a.    the date thereof;

b.    the identify of the particular product, the NDC number, package sizes in extended units per package, and any and all other unique codes or other identifiers;

c.    the number of packages sold, returned or otherwise affected by the transaction;

d.    any price or unit adjustments—whether monthly, quarterly or at any other periodicity—involving or relating to the sale or transaction;

- 7 -

      e.     the transaction price in dollars per package for each sale or other transaction;

      f.     the net extended amount in dollars for each transaction;

      g.     the amount of the chargeback, rebate, discount, and/or consideration given and/or accrued, the contract or other bases upon which the chargeback, rebate, discount, and/or consideration is calculated, the date thereof, and any and all codes relating to transaction types; and

      h.     the sales, or group of sales, upon which the chargeback, rebate, discount, and/or other consideration is based, including the identity of the particular product, the NDC number, package size in extended units per package, the number of packages purchased, the date(s) of the sales, or group of sales, and the invoice amount in dollars for the sale(s) or group of sales.

4.     All documents created during calendar years 2002 through 2007 that describe your pricing strategies or pricing formulas for ARV drugs, including, but not limited to, documents describing how you determine the price for particular ARV drugs, any analyses of wholesaler and distributor pricing for ARV drugs, and any agreements between you and your customers specifying pricing or pricing formulas.

5.     All documents discussing the impact on your gross profit margins and/or your volume of sales of ARV drugs as a result of an increase in the acquisition costs of Norvir® and/or Kaletra®.



1   Laurence D. King (SBN 206423)
    Linda M. Fong (SBN 124232)
2   350 Sansome Street, Suite 400
    San Francisco, CA 94104
3   Telephone:     (415) 772-4700
    Facsimile:      (415) 772-4707
4   Email: lking@kaplanfox.com
            lfong@kaplanfox.com
5
6   *Attorneys for Individual and Representative Plaintiff*
    *Meijer, Inc. and Meijer Distribution, Inc.*
7   [Additional Counsel on Signature Page]

8
9                  UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                       OAKLAND DIVISION

12
13   MEIJER, INC. and MEIJER
     DISTRIBUTION, INC., on behalf of
14   themselves and all others similarly situated,     Case No. C 07-5985 CW

15                  Plaintiffs,                         **CONSOLIDATED AMENDED
                                                        COMPLAINT**
16   v.
                                                        **JURY TRIAL DEMAND**
17   ABBOTT LABORATORIES,
     Defendant.
18
19   ROCHESTER DRUG CO-OPERATIVE,                       Case No. C 07-6010 CW
     INC. on behalf of themselves and all others
20   similarly situated,                                **CONSOLIDATED AMENDED
                                                        COMPLAINT**
21                  Plaintiffs,
                                                        **JURY TRIAL DEMAND**
22   v.

23   ABBOTT LABORATORIES,

24                  Defendant.

25   *[caption continues on next page]*

26

27

28

1

2  LOUISIANA WHOLESALE DRUG
   COMPANY, INC., on behalf of themselves
   and all others similarly situated,

3                                              Case No. C 07-6118 CW

4              Plaintiffs,                      **CONSOLIDATED AMENDED
                                               COMPLAINT**
5  v.
                                               **JURY TRIAL DEMAND**
6  ABBOTT LABORATORIES,

7  Defendant.

8                        <u>**NATURE OF THE ACTION**</u>

9          Plaintiffs Meijer, Inc., Meijer Distribution, Inc., Rochester Drug Cooperative, Inc.,

10  and Louisiana Wholesale Drug Co., Inc. (collectively "Plaintiffs") bring this class action on behalf

11  of themselves and all others similarly situated challenging defendant Abbott Laboratories'

12  unlawful monopolization of the markets for Boosting and Boosted protease inhibitors, drugs used

13  to treat medical disorders caused by the human immunodeficiency virus ("HIV"). Defendant

14  Abbott Laboratories ("Abbott" or "Defendant") has unlawfully leveraged its monopoly position as the

15  sole provider of Norvir, a protease inhibitor ("PI") that is used to boost the therapeutic effects of

16  other protease inhibitors, in order to disadvantage its competitors and restrict competition in the

17  closely related Boosted Market. Abbott's anticompetitive scheme has resulted in a suppression of

18  competition in the Boosted Market and the Boosting Market and has caused Plaintiffs and other

19  direct purchasers to pay artificially inflated prices for the relevant drugs.

20                              <u>**PARTIES**</u>

21          1.      Plaintiffs Meijer, Inc. and Meijer Distribution, Inc. (collectively, "Meijer")

22  are corporations organized under the laws of the State of Michigan, with their principal place of

23  business located at 2929 Walker Avenue, NW, Grand Rapids, Michigan 49544. Meijer is the

24  assignee of the claims of the Frank W. Kerr Co., which, during the class period, as defined below,

25  purchased Norvir and Kaletra directly from Abbott and suffered antitrust injury as a result of

26  Abbott's anticompetitive conduct alleged herein.

27          2.      Plaintiff Rochester Drug Cooperative, Inc. ("RDC") is a pharmaceutical

28  wholesaler located at 50 Jet View Drive, Rochester, New York, 14624. During the relevant

1    period, Plaintiff purchased Norvir and Kaletra directly from Abbott, and was injured as a result of

2    Defendant's anti-competitive conduct alleged herein.

3         3.    Plaintiff Louisiana Wholesale Drug Company, Inc. ('LWD') is a

4    pharmaceutical wholesaler and corporation organized under the laws of the State of Louisiana and

5    is located at 20851-49 South Service Road, in Sunset, Louisiana 70584. During the relevant

6    period, LWD purchased Norvir and Kaletra directly from Abbott, and suffered antitrust injury as

7    a result of the anti-competitive conduct alleged herein.

8         4.    Defendant Abbott is a corporation organized and existing under the laws of

9    the State of Illinois and having its headquarters and principal place of business located at 100

10   Abbott Park Road, Abbott Park, Illinois.  Abbott is engaged in the development, manufacture and

11   sale of pharmaceutical and nutritional products.  Abbott has facilities in at least 14 states,

12   including at least 3 in this District.

13                          **JURISDICTION AND VENUE**

14        5.    This action arises under section 2 of the Sherman Act, 15 U.S.C. § 2, and

15   sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  The Court has subject-matter

16   jurisdiction pursuant to 28 U.S.C. 1331 and 1337(a).

17        6.    Venue is proper in this Court pursuant to section 12 of the Clayton Act, 15

18   U.S.C. § 22, and Local Rules of the United States District Court for the Northern District of

19   California 3-2 because Abbott is an inhabitant of this District or is found or transacts business

20   there and because a substantial part of the events giving rise to Plaintiff's claims occurred in this

21   District.  Venue is also proper pursuant to 28 U.S.C. § 1391.

22        7.    Intradistrict assignment is proper in the San Francisco/Oakland Division,

23   pursuant to L.R. 3-2( c) & (d), because a substantial part of the events which give rise to the claim

24   occurred in Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Napa, San

25   Francisco, San Mateo and Sonoma counties.

26

27

28

**TRADE AND COMMERCE**

8.    The pharmaceutical products at issue in this case are sold in interstate commerce, and the unlawful activities alleged in this Complaint have occurred in, and have had a substantial effect upon, interstate commerce.

**FACTUAL BACKGROUND**

9.    PIs are considered the most powerful treatment in the medical battle against HIV and the disorders it causes, including acquired immune deficiency syndrome ('AIDS'). These drugs work by blocking the action of protease, an enzyme needed for HIV to reproduce and infect other cells.

10.    Although PIs present an effective treatment, they have several impediments, including: pill burden, dietary requirements, and severe side effects. Each PI presents different degrees of impediment and efficacy. In addition, patients develop resistance to certain PIs–asignificant challenge to the treatment of HIV–as the disease progresses

11.    There are several PIs currently on the market, including Norvir (a Boosting drug), manufactured by Abbott and introduced in 1996, and Kaletra, also manufactured by Abbott and introduced in 2000. Kaletra is a combination drug consisting of Norvir and another Abbott PI, whose chemical or generic name is lopinavir (a Boosted drug). As explained below, while Norvir was introduced as a stand-alone treatment, its principal use today is to boost the therapeutic effects (and reduced the required dosage) of other PIs.

12.    Abbott developed Norvir with the assistance of a National Institute of Health grant and spent only about $15 million of its own funds on pre-approval clinical trials for the drug. By the end of 2001, Norvir had generated cumulative sales for Abbott of more than $1 billion.

13.    After Norvir's release, it was discovered that, when used in small quantities with another PI, Norvir would boost the anti-viral effects of the other PI. Not only did a small dose of Norvir make other PIs more effective and decrease side effects associated with high doses, but it also slowed down the rate at which HIV developed resistance to the effects of PIs. Norvir is the only PI known to have such properties and, as a result, for such 'boosting' purposes,

1  there is no substitute for Norvir.  In addition to its direct therapeutic benefits, a regimen

2  consisting of a PI boosted by Norvir improves convenience for patients in comparison to an

3  unboosted regimen by reducing the required dosage of the PI and lessening food restrictions, both

4  important factors in ensuring adherence to HIV antiviral therapy.

5          14.    Recent research has also shown significant benefits from the use of

6  Boosted-PI regimens, especially for patients who experience failure of treatment regimens

7  combining PIs with other anti-HIV drugs.  Such treatment failures are marked by the emergence

8  of drug-resistant mutations that limit the benefits of other drugs in the future, because of cross-

9  resistance among HIV medications.

10          15.    Abbott has never sought to use its intellectual property to prevent other

11  manufacturers from creating and selling Boosted-PIs that rely on Norvir's use.  Indeed, Abbott has

12  disclaimed such a use from the exclusionary scope of its patent rights. *See In Re Abbott*

13  *Laboratories Norvir Antitrust Litigation,* 442 F. Supp.2d 800, 807-810 (N.D. Cal. 2007).  Abbott

14  profited by licensing competitors the right to market PIs to be co-administered with Norvir.

15  Abbott licensed both explicitly and implicitly competitors the right to market PIs to be co-

16  administered with Norvir.  Based on Abbott's course of conduct, Abbott knowingly created the

17  conditions for Norvir to become the *de facto* standard boosting agent.

18          16.    As noted above, Abbott also markets Kaletra, which consists of Norvir and

19  another Abbott PI, lopinavir, combined in a single pill, *i.e.*, Kaletra is lopinavir boosted by

20  Norvir.  Although effective and widely used, Kaletra has significant side effects, including

21  hyperlipidemia, which renders patients more vulnerable to heart attacks and strokes.

22          17.    Thus, in the "Boosting Market," Norvir is the only product available, while in

23  the "Boosted Market," Kaletra competes with other PIs, each of which is prescribed, dispensed and

24  taken in conjunction with Norvir.  This creates a situation in which the same firm participates in

25  two closely related markets, with the product sold in one of the two markets being an input or

26  component of the product sold in the other market.  If such a firm lacks competition in the market

27  for sales of the input or component product, it may be able to use its monopoly position in that

28

1    market to disadvantage its competitors in the related market and monopolize or attempt to

2    monopolize the related market.  That is exactly what Abbott has done here.

3        18.    Abbott's anticompetitive conduct involves both of these markets.  First,

4    Abbott has leveraged its monopoly position (100% dominance) in the Boosting Market to impede

5    rivals to Abbott's Kaletra product in the Boosted Market.  And, second, by improperly impeding

6    the development of potential rivals to Norvir (and/or by delaying the development of technologies

7    that would have permitted Norvir to be used as a PI-Boosting drug in substantially lesser amounts

8    far earlier (and thus effectively brought lower prices to purchasers earlier) in the Boosting

9    Market, Abbott artificially maintained and/or enhanced and exploited Norvir's monopoly position

10    in the Boosting Market.

11                    **ABBOTT'S ANTICOMPETITIVE CONDUCT**

12        19.    Prescriptions for Kaletra rose steadily from its introduction in September

13    2000 through mid-2003, at which point Kaletra enjoyed over three-quarters of the Boosted

14    Market.  However, Kaletra's dominance of the Boosted Market was about to be threatened.

15        20.    On information and belief, in 2001 (or earlier), Abbott came to realize that

16    Kaletra's domination of the Boosted Market would soon be challenged by new Boosted-PIs that

17    were then expected to be coming to market imminently.

18        21.    On information and belief, during 2002 (or earlier), Abbott became

19    increasingly concerned about the competitive threat to Kaletra posed by soon-to-be-introduced

20    Boosted-PIs, and began to formulate plans to thwart the impact on Kaletra of those new products.

21    Abbott considered various strategies for leveraging its Norvir dominance to impair Kaletra's

22    rivals, including, *e.g.*: (a) removing Norvir from the market as a stand-along product, and (b)

23    raising Norvir's price substantially in order to make it prohibitively expensive for patients to use

24    rivals' Boosted-PI products.

25        22.    In June 2003, Bristol-Myers Squibb Co. introduced Reyataz, a PI designed

26    to be boosted by Norvir.  In October 2003, GlaxoSmithKline introduced Lexiva, another PI

27    designed to be boosted by Norvir.  Studies showed that, when boosted with Norvir, the new PIs

28    were as effective as Kaletra, and were more convenient.  On information and belief this caused

1    concern at Abbott that Kaletra's market share would be threatened by these new Boosted-PI

2    competitors.  And, in fact, Kaletra's share of the Boosted Market began to decline.

3          23.    Beginning in the second half of 2003, both Reyataz and Lexiva began to

4    make steady inroads into Kaletra's share of the Boosted Market.

5          24.    Abbott was well aware of the competitive threat posed by Reyataz and

6    Lexiva and acted quickly to suppress it.  Overnight, on December 3, 2003, as part of the

7    monopolization scheme alleged herein, Abbott raised the wholesale price of Norvir by

8    approximately 400%, from $205.74 to $1,028.71 for a 120-count bottle of 100 mg capsules.

9    However, Abbott did not raise the price of Kaletra, which incorporates Norvir.  In effect, Abbott

10   raised the price of Norvir only when it is used to boost a non-Abbott PI.  By instituting this

11   enormous price hike, Abbott drastically increased the cost of regimens using Norvir to boost

12   competing PIs.  The annual cost of Norvir needed in such a regimen increased by $6,258 per year

13   for PIs such as Lexiva requiring twice-daily dose of Norvir.  For Aptivus (tipranavir), a new PI

14   marketed by Boehringer Ingelheim, the optimal Norvir boosting dose increased by more than

15   $12,000 per year.

16         25.    Faced with the prospect of new competitors to Abbott's Boosted-PI, Kaletra—

17   *i.e.*, two new PIs from GSK (Lexiva) and BMS (Reyataz)—Abbott's executive declined to engage in

18   legal and procompetitive, but potentially ineffective, approaches to defending against a loss of

19   market share.  Instead, its executives formulated an anticompetitive monopolization scheme using

20   Abbott's control of the Boosting Market (Norvir) as leverage to impede rivals of Kaletra in the

21   Boosted Market, and thereby artificially insulate Kaletra from competition.  Abbott executives

22   were well-aware that Abbott had facilitated the use of Norvir as a boosting drug and caused its

23   competitors to rely on the availability of Norvir—through Abbott's past course of conduct and

24   formally through licensing its competitors to promote their PIs with Norvir.  Abbott executives

25   realized that if Abbott could make Norvir unavailable or less desirable when paired with its

26   competitors' PIs—by actually pulling it from the market or by manipulating its price—then its

27   competitors' products in the Boosted Market, which by that time almost always relied on Norvir

28

CONSOLIDATED AMENDED COMPLAINT          - 7 -          CASE NO. 07-CV-05985-CW

1    for boosting due to Abbott's prior conduct, would be impaired, and could not become a significant

2    competitive threat to Kaletra's market share.

3            26.    As reported in the Wall Street Journal, internal Abbott documents reveal,

4    among other things, that: (a) Abbott understood the illegal nature of the price-increase scheme

5    and contemplated other strategies, like ceasing sales of Norvir, to "minimize any federal

6    investigations regarding price increases in the US"; (b) Abbott understood the adverse

7    consequences of the scheme, including that it would "tarnish" the reputation of Abbott's CEO,

8    "[p]osition [Abbott] as [a] big, bad, greedy pharmaceutical company," "[f]uel[] perception[s]

9    regarding lack of Abbott commitment to HIV," and create a "[b]acklash from [the] advocacy

10   community, legislators, [and] physicians"; and (c) Abbott floated pretextual rationales for the price

11   increase but worried about its "[e]xposure on price if forced to open [its] books." Furthermore,

12   removing Norvir from the U.S. market entirely would potentially expose Abbott to the significant

13   financial risk that the NIH would use its "march-in" rights under the Bayh-Dole Act to grant

14   licenses to numerous competitors to allow rivals to manufacture ritonovir and/or to co-formulate

15   their Boosted-PIs with ritonovir in a single pill or capsule.

16           27.    According to internal Abbott emails and other documents released by the

17   Wall Street Journal, one Abbott executive explained Abbott's concern in the following manner:

18   Abbott could not "continue to trade a prescription of Kaletra for a prescription of Norvir at 100

19   mg." Rather than rely on any competitive advantage in the medicinal characteristics of Kaletra, or

20   even on lowering Kaletra's price so that it was more attractive to patients, this executive outlined

21   alternative anticompetitive plans that had been discussed among Abbott management and warned

22   other senior Abbott employees not to be "stunned by the outcome of the thought process."

23           28.    But the emails are stunning.  First, they outlined two potential scenarios for

24   increasing the price of Norvir in an effort artificially to decrease demand for its competitors' PIs.

25   In both scenarios, they suggested leaving the price of Kaletra unchanged, thus giving Abbott a

26   huge price advantage for PIs boosted by Norvir.  They outlined a "rationale" for the proposed

27   Norvir price increase, suggesting that Abbott mislead the public into believing that "it is no longer

28

CONSOLIDATED AMENDED COMPLAINT              - 8 -                    CASE NO. 07-CV-05985-CW

1    feasible for Abbott to provide a production line of Norvir capsules at the current price." The

2    emails, however, frankly admit the "weakness" of this "rationale" its falsity.

3                29.    Even more cynically, the Abbott emails suggested an alternative approach

4    to the price increase: withdraw Norvir capsules from the market entirely, leaving HIV patients

5    only with a liquid form of Norvir that Abbott's own executives admit "taste[s] like someone else's

6    vomit." Other materials reveal that Abbott planned to make up a justification for this withdrawal.

7    Executives considered misleading the public into believing that Abbott was diverting the capsules

8    for humanitarian efforts in "the developing world (i.e. Africa)."

9                30.    An Abbott slide presentation created around the time of these emails

10    further illustrates the anticompetitive and illegitimate motives behind Abbott's price hike.  The

11    presentation reveals, for example, that Abbott sought to "[p]osition Kaletra as a more economical

12    option for boosted ARV [anti-retroviral] therapy." Abbott acknowledged the illegitimacy of its

13    plan, but Abbott still found it easier to mislead the public regarding an anticompetitive price

14    increase than to try to explain a complete withdrawal of Norvir capsules from the market.

15                31.    Abbott further attempted to manage the fallout from its Norvir price

16    increase by publishing misleading comparisons of PI prices.  In promotional and informational

17    materials about Norvir after the price increase, Abbott represented that Norvir was the lowest-

18    priced PI on the market.

19                32.    The Department of Health & Human Services (DHHS') responded with a

20    Warning Letter to Abbott about such materials, calling Abbott's price comparison chart "false or

21    misleading in violation of section 502(a) of the Federal Food, Drug, and Cosmetic Act (Act) (21

22    U.S.C. 352(a))." Specifically, DHHS stated that the price chart was misleading because it

23    compared a "subtherapeutic dose of Norvir (100 mg once daily) to the labeled dosing regimens of

24    other antiretroviral agents" and it "implies that Norvir may be used other than in combination

25    therapy, when it is not labeled for such use." Abbott did not contest the FDA letter, choosing

26    instead to send a letter to healthcare providers retracting and "clarifying" its false statements.

27                33.    On information and belief, internal Abbott documents state Abbott's

28    intentions: the huge price increase for the PI-Boosting drug, Norvir, could be effectively

1   leveraged to insulate Kaletra from competition in the separate Boosted Market.  Abbott's

2   December 3, 2003 price increase was an attempt to leverage its monopoly position in the

3   Boosting Market in order to disadvantage competitors and maintain its dominant position in the

4   Boosted Market.  The attempt succeeded.

5           34.    At the very same time that Abbott was planning to limit Norvir's

6   availability (by either physically removing it from the market or raising its price to make it

7   effectively unavailable), Abbott was approaching BMS, GSK, and other actual and potential

8   Boosted-PI competitors to induce them to take licenses from Abbott for the right to label and

9   market their PIs to be boosted by, or co-administered with, Norvir.  In 2001, Abbott approached

10  GSK to demand that GSK secure a license from Abbott to allow GSK to promote GSK's existing

11  PIs, as well as PIs it had under development, with Norvir.  Abbott and GSK continued to

12  negotiate over such a license during 2001 and 2002 until GSK ultimately acquiesced to this

13  demand, procuring a license from Abbott in December 2002. Under the license, GSK paid

14  substantial sums of money and other valuable consideration in exchange for the right to promote

15  the use and administration of its PIs with Norvir.

16          35.    Abbott negotiated the Norvir licenses with GSK and other competitors

17  during 2001 and 2002 at the very same time that it was secretly considering limiting Norvir's

18  availability.  Abbott never disclosed to GSK and other licensees and potential licensees that

19  Abbott might either remove Norvir from the market or raise its price to make it financially

20  unavailable to many patients. When GSK entered into the Norvir license with Abbott in

21  December 2002, GSK relied on Abbott's good faith not to materially deviate from its prior course

22  of conduct with regard to selling and pricing Norvir.  Up until that point, Abbott had never

23  increased Norvir's price by more than 4% per year.  The largest price increase in HIV therapies

24  had been a 10.4% increase for the price for Combivir and Trizivir in January 2002.  Abbott's

25  overnight 400% price increase for Norvir was unprecedented and especially when considering

26  Abbott's prior conduct of encouraging and facilitating licensing of Norvir for use in the Boosted

27  Market totally unexpected.

28

36.    On information and belief, in reliance on the expectation that Abbott would act in good-faith, and because Abbott concealed its strategy to reduce Norvir's availability and/or dramatically raise its prices, GSK and other PI manufacturers materially delayed developing, testing, and/or launching other potential Boosted-PIs that could be effective with substantially less of Norvir (and thus be less susceptible to impairment by a Norvir price increase) or could be used another PI-Boosting drug entirely, *i.e.*, not Norvir. As a result of Abbott's conduct, no currently available PI has been approved for co-administration with any other PI-Boosting drug besides Norvir.

37.    Had GSK and other competitors known that Abbott was planning to substantially reduce Norvir's availability (either by raising its prices to prohibitive levels or pulling it from the market entirely), GSK and other competitors would not have delayed or postponed efforts to develop alternative Boosted-PI drugs that did not depend upon using 200 mg of the Norvir product as a PI-Boosting drug. For example, due to Abbott's misconduct as described above, GSK was delayed in receiving FDA labeling approval for the use of its Boosted-PI Lexiva with only 100 mg of Norvir per day, rather than 200 mg of Norvir per day to achieve the same clinical results. Lexvia entered the market, belatedly, in October 2007. A result of this new FDA approval for use of Lexiva with only 100 mg of Norvir is that the cost to purchasers of boosting Lexiva with Norvir dropped by one-half. Because GSK (and potentially others) delayed development, testing and FDA-approval of Boosted-PIs that would be effective with lower amounts of Norvir: (a) purchasers in the Boosted Market paid more for Norvir than they otherwise would have; and (b) GSK's rival Boosted-PI products were rendered more expensive (and therefore less of a competitive threat to Kaletra).

38.    Abbott's exclusionary conduct has unlawfully caused the Boosted Market to standardize on Norvir for boosting purposes and has significantly retarded the advent of alternatives to Norvir in the United States, thereby enabling Abbott to sell Norvir at artificially inflated prices. But for Abbott's illegal conduct, multiple other avenues for providing, or obviating the need for, boosting functionality would have been invested in, pursued, resulting in a much lower demand, and therefore profitably sustainable price, for Norvir.

1      39.    Abbott's leveraging scheme effectively halted the decline in market share of

2   Kaletra.  By 2006, Kaletra's share of the Boosted Market had risen to approximately the same

3   dominant share it had held prior to the introduction of Reyataz.  This change was due to the

4   competitive disadvantage imposed on non-Abbott PIs by the December 2003 price increase on

5   Norvir.

6      40.    By leveraging its monopoly power in the Boosting Market to impair rivals

7   in the Boosted Market, Abbott's 400% Norvir price increase not only impeded competition by

8   inflating the costs of using rivals' Boosted-PI products, but also caused its Boosted-PI competitors

9   to forego responding to Abbott's conduct by lowering price.  After December 2003, Abbott's

10  Boosted-PI competitors knew that any price reductions they took could immediately be undercut

11  by further Norvir price *increases*.  In other words, by leveraging its monopoly in the Boosting

12  Market, Abbott could react to price cuts by its Boosted-PI rivals not with price reductions of its

13  own on its Boosted-PI product as one would expect in a competitive market, but rather with price

14  increases on a different product.  In this way, Abbott's Boosted-PI rivals had little incentive to get

15  into a competitive battle with Abbott in the Boosted Market given that Abbott controlled the

16  Boosting Market.  By undermining competitors' incentives to price compete, Abbott's conduct

17  reduced price competition as a whole in the Boosted Market.  Consequently, the December 2003

18  Norvir price increase not only raised the costs of using rivals' products, but also reduced the

19  overall degree of price competition in the Boosted Market, thereby further reducing competitive

20  pressure on Abbott to reduce Kaletra's prices.

21      41.    The following allegations are sufficient, but not necessary, to state a claim.

22  On information and belief: (a) if the penalty a purchaser would pay on the required dosage of

23  Norvir for buying a Boosted-PI from a supplier other than Abbott were subtracted from the

24  imputed price of the Boosted-PI portion of Kaletra, then the resulting price would be below

25  Abbott's average variable costs relating to the Boosted-PI portion of Kaletra; and (b) if Abbott had

26  to pay its own market price for the ritonavir/Norvir that goes into Kaletra, Abbott's selling Kaletra

27  at its current market price would not be profitable.

28

42.    As a direct and proximate result of Abbott's unlawful conduct, Plaintiffs and other similarly situated direct purchasers have been deprived of the benefit of free and open competition in both the Boosting and Boosted Markets and have been injured in their businesses and properties by paying more for the relevant Abbott drugs than they would have in the absence of Abbott's unlawful, anticompetitive conduct.

## RELEVANT MARKETS

43.    There are two product markets relevant to Plaintiffs' antitrust claims: the Boosting Market, which consists of Norvir alone, and the Boosted Market, which consists of Kaletra and a number of non-Abbott PIs, each of which is prescribed, dispensed and used in conjunction with Norvir. The relevant geographic market is the United States. With respect to both product markets, a firm that was the only seller of such products in the United States would have the ability to profitably sell those products at a price substantially above the competitive level without losing significant sales.

44.    At all relevant times, Abbott has had a 100% share of the Boosting Market and has had a dominant share of the Boosted Market. At all relevant times, Abbott possessed monopoly power—the ability to profitably raise price significantly above competitive level without losing significant sales—in both relevant markets.

45.    There are barriers to entry in both the Boosted and Boosting Markets. The products in these markets require millions of dollars and years to design, develop, and distribute. Compounding these barriers to entry, both markets require government approvals to enter and are may be covered by patents and other forms of intellectual property. Thus, competitors or potential market entrants lack the capacity to increase output in the short run.

46.    The unlawful actions alleged above were taken for the purpose of maintaining Abbott's dominant share of the Boosted Market.

## CLASS ACTION ALLEGATIONS

47.    Plaintiffs bring this action on their own behalf and under Fed. R. Civ. P. 23(a) & (b)(3), as representatives of a class (the 'Class') defined as follows:

1    All persons or entities in the United States that purchased Norvir
     and/or Kaletra directly from Abbott or any of its divisions,
2    subsidiaries, predecessors, or affiliates during the period from
     December 3, 2003 through such time as the effects of Abbott's
3    illegal conduct have ceased, and excluding federal governmental
     entities, Abbott, and Abbott's divisions, subsidiaries, predecessors,
4    and affiliates.

5    48.    On information and belief, hundreds of entities in the United States have

6    purchased Norvir and/or Kaletra directly from Abbott.  Thus, members of the Class are so

7    numerous that joinder is impracticable.

8    49.    Plaintiffs' claims are typical of those of the Class.

9    50.    Plaintiffs and all members of the Class were damaged by the same conduct

10   of the Defendant.

11   51.    Plaintiffs will fairly and adequately protect and represent the interests of

12   the Class. The interests of the Plaintiffs are not antagonistic to the Class.

13   52.    Plaintiffs are represented by counsel who are experienced and competent in

14   the prosecution of complex class action antitrust litigation.

15   53.    Questions of law and fact common to the members of the Class

16   predominate over questions, if any, that may affect only individual members because Defendant

17   has acted and refused to act on grounds generally applicable to the entire Class.  Such generally

18   applicable conduct is inherent in the Defendant's exclusionary and anticompetitive conduct in

19   monopolizing and attempting to monopolize the Boosted Market and in monopolizing the

20   Boosting Market, as more fully alleged herein.

21   54.    Questions of law and fact common to the Class include:

22   a.    whether the Defendant intentionally and unlawfully impaired or

23   impeded competitors the Boosting and/or Boosted Markets;

24   b.    whether Abbott unlawfully attempted to monopolize the Boosting

25   and/or Boosted Market during the Class Period;

26   c.    whether Abbott engaged in anticompetitive conduct in order to

27   leverage its monopoly in the Boosting Market to obtain, maintain, or extend monopoly power in

28   the Boosted Market;

CONSOLIDATED AMENDED COMPLAINT          - 14 -                    CASE NO. 07-CV-05985-CW

1      d.      whether the geographic market for both PI-Boosting drugs and

2   Boosted-PIs is the United States;

3      e.      whether Abbott has monopoly power in a relevant market defined

4   as the Boosting Market;

5      f.      whether Abbott intended to monopolize the Boosted Market or to

6   maintain or extend an existing monopoly on the Boosted Market, and in fact maintained or

7   extended monopoly power in the Boosted Market;

8      g.      whether there was and is a dangerous probability that Abbott would

9   succeed in monopolizing the Boosted Market;

10     h.      whether Abbott had pro-competitive reasons for its conduct;

11     i.      the effects of Abbott's attempted monopolization on prices of

12   Boosted-PIs;

13     j.      whether Plaintiff and other members of the Class have been

14   damaged by paying more for the relevant drugs as a result of Defendant's unlawful behavior; and,

15     k.      the proper measure of damages.

16      55.   Class action treatment is a superior method for the fair and efficient

17   adjudication of the controversy, in that, among other things, such treatment will permit a large

18   number of similarly situated persons to prosecute their common claims in a single forum

19   simultaneously, efficiently, and without the unnecessary duplication of effort and expense that

20   numerous individual actions would engender.  The benefits of proceeding through the class

21   mechanism, including providing injured persons or entities with a method for obtaining redress

22   for claims that might not be practicable for them to pursue individually, substantially outweigh

23   any difficulties that may arise in management of this class action.

24      56.   Plaintiffs know of no difficulty to be encountered in the maintenance of

25   this action as a class action.

26                    **FIRST CAUSE OF ACTION**
                **Monopolization of the Boosted Market (15 U.S.C. § 2)**
27

28

57.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 56 above.

58.    At all relevant times, Abbott has had monopoly power in both the Boosting Market and the Boosted Market.

59.    Abbott has willfully maintained its monopoly power in the Boosted Market through exclusionary and anticompetitive means.  As described in more detail above, Abbott induced competitors in the Boosted Market to rely upon Norvir, then overnight raised the price of Norvir by approximately 400% in December 2003, and maintained that inflated price to the present day.  Norvir is sold at a much lower price when used as one component of Abbott's own Boosted-PI, Kaletra.  By engaging in this conduct, and instituting such a price increase, Abbott has improperly leveraged its monopoly position in the Boosting Market to gain an artificial competitive advantage and unfairly impede and impair its competitors in the Boosted Market. The purpose and effect of Abbott's conduct have been to suppress rather than promote competition on the merits.

60.    There is no procompetitive justification for Abbott's conduct.

61.    Plaintiffs have been injured in their businesses and properties by reason of Abbott's unlawful monopolization.  Plaintiffs' injuries consist of paying higher prices to purchase the relevant products than they would have paid absent Abbott's conduct.  Plaintiffs' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Abbott's conduct unlawful.

## SECOND CAUSE OF ACTION
### Attempt to Monopolize the Boosted Market (15 U.S.C. § 2)

62.    Plaintiffs incorporates by reference the allegations contained in paragraphs 1 through 61 above.

63.    At all relevant times, Abbott has had monopoly power in the Boosting Market and, in the alternative, a dangerous probability of achieving monopoly power in the Boosted Market.

CONSOLIDATED AMENDED COMPLAINT            - 16 -            CASE NO. 07-CV-05985-CW

64.     Abbott has attempted to monopolize the Boosted Market through exclusionary and anticompetitive means.  As described in more detail above, Abbott induced competitors in the Boosted Market to rely upon Norvir, then overnight raised the price of Norvir by approximately 400% in December 2003, and maintained that inflated price to the present day. Norvir is sold at a much lower price when used as one component of Abbott's own Boosted-PI, Kaletra.  By engaging in this conduct, and instituting such a price increase, Abbott has improperly leveraged its monopoly position in the Boosting Market to gain an artificial competitive advantage and unfairly impede and impair its competitors in the Boosted Market.  The purpose and effect of Abbott's conduct have been to suppress rather than promote competition on the merits.

65.     At all relevant times, Abbott has had the specific intent to monopolize the Boosted Market.

66.     There is no procompetitive justification for Abbott's conduct.

67.     Plaintiffs have been injured in their businesses and properties by reason of Abbott's unlawful attempt to monopolize.  Plaintiffs' injuries consist of paying higher prices to purchase the relevant products than they would have paid absent Abbott's conduct.  Plaintiffs' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Abbott's conduct unlawful.

**THIRD CAUSE OF ACTION**
**Monopolization of the Boosting Market (15 U.S.C. § 2)**

68.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 67 above.

69.     Abbott has willfully enhanced and maintained its monopoly power in the Boosting Market through exclusionary and anticompetitive means. As described in more detail above, Abbott deceptively induced rivals to forego developmental alternatives and instead standardize around the use of Norvir for boosting purposes. Given that competitors were induced to lock in to using Norvir, Abbott exercised its monopoly power in the Boosting Market by raising the price of Norvir approximately 400% in December 2003. Abbott has maintained that

1    price to the present day. The purpose and effect of Abbott's conduct has been to suppress rather

2    than promote competition on the merits.

3          70.   There is no pro competitive justification for Abbott's conduct.

4          71.   Plaintiffs and the Class have been injured in their businesses and properties

5    by reason of Abbott's unlawful monopolization. Plaintiffs' injuries consist of paying higher prices

6    to purchase the relevant products than they would have paid absent Abbott's conduct. These

7    injuries to Plaintiffs' businesses and properties are of the type the antitrust laws were designed to

8    prevent and flow from that which makes Abbott's conduct unlawful.

9                        **PETITION FOR RELIEF**

10         WHEREFORE, Plaintiffs petition that:

11         a.    The Court determine that this action may be maintained as a class

12   action pursuant to Fed. R. Civ. P. 23, that Plaintiffs be appointed class representatives, and that

13   Plaintiffs' counsel be appointed as counsel for the Class;

14         b.    The conduct alleged herein be declared, adjudged and/or decreed to

15   be unlawful under Section 2 of the Sherman Act, 15 U.S.C. § 2;

16         c.    Plaintiffs and the Class recover their overcharge damages, trebled,

17   and the costs of the suit, including reasonable attorneys' fees as provided by law; and

18         d.    Plaintiffs and the Class be granted such other, further, and different

19   relief as the nature of the case may require or as may be determined to be just, equitable and

20   proper by this Court.

21                        **JURY TRIAL DEMAND**

22         Plaintiffs demand a trial by jury of all issues so triable.

23

24   Dated: January 11, 2008

25                              KAPLAN FOX & KILSHEIMER LLP

26                              By:   /s/ Laurence D. King

27                              Laurence D. King (SBN 206423)
                                Linda M. Fong (SBN 124232)
                                350 Sansome Street, Suite 400
28                              San Francisco, CA 94104
                                Telephone:   (415) 772-4700

1    Facsimile:   (415) 772-4707
     Email: lking@kaplanfox.com
2    lfong@kaplanfox.com

3    Robert N. Kaplan, Admitted *Pro Hac Vice*
     Linda P. Nussbaum, Admitted *Pro Hac Vice*
4    850 Third Avenue, 14th Floor
     New York, NY 10022
5    Telephone:   (212) 687-1980
     Facsimile:   (212) 687-7714
6    Email: rkaplan@kaplanfox.com
     lnussbaum@kaplanfox.com
7    garenson@kaplanfox.com

8    *Lead Counsel for Meijer, Inc. and Meijer
     Distribution, Inc.*
9

10   BERGER & MONTAGUE, P.C.
     Daniel Berger
11   danberger@bm.net
     Eric L. Cramer, Admitted *Pro Hac Vice*
12   ecramer@bm.net
     David F. Sorensen
13   dsorensen@bm.net
     1622 Locust Street
14   Philadelphia, PA 19103
     Telephone:   (215) 875-3000
15   Facsimile:   (215) 875-4604

16   *Lead Counsel for Rochester Drug Cooperative, Inc.*

17

18   GARWIN GERSTEIN & FISHER, LLP
     Bruce E. Gerstein, *Pro Hac Vice*
19   Noah H. Silverman, *Pro Hac Vice*
     1501 Broadway, Suite 1416
     New York, New York 10036
20   Tel: (212) 398-0055
     Fax: (212) 764-6620
21   E mail:  bgerstein@garwingerstein.com
              nsilverman@garwingerstein.com
22
     *Lead Counsel for Louisiana Wholesale Drug Co.,
23   Inc.*

24   ***Additional Counsel for Plaintiffs:***

25   ODOM & DES ROCHES, LLP
26   John Gregory Odom, *Pro Hac Vice*
     Stuart E. Des Roches, *Pro Hac Vice*
27   John Alden Meade, *Pro Hac Vice*
     Suite 2020, Poydras Center
28   650 Poydras Street

1   New Orleans, LA 70130
    Tel: (504) 522-0077
2   Fax: (504) 522-0078
    E mail:  jodom@odrlaw.com
3            stuart@odrlaw.com

4   PERCY SMITH & FOOTE, LLP
    David P. Smith, *Pro Hace Vice*
5   W. Ross Foote, *Pro Hace Vice*
    720 Murray Street
6   P.O. Box 1632
    Alexandria, LA 71309
7   Tel: (318) 445-4480
    Fax: (318) 487-1741
8   E mail:  dpsmith@psfllp.com
             rfoot@psfllp.com
9
    KOZYAK TROPIN & THROCKMORTON
10  Tucker Ronzetti, *Pro Hac Vice*
    Adam Moskowitz, *Pro Hac Vice*
11  2800 Wachovia Financial Center
    200 South Biscayne Boulevard
12  Miami, Florida 33131-2335
    Telephone: (305) 372-1800
13  Telecopier: (305) 372-3508

14  AUBERTINE DRAPER ROSE, LLP
    Andrew E. Aubertine, *Pro Hac Vice*
15  aa@adr-portland.com
    1211 SW Sixth Avenue
16  Portland, Oregon 97204
    Telephone:    (503) 221-4570
17  Facsimile:    (503) 221-4590

18  LAW OFFICES OF JOSHUA P. DAVIS
    Joshua P. Davis (State Bar No. 193254)
19  *davisj@usfca.edu*
    437A Valley Street
20  San Francisco, CA 94131
    Telephone:    (415) 422-6223
21
    VANEK, VICKERS & MASINI, P.C.
22  Joseph M. Vanek, Admitted *Pro Hac Vice*
    David P. Germaine, Admitted *Pro Hac Vice*
23  111 South Wacker Drive, Suite 4050
    Chicago, IL 60606
24  Telephone:    (312) 224-1500
    Facsimile:    (312) 224-1510
25  Email:  jvanek@vaneklaw.com
             dgermaine@vaneklaw.com
26
    SPERLING & SLATER
27  Paul E. Slater, Admitted *Pro Hac Vice*
    55 West Monroe Street, Suite 3200
28  Chicago, Illinois 60603

1

2

Telephone:    (312) 641-3200
Facsimile:    (312) 641-6492
Email:  pes@sperling-law.com

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28