IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEIJER, INC., & MEIJER DISTRIBUTION, INC.,<br><br>    Plaintiffs,<br><br>  v.<br><br>ABBOTT LABORATORIES,<br><br>    Defendant.<br>_____/ | No. C 07-5985 CW<br>(CONSOLIDATED)<br><br>ORDER DENYING DEFENDANT'S MOTION TO COMPEL DISCOVERY |

    Plaintiffs Meijer, Inc., Meijer Distribution, Inc., Rochester Drug Cooperative, Inc. and Louisiana Wholesale Drug Company, Inc. are pharmaceutical wholesalers that purchase Kaletra and Norvir, the drugs whose prices are the subject of this antitrust action, directly from Defendant Abbott Laboratories.[1]  Abbott moves to compel Plaintiffs to produce information concerning sales of Kaletra and Norvir to their customers.  Abbott argues that this information is probative of whether a conflict might exist between members of the putative class of direct purchasers, such that class certification is inappropriate.  Plaintiffs oppose Abbott's motion. Pursuant to the parties' stipulation, the matter was taken under submission on the papers.  Having considered all of the papers

---

[1] The factual background of this case is set out in detail in the Court's order denying Abbott's motion to dismiss (Docket No. 58).

filed by the parties, the Court denies Abbott's motion.

DISCUSSION

Rule 23(a)(4) of the Federal Rules of Civil Procedure establishes as a prerequisite for class certification that "the representative parties will fairly and adequately protect the interests of the class." Here, the putative class consists of:

> All persons or entities in the United States that purchased Norvir and/or Kaletra directly from Abbott or any of its divisions, subsidiaries, predecessors, or affiliates during the period from December 3, 2003 through such time as the effects of Abbott's illegal conduct have ceased, and excluding federal governmental entities, Abbott, and Abbott's divisions, subsidiaries, predecessors, and affiliates.

Compl. ¶ 47.

Abbott maintains that certain members of the putative class may have benefitted from the increase in the wholesale price of Norvir in two ways:

> First, some wholesalers sell Norvir and Kaletra to pharmacies and other retailers on a cost-plus basis. Cost-plus pricing means that these wholesalers charge their customers their wholesale acquisition costs ("WAC") plus a set percentage mark-up (*i.e.* their profit margin). Because their profit margins increase proportionally with the increase in their acquisition costs, these wholesalers stand to benefit -- and, in fact, did benefit -- from the increases in the prices Abbott charged for Norvir and Kaletra. Second, some wholesalers also profit in other ways from higher prices, including from the interest (or, "float") they earn on the difference between their accounts receivable from their buyers and the accounts payable from their suppliers. As [Abbott's expert] Prof. Hay explains, large wholesalers with substantial volume of sales can earn significant profits from the "float," and higher prices can increase these profits considerably.

Def.'s Mot. at 2-3 (citations omitted). Abbott postulates that these class members may prefer Abbott's current pricing structure, and thus their interests will not be served by the named Plaintiffs, who challenge the structure as anticompetitive.

2

In order to determine whether certain class members may have benefitted from the Norvir price increase, Abbott served interrogatories and document requests on Plaintiffs seeking detailed and extensive transaction-level information about sales of anti-retroviral drugs by all putative class members.[2] Abbott intends to analyze this "downstream" sales information to oppose Plaintiffs' motion for class certification by showing that a fundamental conflict exists among members of the putative class.

In <u>Hanover Shoe, Inc. v. United Shoe Machinery Corp.</u>, 392 U.S. 481 (1968), the Court held that when a seller overcharges a buyer in violation of the antitrust laws, the fact that the buyer raises the price for its own product, thereby passing on the overcharge to its customers and avoiding a loss in profit, has no bearing on the issue of whether the buyer has suffered an injury and thus has the right to recover damages from the seller.  Rather, damages are appropriate to the extent the buyer was overcharged, and must be measured accordingly.  <u>See</u> <u>id.</u> at 489-92.  Given this holding, the parties appear to agree that the downstream sales information Abbott seeks is not relevant to any issue to be tried in this case, including the issue of damages.  However, Abbott notes that it seeks the information exclusively for the purpose of demonstrating a potential conflict of interest among class members.

In <u>Illinois Brick Co. v. Illinois</u>, 431 U.S. 720 (1977), the Court reaffirmed its view in <u>Hanover Shoe</u> that the effect of an

---

[2] In its reply brief, Abbott states that, despite the broad scope of its formal discovery requests, "[f]or purposes of this motion, Abbott has agreed to seek only a limited set of data and documents relating to the prices and total annual sales by the named Plaintiffs of Norvir, Kaletra, Reyataz and Lexiva."  Def.'s Reply Br. at 13.

3

1  overcharge on a buyer's profits is not an appropriate topic of
2  inquiry.  It noted that the "principal basis" for its earlier
3  decision was "the Court's perception of the uncertainties and
4  difficulties in analyzing price and out-put decisions 'in the real
5  economic world rather than an economist's hypothetical model.'"
6  Id. at 731-32 (quoting Hanover Shoe, 392 U.S. at 493).  In the
7  Court's view, the "evidentiary complexities and uncertainties"
8  involved in analyzing the impact of an overcharge on a firm's
9  profits would result in "long and complicated" proceedings that
10 would ultimately prove inconclusive.  Id. at 732.
11     Notwithstanding the Supreme Court's admonitions about the
12 utility and feasibility of this type of analysis, Abbott urges the
13 Court to adopt the approach of the Eleventh Circuit in Valley Drug
14 Co. v. Geneva Pharmaceuticals, Inc., 350 F.3d 1181 (11th Cir.
15 2003).  In that case, the court addressed the propriety of class
16 certification where, as Abbott alleges is the case here, some
17 members of the direct purchaser class had potentially benefitted
18 from the conduct the named plaintiffs were challenging as
19 anticompetitive -- namely, an agreement that kept off the market
20 generic versions of a branded drug.  Because wholesalers, "who play
21 a central role in the distribution of branded drugs, are often
22 bypassed in the distribution chain for many generic sales," id. at
23 1191, it was possible that their interests would not be served by
24 the litigation.  The court therefore found that the district court
25 had erred in not permitting discovery on downstream sales, which
26 might have allowed the defendant to demonstrate that some members
27 of the class, but not others, benefitted from the limited
28 availability of lower-cost generic drugs.

4

In reaching its decision, the Eleventh Circuit construed Hanover Shoe and Illinois Brick narrowly as standing only "for the proposition that a direct purchaser who passes on overcharges to his own customers nevertheless suffers cognizable anti-trust injury and may sue to recover damages regardless of whether he actually profited from the defendants' conduct." Id. at 1192. In so doing, however, the court did not give sufficient weight to what the Supreme Court called the "principal basis" for its decisions: the practical difficulty of determining whether and to what extent a party benefits from one economic arrangement as opposed to another. Just as it is difficult to determine from downstream sales data whether an overcharge has caused a direct purchaser to suffer a financial loss that can serve as a measure of damages, see Illinois Brick, 431 U.S. at 731-32, it is likewise difficult to determine, as Abbott proposes to do, whether an overcharge has conferred a financial benefit on a direct purchaser.

Nor is the Court persuaded that the specific circumstances of this case render an economic benefits analysis feasible. "While recognizing that the difficulties and uncertainties involved in determining actual economic injury might be less substantial in the context of some markets than in others, the Supreme Court has rejected a number of 'attempts to carve out exceptions to the Hanover Shoe rule for particular types of markets,' when the attempts reintroduced the need to assess the effects of an overcharge on the purchaser's prices, costs, sales, and profits." In re Buspirone Patent Litig., 210 F.R.D. 43, 60 (S.D.N.Y. 2002)

(quoting Illinois Brick, 431 U.S. at 744).[3]  In addition, the burden of producing the discovery Abbott seeks and the potential deterrent effect thereof far outweighs the limited potential of the sales data to provide insight into whether the pursuit of this action is in the interests of putative class members.  See In re Pressure Sensitive Labelstock Antitrust Litig., 226 F.R.D. 492, 498 (M.D. Pa. 2005) ("[T]he Supreme Court has cautioned that the effectiveness of antitrust actions may be substantially reduced if defendants are allowed to pursue an inquiry into downstream activities and the massive discovery that such an inquiry would entail.  Furthermore, the marginal relevance of the information sought is clearly outweighed by the burden and expense that the proposed discovery would impose.") (citation omitted).

Other courts have recognized that Valley Drug conflicts with the Supreme Court's decisions in Hanover Shoe and Illinois Brick in additional respects.  In Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd., 246 F.R.D. 293 (D.D.C. 2007), for example, the court stated:

> In [Valley Drug], the Eleventh Circuit found that proposed named plaintiffs could not adequately represent the interests of a class of direct purchasers, including the Big Three [wholesalers], because the Big Three "appear to benefit from the effects of the conduct alleged to be wrongful by the named plaintiffs because their net economic situation is better off when branded

---

[3] The Court notes also that the relevant inquiry is not whether certain class members benefit from the current pricing structure as compared to the pricing structure before the Norvir price increase.  Rather, the question is whether those class members benefit from the current pricing structure as compared to the pricing structure following any changes Abbott makes to it as a consequence of this lawsuit.  Because those changes will not necessarily result in the price of Norvir returning to its previous level, it is not clear that downstream sales data will have any bearing on the issue of intra-class conflict.

6

> drugs dominate the market." 350 F.3d at 1191. The Court respectfully disagrees with the Eleventh Circuit's conclusion, however, because it conflicts with the Supreme Court's decisions in <u>Hanover Shoe</u> and <u>Illinois Brick</u>. . . .
>
> <u>Hanover Shoe</u> "precludes not only the 'passing on' defense, but also the subtle variation asserted here, which might be termed the 'otherwise benefitting' defense." <u>In re Relafen Antitrust Litig.</u>, 346 F. Supp. 2d 349, 369 (D. Mass. 2004) (citing <u>Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.</u>, 131 F.3d 874, 884-85 (10th Cir. 1997)); <u>see also</u> <u>Hawaii v. Standard Oil Co. of Cal.</u>, 405 U.S. 251, 264 n.14 (1972) ("[D]amages are established by the amount of the overcharge [and] [u]nder § 4, courts will not go beyond the fact of this injury to determine whether the victim of the overcharge has partially recouped its loss in some other way."). The Eleventh Circuit purports to recognize this proposition, and to distinguish <u>Hanover Shoe</u> and <u>Illinois Brick</u> on the grounds that those cases did not address "a party's burden to satisfy the class certification prerequisites established by Rule 23(a)." <u>Valley Drug</u>, 350 F.3d at 1192. However, the Eleventh Circuit's holding fails to appreciate the true import of the <u>Hanover Shoe</u> rule that a direct purchaser may recover the full amount of the overcharge, even if he is otherwise benefitted, because the antitrust "injury occurs and is complete when the defendant sells at the illegally high price." <u>In re Cardizem CD Antitrust Litig.</u>, 200 F.R.D. 279, 313 (E.D. Mich. 2001) (citing <u>Sports Racing Servs., Inc.</u>, 131 F.3d at 883); <u>see also</u> <u>Relafen</u>, 346 F. Supp. 2d at 369. As such, Defendants' arguments that the Big Three actually benefitted from the delayed entry of Balziva into the market due to the generic bypass phenomenon are irrelevant as a matter of law, and cannot serve to demonstrate that a conflict exists between Plaintiffs' interests and those of the Big Three with respect to this litigation.

<u>Id.</u> at 303-04 (footnotes omitted, citation format altered). <u>See also</u> <u>In re Wellbutrin SR Direct Purchaser Antitrust Litig.</u>, 2008 WL 1946848, at *6 (E.D. Pa.) ("[B]ecause all class members have the right to pursue overcharge damages, they have the same incentive to do so, and there is no conflict among class members allegedly harmed by the same antitrust violation. Accordingly, the Court declines to follow <u>Valley Drug</u> and will adhere instead to the principles announced in <u>Hanover Shoe</u> and <u>Illinois Brick</u>.")

7

1    Abbott makes the valid point that in <u>Meijer v. Warner Chilcott</u>
2 and <u>Wellbutrin</u>, generic drugs had already entered the market by the
3 time litigation was underway.  Thus, even if successful, the
4 lawsuits would not have resulted in the discontinuation of a
5 benefit that some members of the class were continuing to enjoy.
6 Here, in contrast, even though all class members stand to receive
7 damages if this lawsuit is successful, some of them may also be
8 forced to forgo the allegedly increased profits that have stemmed
9 from the challenged pricing structure.[4]  Abbott also notes for the
10 first time in its reply brief[5] that the nature of any remedial
11 changes it may make to its pricing structure will depend on the
12 antitrust theory that is advanced by Plaintiffs and adopted by the
13 Court.  It argues that, because of each class member's distinct
14 sales profile, not all class members will prefer the same set of
15 remedial changes.  Thus, Abbott asserts, in advancing any
16 particular antitrust theory, Plaintiffs are not capable of
17 representing the interests of all class members simultaneously.

18    It must be emphasized, however, that the information Abbott
19 seeks is relevant only insofar as it demonstrates that the
20 interests of putative class members would not be served by a
21 successful challenge to Abbott's current pricing structure.  Even

---

[4] Plaintiffs note that they do not seek an injunction requiring Abbott to restructure its pricing of Norvir and Kaletra.  Instead, they seek damages for alleged overcharges, which they claim would benefit all class members.  Nonetheless, any finding by this Court that Abbott's pricing is anticompetitive would necessarily require Abbott to restructure its pricing in order to avoid liability for future damages.  Thus, it is at least theoretically possible that a particular class member would prefer to forgo an award of damages in lieu of the continuation of the current pricing structure.

[5] Plaintiffs' motion for leave to file a sur-reply (Docket No. 91) is GRANTED.

8

if the information were to demonstrate that certain class members have benefitted from the Norvir price increase while others have not, it would at most constitute circumstantial evidence suggesting that some class members may prefer to continue operating under the current pricing structure rather than obtain the damages they would be due if Plaintiffs prevail.

But there is a much simpler and more effective way of determining class members' preferences: notify them of the action and give them the opportunity to opt out of the class or to enter an appearance. This procedure, specified in Rule 23(c)(2) of the Federal Rules of Civil Procedure, provides a mechanism for minimizing the potential for intra-class conflict. Roberts v. Heim, 670 F. Supp. 1466, 1491 (N.D. Cal. 1987) ("Court[s] have long recognized the use of the 'opt out' mechanism to ameliorate class conflicts."); Lerwill v. Inflight Motion Pictures, Inc., 582 F.2d 507, 512 (9th Cir. 1978) ("While a right to withdraw from a class action is not always a complete answer to an alleged conflict among class members, in these circumstances that option fairly protected the interests of any dissident employees.") (citation omitted).

In this particular case, there is little risk that direct purchasers whose interests are not served by the lawsuit will remain in the class. As Abbott's customers, members of the proposed class are easily identifiable. They are also sophisticated business entities that are not likely to fail to appreciate the potential effects of this litigation. Notice is

therefore an effective means of protecting their interests.[6]  See Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd., 247 F.R.D. 253, 268-69 (D. Mass. 2008) ("[S]hould any fundamental conflict arise, a ready mechanism exists to protect it -- the opt-out provision. . . . Sophisticated players such as distributors and large hospitals can determine for themselves whether a fundamental conflict exists within the class.").

CONCLUSION

For these reasons, Abbott's motion to compel (Docket No. 71) is DENIED.  Its motion for an extension of time to file its opposition to Plaintiffs' motion for class certification (Docket No. 88) is GRANTED.  The opposition is due one week from the date of this order.  The reply due date is extended accordingly.  The hearing will be held as scheduled.

IT IS SO ORDERED.

Dated: 6/18/08

CLAUDIA WILKEN
United States District Judge

---

[6] Notably, counsel for the three largest drug wholesalers, which Abbott itself maintains account for eighty percent of all purchases of Norvir and Kaletra, have addressed letters to the Court stating their position on the matter.  Although Abbott specifically mentions these class members as likely to have benefitted from the Norvir price hike, they state in clear terms that there is no present or foreseeable conflict between them and the named Plaintiffs.  Abbott's argument that these letters carry no weight because they are not sworn declarations is not well taken.  A letter from a class member's attorney stating that the class member's interests are aligned with those of the named Plaintiffs is probative of whether a fundamental conflict exists.