

Nicole M. Norris (SBN 222785)
WINSTON & STRAWN LLP
101 California Street, Suite 3900
San Francisco, CA  94111-5894
Telephone:    415-591-1000
Facsimile:    415-591-1400
Email: nnorris@winston.com

James F. Hurst (*Admitted Pro Hac Vice*)
David J. Doyle (*Admitted Pro Hac Vice*)
Samuel S. Park (*Admitted Pro Hac Vice*)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Telephone:    312-558-5600
Facsimile:    312-558-5700
Email: jhurst@winston.com; ddoyle@winston.com;
spark@winston.com

Charles B. Klein (*Admitted Pro Hac Vice*)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C.  20007
Telephone:    202-282-5000
Facsimile:    202-282-5100
Email: cklein@winston.com

Attorneys for Defendant
ABBOTT LABORATORIES

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| MEIJER, INC. & MEIJER DISTRIBUTION, INC., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ABBOTT LABORATORIES,<br><br>Defendant. | **Case No. C 07-5985 CW**<br><br>*Related Per October 31, 2007 Order to Case No. C 04-1511 CW*<br><br>CONSOLIDATED CASE<br><br>**ABBOTT LABORATORIES' OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:    August 7, 2008<br>Time:    2:00 p.m.<br>Courtroom:  2 (4th Floor)<br>Judge:    Hon. Claudia Wilken |

*Sidebar (vertical):* Winston & Strawn LLP / 35 W. Wacker Drive / Chicago, IL 60601-9703

1

**TABLE OF CONTENTS**

2

INTRODUCTION ..................................................................................................1

BACKGROUND ...................................................................................................3

    I.    Plaintiffs Allege Two Distinct Sherman Act Claims—Boosted Market Monopolization And Boosting Market Monopolization....................................4

        A.    Plaintiffs' Boosted Market Monopolization Claims.................................4

        B.    Plaintiffs' Boosting Market Monopolization Claim..................................5

PROPOSED CLASS AND CLASS REPRESENTATIVES.................................5

LEGAL STANDARD FOR CLASS CERTIFICATION ....................................6

ARGUMENT ........................................................................................................7

    I.    Meijer Lacks Standing To Sue. ..............................................................7

    II.    Plaintiffs Cannot Meet Their Burden Of Satisfying The Rule 23(a) Prerequisites In Light Of Multiple, Intra-Class Conflicts Going To The Heart Of This Case. ...............................................................................9

        A.    Plaintiffs Bear The Burden Of Showing That There Is No Intra-Class Conflict..........................................................................9

        B.    The Proposed Class Creates Four Types Of Intra-Class Conflicts. .........10

            1.    The Interests Of Kaletra-Only Purchasers Are Antagonistic To Plaintiffs' Boosting Market Monopolization Claim.................10

            2.    The Interests Of Kaletra-Only And Norvir-Only Purchasers Directly Conflict With Regard To The Boosted Market Monopolization Claim................................................12

            3.    Putative Class Members Have Antagonistic Economic Interests With Respect To Plaintiffs' Decision To Forgo Lost Profit Damages. ........................................................13

            4.    Putative Class Members Have Antagonistic Economic Interests Because Some Receive A Net Benefit From The Price Increases At Issue.......................................................14

        C.    Subclasses And Opt-Out Rights Cannot Cure These Intra-Class Conflicts..................................................................16

    III.    Plaintiffs Also Have Failed to Satisfy The Rule 23(b)(3) Requirements..............18

        A.    Plaintiffs Have Failed to Satisfy The Predominance Requirement..........18

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

i

CASE NO. C 07-5985 CW - ABBOTT LABORATORIES' OPPOSITION TO DIRECT
PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1.    **Plaintiffs' Proposed Method For Using Common Evidence To Show Both The Fact Of Injury And Amount Of Overcharges Is Flawed.** ................................................. 19

2.    **Any Determination Of The Fact Of Injury Or The Amount Of Damages Would Turn On Individualized Issues.** ...................... 21

3.    **The Central District Of California Held That The Predominance Requirement Was Not Satisfied Under Virtually Identical Circumstances.** .................................................. 22

4.    **Plaintiffs Fail To Address This Court's Distinction Between Norvir As A Standalone PI And Norvir As A Booster.** ................. 24

B.    **The Class Action Vehicle Is Not A Superior Method Of Resolving This Case.** ................................................................ 24

IV.    **Class Certification Should Be Denied Because The Claims Are Meritless.** .......... 25

**CONCLUSION** ............................................................................................. 25

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

CASE NO. C 07-5985 CW - ABBOTT LABORATORIES' OPPOSITION TO DIRECT
PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aamco Automatic Transmissions, Inc. v. Tayloe,*
    67 F.R.D. 440 (E.D. Pa. 1975) ........................................................ 17

*Abercrombie v. Lum's, Inc.,*
    345 F. Supp. 387 (S.D. Fla. 1972) ................................................... 17

*Al Barnett & Son, Inc. v. Outboard Marine Corp.,*
    64 F.R.D. 43 (D. Del. 1974) ............................................................. 15

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group,*
    247 F.R.D. 156 (C.D. Cal. 2007) ........................................... 19, 22, 23

*Alpert v. U. S. Indus.,*
    59 F.R.D. 491 (C.D. Cal. 1973) ....................................................... 17

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997) ................................................................... 10, 24

*Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.,*
    222 F.3d 52 (2d Cir. 2000) ................................................................ 9

*Bell Atlantic Corp. v. AT&T,*
    339 F.3d 294 (5th Cir. 2003) ..................................................... 19, 24

*Bishop v. Committee on Prof'l Ethics,*
    686 F.2d 1278 (8th Cir. 1982) ......................................................... 10

*Blackie v. Barrack,*
    524 F.2d 891 (9th Cir. 1975) ........................................................... 16

*Blades v. Monsanto Co.,*
    400 F.3d 562 (8th Cir. 2005) ........................................................... 19

*Cascade Health Solutions v. PeaceHealth,*
    515 F.3d 883 (9th Cir. 2008) ................................................ 5, 14, 25

*Chestnut Fleet Rentals, Inc. v. Hertz Corp.,*
    72 F.R.D. 541 (E.D. Pa. 1976) ........................................................ 15

*Clark v. Experian Information Solutions, Inc.,*
    2001 WL 1946329 (D.S.C. 2001) .................................................... 18

*Cotchett v. Avis Rent A Car System, Inc.,*
    56 F.R.D. 549 (S.D.N.Y. 1972) ....................................................... 17

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

*Winston & Strawn LLP*
*35 W. Wacker Drive*
*Chicago, IL 60601-9703*

*Crawford v. Honig,*
   37 F.3d 485 (9th Cir. 1995)............................................................................................ 9

*Cummings v. Connell,*
   316 F.3d 886 (9th Cir. 1998).......................................................................................... 10

*District Distributors, Inc. v. Heublein, Inc.,*
   1971 WL 559 (D.D.C. May 28, 1971)........................................................................... 8, 9

*Feinstein v. Firestone Tire & Rubber Co.,*
   535 F. Supp. 595 (S.D.N.Y. 1982) ................................................................................. 18

*Frankford Hospital v. Blue Cross of Greater Philadelphia,*
   67 F.R.D. 643 (E.D. Pa. 1975) ................................................................................. 24, 25

*Free World Foreign Cars, Inc. v. Alfa Romeo, S.p.A.,*
   55 F.R.D. 26 (S.D.N.Y. 1972) ....................................................................................... 16

*General Telephone Co. of Southwest v. Falcon,*
   457 U.S. 147 (1982)......................................................................................................... 6

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998)..................................................................................... 6, 10

*Hansberry v. Lee,*
   311 U.S. 32 (1940).......................................................................................................... 9

*Heerwagen v. Clear Channel Comms.,*
   435 F.3d 219 (2d Cir. 2006) .......................................................................................... 22

*Honolulu Fed. Sav. & Loan Ass'n v. Verex Assurance, Inc.,*
   116 F.R.D. 474 (D. Haw. 1987) ..................................................................................... 10

*Illinois State Rifle Ass'n v. State of Ill.,*
   717 F. Supp. 634 (N.D. Ill. 1989) .................................................................................. 25

*In re Abbott Labs. Norvir Antitrust Litig.,*
   2007 WL 1689899 (N.D. Cal. June 11, 2007)........................................................... passim

*In re Citric Acid Antitrust Litigation,*
   1996 WL 655791 (N.D. Cal. 1996) .................................................................................. 6

*In re Ditropan XL Antitrust Litigation,*
   2007 WL 2978329 (N.D. Cal. Oct. 11, 2007) .................................................................. 8

*In re Industrial Gas Antitrust Litigation,*
   100 F.R.D. 280 (N.D. Ill. 1983) ..................................................................................... 21

*In re Jackson Nat. Life Ins. Co. Premium Litigation,*
   209 F.R.D. 134 (W.D. Mich. 2002)................................................................................ 18

*In re Methionine Antitrust Litig.,*
  204 F.R.D. 161 (N.D. Cal. 2001) ........................................................................................... 6

*In re NCAA I-A Walk-On Football Players Litig.,*
  2006 U.S. Dist. LEXIS 28824 (W.D. Wash. May 3, 2006) ................................................. 15

*In re Playmobil Antitrust Litig.,*
  35 F. Supp. 2d 231 (E.D.N.Y. 1998) ...................................................................................... 7

*In re Terazosin Hydrochloride Antitrust Litig.,*
  223 F.R.D. 666 (S.D. Fla. 2004) ........................................................................................... 15

*In re Visa Check/MasterMoney Antitrust Litig.,*
  280 F.3d 124 (2d Cir. 2001) ........................................................................................... 10, 19

*Johnson v. Shreveport Garment Co.,*
  422 F. Supp. 526 (W.D. La. 1976), *aff'd,* 577 F.2d 1132 (5th Cir. 1978) ........................... 10

*Lerwill v. Inflight Motion Pictures, Inc.,*
  582 F.2d 507 (9th Cir. 1978) .......................................................................................... 16, 17

*Lukenas v. Bryce's Mountain Resort, Inc.,*
  66 F.R.D. 69 (W.D. Va.1975) ................................................................................................ 16

*Marshall v. Holiday Magic, Inc.,*
  550 F.2d 1173 (9th Cir. 1977) .............................................................................................. 17

*Matarazzo v. Friendly Ice Cream Corp.,*
  62 F.R.D. 65 (E.D.N.Y. 1974) .............................................................................................. 17

*Moore v. Southeast Toyota Distributors, Inc.,*
  1982 U.S. Dist. LEXIS 12790 (N.D. Ala. 1982) ............................................................ 21, 22

*Order, Oct. 21, 2004, Doe v. Abbott Labs.,*
  No. C 04-1511 ......................................................................................................................... 4

*Pehr v. University of Chicago,*
  799 F. Supp. 862 (N.D. Ill. 1992) ......................................................................................... 25

*Phillips v. Klassen,*
  502 F.2d 362 (D.C. Cir. 1974) ........................................................................................ 16, 17

*Plekowski v. Ralston Purina Co.,*
  68 F.R.D. 443 (M.D. Ga. 1975) ............................................................................................ 10

*Rutledge v. Electric Hose & Rubber Co.,*
  511 F.2d 668 (9th Cir. 1975) ................................................................................................ 24

*Thompson v. T. F. I. Cos.,*
  64 F.R.D. 140 (N.D. Ill. 1974) ............................................................................................. 17

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*,
   350 F.3d 1181 (11th Cir. 2003) ........................................................ 15

*Windham v. American Brands, Inc.*,
   565 F.2d 59 (4th Cir. 1977) (en banc) .............................................. 7

*Yerkovich v. AAA*,
   461 Mich. 732 (2000) ...................................................................... 8

STATUTES

28 U.S.C. § 1292(b) ............................................................................. 25

OTHER AUTHORITIES

*Fundamental Requirements for Class Suit*, 89 HARV. L. REV. 1454, 1488 (1976) ............... 17, 18

Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 3.30 (4th ed. 2002) ............... 16

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

CASE NO. C 07-5985 CW - ABBOTT LABORATORIES' OPPOSITION TO DIRECT
PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1
**INTRODUCTION**

2      Plaintiffs have overreached by attempting to certify a massive, nationwide class consisting of

3 parties running the gamut from wholesalers to hospitals to pharmacies to free HIV clinics. These

4 parties engage in different types of businesses and have starkly divergent economic interests with

5 respect to the alleged conduct. Some putative class members (including all Plaintiffs) purchased

6 both Norvir® and Kaletra®, but most purchased one and not the other. Some actually benefited

7 from the price increases at issue, but others did not. And the putative class members did not even

8 pay the same prices. Given these differences, it is not surprising that almost seven percent of

9 proposed class opted-out before Plaintiffs even filed their class certification brief.

10      The only thing these "direct purchasers" have in common is that they bought either Norvir,

11 Kaletra or both from Abbott. Plaintiffs, which have their own unique interests, seek to recover

12 "millions, if not billions, of dollars" for alleged overcharges—trebled—on behalf of this hodgepodge

13 of parties. (Mot. at 4). But they fail to address the disparate characteristics of the proposed class and

14 their competing claims. Instead, they summarily argue that the interests of all putative class

15 members are completely aligned, and that proof of injury and damages is straightforward. They also

16 argue that the Court should err on the side of certifying the proposed class. This mischaracterizes

17 Plaintiffs' burden, one they have not met for the following reasons.

18
### *Meijer Lacks Standing*

19      Plaintiffs Meijer, Inc. and Meijer Distribution, Inc. (together, "Meijer") lack standing to sue

20 and, therefore, cannot even get past this threshold class certification hurdle. Meijer is *not* a direct

21 purchaser. Rather, it is an indirect purchaser that brought suit under a purported assignment from the

22 Frank W. Kerr Co. ("Kerr"), which allegedly is a direct purchaser. The purported assignment cannot

23 provide standing, however, because: (1) Meijer has not shown that its claims fall within the scope of

24 the assignment; (2) ████████████████████████████████████████

25 ████████████████████████████████████; and (3) the assignment lacks consideration.

26
### *Plaintiffs Have Failed To Satisfy The Rule 23(a) Prerequisites*

27      Plaintiffs have failed to satisfy the Rule 23(a) prerequisites due to four intra-class conflicts

28 going to the heart of Plaintiffs' theories of liability, causes of action and proposed remedies.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

First, Plaintiffs' Boosting Market monopolization claim conflicts with the interests of direct purchasers that purchased only Kaletra, a group that comprises about a quarter of the class and has no ability to recover "overcharges" for Norvir purchases under the Boosting Market monopolization claim. To prevail under that claim, Plaintiffs must prove that Abbott's patents did *not* create a legitimate monopoly over the Boosting Market but, rather, that Abbott has such a monopoly *only* because of some sort of anticompetitive conduct. But Kaletra-only putative class members benefit from the exact opposite allegation—*i.e.*, that Abbott's patents *did* create a monopoly over the Boosting Market, the very foundation for Doe/SEIU's monopoly leveraging claim. Kaletra-only purchasers have no interest in foregoing this argument and assuming the *extra* burden of proving that some improper conduct beyond Abbott's patents was necessary to give Abbott a monopoly over the Boosting Market. This is an irreconcilable conflict—the same class cannot take the position that Abbott's patents *did create* and *did not create* a legitimate monopoly at the same time.

Second, to the extent Plaintiffs attempt to seek Norvir overcharges in the Boosted Market claim, such a theory would heighten the intra-class conflict between those direct purchasers that seek Kaletra overcharges and those that seek Norvir overcharges. Norvir-only purchasers would have an interest in arguing that the price of Kaletra is too *low*. This theory of liability, however, directly conflicts with the interests of Kaletra-only purchasers. To recover Kaletra overcharge damages, they must argue that the price of Kaletra is *too high*. Again, these positions are in direct conflict.

Third, Plaintiffs already have decided to limit the remedy in this case to overcharge damages, expressly disclaiming any request for lost profits. Although this decision may be in their respective economic interests, there is reason to believe that the decision conflicts with the interests of other members of the proposed class, such as Kaletra-only purchasers that may have a stronger lost profits theory than overcharge damages theory.

Finally, some putative class members benefited and will continue to benefit from the price increases at issue because they resell drugs on a cost-plus basis. Those class members have economic interests antagonistic to those of the remaining putative class members with regard to Plaintiffs' alternative, but conflicting, theories of liability. These theories, if successful, would have very different effects on Abbott's pricing of Norvir and Kaletra on a going-forward basis. Those

2

1   that profit from price increases on Norvir and Kaletra would prefer to pursue theories of liability that

2   would allow Abbott to retain some of the current prices for these drugs, or even increase them.  The

3   other putative class members, in contrast, would prefer an entirely different theory of liability that

4   essentially would require Abbott to roll-back its pricing for those drugs.

5       These four intra-class conflicts cannot be resolved through subclasses or the opt-out

6   procedure, thus precluding Plaintiffs from showing adequacy of representation and typicality.

7               ***Plaintiffs Also Have Failed To Satisfy The Rule 23(b)(3) Prerequisites***

8       Even if Plaintiffs could overcome the multiple and fundamental intra-class conflicts, they

9   still have not satisfied their burden under Rule 23(b)(3) of showing that common issues predominate.

10  Plaintiffs' proposed "methodology" for showing the fact of injury and amount of damages assumes

11  that all, or nearly all, direct purchasers paid the Wholesale Acquisition Cost ("WAC") or some

12  consistent percentage of WAC.  But the evidence shows that:  (1) the net price paid by direct

13  purchasers often was less than WAC; (2) different direct purchasers paid different net prices; and

14  (3) the net price many direct purchasers paid changed over time, and those changes varied by direct

15  purchaser.  Taking these individual variations into account would require dozens of mini-trials, thus

16  defeating the purpose of a class action.  Moreover, Plaintiffs have made no effort to explain how

17  they will distinguish the purported overcharges based on purchases of Norvir for use as a booster

18  from non-challenged charges based on purchases of Norvir for use as a standalone PI.

19      Finally, Plaintiffs have not shown that a class action is the superior vehicle to resolve the

20  issues in this case.  They have failed to explain why the sophisticated members of the putative class

21  could not bring their own suit or intervene if they have an interest in pursuing the claims in this

22  case.  In fact, thirteen putative class members already have filed suit separately.  A superior

23  approach to classwide litigation, one that might resolve the conflicts and predominance issues

24  described above, would be to allow direct purchasers with an actual interest in this case to intervene.

25                                      **BACKGROUND**

26      By now, this Court is quite familiar with Abbott's two patented HIV drugs, Norvir and

27  Kaletra, and the general antitrust allegations alleged in the related cases.  This consolidated direct

28  purchaser putative class action, however, is unique in certain crucial respects, as discussed below.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

**I.     Plaintiffs Allege Two Distinct Sherman Act Claims—Boosted Market Monopolization And Boosting Market Monopolization.**

**A.     Plaintiffs' Boosted Market Monopolization Claims.**

In the first two counts of Plaintiffs' Consolidated Amended Complaint, they allege a theory of "Boosted Market" monopolization and attempted monopolization under the Sherman Act. (Am. Compl. ¶¶ 57-67). As in the other Norvir cases, Plaintiffs allege a patent-monopoly leveraging theory of liability under which Abbott purportedly monopolized the market for boosted PIs (the Boosted Market) by raising the price of its patented drug, Norvir, which is used in a "separate market" (the Boosting Market) to "boost" the activity of PIs in the Boosted Market. (Mot. at 3). Plaintiffs complain that Abbott charged a "much lower price" for Norvir's active ingredient when it is bundled with another PI in the form of Kaletra. (Am. Compl. ¶ 59).

In their motion for class certification, Plaintiffs explain that, in their view, the Boosted Market monopolization claim supports a finding of overcharges with regard to Kaletra. They argue that Abbott's purported monopolization of the Boosted Market caused competing PI products in that market to become "substantially more expensive relative to Kaletra," thus "thwart[ing] competition" in that market. (Mot. at 5). Plaintiffs argue (unlike the plaintiffs in *Doe/SEIU*) that once Abbott "succeeded sufficiently in neutralizing its boosted rivals' ability to compete on price, Abbott began (safely) inflating Kaletra's price . . . a total of 25% from June 2005 through October 2007," thus allegedly constituting a supra-competitive price increase. (*Id.* at 6).

Plaintiffs fail to mention that this 25% price increase coincided with Abbott's release of an improved formulation of Kaletra (Kaletra Meltrex®) that justified the price increase and is consistent with price increases by competitors. Nevertheless, through their expert, Plaintiffs have offered various—but conflicting—theories of liability that they claim could support a finding this 25% increase constitutes a recoverable overcharge under a recoupment theory.

Even so, it is unclear what damages Plaintiffs claim in the Boosted Market. If they seek to recover Norvir overcharges, they have already conceded that Norvir is in a "separate market" from the alleged Boosted Market. (Mot. at 3). This allegation is necessary because their monopoly leveraging theory depends on the existence of two, distinct markets. (*See Order, Oct. 21, 2004, Doe*

1    *v. Abbott Labs.,* No. C 04-1511, at 5).  As a result, any effort to collect Norvir overcharges would be

2    legally flawed because Norvir is not in the market that allegedly was monopolized.

3        **B.    Plaintiffs' Boosting Market Monopolization Claim.**

4        Plaintiffs' Amended Complaint also contains a third cause of action unique to all the related

5    Norvir cases based on allegations that Abbott monopolized the Boosting Market, which Plaintiffs

6    have defined as consisting of "Norvir alone."  (Am. Compl. ¶¶ 43, 68-71).  Plaintiffs presumably

7    pleaded this novel Boosting Market monopolization claim to justify a claim for Norvir overcharges.

8        According to Plaintiffs, Abbott allegedly stifled innovation in the Boosting Market by

9    "deliberately inducing potential competitors in the boosting market into relying on Norvir as the de

10   facto boosting agent," thus purportedly suppressing competition in that market.  (Mot. at 4; Am.

11   Compl. ¶ 36).  Plaintiffs' theory under this cause of action, therefore, is that Abbott initially charged

12   a low price for its patented Norvir (though they do not allege predatory pricing with regard to

13   Norvir) and induced competitors to enter into license agreements covering Norvir to lull these

14   competitors into delaying products that could compete with Norvir.  No other Norvir plaintiff has

15   made this allegation, and for good reason.  Plaintiffs argue that Abbott should have charged *more* for

16   Norvir before December 2003 to stimulate competition, or declined to permit competitors from co-

17   promoting their PIs for use with Norvir.  But low prices and license agreements are not anti-

18   competitive.  *See, e.g., Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 904 (9th Cir. 2008).

19       Nevertheless, Plaintiffs, through their expert, have offered a purported basis upon which to

20   conclude that the Norvir price increase supports recoverable overcharges under this cause of action.

21   Importantly, however, Kaletra is not alleged to be in the Boosting Market.  Nor, of course, could it

22   be if Plaintiffs hope to maintain their monopoly-leveraging theory, a theory that requires the

23   existence of two separate markets.  Therefore, a finding of Boosting Market monopolization would

24   not support a remedy of Kaletra overcharge damages.

25                   **PROPOSED CLASS AND CLASS REPRESENTATIVES**

26       Plaintiffs seek to certify a nationwide class of direct purchasers of Norvir and/or Kaletra.

27   The proposed class includes a broad cross-section of the pharmaceutical distribution chain—

28   including large national wholesalers, smaller regional wholesalers, large retail pharmacies, small

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

5

1   independent pharmacies, large for-profit hospital systems, and small not-for-profit free AIDS clinics.

2   These entities differ greatly in the purpose for which they buy Norvir and/or Kaletra, the manner in

3   which they profit (or not) from the sale of those drugs, and the volume of their purchases.  A

4   significant percentage (about ███) of this putative class did not purchase both Norvir and Kaletra

5   from Abbott during the relevant time.  About ███ purchased Norvir but no (or very little) Kaletra,

6   and about ███ purchased Kaletra but no (or very little) Norvir.  (*See* Hay Decl. ¶ 30).

7        The proposed class representatives include Plaintiffs Rochester Drug and Louisiana

8   Wholesale, which allegedly purchased *both* Norvir and Kaletra directly from Abbott.  The third

9   proposed representative is Meijer, which did not purchase either Norvir or Kaletra directly from

10  Abbott.  Meijer is an indirect purchaser suing based solely on a purported assignment of antitrust

11  claims by Kerr, a direct purchaser.  (Am. Compl. ¶ 1).  Kerr, like Rochester Drug and Louisiana

12  Wholesale, allegedly purchased *both* Norvir and Kaletra directly from Abbott.  (*Id.*).

### LEGAL STANDARD FOR CLASS CERTIFICATION

14       Plaintiffs bear the burden of establishing that the proposed class satisfies the requirements of

15  class certification.  *See Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1022 (9th Cir. 1998).  As this

16  Court has noted, "[a] district court may certify a class only if, after 'rigorous analysis,' it determines

17  that the party seeking certification has borne its burden."  *In re Abbott Labs. Norvir Antitrust Litig.*,

18  2007 WL 1689899, at *2 (N.D. Cal. June 11, 2007) (citation omitted).  A failure "to carry this

19  burden as to any one of the requirements precludes the maintenance of the lawsuit as a class action."

20  *In re Citric Acid Antitrust Litigation*, 1996 WL 655791, at *2 (N.D. Cal. 1996).  This is true even

21  though the Court certified the class in *Doe/SEIU*.  *See In re Methionine Antitrust Litig.*, 204 F.R.D.

22  161, 164 (N.D. Cal. 2001) (holding that certification of a class in a related case was "from one to

23  several steps removed" from certification of the proposed class).

24       The Rule 23(a) class certification requirements include **typicality** (*i.e.*, that "the claims or

25  defenses of the representative parties are typical of the claims or defenses of the class") and

26  **adequacy of representation** (*i.e.*, that "the representative parties will fairly and adequately protect

27  the interest of the class").  "[A]ctual, not presumed, conformance with Rule 23(a) remains . . .

28  indispensable."  *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982).

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1    Plaintiffs seek class treatment under Rule 23(b)(3) to recover damages.  As a result, they

2  must show the additional elements of *predominance* (*i.e.*, that "the questions of law or fact common

3  to the class members predominate over any questions affecting only individual members") and

4  *superiority* (*i.e.*, "that a class action is superior to other available methods for fairly and efficiently

5  adjudicating the controversy").  Fed. R. Civ. P. 23(b)(3).

6    Faced with this extensive burden, Plaintiffs ask this Court to tip the scales, arguing that any

7  doubts about the appropriateness of class certification should be resolved in their favor.  But such a

8  "rebuttable presumption" in favor of class certification for antitrust suits conflicts with Rule 23 and

9  has been rejected.  *See, e.g., Windham v. American Brands, Inc.*, 565 F.2d 59, 65 n.6 (4th Cir. 1977)

10  (en banc).  Shifting the burden of proof to defendants would improperly "place anti-trust suits in a

11  preferred position over even plaintiffs in discrimination cases."  *Id.* [1]

12                                    **ARGUMENT**

13    The Court should deny Plaintiffs' motion for class certification because they have failed to

14  meet their burden of satisfying the class action requirements.

**I.    Meijer Lacks Standing To Sue.**

16    As this Court noted in *Doe/SEIU*, "standing 'is a jurisdictional element that must be satisfied

17  before class certification.'"  *In re Abbott Labs.*, 2007 WL 1689899, at *2 (quoting *Nelsen v. King

18  County*, 895 F.2d 1248, 1249-50 (9th Cir.1990)).  Meijer cannot even surmount this threshold

19  requirement.  It does not claim to be a member of the class of direct purchasers, but instead alleges

20  that it has standing as an "assignee of the claims of the Frank W. Kerr Co."  (Am. Compl. ¶ 1).  But

21  the assignment upon which Meijer relies does not confer standing.

22    <u>First</u>, Meijer has not shown that its claims fall within the scope of the purported assignment.

23  ████████████████████████████████████████████████████████████

24

25  _____

[1] The cases cited by Plaintiffs are limited to price-fixing conspiracies, where violations often are

26  "continuous, widespread and detrimental, to as yet, unidentified consumers" that otherwise "would
[not] know of their rights at all," and "it would be unlikely for individual plaintiffs to pursue the

27  claims separately" because each would have only an extremely small recovery.  *In re Playmobil
Antitrust Litig.*, 35 F. Supp. 2d 231, 238-39 (E.D.N.Y. 1998).  This is not the case here, where the

28  putative class members are identifiable, sophisticated entities that purport to assert large claims.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1

2

3

4

5

6

7     <u>Second</u>, Kerr's assignment to Meijer ▮▮▮▮▮▮▮▮▮▮▮▮ is invalid. This

8 Court recently held—▮▮▮▮▮▮▮▮▮▮▮—that a direct purchaser's assignment of

9 its rights to bring an antitrust suit is invalid if the agreement governing its purchases precludes an

10 assignment of those rights without the defendant's prior written consent and that consent was not

11 obtained. *In re Ditropan XL Antitrust Litigation*, 2007 WL 2978329, *2 (N.D. Cal. Oct. 11, 2007).

12

13

14

15

16

17

18

19     <u>Finally</u>, the agreement purporting to assign Kerr's rights to Meijer also is invalid because it

20 lacks consideration. Because Kerr and Meijer are Michigan corporations, that state's laws govern

21 the assignment. Under Michigan law (as in most, if not all, other states), contracts are void if they

22 lack consideration. *See, e.g.*, *Yerkovich v. AAA*, 461 Mich. 732, 740 (2000). Thus, an assignment

23 that is void for lack of consideration cannot provide a basis for antitrust standing. *See District*

24 *Distributors, Inc. v. Heublein, Inc.*, 1971 WL 559, at *3 (D.D.C. May 28, 1971).

25

26

27

28



1

2

As a minimum, these particularized defenses render Meijer's claims atypical of those asserted by the putative class. *See Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.*, 222 F.3d 52, 92 (2d Cir. 2000) ("[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.").

## II. Plaintiffs Cannot Meet Their Burden Of Satisfying The Rule 23(a) Prerequisites In Light Of Multiple, Intra-Class Conflicts Going To The Heart Of This Case.

Plaintiffs request certification of a massive, nationwide class consisting of a diverse group of entities and seeking as much as "billions of dollars" in alleged overcharge damages. (Mot. at 4). Accordingly, the Court must take special care when "rigorous[ly]" scrutinizing whether this putative class action should be allowed to proceed. *In re Abbott Labs.*, 2007 WL 1689899, at *2. As demonstrated below, Plaintiffs' theories of liability, causes of action and decision to seek only overcharge damages create four distinct types of fundamental intra-class conflicts that preclude class certification under the adequacy of representation and typicality class action prerequisites.

### A. Plaintiffs Bear The Burden Of Showing That There Is No Intra-Class Conflict.

Plaintiffs must show that "[t]here are no actual or potential conflicts between the Direct Purchaser Class members and the representative Plaintiffs." (Mot. at 13; *see also* Fed. R. Civ. P. 23(a)(3), (a)(4)). An absence of conflict ensures constitutional due process for absent class members given that "[c]lass members who are not parties to a class action suit nevertheless are bound by the judgment in the suit[.]" *Crawford v. Honig*, 37 F.3d 485, 487 (9th Cir. 1995); *Hansberry v. Lee*, 311 U.S. 32, 37-38 (1940). As the Ninth Circuit has explained, these due process concerns are satisfied only "if the absent members' interests are adequately represented by the class members who are present." *Crawford*, 37 F.3d at 487.

It is thus incumbent on the Court to give "due regard for the protection of the rights of absent parties which due process exacts" in the face of conflicts between putative class representatives and members of the proposed class. *Hansberry*, 311 U.S. at 44. In light of this constitutional dimension, "[e]xamination of potential conflicts of interest has long been an important prerequisite to class

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1  certification." *Hanlon*, 150 F.3d at 1020.  In fact, "[t]he adequacy of the representation issue is now

2  of critical importance in all class actions and the court is under an obligation to pay careful attention

3  to the Rule 23(a)(4) prerequisite in every case." *Bishop v. Committee on Prof'l Ethics*, 686 F.2d

4  1278, 1288 (8th Cir. 1982) (quoting C. Wright & A. Miller, *Federal Practice and Procedure* § 1765,

5  at 616-17 (1972)).  As one court noted, the adequacy requirement "lies at the heart of the rationale

6  supporting the class action." *Johnson v. Shreveport Garment Co.*, 422 F. Supp. 526, 531 (W.D. La.

7  1976), *aff'd,* 577 F.2d 1132 (5th Cir. 1978).

8      The Ninth Circuit has explained that even just "*some evidence of an actual conflict*" will be

9  sufficient to defeat class certification.  *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 1998)

10  (emphasis added).  In fact, courts often find that the mere *potential* for a conflict of interest among

11  members of the proposed class warrants the rejection of class certification.[2]

12      **B.    The Proposed Class Creates Four Types Of Intra-Class Conflicts.**

13      Plaintiffs summarily argue in two paragraphs that no intra-class conflicts exist.  (Mot. at 13-

14  14).  As this Court has made clear, however, it "need not accept conclusory or generic allegations

15  regarding the suitability of the litigation for resolution through class action." *In re Abbott Labs.*,

16  2007 WL 1689899, at *2.  This principle rings true here.  As discussed below, Plaintiffs' conclusory

17  allegations ignore four types of intra-class conflicts that go to the heart of this case.

18      **1.    The Interests Of Kaletra-Only Purchasers Are Antagonistic To Plaintiffs'**

19          **Boosting Market Monopolization Claim.**

20      Plaintiffs' Boosting Market claim undercuts the Boosted Market claim.  This creates an

21  actual and irreconcilable conflict between Plaintiffs and those putative class members that purchased

22  only (or primarily) Kaletra.

23

24  [2] *See, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 610 (1997) (upholding circuit court's
    determination that "serious intra-class conflicts preclude[d] th[e] class from meeting the adequacy of
25  representation requirement"); *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d
    Cir. 2001) ("Rule 23(a)(4) is designed to ferret out potential conflicts between representatives and
26  other class members."); *Honolulu Fed. Sav. & Loan Ass'n v. Verex Assurance, Inc.*, 116 F.R.D. 474,
    477 (D. Haw. 1987) (holding that "a potential conflict exists and precludes [the plaintiff] from
27  adequately representing the class"); *Plekowski v. Ralston Purina Co.*, 68 F.R.D. 443, 452 (M.D. Ga.
    1975) ("One does not have to show actual antagonistic interests; the potentiality is enough.").

28

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1    Kaletra-only purchasers sue only under the Boosted Market claims and have nothing to gain

2    from the Boosting Market claim.  As discussed above, about ███ of the proposed class purchased

3    only (or primarily) Kaletra.  (Hay Decl. ¶ 30).  These putative class members have no standing to sue

4    (or no real economic interest in suing) for Boosting Market monopolization because that claim only

5    permits recovery of overcharge damages for purchases of Norvir, which is the only drug in the

6    alleged Boosting Market.

7    Under the Boosted Market claims, Plaintiffs allege that Abbott legally acquired monopoly

8    power in the Boosting Market by virtue of its patents and leveraged that power to monopolize the

9    Boosted Market—that is, Abbott's *lawful patents* allegedly exclude rivals from competing with

10   Norvir.  This is the theory pursued by Doe and SEIU, which concede that Abbott's monopoly power

11   in the Boosting Market is "fully legal."  (Hearing Tr., Sept. 17, 2004, at 19:12-21).

12   In stark contrast, however, Plaintiffs' novel Boosting Market claim requires them to show

13   that Abbott's patents do *not* give it monopoly power in the Boosting Market.  Rather, Plaintiffs must

14   show that rivals would have developed products and competed with Norvir on price in the Boosting

15   Market but-for *unlawful conduct* by Abbott that excluded these competitors.  Otherwise, there would

16   be no anticompetitive effect and thus no antitrust injury stemming from Abbott's conduct in the

17   market.

18   These clashing theories present a fundamental conflict of interest between Plaintiffs and

19   Kaletra-only purchasers.  Plaintiffs cannot argue that Abbott's *conduct* excluded rivals without

20   conceding that its patents do not provide Abbott with monopoly power in the Boosting Market.

21   Similarly, Plaintiffs cannot argue that Abbott's *patents* excluded rivals without conceding that its

22   conduct had no effect on the Boosting Market.  The positions are mutually exclusive.

23   This conflict is analogous to the one that defeated class certification in *Mayfield v. Dalton*,

24   where two U.S. Marines sought to certify a class of military personnel against a government

25   program to collect their DNA samples and store them in a centralized repository.  109 F.3d 1423,

26   1424 (9th Cir. 1997).  The Ninth Circuit found an intra-class conflict because "there were

27   undoubtedly people among the broad class proposed by them who did not oppose the repository, and

28   who, in fact, approved of it and wished the policies fully enforced."  *Id.* at 1427.  The Ninth Circuit

refused to certify the class because the interests of the representatives were not necessarily aligned with *all* members of the class.

As in *Mayfield*, class certification should be denied because Kaletra-only purchasers—about one-quarter of the putative class—would prefer to argue that Abbott's monopoly power is perfectly legal, and would oppose the very theory underlying Plaintiffs' Boosting Market claim. They have nothing to gain, and much to lose, by incurring the additional and unnecessary burden of having to prove anticompetitive conduct in *both* the Boosting and Boosted Markets. (Hay Decl. ¶¶ 62-68).

### 2.    The Interests Of Kaletra-Only And Norvir-Only Purchasers Directly Conflict With Regard To The Boosted Market Monopolization Claim.

There is an additional irreconcilable conflict between those putative class members that purchased only (or primarily) Kaletra and those that purchased only (or primarily) Norvir with regard to the alleged anticompetitive effects of Abbott's pricing behavior in the Boosted Market.

Plaintiffs allege that Abbott monopolized the Boosted Market when it "overnight, on December 3, 2003, raised the price of Norvir by 400%," but "did not similarly impose a massive spike in the price of ritonavir when sold as part of Kaletra." (Mot. at 5). As a result, Plaintiffs allege, "[p]atients using Norvir to boost Abbott's rival boosted drugs now had to pay a penalty for buying Norvir as a stand-alone product (as opposed to buying it as part of Kaletra)." (*Id.*). Plaintiffs also allege that the putative class began paying an overcharge on purchases of Kaletra starting when Abbott allegedly increased Kaletra's price by 13.2% in 2005. (Mot. at 6).

This theory raises a direct intra-class conflict to the extent Plaintiffs were to attempt to seek Norvir overcharges based on the Boosted Market claim. The theory for Norvir overcharge damages presumably would be that Norvir was priced at a supra-competitive level because the price of Norvir plus a competing PI was high in comparison to the price of Kaletra, and this price differential was exclusionary because competitors could not compete with Kaletra's comparatively low price. Under the very premise of this theory, however, the conduct no longer becomes exclusionary—and, therefore, any Norvir overcharges would cease—once the price of Kaletra increased to a competitive level. Thus, putative class members seeking to recover overcharges for Norvir used as a booster have an interest in maximizing their damages by proving that the price of Kaletra was, and remains,

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

*too low.*  They would have no interest in proving that the price of Kaletra is competitive, let alone supra-competitive.  In contrast, Kaletra-only direct purchasers must prove precisely that Kaletra is priced supra-competitively—*i.e.*, *too high*.  This is the only way for them to recover damages for Kaletra overcharges.  (*See* Hay Decl. ¶¶ 62-71).   Plaintiffs make no effort to address this obvious and direct intra-class conflict.

> **3.    Putative Class Members Have Antagonistic Economic Interests With Respect To Plaintiffs' Decision To Forgo Lost Profit Damages.**

Plaintiffs also fail to address that Kaletra-only purchasers would have a very limited claim for overcharge damages under any of Plaintiffs' theories.  From an economic perspective, some or all of these direct purchasers might prefer to pursue a lost profits theory under which they might argue that they profited more from sales of rival PIs together with Norvir than from sales of Kaletra, and that Abbott's conduct shifted sales from the former to the latter.  Yet, Plaintiffs have unilaterally and expressly foreclosed that possibility by disclaiming any request for lost profits.  (*See* Pls.' Opp'n to Mot to Compel filed May 23, 2008 at 1; *see also* Hay Decl. ¶¶ 72-75).  Again, Plaintiffs have acted on behalf of their interests, not as an adequate representative of the class they purport to lead.

The Ninth Circuit has rejected class certification in a directly analogous circumstance.  In *Molski v. Gleich*, a disabled individual brought a disability discrimination case on behalf of himself and a putative class.   318 F.3d 937, 941 (9th Cir. 2003).  The district court certified a settlement class, but some absent class members objected.  *Id.*  On appeal, the Ninth Circuit noted that, under California law, some plaintiffs, but not the class representative, could have received damages in excess of the statutory amount in the presence of "egregious circumstances."  *Id*. at 955.  The Court of Appeals reversed class certification because "[t]he record does not show whether [the class representative] suffered in the same manner as others in the class may have."  *Id*.  In other words, as here, the class representative may have acted to further his own economic interests to the detriment of the economic interests of absent class members.

Similarly, in *Lanzarone v. Guardsmark Holdings, Inc*., the Central District of California denied class certification because representatives sought relief contrary to the interests of some

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1    absent class members, thus creating "an incurable conflict . . . [t]hat goes to the heart of the claim

2    presented." 2006 U.S. Dist. LEXIS 95785, at *22 (C.D. Cal. Sept. 7, 2006).

3        This case is no different. Plaintiffs have placed their interests ahead of absent putative class

4    members, a classic basis to deny class certification.

5            **4.    Putative Class Members Have Antagonistic Economic Interests Because**

6                 **Some Receive A Net Benefit From The Price Increases At Issue.**

7        A fourth intra-class conflict exists because some putative class members benefit from higher

8    drug prices, while others do not. As explained in the Hay Declaration, some direct purchasers set the

9    resale prices to pharmacies and other retailers on a cost-plus or equivalent (*e.g.*, list-less) basis,

10   which means that they charge the WAC plus a set percentage mark-up. (Hay Decl. ¶¶ 15-19). By

11   using cost-plus or equivalent pricing strategies, their profit margin on sales of a particular drug

12   increases proportionately with the acquisition cost of the drug. Thus, unlike other putative class

13   members, they benefit from the higher prices of Norvir and Kaletra. (*See id.*).

14       Even without downstream discovery, this economic reality creates a intra-class conflict as to

15   which of Plaintiffs' alternative, and conflicting, theories of antitrust liability to pursue in this case.

16   Based on the declaration submitted by Plaintiffs' expert in support of class certification, they intend

17   to prove liability under a "consumer-welfare standard" or, alternatively, a "*Cascade* test." (Singer

18   Decl. ¶¶ 25-33). Dr. Singer's consumer-welfare standard involves two distinct theories. He claims

19   that liability can be proven under this standard by showing *either* that: (1) Abbott "raised rivals'

20   costs" by increasing the price of Norvir without a commensurate increase in the price of Kaletra; *or*

21   (2) "Abbott was able to squeeze buyers' surplus" by raising the price of Norvir above an

22   "Independent Monopoly Price," which Dr. Singer defines as the price of Norvir pre-December 2003.

23   (*Id.* at ¶¶ 25-27). Under Dr. Singer's "*Cascade* test," Plaintiffs can prove liability by showing that

24   Abbott is pricing the lopinavir component of Kaletra below average-variable-cost. (*Id.* at ¶¶ 28-33;

25   *see also* Hay Decl. at ¶ 37).

26       As this Court recognized, "each theory of liability would likely have a very different effect

27   on Abbott's pricing going-forward, as Abbott likely cannot afford to continue behavior that was

28   deemed to violate the antitrust laws." (Order, June 18, 2008, No. C 07-5985 CW, at 8). Those direct

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

purchasers that profit from Abbott's price increases would have a financial interest in pursuing a theory that would provide them with overcharge damages *and* would not curtail Abbott's ability to maintain or increase its current prices for Norvir or Kaletra.  In contrast, other putative class members (perhaps including Plaintiffs themselves) would have an opposing financial interest in pursuing a theory of liability that would require Abbott to roll-back its prices.  (*See id.* at ¶¶ 53-56).

Conflicting interests such as these have led to the denial of class certification.  In *Telecomm Tech. Servs. v. Siemens Rolm Communs., Inc.*, the plaintiffs were independent service organizations that serviced the telephone switching equipment of the defendant.  172 F.R.D. 532, 536 (N.D. Ga. 1997).  The defendant argued that Siemens sought to monopolize the after-market for service by requiring purchasers of its equipment to also purchase its service contract to obtain replacement parts.  *Id.* at 536-37.  The defendant argued, however, that if the suit were successful, it would be forced to raise its prices for its replacement parts to compensate for the lost services income.  *Id.* at 544-45.  This, in turn, would also trigger an increase in prices for used parts.  *Id.*  The court denied class certification because those class members that bought and sold used parts would benefit, but only at the expense of class members that would pay higher prices for new and used parts.  *Id.* at 545; *see also Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181 (11th Cir. 2003) (holding that district court abused its discretion by failing to evaluate "whether the 'adequacy of representation' requirement could be satisfied by the named representatives" where "the most significant members of the certified class arguably experienced a net gain from the conduct alleged to be illegal"); *In re Terazosin Hydrochloride Antitrust Litig.*, 223 F.R.D. 666, 668 (S.D. Fla. 2004) (denying class certification on remand).[3]

The same result is warranted here, where Plaintiffs have made no effort to explain how they will determine the ultimate theory of liability to pursue in this case even though members of the putative class have very different economic interests when it comes to that decision.  Again, the

---

[3] Courts often find intra-class conflicts where some class members would profit at others' expense. *See, e.g., Chestnut Fleet Rentals, Inc. v. Hertz Corp.*, 72 F.R.D. 541, 546 (E.D. Pa. 1976); *In re NCAA I-A Walk-On Football Players Litig.*, 2006 U.S. Dist. LEXIS 28824, *22-*31 (W.D. Wash. May 3, 2006); *Al Barnett & Son, Inc. v. Outboard Marine Corp.*, 64 F.R.D. 43, 50 (D. Del. 1974).

CASE NO. C 07-5985 CW - ABBOTT LABORATORIES' OPPOSITION TO DIRECT
PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    Court has a duty to ensure that all members of the putative would be adequately represented, and

2    Plaintiffs have not satisfied their burden of making that showing.  *See* Fed. R. Civ. P. 23(a)(4).

### C.    Subclasses And Opt-Out Rights Cannot Cure These Intra-Class Conflicts.

4    These four intra-class conflicts go to "the very heart of the suit."  *Blackie v. Barrack*, 524

5    F.2d 891, 909 (9th Cir. 1975).  They concern the potential theories of liability offered by Plaintiffs'

6    expert, the competing causes of action themselves, and the potential for antagonistic remedies.  If the

7    putative class were certified, all class members would be bound by the positions advanced, and

8    concessions made, by Plaintiffs.  As discussed above, however, the proposed class representatives

9    cannot favor any one theory or cause of action without taking a position antagonistic to the economic

10    interests of at least some absent members of the putative class.

11    Unlike in *Doe/SEIU*, the use of subclasses to cure the conflict is not an option.  There are no

12    adequate representatives for subclasses comprised of those direct purchasers that (1) purchased only

13    (or primarily) Norvir, (2) purchased only (or primarily) Kaletra, (3) prefer a lost profits theory to an

14    overcharge damages theory, or (4) received a net benefit from the price increases.

15    Nor can Plaintiffs circumvent their burden of showing adequacy of representation and

16    typicality by suggesting that members with antagonistic interests can always opt-out of the class.

17    *See Phillips v. Klassen*, 502 F.2d 362, 367 (D.C. Cir. 1974) (The problems in the class "cannot be

18    avoided merely by saying that it is always open to members of a class to 'opt out.'").  The purpose of

19    the opt-out mechanism is not to waive these class action prerequisites, but rather to address those

20    "conflicts that are merely conjectural."  Herbert B. Newberg & Alba Conte, *Newberg on Class*

21    *Actions* § 3.30 (4th ed. 2002).  "It is no answer to say that [putative class members] may opt out

22    under the provisions of Rule 23(c)(2).  The machinery of the Rule, with its attendant expense, should

23    not be brought into play unless initially plaintiff, who has the burden of proof, justifies its

24    application."  *Free World Foreign Cars, Inc. v. Alfa Romeo, S.p.A.*, 55 F.R.D. 26, 29 (S.D.N.Y.

25    1972); *see also Lukenas v. Bryce's Mountain Resort, Inc.*, 66 F.R.D. 69, 72 (W.D. Va.1975) (holding

26    that exclusion "may not be used to achieve compliance with the prerequisites of 23(a)").

27    As the Ninth Circuit itself has noted, "a right to withdraw from a class action is not always a

28    complete answer to an alleged conflict among class members."  *Lerwill v. Inflight Motion Pictures,*

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

*Inc.*, 582 F.2d 507, 512 (9th Cir. 1978); *see also Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1179 (9th Cir. 1977) ("I do not believe that a provision for opting out of the class provides an entirely satisfactory answer to the claim that a lead attorney failed to discharge that duty of representation.")  (Kennedy, J., concurring); *Lerwill*, 582 F.2d at 512 (adopting Judge Kennedy's concurring statement in *Marshall*).  In fact, courts have repeatedly refused to use the exclusion of class members as a cure-all for serious class conflicts, generally for two reasons.[4]

First, forcing class members to opt out shifts the burden from the named plaintiffs to the absent class members to accurately forecast any conflicts that may arise between their interests and those of the class representatives.  To be sure, many putative class members may decline to opt out of the class despite an intra-class conflict affecting their interests, either because they are not adequately informed of the conflict or because they cannot afford to pursue a suit on their own. *Alpert v. U. S. Indus.*, 59 F.R.D. 491, 499 (C.D. Cal. 1973); *Fundamental Requirements for Class Suit*, 89 Harv. L. Rev. 1454, 1488 (1976).   Thus, "[a]n action which forces a significant portion of the class to take active steps to exclude themselves is inappropriate."  *Alpert*, 59 F.R.D. at 499.

In *Gardner v. Equifax Information Services, LLC*, the court rejected the plaintiff's attempt to "place a burden on members of the potential class to opt-out."  2007 WL 2261688, *5 (D. Minn. 2007).  The court indicated that it was "unwilling to effectively bar absent class members' future legal claims because of the failure of those parties to opt-out."  *Id.*  This same concern is especially pertinent here, where Plaintiffs' classwide allegations raise four distinct and fundamental intra-class conflicts that are not necessarily apparent on the face of the complaint.

Second, even if parties did opt out, their interests could still be harmed through the effects of the judgment in the class action.  For example, a judgment for the Plaintiffs would force Abbott to either lower the price of Norvir or raise the price of Kaletra, either of which could harm some class members.  This outcome "may frustrate existing class members' attempt to litigate independently."

---

[4] *See, e.g., Phillips*, 502 F.2d at 367; *Alpert v. U. S. Indus.*, 59 F.R.D. 491, 499 (C.D. Cal. 1973); *Abercrombie v. Lum's, Inc.*, 345 F. Supp. 387, 394 (S.D. Fla. 1972); *Cotchett v. Avis Rent A Car System, Inc.*, 56 F.R.D. 549, 553 (S.D.N.Y. 1972); *Aamco Automatic Transmissions, Inc. v. Tayloe*, 67 F.R.D. 440, 447 (E.D. Pa. 1975); *Thompson v. T. F. I. Cos.*, 64 F.R.D. 140, 149 (N.D. Ill. 1974); *Matarazzo v. Friendly Ice Cream Corp.*, 62 F.R.D. 65, 68 (E.D.N.Y. 1974).

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

CASE NO. C 07-5985 CW - ABBOTT LABORATORIES' OPPOSITION TO DIRECT
PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1   *See Fundamental Requirements*, 89 HARV. L. REV. at 1488; *see also In re Jackson Nat. Life Ins. Co.*

2   *Premium Litigation*, 209 F.R.D. 134, 142 (W.D. Mich. 2002) (holding that even if class members

3   could opt out, their interests would "nonetheless unavoidably be impugned"); *Feinstein v. Firestone*

4   *Tire & Rubber Co.*, 535 F. Supp. 595, 606-07 (S.D.N.Y. 1982) (opt-outs would be "an awkward and

5   inadequate solution to an inherently insoluble certification problem"); *Clark v. Experian Information*

6   *Solutions, Inc.*, 2001 WL 1946329, *4 (D.S.C. 2001) (finding that *res judicata* would "jeopardize

7   [opt-outs'] rights to seek alternative grounds of relief in a subsequent case").  Moreover, a class

8   involving a significant number of opt-outs "would deprive the court of an important source of

9   information about the class, and may therefore handicap the court's efforts to protect absentees."

10  *Fundamental Requirements*, 89 HARV. L. REV. at 1488.

11         For these reasons, Plaintiffs cannot circumvent the adequacy of representation requirement

12  by claiming that the opt-out mechanism is a cure for all conflicts.  Even if, as the Court suggested in

13  its order denying Abbott's motion to dismiss, the opt-out procedure could cure one of the conflicts, it

14  would defeat the purpose of Rule 23(a)(4) to invoke this procedure as a remedy for *four* distinct and

15  fundamental intra-class conflicts.  And even assuming the three largest drug wholesalers (which all

16  purchased both Norvir and Kaletra) believe their interests are aligned with those of the proposed

17  class representatives, this belief would not in any way address intra-class conflicts that uniquely

18  apply ███████████████ of the proposed class that did not purchase both Norvir and

19  Kaletra.  This may explain why a large percentage of the putative class opted out before Plaintiffs

20  even moved for class certification and, therefore, apparently believe that the proposed class

21  representatives would not adequately represent their interests.  These unique circumstances warrant

22  strict scrutiny of the adequacy of representation and typicality class action prerequisites and are an

23  undeniable symptom of the incurable intra-class conflicts discussed above that defeat class

24  certification.

25  **III.    Plaintiffs Also Have Failed to Satisfy The Rule 23(b)(3) Requirements.**

26         **A.    Plaintiffs Have Failed to Satisfy The Predominance Requirement.**

27         Plaintiffs must show that "questions of law or fact common to the members of the class

28  predominate over any questions affecting only individual members," Fed. R. Civ. P. 23(b)(3), and

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1   thus the common questions provable through generalized evidence outweigh questions that must be

2   proven individually, *see Visa Check/MasterMoney*, 280 F.3d at 136.  This predominance inquiry is

3   designed to "prevent[] the class from degenerating into a series of individual trials." *Bell Atlantic*

4   *Corp. v. AT&T*, 339 F.3d 294, 302 (5th Cir. 2003).  Courts deny class certification where, as here,

5   the "plaintiffs have not shown that the fact of injury element can be proven for all class members

6   with common evidence."  *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group*, 247 F.R.D.

7   156, 165 (C.D. Cal. 2007); *Blades v. Monsanto Co.*, 400 F.3d 562, 571 (8th Cir. 2005).

8       **1.    Plaintiffs' Proposed Method For Using Common Evidence To Show Both**

9           **The Fact Of Injury And Amount Of Overcharges Is Flawed.**

10      Plaintiffs and their expert argue that "common evidence showing that conduct artificially

11  inflates Abbott's list prices, constitutes common proof that *all* class members are overcharged."

12  (Mot. at 19 (emphasis in original); *see also* Singer Decl. at ¶ 38).  They also argue that overcharge

13  damages can be calculated as "the average actual price paid by Class members less the but-for price

14  they would have paid (*i.e.*, the 'before' price absent the price hike) multiplied by the total amount

15  purchased by Class members during the Class period."  (Mot. at 22-23).  But their theory depends on

16  the incorrect assumption that "all or almost all class members pay WAC or some variant of, or

17  discount off of, WAC on some or all of their purchases."  (Singer Decl. at ¶ 38; *see also* Mot. at 19).[5]

18  In fact, ██████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████████████████

20  ████████████████████████.  (*See* Hay Decl. at ¶ 11 & Chart 16).

21      First, the net price paid by direct purchasers often was less than WAC.  (*Id.* at ¶¶ 96-104 &

22  Charts 4-8).  ████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████████████

24  ██████████████████████████████████████████.  Dr. Singer concedes this fact by

25

26  [5] Plaintiffs mischaracterize the testimony of Joseph Fiske in the *Doe/SEIU* litigation.  As discussed
    in the Hay Declaration, while it is true that wholesalers pay WAC as an initial price, they receive
27  chargebacks from Abbott on sales to customers that have negotiated discounts directly with Abbott.
    Thus, the net price paid by wholesalers is often substantially less than WAC.  (Hay Decl. at ¶ 104).

28

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

acknowledging that "certain entities, including governmental purchasers, were wholly or largely

unaffected by the December 2003 Norvir price hike," and that "there would be no overcharge on

those particular units purchased by wholesalers (and resold to these governmental entities at non-

inflated prices)." (Singer Decl. ¶ 36 n. 39).  This concession alone should be fatal to Plaintiffs'

claim of predominance.

   Second, different direct purchasers paid different net prices.  (Hay Decl. ¶¶ 105-107 & Charts

9-12).  Abbott's sales data show that prices for both Norvir and Kaletra varied significantly by direct

purchaser. ███████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

   Third, the net price many direct purchaser paid changed over time, and those changes varied

by direct purchaser.  (*Id.* at ¶¶ 108-116 & Charts 13-20).  Contrary to Plaintiffs' and Dr. Singer's

assumption, the discounts and chargebacks that each direct purchaser received were not constant or

fixed percentages of WAC.  (*Id.* at ¶ 109). ████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████

   One important reason why the size of discounts and chargebacks varies over time is that the

largest discounts are negotiated between Abbott and third-party payors or retailers, not between

Abbott and the direct purchaser.  (*Id.* at ¶¶ 94-96 & Chart 4).  Thus, the price each direct purchaser

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1  pays for each unit of Norvir and Kaletra depends on the customer to which the direct purchaser sells

2  that unit.  Dr. Singer acknowledged as much when he noted that wholesalers were not overcharged

3  on units of Norvir sold to entities unaffected by the price increase.  (Singer Decl. at ¶ 36 n. 39).

4       In sum, given that not all direct purchasers paid WAC, that different direct purchasers paid

5  different net prices, and that the net price many direct purchaser paid changed over time, and those

6  changes varied by direct purchaser, Plaintiffs cannot show class-wide impact and damages simply by

7  showing that WAC (*i.e.*, the wholesale list price) for Norvir and Kaletra increased.

8            **2.    Any Determination Of The Fact Of Injury Or The Amount Of Damages**

9                 **Would Turn On Individualized Issues.**

10      Even if Plaintiffs were permitted to attempt to revise their methodology to use the net price

11 each individual paid immediately before December 3, 2003 (which itself would require

12 individualized evidence), Plaintiffs still could not provide a meaningful methodology for calculating,

13 based on common evidence, the net price each putative class member would have paid in the but-for

14 world.  The Court cannot assume that the net price a direct purchaser paid just before the price

15 increase—or even the average net price it paid over some period of time—reflects the net price that

16 direct purchaser would have paid over the next four-plus years.  Such a methodology would be "so

17 insubstantial that it realistically amounts to no method at all."  *In re Industrial Gas Antitrust

18 Litigation*, 100 F.R.D. 280 (N.D. Ill. 1983).   This Court "is not impotent under Rule 23, bound to

19 accept any common methodology for damages which the plaintiffs may submit when seeking class

20 certification."  *Moore v. Southeast Toyota Distributors, Inc.*, 1982 U.S. Dist. LEXIS 12790, *12

21 (N.D. Ala. 1982).

22      Even before December 3, 2003, there was significant variability in the net prices each direct

23 purchaser paid over time.  (*Id*. at ¶ ¶ 115-16 & Chart 19-20).  ███████████████

24 ██████████████████████████████████████████████████

25 ██████████████████████████████████████████████

26 ████████████████      Thus, calculating the average net price that any direct purchaser paid before

27 December 3, 2003 would turn on the period over which that average is calculated.

28

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1   More importantly, to determine an accurate but-for price, not only would the jury need to

2   account for the variability in the net prices any given direct purchaser paid before December 3, 2003,

3   it would also need to account for any factors that might influence the net price going forward. This

4   would include any changes in the mix of customers to which a direct purchaser sells or in the level

5   of discounts those customers negotiate with Abbott. (*Id.* at ¶ 119). As discussed above, however,

6   the magnitude of discounts and chargebacks a direct purchaser received varied significantly over

7   time after December 3, 2003. There is no basis to assume that each direct purchaser would have

8   maintained the same customer base and that the agreements its customers negotiated with Abbott

9   would have remained the same over the damages period spanning four-plus years. (*Id.* at ¶ 122).

10  There is also no reason to believe that Abbott would have kept the same price for Norvir over that

11  period. (*Id.* at ¶ 79). If Abbott would have taken even small annual price increases in the but-for

12  world, direct purchasers that sold to entities that "were wholly or largely unaffected by the

13  December 2003 price hike" (Singer Decl. ¶ 36 n.39) may have paid more in the but-for world.

14  In sum, there is simply no way without individualized trials to determine whether each class

15  member even paid more in the actual world than they would have paid in the but-for world, let alone

16  the amount of any purported overcharges. *See Heerwagen v. Clear Channel Comms.*, 435 F.3d 219,

17  229 (2d Cir. 2006) (denying class certification on predominance grounds in a monopolization case

18  because damages would have to be proven on a case-by-case basis).

19  **3.    The Central District Of California Held That The Predominance**

20  **Requirement Was Not Satisfied Under Virtually Identical Circumstances.**

21  Last year, the Central District of California rejected class certification in a direct purchaser

22  case involving very similar fact-specific issues affecting the alleged overcharges. *Allied Orthopedic*,

23  247 F.R.D. at 178. That case involved allegations of predatory conduct "calculated to avert or

24  deflect generic competition" in violation of the Sherman Act. *Id.* at 162. To show class-wide

25  impact, the plaintiffs submitted an expert affidavit concluding that but-for the alleged predatory

26  conduct, the defendant would have been able to charge an average of only $6 for its equipment. *Id.*

27  at 165. The expert concluded that each class member that paid more than the $6 average paid an

28  illegal overcharge, and he attempted to show that almost all class members paid more than $6. *Id.*

1    The court rejected this theory because "proof of fact of injury requires much more than a

2    simple showing that the plaintiffs purchased an item in a world where average prices were inflated."

3    *Id*. at 166 (citation omitted).  It noted that, as here, the "clear standard in the market" had "long been

4    to charge a range of prices to different customers even for identical products."  *Id*. at 167.  And, in

5    that market, as here, distributors "purchase from [the defendant] at list prices and resell to end-users

6    at prices negotiated and contracted for between the end-user and [the defendant]."  *Id*. at 159.  The

7    distributors receive "reimbursement from [the defendant] for any difference between the list and

8    contract prices."  *Id*.  There was thus a "widely varying distribution" of prices, and "the *average*

9    *price* for any particular sensor only furnishe[d] part of the picture."  *Id*. at 167 (emphasis in original).

10    In light of this variability and plaintiffs' expert's failure to examine the distribution of prices

11    charged at a single point in time or over the course of the class period, the court held that it had

12    "little basis to conclude that the average price of generics sets some sort of evidentiary standard by

13    which it may be decided that all or virtually all purchasers . . . were overcharged."  *Id*.  The court

14    noted that, as here, some purchasers may not even have paid less in the "but-for" world.  *Id*.

15    The court found "[e]ven more problematic" the plaintiffs' "failure to address the distribution

16    of [the defendant's] prices in the but-for world."  *Id*.  The plaintiffs could not show that each and

17    every class member would have paid the $6 but-for price.  Thus, the use of the average price in the

18    but-for world failed to address the relevant question, which is "what each purchaser paid in the

19    actual world, relative to what that purchaser would have paid in the but-for world."  *Id*.  Instead, the

20    plaintiffs and their expert incorrectly addressed only "what each purchaser paid in the actual world,

21    relative to the *average price* . . . in the but-for world."  *Id*.

22    As in *Allied Orthopedic*, the methodology offered in this case by Plaintiffs and their expert

23    for assessing fact of injury and overcharge damages with common evidence would not permit a jury

24    to determine with any reasonable accuracy the price each putative class member would have paid in

25    the but-for world.  *Allied Orthopedic* makes it clear that Plaintiffs' failure to provide any viable

26    methodology to compute class-wide overcharge damages based on common evidence precludes

27    certification of the proposed class.  *Id.* at 164.

28

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

4.      **Plaintiffs Fail To Address This Court's Distinction Between Norvir As A Standalone PI And Norvir As A Booster.**

Plaintiffs also fail to address that only Norvir's use as a booster drug falls within their antitrust claims because Norvir's use as a standalone PI is specifically excluded from both alleged relevant markets. *See In re Abbott Labs.*, 2007 WL 1689899, *4 (finding that a proposed class representative was "excluded from class membership because he did not use Norvir as a booster"). Some class members may have sold Norvir for use only as a PI, while others may have sold it for use only as a booster, and still others may have sold it for both uses. If a class were certified, each class member would need to distinguish between these two uses to demonstrate their entitlement to any overcharges. Such individualized determinations would inevitably devolve into "a series of individual trials" rendering the class action unmanageable. *Bell Atlantic Corp.,* 339 F.3d at 302.

B.      **The Class Action Vehicle Is Not A Superior Method Of Resolving This Case.**

Federal Rule 23(b)(3) also requires the Court to find that the proposed "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *Rutledge v. Electric Hose & Rubber Co.*, 511 F.2d 668, 673 (9th Cir. 1975). According to the Supreme Court, the drafters of Rule 23(b)(3) "had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (quotations omitted). Class actions are *not* as necessary where, as here, "the stake of each [putative class] member bulks large and his will and ability to take care of himself are strong." *Id*. at 616. In those cases, courts should consider alternatives to a class action, such as joinder, intervention, and the use of a test case. *Frankford Hospital v. Blue Cross of Greater Philadelphia*, 67 F.R.D. 643, 648 (E.D. Pa. 1975) (denying class certification in favor of intervention).

This is such a case. The putative class members are not individual purchasers of Norvir (as in the indirect purchaser case) and/or Kaletra. They are sophisticated corporations that, at least according to Plaintiffs, purport to seek significant damages. In fact, more than ███ of Kaletra and Norvir purchases were made by three direct purchasers that hired large law firms to represent them

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1    in connection with this case.  (*See* Glackin Decl. in Supp. of Pls.' Opp'n to Mot to Compel, Exs. 1-

2    3).  There is nothing to prevent them or others from filing suit.  Many have done just that.

3         In *Frankford Hospital*, the court found that superiority had not been demonstrated because

4    separate suits showed "an interest on the part of a large number of the members of the putative class

5    in individually controlling the prosecution of separate actions." 67 F.R.D. at 648.  A better method,

6    the court held, would be to allow other putative class members to intervene as plaintiffs in the

7    current suit.  *Id*.  As in *Frankford Hospital*, the preferable procedure here is to allow those direct

8    purchasers that have not already opted out to intervene.  This approach could solve not only the

9    predominance and superiority problems with the proposed class, but also the intra-class conflicts.

10   **IV.    Class Certification Should Be Denied Because The Claims Are Meritless.**

11        Courts can and do reject class certification where there are fundamental legal flaws in the

12   asserted legal theories that render them facially deficient.  *See, e.g., Pehr v. University of Chicago*,

13   799 F. Supp. 862, 869 (N.D. Ill. 1992) (refusing to consider class certification where "the plaintiff's

14   own individual claim appeared from the outset to be wholly without merit even in facial terms");

15   *Illinois State Rifle Ass'n v. State of Ill.*, 717 F. Supp. 634, 639 (N.D. Ill. 1989) (refusing to consider

16   class certification when "this Court viewed the Complaint as facially suspect in more than one

17   respect that appeared incurable"). Under this authority, Abbott submits—and preserves for appeal its

18   position given the Court's prior rulings—that class certification should be denied because Plaintiffs

19   have not sufficiently alleged below-cost pricing under *Cascade* to support either the Boosted Market

20   or Boosting Market monopolization claims.  In support, Abbott incorporates by reference its

21   arguments in connection with the motions to dismiss in these related cases as well as Abbott's briefs

22   in connection with its motion for certification of interlocutory appeal under 28 U.S.C. § 1292(b).

23        Also, for the reasons discussed in the supporting Hay Declaration, the theories of liability and

24   damages asserted by Plaintiffs and their expert have no viable economic basis, thus independently

25   warranting denial of class certification.  (Hay Decl. ¶¶ 32-43, 76-91).

26                                **CONCLUSION**

27        For the foregoing reasons, Abbott respectfully requests that the Court deny Plaintiffs' Motion

28   for Class Certification.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Dated:  June 25, 2008                        WINSTON & STRAWN LLP


                                        By:    /s/ James F. Hurst
                                               _____

                                               James F. Hurst
                                               Attorneys for Defendant
                                               ABBOTT LABORATORIES

**Winston & Strawn LLP**
**35 W. Wacker Drive**
**Chicago, IL 60601-9703**

CASE NO. C 07-5985 CW - ABBOTT LABORATORIES' OPPOSITION TO DIRECT
PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION