Nicole M. Norris (SBN 222785)
WINSTON & STRAWN LLP
101 California Street, Suite 3900
San Francisco, CA 94111-5894
Telephone:    415-591-1000
Facsimile:     415-591-1400
Email: nnorris@winston.com

James F. Hurst (*Admitted Pro Hac Vice*)
David J. Doyle (*Admitted Pro Hac Vice*)
Samuel S. Park (*Admitted Pro Hac Vice*)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Telephone:    312-558-5600
Facsimile:     312-558-5700
Email: jhurst@winston.com; ddoyle@winston.com;
spark@winston.com

Charles B. Klein (*Admitted Pro Hac Vice*)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20007
Telephone:    202-282-5000
Facsimile:     202-282-5100
Email: cklein@winston.com

Attorneys for Defendant
ABBOTT LABORATORIES

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

MEIJER, INC. & MEIJER DISTRIBUTION, INC., on behalf of themselves and all others similarly situated,

           Plaintiffs,

    vs.

ABBOTT LABORATORIES,

           Defendant.

**Case No. C 07-5985 CW**

*Related Per October 31, 2007 Order to Case No. C 04-1511 CW*

CONSOLIDATED CASE

**DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES' OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Date:        August 7, 2008
Time:        2:00 p.m.
Courtroom: 2 (4th Floor)
Judge:       Hon. Claudia Wilken

*Winston & Strawn LLP*
*35 W. Wacker Drive*
*Chicago, IL 60601-9703*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

**TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................................3

       A.     Qualifications..............................................................................................3

       B.     Assignment..................................................................................................4

       C.     Summary of opinions ..................................................................................5

II.    PURPORTED CLASS MEMBERS WOULD HAVE CONFLICTING ECONOMIC INTERESTS
       WITH REGARD TO FUNDAMENTAL ECONOMIC ISSUES IN THIS CASE ...................10

       A.     Plaintiffs' purported class.........................................................................10

              1)     The class proposed by plaintiffs includes different types of firms that
                     compete in different downstream markets. .....................................11

              2)     The class proposed by plaintiffs includes firms that profit from higher
                     drug prices, including higher prices of Norvir and Kaletra...........12

              3)     The class proposed by plaintiffs includes direct purchasers that bought
                     only Kaletra, purchasers that bought only Norvir, and purchasers that
                     bought both. ....................................................................................19

       B.     Purported class members would have antagonistic economic interests
              with respect to plaintiffs' fundamental theory of liability .......................20

              1)     Prof. Singer offers three alternative theories of liability that have very
                     different implications for what constitutes competitive pricing......20

              2)     Direct purchasers that benefit from higher drug prices would have
                     conflicting economic interests with those that do not.....................26

              3)     Direct purchasers that primarily buy Norvir would have conflicting
                     economic interests with those that primarily buy Kaletra. .............30

       C.     Purported class members would have antagonistic economic interests in
              whether to pursue "Boosted Market" or "Boosting Market"
              monopolization claims and seek overcharges in such claimed markets .....32

              1)     Plaintiffs' "Boosting Market" monopolization claims are detrimental
                     to purported class members that purchased only or primarily Kaletra. .........33

              2)     Plaintiffs' claims of overcharges on purchases of Kaletra are
                     detrimental to purported class members that purchased primarily
                     Norvir...............................................................................................35

       D.     Purported class members would have antagonistic economic interests
              with regard to whether to seek overcharges or lost profits.......................36

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

**III.** **ASSESSING ANTITRUST INJURY AND ESTIMATING CLAIMED OVERCHARGES REQUIRES INDIVIDUALIZED ECONOMIC ANALYSIS THAT CANNOT BE CONDUCTED ON A CLASS-WIDE BASIS** .................................................................................**38**

**A.** **Dr. Singer's proposed methodologies for assessing antitrust injury and estimating claimed overcharges are flawed** ............................................**38**

    *1)* *Dr. Singer's methodology for Norvir* ................................................38

    *2)* *Dr. Singer's methodology for Kaletra* ..............................................42

**B.** **There was significant variation in the net prices that direct purchasers paid for Norvir and Kaletra in the actual world** .......................................**45**

    *1)* *Contrary to Dr. Singer's claims, a substantial portion of Norvir and Kaletra sales were discounted from the wholesale list price* ............46

    *2)* *Contrary to Dr. Singer's claims, Norvir and Kaletra effective transaction prices varied widely in the actual world* ........................55

    *3)* *Contrary to Dr. Singer's claims, discounts were not uniform and constant but varied widely across buyers and over time.* ...............58

**C.** **Determining the prices that direct purchasers would have paid in the but-for world would require highly individualized analysis.** .........................**64**

    *1)* *The prices each direct purchaser paid before December 2003 varied significantly over time and across individual transactions.* ..........65

    *2)* *Determining the prices that direct purchasers would have paid in the but-for world would require highly individualized analysis.* ..........67

**D.** **Individualized analysis would be required to determine whether Norvir was used as a PI booster or a stand-alone PI** ......................................**70**

**IV.** **CONCLUSIONS** ..............................................................................................**71**

DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES
OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**Winston & Strawn LLP**
35 W. Wacker Drive
Chicago, IL 60601-9703

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.     INTRODUCTION

## A.  Qualifications

1.     I am an Associate Professor and Founding Chair of the Department of Pharmaceutical Economics and Policy at the University of Southern California (USC).  Our faculty in the School of Pharmacy constitutes one of the largest and most prominent academic groups in the United States focused specifically on pharmaceutical economics.  I also have a joint appointment in the USC Department of Economics.  I specialize in the fields of pharmaceutical economics and health economics.

2.     I have published more than 120 peer-reviewed scientific articles and numerous other reports and reviews in the fields of pharmaceutical economics and health economics.  I am a founding Executive Board member of the International Society for Pharmacoeconomics and Outcomes Research and Founding Editor of its scientific peer-reviewed journal, *Value in Health*. *Value in Health* is the leading scientific journal in pharmaceutical economics, health policy and health services research according to the ISI Journal Citation Report.  I am a member of the Executive Board of the American Society of Health Economists.  I am also a Scientific Advisory Board member for the Disease Management Association of America and for the International Society for Pharmacoeconomics and Outcomes Research.

3.     I earned my B.A. summa cum laude in economics from Amherst College in 1974, and my M.A., M.Phil. and Ph.D. in economics from Yale University between 1976 and 1980.  I have taught at Stanford University, University of California at Santa Barbara, University of Connecticut, and Yale University, and have been a tenured faculty member at USC since 1992.

4.     I have provided expert consultation on pharmaceutical economics and health economics to the U.S. Health Care Financing Administration (now the Center for Medicare and Medicaid Services), the U.S. Agency for Health Care Research and Quality, the U.S. Centers for Disease Control and Prevention, the U.S. Public Health Service, the U.S. Food and Drug Administration, the U.S. Environmental Protection Agency, the Government of Hungary, the Hong Kong Centre for Economic Research, the Hong Kong Medical Executives Association, the World Bank, the

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1   California AIDS Commission, the California Medi-Cal Drug Advisory Board, the County of San

2   Diego Medically Indigent Adult program, and the County of Sacramento Homeless Program.  I have

3   also provided expert reports in several cases relating to pharmaceutical and medical issues.  A

4   complete list of my current and past positions as well as a list of my prior experience as an expert

5   within the preceding four years is contained in my curriculum vitae (attached hereto as Appendix A).

6       **B.  Assignment**

7       5.      Plaintiffs Meijer, Inc. and Meijer Distribution, Inc. ("Meijer"), Rochester Drug

8   Cooperative, Inc. ("Rochester"), and Louisiana Wholesale Drug Company, Inc. ("Louisiana

9   Wholesale") (collectively "plaintiffs") claim that Abbott Laboratories ("Abbott") "leveraged" its

10  monopoly power in a "Boosting Market," consisting only of Norvir, to monopolize (or attempt to

11  monopolize) a so-called "Boosted Market," consisting of protease inhibitors ("PIs") boosted by

12  Norvir.[1]  In particular, plaintiffs claim that by raising the price of Norvir without initially raising the

13  price of Kaletra, Abbott disadvantaged competing PIs that are boosted by Norvir.  According to

14  plaintiffs, Abbott's conduct had the effect of reducing price competition in the "Boosted Market"

15  and subsequently allowed Abbott to anticompetitively increase the price of Kaletra.[2]

16      6.      Plaintiffs also allege in a separate cause of action, that Abbott has engaged in conduct to

17  maintain a monopoly in the "Boosting Market."  In particular, plaintiffs allege that Abbott

18  "maintained its monopoly power in the boosting market by deliberately inducing potential

19  competitors in the boosting market into relying on Norvir as the de facto boosting agent, thereby

20  impeding the development of potential rivals to Norvir and/or delaying the development of

21

22

23  _____

    [1] Consolidated Amended Complaint ("Complaint"), pp. 5-6; Direct Purchaser Class Plaintiffs'
    Notice of Motion and Motion for Class Certification, ("Motion for Class Certification"), p. 5.

24
    [2] Complaint, p. 12.  Specifically, plaintiffs argue that "from December 2003 until June 2005, Abbott
25  waited to see if it had accomplished its goal of impairing the growth of its boosted rivals, and thus
    kept Kaletra's price steady.  However, once it felt it had succeeded sufficiently in neutralizing its
26  boosted rivals' ability to compete on price, Abbott began (safely) inflating Kaletra's price:  13.2
    percent in 2005 and a total of 25 percent from June 2005 through October 2007."  Motion for Class
27  Certification, pp. 5-6.

28  _____
                                      4

1  technologies that would have permitted Norvir to be used in substantially smaller amounts."[3]

2  According to plaintiffs, this "enabl[ed] Abbott to sell Norvir at artificially inflated prices."[4]

3      7.      I have been asked by counsel for Abbott to analyze (1) whether there are fundamental

4  conflicts of interest among members of the proposed class with regard to key economic issues; and

5  (2) whether certain economic issues arising from plaintiffs' antitrust allegations, including the

6  claimed antitrust injury and the estimate of claimed overcharges, could be assessed on a class-wide

7  basis or whether the need for highly individualized economic analysis would make such an

8  assessment impossible or impractical on a class-wide basis.  In addition, I have been asked to review

9  the declaration of plaintiffs' expert, Dr. Hal Singer, and evaluate whether the conclusions contained

10  therein are methodologically sound and consistent with economic principles.[5]

11      8.      This report summarizes my current opinions based on the materials I have reviewed to

12  date.  My review has included the Complaint, plaintiffs' Motion for Class Certification, the Singer

13  Declaration, other filings in the case, produced documents, Abbott sales data, prescription market

14  data, HIV market research reports, and various sources of publicly available information about the

15  pharmaceutical industry.  A complete list of the materials I have relied upon is attached as Appendix

16  B.

17      **C.  Summary of opinions**

18      9.      Based on my review and analysis to date, I conclude the following:

19          (1) Purported class members would have conflicting economic interests with regard to

20              fundamental economic issues in this case.

21              a.  The class proposed by plaintiffs consists of very different types of firms,

22                  including large national wholesalers and smaller regional and specialized

23                  wholesalers.  The purported class also includes many entities that are not

24                  wholesalers, including national and regional pharmacy chains, single-store

25

26  [3] Motion for Class Certification, p. 4.  *See also*, Complaint, pp. 5-6, 10.

27  [4] Complaint, p. 11.

    [5] Class Certification Declaration of Hal Singer, Ph.D. ("Singer Declaration").

28

DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES
OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

**Winston & Strawn LLP**
**35 W. Wacker Drive**
**Chicago, IL 60601-9703**

pharmacies, Internet/mail-order pharmacies, non-profit and for-profit hospitals, and non-profit HIV clinics. These retailers compete in very different downstream markets than wholesalers.

b. The class proposed by plaintiffs also includes firms that profit from higher drug prices and some that may not. Some wholesalers, including the "Big 3" national wholesalers, sell drugs to pharmacies and other retailers on a "cost-plus" basis, which means that they set retail prices based on a percentage mark-up over their acquisition costs. Under cost-plus pricing, a wholesaler's profit margin on sales of a particular drug increases proportionately with the acquisition cost of the drug. Wholesalers also profit from higher drug prices in other ways, including from the "float." Therefore, some purported class members likely have benefited from the challenged conduct in this case.

c. The class proposed by plaintiffs includes direct purchasers that bought only Kaletra, purchasers that bought only Norvir, and purchasers that bought both. In fact, ████████ of purported class members had no purchases either of Norvir or of Kaletra—that is, they did not purchase both. Even a greater percentage bought primarily, but not entirely, one or the other. In contrast, plaintiffs had a more balanced mix of Norvir and Kaletra purchases.

d. Purported class members would have antagonistic economic interests with respect to plaintiffs' fundamental theory of liability. Dr. Singer seems to propose three different economic and legal frameworks for assessing liability in this case: (1) a "raising rivals' costs" framework, (2) a "squeeze buyers' surplus" framework, and (3) a *Cascade* standard. These different frameworks have very different implications for what constitutes anticompetitive pricing.

e. If Abbott were found liable, plaintiffs' theory of liability could determine Abbott's conduct going forward. But the different, and conflicting, theories of

**Winston & Strawn LLP**
35 W. Wacker Drive
Chicago, IL 60601-9703

liability offered by Dr. Singer likely would have very different implications for

Abbott's future pricing of Norvir and Kaletra:

i)  Dr. Singer's "squeeze buyers' surplus" framework, which seems to imply that

    any increase of the price of Norvir is anticompetitive, could force Abbott to

    roll-back the price of Norvir, perhaps to pre-December 2003 levels.

ii) Dr. Singer's "raising rivals' costs" framework, which seems to imply that any

    increase in the price of Norvir without a commensurate increase in the price of

    Kaletra is anticompetitive, may result in prices for Norvir and Kaletra that are

    higher than Dr. Singer's "squeeze buyers' surplus" theory, since Abbott likely

    would find it profit-maximizing to set the price of Norvir higher than pre-

    December 2003 levels and to increase the price of Kaletra commensurately.

iii) The *Cascade* standard likely would lead to higher prices of Norvir than the

    other two frameworks, and a price of Kaletra higher than the "squeeze buyers'

    surplus" framework but lower than the "raising rivals' costs" framework.

f.  Members of the purported class would have conflicting economic interests with

    respect to which liability standard to pursue depending on whether (1) they profit

    or lose from higher drug prices and (2) they purchase primarily Norvir or Kaletra.

g.  Purported class members also would have antagonistic economic interests in

    pursuing plaintiffs' distinct and separate claims—the "Boosted Market"

    monopolization claims or the "Boosting Market" monopolization claims.  Direct

    purchasers that bought only (or primarily) Kaletra would have no (or little)

    economic interest in pursuing plaintiffs' "Boosting Market" monopolization

    claims because they are not purchasers in the claimed "Boosting Market," which

    plaintiffs claim consists of only Norvir.  In fact, plaintiffs' "Boosting Market"

    monopolization claims are detrimental to purchasers of Kaletra because they

    increase the burden to show liability under the "Boosted Market" monopolization

    claims.  In particular, plaintiffs will have to prove that Abbott engaged in two

7

DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES
OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

very different types of anticompetitive conduct in two different alleged relevant markets.

h.  Pursuing overcharges on Kaletra is detrimental to purported class members that purchased primarily Norvir.  Plaintiffs' claim that increases in the price of Kaletra are supracompetitive, and therefore constitute overcharges, contradicts the claim that the increase in the price of Norvir without a commensurate increase in the price of Kaletra is anticompetitive because it yields a price of Kaletra that is too low relative to the price of Norvir.

i.  Purported class members would also have antagonistic economic interests with regard to whether to seek overcharges or lost profits.  While purchasers of Norvir prefer to seek overcharges, purchasers of Kaletra may prefer to seek lost profits rather than overcharges because potential overcharges on Kaletra, even if plaintiffs can show liability and prove overcharges, are (at best) minimal.

(2) Assessing antitrust injury and estimating claimed overcharges requires individualized economic analysis that cannot be conducted on a class-wide basis.

a.  Dr. Singer proposes methodologies for assessing antitrust injury and estimating overcharges that are based solely on the wholesale list price (WAC).  But list prices cannot be used as a basis to conclude that all purported class members suffered antitrust impact and to estimate the extent of the claimed overcharges because they do not reflect the actual prices that direct purchasers of pharmaceutical products actually pay to manufacturers.

b.  Contrary to Dr. Singer's unsupported assertions that essentially all purported class members paid list prices in the "actual world," the Abbott sales data indicates that discounts from list prices on the sale of Norvir and Kaletra were significant, both in terms of frequency and magnitude.  In fact, ■ percent of purported class members made at least some purchases at less than list price.  For some purported

8

1    class members, the majority of their purchases of Norvir and Kaletra were

2    discounted from list prices.

3    c.   Because discounts on purchases of Norvir and Kaletra varied widely across

4         buyers, there was also significant variation in the net prices paid by purported

5         class members in the actual world. ████████████████████████████

6         ████████████████████████████████████████████████████.

7         While some purported class members paid list prices, others paid only a small

8         fraction of list prices.

9    d.   The prices that many direct purchasers paid for Norvir and Kaletra changed over

10        time, and those changes varied significantly across direct purchasers.  For

11        instance, while the prices paid by some direct purchasers for Norvir increased by

12        400 percent after December 2003, the average prices that others paid actually

13        *decreased*.

14   e.   Dr. Singer also assumes without basis that prices "but-for" the challenged conduct

15        would be uniform across direct purchasers.  But Norvir and Kaletra prices were

16        not even uniform in Dr. Singer's proposed but-for world (*i.e.*, pre-December 2003

17        for Norvir).  In fact, there was significant variability across direct purchasers and

18        over time.

19   f.   A more significant flaw in Dr. Singer's proposed methodology is his failure to

20        recognize that prices in the "but-for world" would differ across direct purchasers,

21        and from the prices that any purchaser paid prior to the Norvir and Kaletra

22        wholesale list price increases.  In fact, determining the prices that direct

23        purchasers would have paid in the but-for world would require highly

24        individualized economic analysis that cannot be conducted on a class-wide basis.

25        For instance, because discounts are negotiated by the customers of purported class

26        members (*e.g.*, GPOs, third-party payors, and government entities), the discounts

27        received by a direct purchaser depend on the direct purchaser's customers and

28

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1  their ability to bargain for favorable pricing.  But the customers of direct

2  purchasers change significantly over time.  These changes in customer have a

3  substantial impact on the average prices paid by any purported class member.  To

4  assess antitrust injury and estimate overcharges, it is necessary to account for this

5  and other factors that influenced the price of each purported class member during

6  the relevant period.  Dr. Singer makes no attempt to do so.

7  g.  Because Dr. Singer proposes methodologies based solely on list prices, and

8  completely ignores important individualized economic issues, he fails to show

9  that the antitrust impact and associated claimed overcharges can be assessed on a

10  class-wide basis using common evidence.

11  h.  Dr. Singer's assumption that the entire increase in the price of Norvir constitutes

12  overcharges on all purchases of Norvir (which ignores the fact that Abbott had a

13  legitimate business interest in repositioning Norvir in its new role as a booster PI)

14  is inconsistent with the fact that Norvir is used both as a PI booster and as a stand-

15  alone PI.  Plaintiffs' liability theory only applies to the use of Norvir as a booster

16  to other PIs.  Under plaintiffs' theory of monopoly leveraging, increases in the

17  price of Norvir when used as a stand-alone PI cannot have any anticompetitive

18  effects and, therefore, cannot be considered antitrust injury or overcharges.  Dr.

19  Singer does not propose any methodology for separating sales of Norvir to be

20  used as a PI booster and sales of Norvir as a stand-alone PI.

21  **II.  PURPORTED CLASS MEMBERS WOULD HAVE CONFLICTING ECONOMIC INTERESTS WITH**

22  **REGARD TO FUNDAMENTAL ECONOMIC ISSUES IN THIS CASE**

23  **A.  Plaintiffs' purported class**

24  10.  Plaintiffs bring this case on behalf of a purported class consisting of "[a]ll persons or

25  entities in the United States that purchased Norvir and/or Kaletra directly from Abbott or any of its

26  divisions, subsidiaries, predecessors, or affiliates during the period from December 3, 2003 through

27  such time as the effects of Abbott's illegal conduct ceased, and excluding government entities,

28

1    Abbott, and Abbott's divisions, subsidiaries, predecessors and affiliates."[6]  Plaintiffs claim that, as a

2    result of Abbott's alleged anticompetitive conduct, members of the proposed class paid

3    supracompetitive prices in their purchases of both Norvir and Kaletra.[7]  As I describe below,

4    plaintiffs' purported class includes very different types of direct purchasers that compete in very

5    different downstream markets.  Because of these differences, members of the purported class are

6    affected very differently by the challenged conduct and, as a result, have antagonistic economic

7    interests with respect to some key issues in this case, including plaintiffs' theory of liability.[8]

8        *1) The class proposed by plaintiffs includes different types of firms that compete in*

9        *different downstream markets.*

10    11.    The class proposed by plaintiffs includes very different types of firms.  Some of the

11    purported class members are large drug wholesalers such as Cardinal Health ("Cardinal"),

12    McKesson Corporation ("McKesson"), and AmerisourceBergen.  It is estimated that these "Big 3"

13    drug wholesalers distribute between 90 and 95 percent of all drugs in the U.S.[9] ████████████

14    ██████████████████████████████████████████████████████████████████████████████████

15    ████████████████ ██████.[10]

16    12.    The purported class includes other regional wholesalers and specialized wholesalers.

17    Two of the proposed class representatives, Rochester and Louisiana Wholesale are both small

18    regional wholesalers.  Meijer, a drug retailer, is not a direct purchaser of Norvir and Kaletra, but

19    rather an indirect purchaser.  I understand that Meijer purports to bring suit under assignment from

---

[6] Motion for Class Certification, p. 1. *See also*, Complaint, p. 14.

[7] Motion for Class Certification, pp. 22-23.

[8] I understand that thirteen purported class members have opted-out.  According to Dr. Singer, Supervalue Inc., Ahold, Safeway Inc., Walgreen Co., The Kroger Co., New Albertson's, Inc., American Store Company, Inc., Rite Aid, JCG USA, Maxi Drug, Inc., Eckerd Co., CVS Pharmacy Inc., and Caremark, L.L.C. have all opted out of the purported class.  Singer Declaration, p. 5.

[9] According to MarketWatch, these three wholesalers "have a virtual lock on the wholesale drug market with at least 90% and as much as 95% of all revenue."  (Russ Britt, "Growing share of 'Big Three' gets federal attention", MarketWatch.com, May 30, 2007, http://www.marketwatch.com/news/story/growing-share-big-three-drug/story.aspx?guid=%7B9F3862C1-7E3A-4D82-94B7-A8E4AE5DAE6A%7D.)

[10] Source:  Abbott Sales Data (RIT0000001-00000003).  Excludes opt-outs from the purported class and government entities.

Declaration of Joel Hay, Ph.D. in Support of Abbott Laboratories
Opposition to Direct Purchaser Class Plaintiffs' Motion for Class Certification

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1    Frank W. Kerr, Co. ("Kerr"), another small regional wholesaler.[11] ███████████████

2    ████████████████████████████████████████████████████████████████████████

3    ███████.[12]

4        13.    The purported class of direct purchasers also includes many entities that are not

5    wholesalers. Plaintiffs define a class consisting of "all persons or entities in the United States that

6    purchased Norvir and/or Kaletra directly from Abbott."[13] But direct purchasers include entities that

7    are not wholesalers, including national and regional pharmacy chains (*e.g.,* ████████████), single-

8    store pharmacies (*e.g.,* ████████████████████████████████████████████████████),

9    Internet/mail-order pharmacies (*e.g.,* ███████), for-profit hospitals (*e.g.,* ████████████████

10   ███████), and non-profit HIV clinics. These entities operate at a different, downstream level in the

11   vertical chain than wholesalers—*i.e.,* they are retailers that supply drugs directly to patients. Drug

12   retailers are likely to face very different competitive conditions in their downstream markets than

13   wholesalers.[14]

14       14.    As I describe below, the different competitive conditions facing direct purchasers

15   strongly suggests that they have very different abilities to pass-through increases in drug prices to

16   their customers and, therefore, have conflicting interests with regard to the conduct challenged in

17   this case.

18           2)   *The class proposed by plaintiffs includes firms that profit from higher drug prices,*

19                *including higher prices of Norvir and Kaletra.*

20       15.    Wholesalers purchase branded drugs at a price referred to as the wholesale acquisition

21   cost ("WAC") or some discount from the WAC (which may include volume discounts and prompt

22

23   _____

     [11] I understand that Meijer's assignment from Kerr may not be valid. Nevertheless, I treat Meijer as
24   Kerr for purposes of this declaration.

     [12] Source: Abbott Sales Data. Excludes opt-outs from the purported class and government entities.
25   [13] Motion for Class Certification, p. 1.

26   [14] Moreover, some of these retailers are not only direct purchasers of Norvir and Kaletra, but are also
     *indirect* purchasers. That is, some purported class members purchase Norvir and Kaletra not only
27   directly from Abbott, but also indirectly from wholesalers and distributors that are also part of the
     proposed class.

28   _____

12

DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES
OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1 | payment discounts).[15]  Wholesalers may also receive "chargebacks" negotiated between the drug

2 | manufacturer and an indirect purchaser (such as a GPO, third-party payor, or hospital) which are

3 | equivalent to discounts from WAC.[16]  Wholesalers sell drugs to pharmacies and other retailers at a

4 | price called the actual acquisition cost ("AAC").  The AAC is the final cost of the drug to the

5 | pharmacy or other retailer after all discounts are subtracted.  The difference between the WAC and

6 | the AAC is the wholesaler's profit margin, which is often expressed in percentage terms.

7 |     16.    The effect of the Norvir and Kaletra price increases on the profit margin of wholesalers

8 | depends on the pricing strategy employed by the wholesaler and on competitive conditions affecting

9 | the wholesaler.  Some wholesalers sell drugs to pharmacies and other retailers on a "cost-plus"

10 | basis.[17]  Cost-plus pricing means that wholesalers charge pharmacies or other retailers their WAC

11 | plus a set percentage mark-up.  For example, a wholesaler that prices on a 10 percent cost-plus basis

12 | will charge $11 to a pharmacy for a drug with a WAC of $10.

13 |     17.    Under cost-plus pricing, a wholesaler's profit margin on sales of a particular drug

14 | increases proportionately with the acquisition cost of the drug.  For instance, in the hypothetical

15 | example above, if the manufacturer implemented a 100 percent increase in its WAC (from $10 to

16 | $20), the wholesaler's price to its customers would increase from $11 to $22 (assuming, as above, 10

17 | percent cost-plus pricing).  The wholesaler's margin of $1 before the price increase therefore

18 | becomes $2 after the price increase (from $20 to $22), an increase of 100 percent in the wholesaler's

---

[15] *See, e.g.*, *Follow The Pill:  Understanding the U.S. Commercial Pharmaceutical Supply Chain*, The Kaiser Family Foundation, March 2005, p. 18; Richard G. Frank, "Prescription Drug Prices: Why Do Some Pay More Than Others Do? *Health Affairs*, March/April 2001, pp. 124-125.  The WAC does not typically reflect all discounts received by the wholesaler or its customers.  The average price paid by wholesalers to manufacturers after all discounts is referred to as the average manufacturer price ("AMP").

[16] *See* discussion Section III.B.1 *infra*.

[17] *See, e.g.*, *A Guide to Understanding Common Prescription Drug Pricing Terms*, Academy of Managed Care Pharmacy, Appendix B, p. 1; Allen Dunehew, "Changing dynamics in the pharmaceutical supply chain: A GPO perspective," *American Journal of Health-System Pharmacy*, (2005), p. 527.

---

13

margin.  Thus, the profit margin of the wholesaler increases proportionately with the increase in the wholesaler's acquisition costs.[18]

18.    The fact that some wholesalers determine their prices based on cost-plus formulas is corroborated by plaintiffs' economic expert in the *Doe v. Abbott* and *SEIU v. Abbott* litigation.[19] Prof. Douglas Greer states that wholesalers "practice markup pricing," citing a law review describing that "[t]he resale price is determined by a more or less standard markup over the invoice cost."[20]

19.    The largest drug wholesalers, which make up the vast majority of direct purchases of Norvir and Kaletra from Abbott, use cost-plus or equivalent pricing strategies and therefore have profited from the higher prices of Norvir and Kaletra.  ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ ██ .[21]  Publicly available information indicates that these large national wholesalers set prices to pharmacies and other retailers on a cost-plus or equivalent (*e.g.,* list-less) basis.  For example, a contract between Cardinal and CVS pharmacies filed with the Securities and Exchange Commission (SEC) states that:

> CVS will pay a Cost of Goods for Merchandise in an amount equal to *"Cardinal's Cost"* plus the percentage set forth in the Section 3(a) Disclosure Schedule.  The term *"CARDINAL'S COST"* as used herein means the

---

[18] An alternative to pricing on a cost-plus basis is setting price on a "list-less" basis.  A "list-less" price is a mark-down from a suggested list price that the wholesaler charges pharmacies and other retailers, called the average wholesale price ("AWP").  Pharmacies and other retailers pay the AWP minus some percentage discount from that list price.  Because the AWP typically is a proportionate mark-up over WAC, the cost-plus and list-less pricing approaches by wholesalers essentially yield the same result -- the wholesaler's profit margin increases proportionately with the acquisition cost of a particular drug.

[19] *John Doe 1 and John Doe 2, on behalf of Themselves and All Other Persons Similarly Situated, v. Abbott Laboratories*, First Amended Class Action Complaint; *Service Employees International Union Health And Welfare Fund, on Behalf of Itself and All Other Similarly Situated, vs. Abbott Laboratories*, Class Action Complaint.

[20] Expert Report of Douglas F. Greer, Ph.D., pp. 73-74, citing Robert G. Harris and Lawrence A. Sullivan, "Passing on the Monopoly Overcharge:  A Comprehensive Policy Analysis," *University of Pennsylvania Law Review*, December 1979, p. 304.  (Ex. 2 to Klein Decl.)

[21] Source:  Abbott Sales Data.  Estimates exclude opt-outs from the purported class and government entities.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

manufacturer's published wholesale acquisition cost for Merchandise at the date of Cardinal's invoice to CVS, adjusted to reflect any then-applicable contract pricing, but without reduction for cash discounts. Manufacturer off-invoice quantity discounts and promotional allowances which are intended by the manufacturer to be passed through to Cardinal's retail national chain accounts will be made available to CVS.[22]

Cardinal is one of the largest pharmaceutical wholesalers and the largest purchaser of Norvir and Kaletra. CVS is one of the largest pharmacy chains in the U.S.[23]

20.     In contrast, two of the proposed class representatives, Rochester and Louisiana Wholesale, are small regional wholesalers. Meijer is a pharmaceutical retailer supposedly suing on behalf of Kerr, another small regional wholesaler. ████████████████████████ ████████████████████████████████████████████ ████████████████ .[24] The purported class includes other regional wholesalers and specialized wholesalers. Some of these smaller wholesalers likely have different pricing strategies. Their pricing may depend on various factors such as differentiation with other wholesalers (*e.g.,* because of service, location, brand name), local competitive conditions, the wholesaler's competitive strategy, and the type of customers served by the wholesaler. Moreover, as I discuss above, the purported class of direct purchasers includes many entities that are not wholesalers. Because these entities operate at a different, downstream level in the vertical chain than wholesalers—*i.e.,* they are retailers that supply drugs directly to patients—they are likely to face very different competitive conditions, and very different abilities to pass-through drug price increases, in their downstream markets than wholesalers.

21.     In addition, some wholesalers profit from higher drug prices in other ways. One way in which higher drug prices may benefit certain wholesalers is from the "float." The float is the interest

---

[22] Cardinal Wholesale Supply Agreement with CVS Pharmacies, August 2000, available at http://www.sec.gov/Archives/edgar/data/721371/000095015200006483/l83475aex10-30.txt.

[23] *See, e.g*., http://www.cvs.com/corpInfo/about/index.html.

[24] *See* note 12 *supra.*

a firm earns on the difference between its accounts receivable from its buyers and accounts payable to its suppliers. Specifically, when the wholesaler receives payment from its buyer before the wholesaler has to pay the drug manufacturer, the wholesaler can earn interest on the payment from the buyer until payment is due to the manufacturer.[25] Large pharmaceutical wholesalers, which are sophisticated in managing their accounts payable and receivable, earn substantial profit from the float.

22. The value of the float increases with increased dollar sales volume. Because a wholesaler's sales volume increases with higher drug prices, profits from the float also increase with higher drug prices. Certain high-volume wholesalers therefore generate more profit from the "float" when the price of a particular drug increases. The increases in the prices of Norvir and Kaletra, therefore, likely led to higher profits from the float for certain wholesalers.

23. It is unlikely that the Norvir and Kaletra price increases led to a reduction in the sales volume of Norvir and Kaletra that would offset the increased profit margins of certain wholesalers. The demand for Norvir and Kaletra, as for other HIV drugs, is not highly responsive to price changes. In economic terms, this is referred to as inelastic demand.

24. Price is not a primary factor in the decisions of doctors and patients because HIV drugs differ significantly in terms of efficacy, toxicity, drug interactions, side effects, pill burden, dosing frequency, and many other characteristics. Doctors and patients therefore choose drug treatment regimens based on medical considerations, rather than price. Moreover, price is not typically a significant factor in the decisions of doctors and patients because the vast majority of HIV patients have health plan coverage which charges only a fixed co-payment per prescription from their beneficiaries, regardless of the price of the HIV medication. For these health plans, any increase in the price of a drug is covered by the third-party payor, and is not a concern for either the patient or the prescribing doctor. In addition, it is my understanding that no health plans have classified Norvir

---

[25] *See, e.g.*, Allen Dunehew, "Changing dynamics in the pharmaceutical supply chain: A GPO perspective," *American Journal of Health-System Pharmacy* (2005), pp. 527-529.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1  or Kaletra as non-preferred drugs, which would increase the co-payment charged to patients for such

2  drugs.[26]

3      25.    The lack of price sensitivity is indicated by the fact that sales of Norvir kept increasing

4  after the Norvir price increase.  Specifically, ████████████████████████████

5  ████████████████████████████████████████████████.[27]  Thus, the

6  Norvir and Kaletra price increases are unlikely to have resulted in a decrease in the sales volume of

7  Norvir and Kaletra.[28]

8      26.    Because there is no offsetting quantity effect, wholesalers that price on a cost-plus or

9  equivalent basis therefore received a net economic benefit from the Norvir price increase.  For

10  instance,███████████████████████████████████████

11  ██████████████████████████████████████████

12  ████████████████████████████████████████████

13  ████████████████████████████████████████████

14  ███████████████████████████████████████

15  ██████████████████████████████████████████

16  ████████████████████████████████████████

17  ████████████████████████████████████████

18  ████████████████████████████████████████████

19  ███████████████      Of course, actual estimates can only be determined from data and/or

20  documents from direct purchasers of Norvir and Kaletra.

21

22  [26] Letter from John Leonard (Abbott Laboratories Vice President of Global Pharmaceutical
Development) to Care Providers, January 12, 2004 (Ex. 2).

23  [27] Source:  TRX data (NOR00432932).

24  [28] In fact, plaintiffs' claims imply that sales of Norvir would have increased as a result of the
challenged conduct.  Specifically, plaintiffs allege that Abbott's conduct delayed the development of

25  boosted PIs that "did not depend on using 200 mg" of Norvir.  Complaint, p. 11.  In particular,
plaintiffs claim that Abbott's conduct had the effect of delaying GlaxoSmithKline from receiving

26  FDA approval for the use of its boosted PI, Lexiva, with only 100mg of Norvir rather than 200mg,
and therefore induced patients to purchase more Norvir than they otherwise would have.  *Id* at 11.

27  However, to the extent that plaintiffs claims are correct, such conduct would have had the effect of
*increasing* a wholesaler's sales of Norvir.

28

27.     Similarly, wholesalers that manage their accounts payable and receivable to profit from the float also likely received a significant net economic benefit from the Norvir and Kaletra price increases because of the lack of offsetting quantity effects from these price increases. A simple calculation indicates that large drug wholesalers, such as Cardinal, can earn significant profits from the float, and that higher drug prices can considerably impact these profits. The profit that a wholesaler can earn from the float depends on the time interval between its accounts receivable and accounts payable and on the wholesaler's "internal" interest rate. Assuming that the wholesaler receives payment from its buyer one month before the wholesaler has to pay Abbott, the float on Norvir is equal to the monthly interest rate earned on the wholesaler's Norvir purchases.

28.     The most common measure of a firm's internal interest rate is the weighted average cost of capital (WACC).[29] Cardinal's WACC is 8.4 percent.[30] At an annual WACC of 8.4 percent, the monthly internal interest rate is about 0.7 percent. ███████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████████
█████████████████████████████████████████████████
████████████████████████████████████████████████████ .

29.     As I describe below, because some direct purchasers, including the large national wholesalers, likely have received significant financial benefits from the higher prices of Norvir and Kaletra, there is a fundamental conflict of interest between members of the purported class. Specifically, the economic interests of these members of the purported class are not aligned with the economic interests of the plaintiffs who seek to serve as class representatives with respect to plaintiffs' alternate and conflicting theories of liability.

---

[29] The WACC is the average cost that a firm pays to finance its assets, and therefore also is the minimum return that a company must earn on its existing assets to be profitable. The WACC commonly is used internally by firms to determine the economic profitability of particular projects.

[30] Bloomberg Financial Data (2008).

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES
OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

3)  *The class proposed by plaintiffs includes direct purchasers that bought only Kaletra,*
*purchasers that bought only Norvir, and purchasers that bought both.*

30.    The purported class includes direct purchasers that bought only (or primarily) Kaletra and purchasers that bought only (or primarily) Norvir.  As Chart 1 below shows, ███████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████ ████████████████████████████████████████████  Even more purported class members bought primarily, but not entirely, one or the other.  As Chart 1 indicates, purchases by plaintiffs were more balanced between Norvir and Kaletra.



Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

---

[31] Excludes opt-outs, government entities, credits,  reverse chargebacks, and invoices with non-positive revenue or quantity.  Source:  Abbott Sales Data.
[32] *Id.*

DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES
OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1     31.    Thus, plaintiffs are not representative of the purported class in terms of their mix of Norvir and Kaletra purchases. As I discuss in Section II.B below, this indicates that plaintiffs' economic interests likely do not coincide with the economic interests of most purported class members in regard to plaintiffs' fundamental theory of liability and other central issues in this case.

## B. Purported class members would have antagonistic economic interests with respect to plaintiffs' fundamental theory of liability

### 1) Prof. Singer offers three alternative theories of liability that have very different implications for what constitutes competitive pricing.

32.    The primary conduct challenged by plaintiffs is Abbott's increase in the price of Norvir without an initial corresponding increase in the price of Kaletra.[33] However, plaintiffs have offered several alternative and conflicting theories of liability, involving very different legal and economic standards for assessing whether a particular pricing structure constitutes legitimate business conduct or anticompetitive conduct. In fact, Dr. Singer seems to propose three different economic and legal frameworks for assessing liability in this case. Dr. Singer claims that liability can be assessed under a "consumer-welfare standard," which involves two distinct "economic frameworks."[34] In particular, Dr. Singer proposes that liability can be proven under a "consumer-welfare standard" either by showing that Abbott "raised rivals' costs" (theory 1) or under a "second classwide economic framework" which assesses whether Abbott "squeeze[d] buyers' surplus" (theory 2).[35] Alternatively, Dr. Singer proposes proving liability under a *Cascade* standard (theory 3).[36]

---

[33] Complaint, p. 10.

[34] Singer Declaration, pp. 13-14.

[35] *Id.* Dr. Singer describes the "raising rivals' costs" framework in paragraphs 25-26 (p. 13), and elaborates on how such a framework can also be used to estimate claimed overcharges on Kaletra in paragraphs 66-67 (pp. 36-37). Dr. Singer describes the "squeeze buyers' surplus" framework in paragraph 27 (p. 14).

[36] Singer Declaration, pp. 14-18. I summarize the liability standards proposed by Dr. Singer in order to demonstrate plaintiffs' antagonistic economic interests with respect to these liability theories. For the purposes of this declaration, I assume that plaintiffs' allegations are true and that Dr. Singer's three liability theories could form the basis for liability in this case. However, I do not accept, expressly or implicitly, that the liability standards proposed by Dr. Singer apply to Abbott's pricing. Nor do I accept Dr. Singer's application of these standards.

33.    The "raising-rivals'-costs" framework (theory 1) proposed by Dr. Singer seems to suggest that any increase in the price of Norvir without a commensurate increase in the price of Kaletra is anticompetitive.  "Raising rivals' costs" is an economic theory in which a firm takes actions for the purpose of increasing the costs of competitors.[37]  Such conduct also may be costly to the firm, but it nevertheless may be profitable if it raises competitors' costs even more.  Accordingly, the "raising-rivals'-costs" framework seems to suggest that any increase in the price of Norvir without a proportionate increase in the price of Kaletra raises the cost of an alternative boosted PI regimen relative to the price of Kaletra.

34.    Dr. Singer's application of the "raising-rivals' costs" framework does not provide any guidance on how to distinguish between anticompetitive conduct and legitimate conduct that is "competition on the merits."  Legitimate and procompetitive business conduct could have the effect of raising the cost of rivals, but that does not make such conduct anticompetitive or exclusionary.[38]  And, such conduct could be profitable for the firm absent any exclusionary effects.  In fact, as I describe in Section III.A.1 below, the increase in the price of Norvir was profitable independent of any effects on Kaletra.

35.    Dr. Singer proposes that liability under his "squeeze buyers' surplus" framework (theory 2) depends on "proof that a penalty price for [Norvir] was set above the 'Independent Monopoly Price.'"[39]  The "squeeze buyers' surplus" framework proposed by Dr. Singer, despite the elaborate language Dr. Singer uses, seems to amount to nothing more than a standard that any increase in the price of Norvir is anticompetitive.  Dr. Singer defines the "penalty price for Norvir" as the price of Norvir after the price increase ($17.14 for 200mg) and the "independent monopoly price" as the

---

[37] *See, e.g.,* Thomas G. Krattenmaker and Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price*, 96 YALE L. J. 209 (1986).  One classic example of this is encouraging labor union activities.  If rivals use proportionately more labor per unit of output than does the dominant firm, the dominant firm's costs will rise less from an increase in the wage rate than do the rivals.  The dominant firm may therefore find it profitable to increase labor wages by encouraging labor union activities, even though a strong union will decrease profits for the firm in the short-run.

[38] *See, e.g.,* David T. Scheffman and Richard S. Higgins, "20 Years of Raising Rivals' Costs," 12 *George Mason Law Review* (2004).

[39] Singer Declaration, p. 14.

DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES
OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1  Norvir price before the price increase ($3.42 for 200mg).[40]   Because, according to Dr. Singer's

2  framework and definitions, the "penalty price for Norvir" would be greater than the "independent

3  monopoly price" for Norvir regardless of the magnitude of the Norvir price increase, Dr. Singer's

4  "squeeze buyers' surplus" liability standard would find Abbott liable if there was *any* increase in the

5  price of Norvir above pre-December 2003 levels.  Dr. Singer also proposes estimating overcharges

6  on the sale of Norvir under the same standard, which assumes that any increase in the price of Norvir

7  is anticompetitive and amounts to overcharges.[41]  For instance, Dr. Singer states that "the overcharge

8  under the consumer-welfare standard is based directly on the 400 percent Norvir WAC price

9  increase."[42]

10       36.     The "squeeze buyers' surplus" framework proposed by Dr. Singer is fundamentally

11  flawed.  There is no economic (or legal) basis for Dr. Singer's standard that any Norvir price

12  increase is anticompetitive.  Drug patents give the patent holder the right to determine the price that

13  it charges for the drug.  Price increases are common in the pharmaceutical industry, for reasons that

14  are completely unrelated to the attempted exclusion of competitors.  In fact, as I discuss in Section

15  III.A.1, Abbott had legitimate business reasons for raising the price of Norvir.  Neither does the fact

16  that Abbott also sells Kaletra (and supposedly competes in a separate "Boosted Market") make any

17  increase in the price of Norvir anticompetitive.  Firms often operate at two different levels in the

18  vertical chain of production.  But this does not provide a basis for price regulation of such firms.

19  Moreover, Dr. Singer's "consumer welfare" standard is so obtuse that it would conclude that the

20  Norvir price increase was anticompetitive even if Abbott had raised the price of Kaletra

21  commensurately—under Dr. Singer's standard, the new price of Norvir (which he refers to as the

22  "penalty price") would be greater than the old price of Norvir (which he refers to as the

23  "independent monopoly price") whether or not Abbott also increased the price of Kaletra.  Thus, Dr.

24  _____

[40] *Id*. at 16.  Throughout his report, Dr. Singer assumes that Norvir is always taken as a booster in a
25  200mg daily dose.  However, Abbott's primary competitors for Kaletra (Reyataz and Lexiva) are
boosted with only a 100mg dose of Norvir.  I accept as true, only for purposes of this declaration,
26  Dr. Singer's calculations in his report.

[41] Singer Declaration, pp. 29-30.
27
[42] *Id.*

28

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1    Singer's "squeeze buyers' surplus" liability standard is fundamentally flawed because it does not

2    help to distinguish between legitimate business conduct and anticompetitive conduct.

3        37.    Lastly, Dr. Singer claims that Abbott's pricing structure may be anticompetitive under a

4    *Cascade* liability standard (theory 3).[43]    Under the *Cascade* standard, a necessary (but not sufficient)

5    condition for an anticompetitive pricing structure is that the "allocated" price of lopinavir in Kaletra

6    (which Dr. Singer refers to as the "in-bundle price of lopinavir") is less than the cost of supplying

7    lopinavir.[44]    Dr. Singer also proposes estimating overcharges under the *Cascade* standard, comparing

8    the actual prices paid to prices they would have paid in "a but-for world in which Abbott imposes a

9    price increase on Norvir, but only up to the level that would be allowed under the *Cascade*

10    standard."[45]

11        38.    Whether or not the *Cascade* standard applies to the case of Abbott's pricing for Norvir

12    and Kaletra, Dr. Singer's application of the standard is fundamentally flawed for several reasons.

13    One significant flaw is that he bases his estimate of the relevant cost of lopinavir on the cost of

14    Kaletra (including promotion, distribution, sales, and R&D costs of Kaletra).[46]    Dr. Singer adjusts

15    the cost of Kaletra by his estimate of the "in-bundle price of lopinavir" pre-December 2003.[47]

16    According to Dr. Singer, the "in-bundle price of lopinavir" pre-December 2003 was $15.36, and the

17    price of Kaletra was $18.78.[48]    Therefore, he attributes 81.8 percent ($15.36/$18.78) of the costs of

18    Kaletra to lopinavir.  He then compares this estimate of the cost of lopinavir, based on his

19    assumption regarding the "in-bundle price of lopinavir" *before* December 2003, to his estimate of

20

21    [43] *Id.* at 14-16.

22    [44] *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008).  In particular, the Court
of Appeals for the Ninth Circuit in *Cascade Health Solutions* concluded that "[t]o prove that a
bundled discount was exclusionary or predatory for the purposes of monopolization or attempted

23    monopolization claim under § 2 of the Sherman Act, the plaintiff must establish that, after allocating
the discount given by the defendant on the entire bundle of products to the competitive product or

24    products, the defendant sold the competitive product or products below its average variable cost of
producing them."  *Id.* at 910.

25    [45] Singer Declaration, p. 5.

26    [46] *Id.* at 18.

27    [47] *Id.*

     [48] *Id.*

28

DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES
OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

the "in-bundle price of lopinavir" *after* December 2003 ($18.78 - $17.14 = $1.64). Therefore, he attributes 81.8 percent of the cost of Kaletra to lopinavir but only 8.7 percent ($1.64/$18.78) of the price of Kaletra to lopinavir.

39. It is no surprise that this calculation yields an estimate of the "in-bundle price of lopinavir" that is less than his estimate of the cost of lopinavir. But this is just an artificial construct of his methodology. There is no economic basis for the assumption that lopinavir accounts for 81.8 percent of the total costs of Kaletra. The relevant measure of the cost of lopinavir should focus on the costs that Abbott would save if lopinavir were not included in Kaletra. Such cost savings are unlikely to be much greater than the production costs of lopinavir. For instance, there likely would be no cost savings in sales and distribution, because the hypothetical "Kaletra" without lopinavir would still be sold and distributed.

40. Dr. Singer also concludes that the "in-bundle price of lopinavir" after December 2003 is $1.64, based on the assumption that Norvir must be taken as a booster in a 200mg daily dose. However, most patients taking a PI boosted by Norvir are prescribed a 100mg dose of Norvir. In fact, Abbott's primary competitors for Kaletra (Reyataz and Lexiva) are boosted with only a 100mg dose of Norvir. If Dr. Singer's calculation is performed using the cost of 100mg of Norvir, then the "in-bundle price of lopinavir" would be $10.21 ($18.78 - $8.57).

41. Of course, this entire discussion also assumes that products are homogeneous, which is inapplicable to the branded drugs industry, and particularly the HIV drug industry, in which products are highly differentiated and there is little price sensitivity. Because HIV drugs are highly differentiated, a competing PI could charge much more than $10.21 and still be able to compete effectively with Kaletra. In fact, Reyataz is priced significantly higher than this, and ███████████ ████████████████████████████████████[49]

42. Moreover, Dr. Singer's calculation of the "in-bundle price of lopinavir" is based on wholesale *list* prices (WAC). But list prices cannot be used as a basis to perform this calculation because they do not reflect the prices that direct purchasers of pharmaceutical products actually pay

[49] Source: TRX data.

1    to manufacturers.  As I discuss in Section III.B.1 below, wholesalers also receive "chargebacks" and

2    other discounts that are negotiated between the drug manufacturer and an indirect purchaser (such as

3    a GPO, third-party payor, or hospital).  Because of these chargebacks and discounts, the average

4    effective prices paid by direct purchasers for Norvir and Kaletra were much lower than WAC.

5    Moreover, because the discounts for Norvir were higher than the rebates for Kaletra, Dr. Singer's

6    calculation, which is based on WAC, significantly underestimates the "in-bundle price of lopinavir."

7    In particular, as Chart 2 below indicates, following the Norvir price increase in December 2003, the

8    "in-bundle price of lopinavir" was $11.02 (using 100mg of Norvir) or $4.25 (under Dr. Singer's

9    assumption of 200mg of Norvir).[50]  Because of increases in the price of Kaletra, these estimates

10    increase to $14.61 and $7.48 by the end of 2007 (assuming 100mg and 200mg of Norvir,

11    respectively).



25    43.    Notwithstanding the fundamental flaws in Dr. Singer's proposed standards for assessing

26    liability in this case, or application of such standards, I assume for the purposes of this declaration

27    ────────────────
[50] Sources:  Abbott Sales Data; NOR 00432933.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1    that Dr. Singer's three liability theories could form the basis for liability in this case in order to

2    assess whether purported class members would have antagonistic economic interests with regard to

3    plaintiffs' central theory of liability.  As I discuss in the sections below, members of the purported

4    class would have conflicting economic interests depending on whether (1) they profit or lose from

5    higher drug prices and (2) they purchase primarily Norvir or Kaletra.

6          *2)  Direct purchasers that benefit from higher drug prices would have conflicting*

7          *economic interests with those that do not.*

8          44.    If Abbott were found liable, plaintiffs' theory of liability could determine Abbott's

9    conduct going forward.  The theories of liability proposed by Dr. Singer are conflicting and,

10   therefore, there can only be one ultimate theory of liability in this case.  However, the different

11   theories of liability offered by Dr. Singer likely would have very different implications for Abbott's

12   future pricing of Norvir and Kaletra if Abbott were found liable.  For example, if the Court were to

13   conclude that any increase in the price of Norvir above pre-December 2003 levels is anticompetitive,

14   such a conclusion could effectively force Abbott to roll back the price of Norvir to avoid continuing

15   damages.  Accordingly, the theory of liability pursued by plaintiffs, if successful, would likely affect

16   Abbott's future pricing of Norvir and/or Kaletra.[51]  However, members of the class proposed by

17   plaintiffs would have antagonistic interests with respect to the alternative theories of liability that

18   plaintiffs propose.  As I describe below, direct purchasers that benefit from higher drug prices would

19   have divergent economic interests from those that do not in terms of which theory of liability to

20   pursue.

21         45.    If Abbott were found liable under the second theory of liability—*i.e.*, if the Court found

22   that any increase in the price of Norvir is anticompetitive—plaintiffs essentially suggest that Abbott

23   should be forced to roll-back the price of Norvir, perhaps to pre-December 2003 levels ($3.42 for a

24   200mg dose or $1.71 for a 100mg dose), regardless of the price of Kaletra.

25

26

_____

27   [51] I am in no way suggesting that any form of injunctive relief would be a proper remedy if plaintiffs
     were to prove that Abbott violated the antitrust laws.

28

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

46.     On the other hand, under the first theory of liability—*i.e.*, if the Court found that increases in the price of Norvir without commensurate increases in the price of Kaletra were anticompetitive—Abbott would be able to maintain a price of Norvir higher than pre-December 2003 levels if it also increased the price of Kaletra proportionately.  In fact, under plaintiffs' first theory, the price of Norvir could remain at current levels ($17.14 for a 200mg dose) if Abbott raised the price of Kaletra to $32.50.[52]  This theory of liability, if successful, likely would result in prices for Norvir and Kaletra going forward that are higher than the second liability theory because Abbott likely would find it profit-maximizing to set the price for Norvir higher than the pre-December 2003 level.

47.     Similarly, the *Cascade* safe harbor standard (theory 3) would result in a Norvir price that is higher than the pre-December 2003 price regardless of the measure used to determine the relevant cost of lopinavir.  Dr. Singer calculates that the price of Norvir under the *Cascade* safe harbor standard could be as high as $14.16 (for a 200mg dose) if Abbott did not increase the price of Kaletra.[53]  If Abbott did raise the price of Kaletra, the price of Norvir could be higher than this. Abbott's future price for Norvir also likely would be higher under the *Cascade* standard than under the first liability theory.  This is because the first liability theory may establish a minimum difference between the price of Kaletra and the price of Norvir that is much larger than under the *Cascade* standard.  The first theory would restrict the difference between the price of Kaletra ($18.78 pre-December 2003) and the price of Norvir ($3.42 for a 200mg dose pre-December 2003) to equal or greater than pre-December 2003 levels ($18.78 - $3.42 = $15.36).[54]  The *Cascade* standard, on the other hand, would restrict the differential between the prices of Kaletra and Norvir to some relevant cost of lopinavir, however it is measured.  According to Dr. Singer, the minimum allowable

---

[52] Pre-December 2003, the difference between the price of Kaletra ($18.78) and a 200mg dose of Norvir ($3.42) was $15.36.  For this difference to remain the same given a 200mg Norvir price of $17.14, the price of Kaletra would need to increase to $32.50 ($17.14 + $15.36).

[53] *Id.* at 23.  Dr. Singer's calculation of the price of Norvir under a *Cascade* standard is flawed for several fundamental reasons that I describe above.  Regardless, I refer to Dr. Singer's calculations for purposes of this declaration to highlight the significantly different implications of the alternative liability theories offered by Dr. Singer.

[54] *Id.* at 16.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

difference in the prices of Kaletra and Norvir under a *Cascade* standard is $4.62.[55]   Because the first

liability theory forces Abbott to increase the price of Kaletra above the profit-maximizing level

much more than the *Cascade* standard for a given increase in the price of Norvir, Abbott's profit-

maximizing price for Norvir under the first theory likely would be lower than under the *Cascade*

standard.

48.    The implication of Dr. Singer's different theories of liability for Abbott's likely future

pricing of Norvir can be summarized as follows:  the post-judgment price of Norvir likely would be

highest under the third theory, followed by the first theory and then the second theory.

49.    The alternative theories of liability offered by plaintiffs also would have very different

implications for Abbott's future pricing of Kaletra.  If Abbott were found liable under the second

liability theory, Abbott's pricing for Kaletra would unlikely be higher than its current level.  Under

the first theory of liability, on the other hand, Abbott could comply with such a liability standard by

increasing the price of Kaletra, rather than decreasing the price of Norvir.  In fact, Abbott may find it

profit-maximizing to keep the price of Norvir at its current level and to raise the price of Kaletra to

$32.50.  Alternatively, Abbott may find it profit-maximizing to lower the price of Norvir somewhat

but still set a price for Kaletra higher than its current level.  Regardless of the precise level of profit-

maximizing prices, liability under the first theory almost surely would imply higher prices for

Kaletra going forward than under the second theory.

50.    The first liability standard also likely would lead to higher prices of Kaletra compared to

the third liability theory, the *Cascade* standard.  As I discuss above, the minimum allowable

difference between the Kaletra and Norvir prices under the first liability theory would be greater

than the price difference under a *Cascade* standard, regardless of the measure used to determine the

relevant cost of lopinavir.  A greater difference between the prices of Kaletra and Norvir likely

would lead to a higher price of Kaletra going forward because, for any price of Norvir, it would yield

a higher minimum allowable price for Kaletra.  Under the *Cascade* standard, according to Dr.

Singer, Abbott would be allowed to increase the pre-December 2003 price of Norvir to $14.16 (for a

[55] *Id*. at 23.

200mg dose) without also raising the price of Kaletra. In contrast, under the first liability theory, any increase in the price of Norvir above pre-December 2003 levels must be accompanied by an increase in the price of Kaletra.

51. The implication of the different theories of liability for Abbott's future pricing for Kaletra can be summarized as: the post-judgment price of Kaletra likely would be highest under the first theory of liability, followed by the third and then by the second.

52. Different types of direct purchasers would be affected very differently by Abbott's post-judgment pricing depending on the theory of liability asserted (assuming liability is determined). As I describe above, some wholesalers use "cost-plus" pricing and profit from the "float" on their sales of pharmaceutical products.[56] These wholesalers receive a net economic benefit from higher drug prices, including Norvir and Kaletra.[57] In fact, plaintiffs have not disputed that some direct purchasers profit from higher Norvir and Kaletra prices.

53. Because plaintiffs' theory of liability may determine Abbott's pricing going forward if Abbott were found liable, these wholesalers may have antagonistic interests to direct purchasers that do not profit from higher drug prices in terms of which theory of liability to pursue. In particular, members of the purported class that do not profit from higher Norvir and Kaletra prices would likely prefer a rollback of the Norvir price increase to pre-December 2003 levels, and therefore would likely find it in their interests to pursue the second theory of liability (*i.e.*, that any increase in the price of Norvir is anticompetitive). For instance, I understand that certain clinics, ████████████ ████████████████████, do not resell Norvir and Kaletra and therefore absorb the entire increase in the price of these and other drugs. These direct purchasers clearly would prefer a theory of liability that would allow them to recover overcharge damages while, at the same time, having the effect of completely rolling back the prices of Norvir and Kaletra.

---

[56] *See* discussion, *supra* at ¶¶ 15-29.

[57] The increases in the prices of Norvir and Kaletra are unlikely to have reduced the quantity of Norvir and Kaletra sold by most wholesalers because the demand for Norvir and Kaletra is very inelastic. *See Id.* at ¶¶ 23-25.

DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES
OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1    54.    On the other hand, members of the purported class that profit from higher Norvir and

2  Kaletra prices (because they pass-through greater than 100 percent of price increases), such as the

3  Big 3 wholesalers, would prefer a liability theory based on the premise that any Norvir price increase

4  must be accompanied by commensurate increases in the price of Kaletra. As I describe above, such a

5  liability standard, if accepted, would entitle these direct purchasers to recover overcharge damages

6  *and* lead to higher prices for Norvir and Kaletra (and thus more future profits for these direct

7  purchasers) than a standard which holds that any increase in the price of Norvir is anticompetitive.

8    55.    Direct purchasers that profit from higher drug prices also would likely prefer a liability

9  theory based on the *Cascade* standard rather than one that could essentially force Abbott to roll back

10  the price of Norvir to pre-December 2003 levels.  Liability under such a standard also would lead to

11  higher prices for Norvir and Kaletra going forward than if Abbott is forced to roll back its prices to

12  pre-December 2003 levels.

13    56.    Whether wholesalers that profit from higher drug prices prefer the first theory of liability

14  or the *Cascade* standard depends on their relative purchases of Norvir and Kaletra.  As explained

15  above, the *Cascade* standard likely would lead to higher Norvir prices but lower Kaletra prices than

16  the second theory of liability.  As I describe in the Section below, this creates another conflict of

17  interest among members of the purported class.

18    *3) Direct purchasers that primarily buy Norvir would have conflicting economic*

19    *interests with those that primarily buy Kaletra.*

20    57.    As I describe above, the purported class of direct purchasers includes purchasers that

21  bought only (or primarily) Kaletra and purchasers that bought only (or primarily) Norvir.  These

22  different subgroups in the purported class also likely have antagonistic interests regarding which

23  liability theory to pursue.  In particular, purchasers that buy only (or primarily) Kaletra likely have

24  conflicting interests with purchasers that buy only (or primarily) Norvir because these subgroups of

25  purchasers likely would be affected differently by Abbott's future pricing structure.  Moreover,

26  whether a particular direct purchaser benefits from Abbott's pricing also depends on whether the

27  purchaser profits from higher drug prices.  For ease of exposition, I divide the purported class

28

DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES
OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

members into four subgroups, as shown in Chart 3 below. In reality, there may be many more than four subgroups of purported members with antagonistic interests because direct purchasers vary along a continuum in terms of their relative purchases of Norvir and Kaletra.

**Chart 3:  Preferred Liability Theories by Direct Purchaser Subgroup**

|  | Purchasers of Kaletra | Purchasers of Norvir |
|---|---|---|
| **Pass-through > 100%** | Prefer high price of Kaletra<br><br>Preferred theory:  1st<br>Second choice:  3rd | Prefer high price of Norvir<br><br>Preferred theory:  3rd<br>Second choice:  1st |
| **Pass-through < 100%** | Prefer low price of Kaletra<br><br>Preferred theory:  2nd<br>Second choice:  3rd | Prefer low price of Norvir<br><br>Preferred theory:  2nd<br>Second choice:  1st |

58.    Because plaintiffs' liability theory may affect Abbott's pricing going forward if Abbott were found liable, these subgroups likely have conflicting interests as to the fundamental theory of liability to pursue. Direct purchasers that buy only (or primarily) Kaletra and pass-through 100 percent or more of drug price increases would prefer a liability theory which leads to higher Kaletra prices going forward. Such purchasers likely would prefer to pursue the first theory of liability (based on the premise that any increase in the price of Norvir without a commensurate increase in the price of Kaletra is anticompetitive), because such a theory likely would lead to higher prices of Kaletra going forward than the second and third theories of liability if Abbott were found liable.

59.    In contrast, direct purchasers that buy only (or primarily) Norvir and pass-through 100 percent or more of drug price increases would prefer a liability theory which leads to higher Norvir prices going forward. Such purchasers likely would prefer to pursue the third liability theory (the *Cascade* standard), because such a theory likely would lead to higher prices of Norvir going forward than the other two theories.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

60.    Direct purchasers that do not pass through more than 100 percent of drug price increases to customers would have altogether different incentives than these two subgroups.  Purchasers of Kaletra and Norvir that do not profit from higher drug prices would prefer lower prices of Kaletra and Norvir, respectively, going forward.  Both of these subgroups likely would prefer the second liability theory—that any increase in the price of Norvir is anticompetitive—which likely would yield lower Kaletra and Norvir prices than the other theories.  But those that purchase mostly Kaletra would prefer the *Cascade* standard to the first liability theory, and those that purchase mostly Norvir would prefer the first theory to the *Cascade* standard.  Chart 3 above summarizes the economic interests of each of the four subgroups with respect to the alternative liability theories.

61.    As the above discussion makes clear, the conflicts among purported class members do not depend on the specific remedy that plaintiffs seek, including whether or not plaintiffs seek injunctive relief or lost profits.  Nor do the conflicting interests among the purported class members relate solely to the estimation of alleged overcharges.  Even assuming that all purported class members have an interest in "maximizing overcharge damages" and do not seek injunctive relief or lost profits, members of the class purported by plaintiffs have antagonistic economic interests with regard to which of at least three potential theories of liability plaintiffs should pursue in this case because plaintiffs' ultimate theory of liability may determine Abbott's future pricing for Norvir and Kaletra if liability were found.

**C.  Purported class members would have antagonistic economic interests in whether to pursue "Boosted Market" or "Boosting Market" monopolization claims and seek overcharges in such claimed markets**

62.    Plaintiffs bring two distinct and separate claims—"Boosted Market" monopolization claims and "Boosting Market" monopolization claims.  Plaintiffs allege that Abbott monopolized (or attempted to monopolize) the so-called "Boosted Market" by raising the price of Norvir without initially raising the price of Kaletra.[58]  According to plaintiffs, Abbott's conduct had the effect of reducing price competition in the "Boosted Market" and subsequently allowed Abbott to

---

[58] Complaint, pp. 5-6; Motion for Class Certification, p. 5.

anticompetitively increase the price of Kaletra.[59]  Second, plaintiffs allege that Abbott has

"maintained its monopoly power in the boosting market by deliberately inducing potential

competitors in the boosting market into relying on Norvir as the de facto boosting agent, thereby

impeding the development of potential rivals to Norvir and/or delaying the development of

technologies that would have permitted Norvir to be used in substantially smaller amounts."[60]

According to plaintiffs, this "enabl[ed] Abbott to sell Norvir at artificially inflated prices."[61]

Plaintiffs seek overcharges on their purchases of Norvir (allegedly resulting from the claimed

monopolization of the "Boosting Market") and on their purchases of Kaletra (allegedly resulting

from the claimed monopolization of the "Boosting Market").

63.    Purported class members would have antagonistic economic interests in pursuing the two

different types of claims brought by plaintiff— the claim of "Boosting Market" monopolization and

the claim of "Boosted Market" monopolization.

1)    *Plaintiffs' "Boosting Market" monopolization claims are detrimental to purported*
     *class members that purchased only or primarily Kaletra.*

64.    As I describe above, the class purported by plaintiffs includes direct purchasers that

bought only (or primarily) Kaletra and direct purchasers that bought only (or primarily) Norvir.

Direct purchasers that bought only Kaletra could not have been injured by the conduct challenged by

plaintiffs that is alleged to have had anticompetitive effects in the "Boosting Market," nor can they

recover overcharges on purchases of Norvir.  Therefore, Kaletra-only purchasers have no economic

interest to pursue plaintiffs' "Boosting Market" claims.

65.    Moreover, not only do Kaletra purchasers not benefit from plaintiffs' "Boosting Market"

monopolization claims, such claims are antagonistic to their claim of monopolization of the

---

[59] Complaint, p. 12 ; Motion for Class Certification, pp. 5-6.  Specifically, plaintiffs state that "from December 2003 until June 2005, Abbott waited to see if it had accomplished its goal of impairing the growth of its boosted rivals, and thus kept Kaletra's price steady.  However, once it felt it had succeeded sufficiently in neutralizing its boosted rivals' ability to compete on price, Abbott began (safely) inflating Kaletra's price:  13.2 percent in 2005 and a total of 25 percent from June 2005 through October 2007."  *Id* at 6.

[60] Motion for Class Certification, p. 4.  *See also*, Complaint, pp. 5-6, 10.

[61] Complaint, p. 11.

DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES
OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1    "Boosted Market." Plaintiffs' "Boosted Market" monopolization claim— that Abbott leveraged its

2    monopoly power in the "Boosting Market" in order to monopolize the "Boosted Market"— requires

3    that Abbott have monopoly power in the "Boosting Market." But this monopoly leveraging claim

4    does not require a showing that Abbott anticompetitively achieved a monopoly in the "Boosting

5    Market." That is, Abbott's claimed "Boosting Market" monopoly could have been acquired through

6    "growth or development as a consequence of a superior product, business acumen, or historic

7    accident"— in particular, its legitimate innovation and patent rights.[62]

8        66. However, plaintiffs' "Boosting Market" claims require that plaintiffs prove that Abbott

9    *anticompetitively* maintained its monopoly in the "Boosting Market." This apparent contradiction

10    between plaintiffs' "Boosted Market" and "Boosting Market" monopolization claims is not just

11    semantic. Plaintiffs' claim that Abbott anticompetitively maintained a monopoly in the "Boosting

12    Market" implies that, but-for Abbott's conduct, Abbott would not have a monopoly in the "Boosting

13    Market." That is, it implies that Abbott's claimed "Boosting Market" monopoly would have been

14    challenged by new PI boosters, and such entry and innovation by rival HIV drug manufacturers

15    would have competitively constrained Abbott's pricing of Norvir. Plaintiffs cannot claim both that

16    Abbott anticompetitively maintained a "Boosting Market" monopoly and that Abbott would have

17    had a monopoly in the "Boosting Market" without such conduct. Anticompetitive conduct requires

18    that, without such conduct, the market would have been more competitive. Otherwise, the conduct

19    could not have had anticompetitive effects. Thus, if plaintiffs argue that the conduct alleged to have

20    monopolized the "Boosting Market" would not have been necessary to maintain Abbott's claimed

21    monopoly in the "Boosting Market," then plaintiffs cannot claim that such conduct led to the

22    increase in the price of Norvir.

23        67. Accordingly, rather than just asserting that Abbott has a legal monopoly in the "Boosting

24    Market" (although they would still have to prove that the relevant market is restricted to PI boosters,

25    a claim that is inconsistent with the economic evidence) plaintiffs will have to prove that Abbott's

26    claimed monopoly was acquired through anticompetitive conduct rather than through Abbott's

27    _____

[62] *United States v. Grinnell Corp.* 384 U.S. 563, 571 (1966).

28

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1    legitimate patent rights.  In particular, plaintiffs will have to show that Abbott engaged in

2    anticompetitive conduct to maintain such a monopoly, and that such conduct was effective.  In

3    particular, plaintiffs will also have to show that Abbott's conduct had the effect of anticompetitively

4    restricting the efforts of Abbott's competitors to develop new PI boosters to compete with Norvir.

5    Moreover, plaintiffs will also have to prove that but-for Abbott's conduct, competing drug

6    manufacturers would have been able to constrain Abbott's pricing of Norvir by developing such new

7    PI boosters.

8        68.    Thus, claims of "Boosting Market" monopolization significantly increase the burden on

9    plaintiffs to show that Abbott monopolized (or attempted to monopolize) the "Boosted Market."  But

10   Kaletra purchasers do not benefit from plaintiffs' "Boosting Market" claims, and such claims are

11   detrimental to their case.  Therefore, Kaletra purchasers would have no incentive to bring such

12   claims.

13           *2) Plaintiffs' claims of overcharges on purchases of Kaletra are detrimental to*

14           *purported class members that purchased primarily Norvir.*

15       69.    Purchasers of Norvir would not be injured as a result of the claimed anticompetitive

16   effects in the "Boosted Market" because they are not purchasers in such a market.  The increase in

17   the price of Norvir is not the alleged anticompetitive injury under plaintiffs' theory of monopoly

18   leveraging.  The alleged anticompetitive effect under plaintiffs' own theory is the harm to

19   competition that is claimed to occur in the purported "Boosted Market."  The increase in the price of

20   Norvir does not arise from some harm to competition in the market which is allegedly monopolized.

21   Norvir is part of the "Boosting Market," not the "Boosted Market" in which plaintiffs claim that

22   Abbott's pricing has led to anticompetitive effects and injury to class members.

23       70.    However, to the extent that plaintiffs will try to argue that the increase in the price of

24   Norvir does constitute antitrust injury under their "Boosted Market" monopolization claims and,

25   therefore, they can recover Norvir overcharges under that claim, plaintiffs' theory of overcharges on

26   purchases of Kaletra would undercut their theory of overcharges on purchases of Norvir.  Plaintiffs'

27   monopoly leveraging theory is that, after the December 2003 Norvir price increase, the price of

28

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1  Kaletra was too low relative to the price of Norvir, such that manufacturers of competing PIs that are

2  boosted by Norvir could not compete effectively.  However, plaintiffs' theory that increases in the

3  price of Kaletra are supracompetitive, and therefore constitute overcharges to purchasers of Kaletra,

4  requires a finding that the price of Kaletra is not too low for other boosted PIs to compete

5  effectively.  Accordingly, under plaintiffs' own monopoly leveraging theory, the increase in the

6  price of Norvir is no longer anticompetitive once the price of Kaletra is supposedly

7  supracompetitive, and therefore there can be no overcharges on Norvir.  Thus, there is an inherent

8  inconsistency between alleged overcharges on Kaletra and alleged overcharges on Norvir in

9  connection with the Boosted Market monopolization claim.

10  71.    This inherent inconsistency between alleged overcharges on Kaletra and alleged

11  overcharges on Norvir creates another conflict of interest between members of the purported class

12  that only (or primarily) bought Norvir and those that only (or primarily) bought Kaletra.  In

13  particular, purported class members would have antagonistic economic interests in regard to whether

14  to pursue a theory of overcharges on purchases of Kaletra, overcharges on purchases of Norvir, or

15  both.  Pursuing overcharges on purchases of Kaletra is detrimental to plaintiffs' attempt to pursue

16  overcharges on Norvir purchases under plaintiffs' "Boosted Market" monopolization theory.

17  **D.  Purported class members would have antagonistic economic interests with regard to**

18  **whether to seek overcharges or lost profits**

19  72.    There are also potential conflicts of interest among purported class members with regard

20  to the type of damages to seek—overcharges or lost profits.  Plaintiffs seek overcharges, not lost

21  profits.[63]  However, direct purchasers that primarily buy Kaletra may prefer to seek lost profits rather

22  than overcharges.  Price increases on Kaletra were very limited during the relevant period.

23  Therefore, even if plaintiffs can prove liability and overcharges on their purchases of Kaletra,

24  potential overcharges may be minimal.  Plaintiffs argue that once Abbott "succeeded in neutralizing

25  its boosted rivals' ability to compete on price, Abbott began (safely) inflating Kaletra's price … a

26

27  ───────────────
[63] Plaintiffs' Opposition to Motion to Compel, p. 17.

28
DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES
OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

total of 25% from June 2005 through October 2007."[64]  But this does not take into account that all or part of these price increases were legitimate business conduct and the fact that most other HIV drug manufacturers also increased prices during the same two-year period.  Moreover, the price increases also coincided with Abbott's introduction of a new and improved Kaletra formulation.  (As I explain in Section III.A.2 below, plaintiffs' theory of overcharges on purchases of Kaletra makes no economic sense.  Nevertheless, I accept for purposes of this section that plaintiffs' claims of overcharges on Kaletra are correct.)

73.    Accordingly, direct purchasers that primarily bought Kaletra may prefer to seek lost profits rather than overcharge damages.  Plaintiffs theory of anticompetitive effects in the "Boosted Market" is that patients have been coerced into purchasing Kaletra rather than competing PIs boosted by Norvir.  Of course, plaintiffs in this and related cases have not been able to show that even a single patient has been forced to take Kaletra instead of an alternative PI.  Moreover, as I have shown elsewhere, the Norvir price increase had no effect on Kaletra's market share, regardless of how the market is defined.[65]  But accepting for purposes of this declaration that plaintiffs' allegations are correct, lost profits to Kaletra purchasers arguably could amount to the difference between their profits on the sale of Kaletra compared to their profits of the sale of competing PIs, including Reyataz and Lexiva.  For some purported class members, this may be greater than any potential overcharges on the purchase of Kaletra.

74.    In contrast, direct purchasers that primarily buy Norvir could not have suffered lost profits, even if Abbott were found liable.  In fact, Norvir purchasers would have profited according to plaintiffs' own theory of liability.  Plaintiffs' theory of anticompetitive effects in the "Boosting Market" is two-fold.  First, plaintiffs allege that Abbott's conduct "enabl[ed] Abbott to sell Norvir at artificially inflated prices."[66]  Second, Abbott's conduct led to higher sales of Norvir because Abbott "delay[ed] the development of technologies that would have permitted Norvir to be used in

---

[64] Motion for Class Certification, p. 6; *see also*, Singer Declaration, p. 27.

[65] *See, e.g., In re Abbott Labs Norvir Antitrust Litigation,* Rebuttal Expert Report of Joel W. Hay, Ph.D., filed October 31, 2007, pp. 61-74.

[66] Complaint, p. 11.

DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES
OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

substantially smaller amounts."[67]  One example of this, according to plaintiffs, is that "GSK was delayed in receiving FDA labeling approval for the use of its Boosted PI Lexiva with only 100mg of Norvir per day, rather than 200 mg of Norvir per day to achieve the same clinical results."[68]  But wholesalers and retailers profit from greater drug sales and, therefore, from higher sales of Norvir. Thus, plaintiffs' claim that Abbott's conduct led to higher sales of Norvir implies that most direct purchasers would have benefited from the challenged conduct.  Accordingly, direct purchasers of Norvir cannot reasonably seek lost profits, which is consistent with plaintiffs' decision to expressly disclaim lost profits in this case.[69]

75.    In sum, the purported class includes members that may have antagonistic economic interests with regard to whether to seek overcharges or lost profits.  Even if liability were found and overcharges and/or lost profits could be proven, potential overcharges would be minimal for purchasers of Kaletra, but lost profits (a theory plaintiffs have expressly abandoned) may be greater. In contrast, plaintiffs will claim, as Dr. Singer does, that overcharges on Norvir are significant, but purchasers of Norvir could not reasonably seek lost profits.  Thus, while direct purchasers that bought primarily Kaletra may prefer to seek lost profits rather than overcharge damages, direct purchasers of Norvir do not.

## III.    ASSESSING ANTITRUST INJURY AND ESTIMATING CLAIMED OVERCHARGES REQUIRES INDIVIDUALIZED ECONOMIC ANALYSIS THAT CANNOT BE CONDUCTED ON A CLASS-WIDE BASIS

### A.    Dr. Singer's proposed methodologies for assessing antitrust injury and estimating claimed overcharges are flawed

#### 1)  Dr. Singer's methodology for Norvir

76.    Dr. Singer proposes two methodologies for estimating overcharges on the sale of Norvir—a "consumer welfare" standard and the "safe harbor" standard implied by *Cascade*.[70]  Dr.

---

[67] Motion for Class Certification, p. 4.  *See also*, Complaint, pp. 10-11.

[68] Complaint, p. 11.

[69] Plaintiffs' Opposition to Motion to Compel, p. 17.

[70] Singer Declaration, pp. 21-22, 29-30.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1    Singer claims that estimating Norvir overcharges under the "consumer welfare" standard is

2    "simple"—it equals the "400 percent Norvir WAC price increase."[71]  In particular, Dr. Singer claims

3    that "[g]iven that the conduct at issue involves, among other things, a 400 percent price increase on

4    the daily dose of Norvir, the differential between actual prices paid, post December 2003, and the

5    but-for prices class members would have paid absent the price hike, represents the overcharges to

6    class members."[72]  Dr. Singer asserts that, under the *Cascade* standard, overcharges on the sale of

7    Norvir would be calculated as the difference between actual Norvir prices and the maximum Norvir

8    price that would pass the *Cascade* test.[73]

9    77.    Both of Dr. Singer's methodologies for assessing alleged overcharges on the sale of

10    Norvir are fundamentally flawed for several reasons.  First, Dr. Singer's claim that the entire

11    increase in the price of Norvir amounts to overcharges because "the conduct at issue involves,

12    among other things, a 400 percent price increase on the daily dose of Norvir," confuses plaintiffs'

13    liability theories.[74]  The increase in the price of Norvir, without an increase in the price of Kaletra, is

14    the conduct that plaintiffs allege monopolized the "Boosted Market," not the "Boosting Market."

15    But, as I describe above, the Norvir price increase is not the alleged anticompetitive effect under

16    plaintiffs' "Boosted Market" monopolization claims.  The alleged anticompetitive effect under

17    plaintiffs' "Boosted Market" monopolization theory is the harm to competition that is claimed to

18    occur in the purported "Boosted Market," not the increase in the price of Norvir, which according to

19    plaintiffs, is in the separate "Boosting Market."

20    78.    Dr. Singer proposes no methodology for assessing claimed overcharges on Norvir that

21    arise from alleged monopolization of the "Boosting Market."  Plaintiffs' claim that the

22    anticompetitive conduct in the "Boosting Market" is that Abbott "induc[ed] potential competitors in

23    the boosting market into relying on Norvir as the de facto boosting agent, thereby allegedly

24    impeding the development of potential rivals to Norvir and/or delaying the development of

25    [71] *Id.* at 29-30.

26    [72] *Id.* at 22.

27    [73] *Id.* at 24.

     [74] *Id.* at 22.

28

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1    technologies that would have permitted Norvir to be used in substantially smaller amounts."[75]

2    According to plaintiffs, this "enabl[ed] Abbott to sell Norvir at artificially inflated prices."[76]  But

3    there is absolutely no basis for Dr. Singer's presumption that the entire increase in the price of

4    Norvir was made possible by such conduct.  Neither does Dr. Singer propose any way of

5    determining alleged overcharges from such challenged conduct.

6        79.    Even if one incorrectly focuses on the Norvir price increase as a measure of overcharges

7    pursuant to plaintiffs' "Boosted Market" monopolization claims, Dr. Singer's "methodology" is

8    nevertheless fundamentally flawed because it assumes that every penny of the increase in the price

9    of Norvir is anticompetitive.  Overcharges typically are estimated as the difference between prices

10    that plaintiffs paid in the "actual world" with prices that plaintiffs would have paid "but-for" the

11    anticompetitive effects of the challenged conduct (referred to as the "but-for world"). The key to

12    estimating alleged overcharges is determining the profit-maximizing prices but-for the alleged

13    monopolization of a relevant market.  But Dr. Singer makes no attempt to estimate the prices for

14    Norvir and Kaletra that Abbott would have charged but-for the alleged intent to monopolize the so-

15    called "Boosted Market."  Instead, he simply assumes, without basis, that Abbott would not have

16    increased the price of Norvir at all.

17        80.    Dr. Singer's assumption would mean that Abbott would not have raised the price of

18    Norvir for over 4.5 years, even though almost all other HIV drugs implemented (typically several)

19    price increases during the period.  Moreover, Dr. Singer's assumption that Abbott would not have

20    increased the price of Norvir at all ignores the fact that Abbott had legitimate reasons for

21    implementing an increase in the price of Norvir.  In particular, Abbott introduced Norvir in 1996 as a

22    stand-alone PI.  As a stand-alone PI, Norvir had a recommended dose of 1,200mg daily.  Through

23    clinical trials and other research, Abbott discovered that Norvir, taken in small doses of 100 to

24    200mg per day, could be used to improve the effectiveness of (or "boost") other PIs.  Additionally,

25    by allowing other PIs to be effective at lower doses, the use of Norvir as a booster also reduced pill

26

27    [75] Motion for Class Certification, p. 4.  *See also*, Complaint, pp. 5-6, 10.

    [76] Complaint, p. 11.

28

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

burden and dosing frequency (and therefore increased patient adherence), reduced side effects from other PIs (such as toxicity, vomiting, and gastric disturbances), and reduced the cost of HIV drug therapy.  Importantly, this "boosting" effect could be attained with only a fraction of Norvir's recommended dose as a stand-alone drug, typically between 100 to 200mg per day.  In essence, Norvir became a new drug with a new clinical use.  As a PI booster, Norvir began to provide significant medical benefit for patients.

81.    Gradually, the use of Norvir began shifting from a stand-alone PI to a PI booster. Because of the much lower recommended dose for Norvir as a PI booster, the average dose of Norvir taken by HIV patients also decreased significantly.  This decline in average dosage was accelerated by the introduction of Reyataz in June 2003, in part because the recommended Norvir boosting dose for Reyataz is one 100mg capsule daily, compared to 200mg for older PIs.  By November 2003, the average daily dose of Norvir was 186mg, or only 15.5 percent of its initial recommended dose.[77] Corresponding to the decline in the average daily dose of Norvir taken by patients, the average daily price of Norvir also decreased significantly.

82.    Thus, while Norvir's new use as a PI booster provided tremendous value to patients, such use also caused the daily price of Norvir to drop considerably.  Accordingly, the increase in the price of Norvir realigned the daily price of Norvir with its value.  The Norvir price increase is consistent with the increased value of Norvir as a PI booster and the reduced average daily price resulting from decreased daily dosages.

83.    In fact, there are numerous examples in the pharmaceutical industry of drugs acquiring new and often more valuable therapeutic roles after being developed and/or approved by the FDA for an initial marketing indication.  In several of these cases, the newer indication is associated with a substantial price increase.  Dr. Singer's assumption that the entire Norvir price increase is anticompetitive assumes that Abbott should not be able to receive any of the increased value of Norvir as a PI booster.

---

[77] HIV Monthly Package Dec 2004.ppt

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

84.    Moreover, in concluding that the entire increase in the price of Norvir amounts to an overcharge, Dr. Singer ignores the possibility that Abbott may have found it profitable to increase the price of Kaletra rather than not increasing the price of Norvir.  Prof. Singer's methodology makes no attempt to determine Abbott's profit-maximizing prices in the "but-for world"—the key element of any damages analysis.

### 2)  *Dr. Singer's methodology for Kaletra*

85.    Dr. Singer claims that but-for Abbott's increase in the price of Norvir, "Kaletra's WAC would not have increased as rapidly or at all in the but-for world."[78]  Dr. Singer proposes a methodology for assessing antitrust impact and estimating claimed overcharges on purchases of Kaletra which consists of two steps.  First, estimating the extent to which the challenged conduct supposedly led to higher prescriptions of Kaletra (and lower prescriptions of rival boosted PIs); and second, determining how Kaletra's lower share would have led to a lower price of Kaletra.  Dr. Singer proposes estimating the first step using Abbott's internal forecasts of Kaletra prescriptions.[79] In particular, he seems to suggest that the difference between the extent to which Abbott predicted Kaletra's prescriptions would fall and the extent to which they actually did fall provides an estimate of the effect of the challenged conduct.  Dr. Singer proposes estimating the second step using (1) theoretical economic models that predict the relationship between prices and market shares and (2) empirical studies "demonstrating the economic effects of competition between branded drugs."[80]  In essence, Dr. Singer's methodology assumes that Kaletra's share of prescriptions decreased more rapidly than it would have but-for the increase in the price of Norvir, and tries to estimate the effect of such that claimed slow-down in Kaletra's share on Abbott's pricing for Kaletra.  Alternatively,

---

[78] Singer Declaration, p. 27.

[79] *Id*. at 25 ("Abbott's internal projections evaluating the potential effects of the December 2003 Norvir price increase confirm that, in Abbott's view, absent its conduct, prescriptions for Kaletra's Boosted alternatives would have been substantially higher, and Kaletra's lower.")

[80] *Id*. at 26-29.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1    Dr. Singer argues that "[o]ne reasonable approach … would be to assume that the but-for price of

2    Kaletra remained at the pre-Norvir-price-increase price of $18.76." [81]

3        86.    Dr. Singer's methodology makes no economic sense and is inconsistent with the

4    economic evidence in this case.  Dr. Singer's methodology is based on an assumption that the Norvir

5    price increase restricted competition and subsequently allowed Abbott to raise the price of Kaletra.

6    In particular, Dr. Singer claims that "Abbott may have waited to see if its attempted impairment of

7    rivals in the Boosted Market would be effective before raising prices, and then did so." [82]  However,

8    Abbott's conduct did not drive any competing boosted PIs out of the market.  Nor could Abbott's

9    conduct have had any permanent effect in restricting the entry of new rival boosted PIs.  Moreover,

10   ████████████████████████████████████████████████████████████████████████████

11   ████████████████████████    ████████    ████████████████████████████████████████

12   █████████████████████████████████████████████████████████████████████████

13   ████████████████████████████ █  ████████████████████████████████████████████

14   ██████████████████████████████████.  Therefore, Dr. Singer's assumption that the Norvir

15   price increase allowed Abbott to subsequently raise the price of Kaletra because of its effect on

16   Kaletra's share, and that Kaletra price increases thus constitute overcharges, is inconsistent with the

17   fact that Kaletra's share of prescriptions has decreased significantly since the Norvir pricing

18   revision.

19       87.    Dr. Singer suggests that Abbott should have lowered the price of Norvir because of its

20   declining market share. [85]  However, this claim is inconsistent with the economics of the

21   pharmaceutical industry and, more specifically, the HIV drug field.  Drug manufacturers typically do

---

22   [81] *Id.* at 31.  Dr. Singer claims that it is also "possible that Abbott would have been forced to lower
23   its price below $18.76 to compete with allegedly superior boosted PIs."

24   [82] *Id.* at 27.

25   [83] Plaintiffs and Dr. Singer have not established that boosted PIs constitute a relevant economic
     market.  In fact, a "Boosted Market" is inconsistent with economic evidence showing significant
26   substitution between boosted PI regimens, NNRTIs, unboosted PI regiments, and other HIV drug
     classes.  Nevertheless, I accept plaintiffs' relevant market definition for purposes of this declaration.

27   [84] Source:  TRX Data.

28   [85] Singer Declaration, p. 31.

DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES
OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1  not lower their prices when their market share falls or in the face of new entry.  For instance, several

2  empirical studies indicate that branded drug manufacturers do not lower prices, and in fact often

3  raise prices, when generic equivalents enter the market.[86]

4  88.    In fact, I am not aware of any PI that has lowered its WAC.  In fact, older boosted PIs

5  that have lost significant share have also increased their WAC as their shares have decreased.  For

6  instance, Viracept, Saquinavir, and Crixivan have all increased their WAC despite significant

7  decreases in share.

8  89.    Dr. Singer's assumption that the entire increase in the price of Kaletra between 2004 and

9  the present was the result of the challenged conduct and therefore represents overcharges also fails to

10  take into account the fact that yearly or bi-yearly price increases are common in the pharmaceutical

11  industry and in the HIV drug field.  Moreover, Abbott introduced Kaletra Meltrex in October 2006,

12  which provided several advantages, including not requiring refrigeration, the freedom to be taken

13  without meals, and the decreased pill burden.  Despite this introduction of a superior form of

14  Kaletra, Dr. Singer assumes, without basis, that Abbott would not have raised the price of Kaletra at

15  all for over 4.5 years.

16  90.    Lastly, Dr. Singer fails to propose a methodology for assessing the profit maximizing

17  price of Kaletra but-for the challenged conduct.  As I discuss above, Abbott may have found it

18  profitable to increase the price of Kaletra rather than not increasing the price of Norvir in the but-for

19  world.  Accordingly, the price of Kaletra in the but-for world may have been even higher than in the

20  actual world.  Thus, direct purchasers that bought Kaletra may have paid higher prices for Kaletra in

21  the but-for world.  Dr. Singer ignores this fundamental issue and instead assumes that, if Abbott

22  were found liable, it would have to roll back the price of Norvir to pre-December 2003 levels.

23

24  [86] *See, e.g.*, Richard Frank and David Salkever, "Generic Entry and the Pricing of Pharmaceuticals,"

25  *Journal of Economics & Management Strategy*, Volume 6, Number 1, Spring 1997, 75–90.  Frank
   and Salkever write:  "Our econometric analysis leads us to make several observations regarding

26  price behavior in this market.  First, it appears that more competition among generic drug producers
   is linked to price reductions for those drugs.  Second, increased competition from generics is not

27  accompanied by lower prices for brand-name drugs.  We found no evidence of brand-name price
   reductions being associated with entry by generic producers.  In fact, the evidence we did uncover is
   consistent with small price rises being tied to expanded competition."

28

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

44

91.     As I describe below, even accepting Dr. Singer's flawed methodologies for assessing antitrust impact and estimating overcharges, whether or not an individual purported class member would have paid lower prices for Norvir and Kaletra but-for the challenged conduct, and the extent of such claimed overcharges, are highly individualized issues that cannot be resolved on a class-wide basis.

**B.  There was significant variation in the net prices that direct purchasers paid for Norvir and Kaletra in the actual world.**

92.     Dr. Singer claims that "common evidence and methods" can be used to show that all purported class members suffered antitrust injury and to estimate claimed overcharges.[87] Overcharges are the difference between the prices paid in the "actual world" and the prices that purported class members would have paid in a world "but-for" the conduct being challenged as anticompetitive (referred to as the "but-for world").  Alleged overcharges therefore can vary across buyers either because actual prices paid vary or because but-for prices vary across buyers.  However, Dr. Singer does not analyze the extent to which actual prices vary across direct purchasers nor how prices would vary in the but-for world.  Instead Dr. Singer assumes, based on the 400 percent increase in the wholesaler list price of Norvir, that all direct purchasers faced overcharges of 400 percent as a result of the challenged conduct.[88, 89]  Similarly, Dr. Singer assumes, based on increases

---

[87] Singer Declaration, pp. 19, 29.

[88] Dr. Singer claims that "[g]iven that the conduct at issue involves, among other things, a 400 percent price increase on the daily dose of Norvir, the differential between actual prices paid, post December 2003, and the but-for prices class members would have paid absent the price hike, represents the overcharges to class members."  *Id.* at 22. Dr. Singer also proposes estimating claimed overcharges using the same "methodology," which is based "directly on the 400 percent Norvir WAC price increase."  *Id.* at 29-30.

[89] As I describe above, Dr. Singer offers alternative methodologies for proving antitrust injury and estimating claimed overcharges on Norvir.  For instance, Dr. Singer proposes proving antitrust injury and estimating overcharges under the *Cascade* standard, in which overcharges on the sale of Norvir would be calculated as the difference between actual Norvir prices and the maximum Norvir price supposedly "allowable" under the *Cascade* test.  *Id.* at 24.  The discussion in this section applies equally to Dr. Singer's alternative methodologies because all assume, without basis or analysis, that all purported class members were overcharged uniformly on their purchases of Norvir and Kaletra. Moreover all of Dr. Singer's methodologies are based on wholesale list prices rather than actual prices paid by direct purchasers.

DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES
OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1   in the wholesale list price, that all purported class members paid a uniform overcharge for Kaletra.[90]

2   However, as I describe below, proof of antitrust impact and the estimation of alleged overcharges are

3   likely to vary in complex ways across direct purchasers because actual prices, as well as the price

4   any given purchaser would have paid in plaintiffs' but-for world, would vary significantly across

5   buyers due to individualized economic factors.  Dr. Singer ignores these issues by proposing

6   methodologies based solely on wholesale *list* prices, which do not reflect the actual prices paid by

7   buyers.

8           1)  *Contrary to Dr. Singer's claims, a substantial portion of Norvir and Kaletra sales*

9               *were discounted from the wholesale list price.*

10  93.     Dr. Singer's conclusion that all purported class members suffered economic injury and

11  faced the same percentage overcharge is based on assumptions that are fundamentally flawed and

12  inconsistent with the economic evidence in this case.  In particular, Dr. Singer assumes that

13  essentially all purported class members paid list prices for Norvir and Kaletra in the actual world.

14  He states that "the evidence indicates that direct sales are typically made at list prices … My review

15  of the database indicates that Abbott does not appear to give discounts or rebates off of list to many

16  directly purchasing entities."[91]  However, contrary to Dr. Singer's unsupported assumption, there

17  were substantial discounts on sales of Norvir and Kaletra during the relevant time period.

18  94.     To analyze the effective prices paid by direct purchasers, it is important to understand the

19  different mechanisms for discounting in the pharmaceutical industry.  Pharmaceutical manufacturers

20  typically charge a wide range of prices to different customers, even for identical products.

21  Wholesalers, government agencies, third-party payors, hospitals, clinics, and various other entities

22  negotiate various types of discounts from drug manufacturers.  These discounts are implemented

23  through different mechanisms, including chargebacks, rebates, and direct discounts.  Wholesalers

24  purchase branded drugs at the wholesale acquisition cost (WAC), which is the wholesale list price of

25  a drug, or some wholesaler discount from the WAC.  These may include discounts given to

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

---

26  [90] *Id.* at 31.  Dr. Singer states that a "conservative interpretation … would be to assume that the but-
for price of Kaletra remained at the pre-Norvir-price increase price of $18.76."

27  [91] *Id.* at 20.

28

wholesalers based on purchase volume or prompt payment. The wholesaler, in turn, sells the drug to the retailer (*e.g.,* a hospital, pharmacy, or clinic) at a price referred to as the actual acquisition cost ("AAC"). The AAC is the price from the wholesaler to the pharmacy or other retailer after all discounts are subtracted.

95.    The WAC is a wholesale list price that does not typically reflect the final price paid by wholesalers or received by the manufacturer. This is because indirect purchasers and third-party payors (including group purchasing organizations ("GPOs"), hospitals, government agencies, insurers, and other entities) typically negotiate lower prices from drug manufacturers. These negotiated prices typically are implemented through the "chargeback" system.[92] In particular, the wholesaler implements a chargeback by keeping track of the prices negotiated between the manufacturer and the customer. The wholesaler pays the WAC (or wholesaler discount from WAC) to the drug manufacturer, and subsequently "charges back" the manufacturer for any difference between the negotiated prices paid by the customer and the WAC. A U.S. Congressional Budget Office study cited by Dr. Singer explains the chargeback mechanism as follows: "the wholesaler learns of the discounted price negotiated between a manufacturer and a particular purchaser. The wholesaler delivers the drug at the discounted price, informs the manufacturer of the discounted delivery, and then is reimbursed by the manufacturer electronically. Such discounts handled through a wholesaler are generally known as chargebacks…"[93]

96.    Chargebacks are equivalent to reductions in the effective prices paid to drug manufacturers. The chargeback system allows wholesalers to distribute products destined for customers that have negotiated very different effective prices with manufacturers. Chart 4 below shows the flow of payments, discounts, and chargebacks that are typical in the pharmaceutical industry. The final price paid by the wholesaler to the drug manufacturer is equal to the WAC minus

---

[92] *See, e.g., Follow The Pill: Understanding the U.S. Commercial Pharmaceutical Supply Chain*, The Kaiser Family Foundation, March 2005; Richard G. Frank, "Prescription Drug Prices: Why Do Some Pay More Than Others Do? *Health Affairs*, March/April 2001.

[93] Singer Declaration, p. 21, citing Congressional Budget Office, *How Increased Competition from Generic Drugs has Affected Prices and Returns in the Pharmaceutical Industry*, July 1998, pp. 24-25.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1  wholesaler discounts, rebates, and chargebacks.  Because of chargebacks and other discounts, actual

2  prices paid by direct and indirect purchasers typically vary in the pharmaceutical industry.  In fact,

3  most pharmaceutical products are not sold by the manufacturer at WAC.

**Chart 4**



97.    Dr. Singer's proposed methodologies for assessing antitrust injury and estimating

overcharges on Norvir and Kaletra improperly are based solely on WAC.[94]  Based on his

methodologies based on WAC, Dr. Singer concludes that antitrust injury, and the extent of

overcharges, can be assessed on a class-wide basis.[95]  But WAC cannot be used as a basis to

conclude that all purported class members were anticompetitively overcharged as a result of

Abbott's conduct, or the extent of such claimed overcharges.  WAC is not the relevant price for

assessing injury and overcharges because WAC does not reflect the prices that direct purchasers of

pharmaceutical products actually pay to manufacturers.  Therefore, proof that all purported class

---

[94] For instance, Dr. Singer proposes estimating claimed overcharges based "directly on the 400 percent Norvir WAC price increase."  Singer Declaration, pp. 29-30.

[95] For example, after proposing the use of economic theories and empirical studies to prove that purported class members "paid artificially inflated prices," he concludes that "[i]n sum, common evidence and methods are available to show that all or nearly all class members paid more for Norvir, Kaletra, or both due to the challenged conduct."  Singer Declaration, p. 29.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

members suffered antitrust injury and estimating the magnitude of claimed overcharges to each purported class member requires much more than showing that the WAC of a particular drug was supposedly higher as a result of the challenged conduct.  Accordingly, Dr. Singer's entire discussion of his proposed methodologies based on WAC is irrelevant to the issue of whether antitrust injury and the extent of claimed overcharges can be assessed on a class-wide basis.  Even if list prices or average prices were higher in the but-for world than in the actual world, this would not show that each individual buyer actually paid higher prices for Norvir and Kaletra as a result of the challenged conduct.  Dr. Singer's approach is analogous to a damages model that assumes people pay the list price for new cars, an assumption that has no basis in the real world

98.    In fact, Dr. Singer recognizes that "wholesalers' net prices for some of the products they purchase can be affected by price concessions given by manufacturers to certain of the wholesalers' customers through the chargeback system."[96]  However, he dismisses the significance of such chargebacks for two reasons.  First, he claims that "a significant portion of the product that wholesalers purchase has no associated chargebacks, and thus is at the WAC price."[97]  Second, Dr. Singer claims that "for sales that are affected by chargebacks … discounts or rebates are made explicitly as a function of the WAC price."[98]  Both of these reasons for dismissing the significance of chargebacks and other discounts are incorrect.

99.    Contrary to Dr. Singer's unsupported assertions, the Abbott sales data indicates that chargebacks and other discounts on the sales of Norvir and Kaletra were significant, both in terms of frequency and magnitude, during the relevant period.  Moreover, both the frequency and magnitude of these chargebacks varied considerably across different direct purchasers.  Charts 5 and 6 show the frequency of chargebacks and other discounts.[99]  In particular, the charts indicate the percentage of

---

[96] Singer Declaration, pp. 20-21.

[97] *Id.*

[98] *Id.*

[99] These and following charts show data for plaintiffs and the "Big 3" wholesalers, as well as the five other wholesalers with the greatest overall share of chargebacks and/or discounts, and having sales in continuous years before and after the December 2003 and June 2005 price increases for Norvir and Kaletra, respectively.  Excludes liquid formulations, opt-outs, and government entities.

**Winston & Strawn LLP**
35 W. Wacker Drive
Chicago, IL 60601-9703

1   purchases (measured in number of Norvir capsules or Kaletra tablets) during the 2004-2007 period

2   with associated chargebacks or other discounts.



Sources:  Abbott Sales Data; NOR 00432933.

DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES
OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**Winston & Strawn LLP**
**35 W. Wacker Drive**
**Chicago, IL 60601-9703**



100.    A substantial percentage of purported class members purchased at least some purchases that were discounted from WAC.

101.    Chargebacks and discounts on Norvir and Kaletra were also significant in terms of their magnitude, and the magnitude of such chargebacks and discounts varied considerably across purported class members.  Chart 7 below shows total chargebacks and other discounts on Norvir as a percent of total purchases during the period 2004 to 2007.  The chart indicates that while some direct purchasers, including plaintiffs, did not receive significant chargebacks and other discounts, other direct purchasers did.  For instance,

---

[100] Source:  Abbott Sales Data.
[101] *Id.*



Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    102.    Some of these chargebacks are related to the fact that Abbott did not increase the price of

22    Norvir on all sales of Norvir, a fact that Dr. Singer recognizes.[102]  In particular, Abbott guaranteed

23    the former Norvir price to all state Medicaid programs and all ADAP programs.  As Abbott Vice

24    President John Leonard wrote in a letter that was widely distributed to all HIV providers at the time

25

26    [102] Singer Declaration, pp. 20-21.  Dr. Singer concedes that "certain entities, including governmental
       purchasers, were wholly or largely unaffected by the December 2003 Norvir price hike," and that
27    "there would be no overcharge on those particular units purchased by wholesalers (and resold to
       these governmental entities at non-inflated prices)."

28

of the Norvir price increase, "Abbott has ensured that these patients will not be impacted by this re-pricing. Specifically, we have met with state ADAP directors and have issued a new Memo of Commitment honoring the former Norvir price for all ADAP programs through June 2005."[103]  This commitment was subsequently extended.[104]  Abbott implements its commitment to maintain the price of Norvir at pre-December 2003 levels through the chargeback system.  In particular, the wholesaler pays the full list price (WAC), and Abbott subsequently issues a chargeback, through the wholesaler, to the customer for the difference between the WAC and the pre-December 2003 price, or some other amount negotiated between Abbott and the retailer, government agency, or third-party payor.

103.    Chart 8 below shows that average chargebacks and discounts on Kaletra were also substantial. ████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████.  This economic evidence is clearly inconsistent with Dr. Singer's assumption that most Norvir and Kaletra "has no associated chargebacks, and thus is at the WAC price."[105]

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

---

[103]  Letter from John Leonard (Abbott Laboratories Vice President of Global Pharmaceutical Development) to HIV Care Providers, January 12, 2004 (Ex. 3 to Klein Decl.).

[104]  According to Mr. Leonard, "[m]ore than half of all patients with HIV receive their drugs through public assistance programs such as ADAPs or Medicaid."  *Id.*

[105]  Singer Declaration, p. 21.

104.    In support of his proposition that essentially all Norvir and Kaletra is sold at WAC, Dr. Singer cites the deposition of Joseph Fiske, Director of Pricing of Planning for Abbott.[106]  Mr. Fiske testified that that ████████████████████████████████████[107]  This is true.  But, as the data shows and as I describe above in paragraphs 92 to 94, discounts negotiated by wholesalers are only one type of price discount in the pharmaceutical industry.  Discounts are also negotiated between manufacturers and various types of *indirect purchasers*, including GPOs, third-party payors, hospitals, pharmacies, and other retailers.  These discounts typically are more significant in magnitude than discounts negotiated by wholesalers because these entities have a greater ability to shift sales to a particular drug manufacturer in exchange for favorable pricing.  Thus, although consistent with Mr. Fiske's testimony, there do not appear to be discounts negotiated directly between Abbott and wholesalers in the Abbott sales data, the data indicates that there are

---

[106] Singer Declaration, p. 20, citing Deposition of Joseph Fiske, August 15, 2007 ("Fiske Deposition"), p. 55.

[107] *Id.*

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

significant discounts and chargebacks negotiated between indirect purchasers and Abbott. In fact, Dr. Singer recognizes the existence of such discounts and chargebacks, stating that "certain entities … were wholly unaffected by the December 2003 price hike… Some of those unaffected customers buy through wholesalers, and thus the discounts off of WAC to the unaffected customers show up in Abbott's chargeback database."[108] All of these types of discounts are equivalent to reductions in the effective prices paid by wholesalers to drug manufacturers.

> 2)  *Contrary to Dr. Singer's claims, Norvir and Kaletra effective transaction prices varied widely in the actual world.*

105.   Because discounts on purchases of Norvir and Kaletra varied widely across buyers, there was also significant variation in the net prices of Norvir and Kaletra paid by purported class members in the actual world. Charts 9 and 10 show actual transaction prices (net of discounts and chargebacks) for Norvir and Kaletra (respectively). Each "marker" in the chart represents a different transaction price in a particular month.[109] For instance, ████████████████████████ ████████████████████████████████████  The charts indicate that, contrary to Dr. Singer's claim that most of Norvir and Kaletra is sold at WAC, Norvir and Kaletra were sold at a wide range of net effective prices. In particular, ███████████████████ ████████████████████████████████████████████ ████████████████████. ██████████████████████ ███████████████████████████████████████ ███████████████████████████

108 Singer Declaration, p. 21.

109 Prices are expressed in terms of capsules (for Norvir) or tablets (for Kaletra, standardized to Kaletra Meltrex dosage strength of 200mg lopinavir/50mg ritonavir).

55
DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES
OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Winston & Strawn LLP**
**35 W. Wacker Drive**
**Chicago, IL 60601-9703**



106.    The variation in prices paid by direct purchasers is also evident from the average prices that individual direct purchasers paid during a particular period in time.  For instance, net effective

**Winston & Strawn LLP**
**35 W. Wacker Drive**
**Chicago, IL 60601-9703**

1  prices for Norvir before December 2003 (which forms the basis for Dr. Singer's assumed but-for

2  price) varied considerably across purported class members.  As Chart 11 indicates,



107.    Similarly, Chart 12 below shows that net effective prices for Kaletra before June 2005,

the first increase in Kaletra's WAC during the relevant period, varied considerably across purported

class members.  For instance,

Dr. Singer fails to examine the distribution of

prices at any point in time before or after the alleged damages period.  Instead, he merely assumes

that the variation in the actual prices of Norvir and Kaletra does not matter.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

3)  *Contrary to Dr. Singer's claims, discounts were not uniform and constant but varied widely across buyers and over time.*

108.    Dr. Singer's other reason for dismissing the importance of chargebacks and other discounts—that "discounts or rebates are made explicitly as a function of the WAC price"—also is fundamentally flawed and inconsistent with the economic evidence in this case.[110]  Dr. Singer seems to suggest that whenever discounts are expressed as a function of list price, such discounts can be ignored in assessing antitrust injury and estimating claimed overcharges.  But such a claim is incorrect.  If discounts are a fixed percentage of the list price *and that fixed percentage discount does not change over time*, then price changes will be uniform across buyers.  Under such circumstances, the impact of a particular price increase will not vary across buyers and may not require individualized analysis.[111]  However, the fundamental assumption implicit in Dr. Singer's

---

[110] Singer Declaration, p. 20.

[111] The following numerical example helps illustrate Dr. Singer's point.  If chargebacks, discounts, and rebates for certain customers are always 10 percent of the list price, then a percentage price increase will be the same for customers that receive discounts and customers that do not.  If list prices increase from $10 to $20, then the price paid by a customer that does not receive discounts increases by 100 percent.  A customer that receives a 10 percent discount will pay $18 (a 10 percent

58

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1  justification for his dismissal of the relevance of chargebacks is that the percentage discount from

2  the list price does not change over time (or, that if it does change, it changes in the exact same

3  manner for all buyers).  Only under such circumstances will changes in list prices have a uniform

4  impact on purported class members.

5      109.    Dr. Singer's assumption is inconsistent with the pricing of Norvir and Kaletra during the

6  relevant period.  Discounts that each direct purchaser received were not constant or fixed

7  percentages of WAC.  Charts 13 and 14 show average discount percentages as a percent of total

8  expenditures for Norvir and Kaletra, respectively, on a year-by-year basis.  The charts indicate that

9  average discount percentages change significantly over time, and that they change very differently

10  for different purported class members.  For instance, Chart 13 indicates that for some wholesalers,

11  ████████████████████████████████ chargebacks and other discounts on purchases of

12  Norvir increased significantly. ████████████████████████████

13  ████████████████████████████████████████████

14  ████████████████████████████████████████████

15  ██████████████████████████████████████████████

16  ████████████████████████████████████████████

17  ██████████████████████.  The fact that average chargebacks changed significantly over time, and

18  those changes were not uniform across buyers, is wholly inconsistent with Dr. Singer's assumption

19  which forms the basis for his conclusion that antitrust injury and overcharges can be estimated using

20  common proof based on WAC.

27  discount from $20) instead of $9 (a 10 percent discount from $10).  This is also a 100 percent
increase in the price paid.





DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES
OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

110.    The fact that the discounts received by direct purchasers changed over time, and those changes varied by direct purchaser, is also evident from the fact that direct purchasers faced very different increases in the effective prices of Norvir and Kaletra.  Chart 15 below shows average net prices for Norvir paid by direct purchasers each year between 2003 and 2007.  Chart 16 summarizes the overall change in the average price by showing the difference between the average net effective price paid by the direct purchasers in 2003 (until December) and the average net effective price paid between 2004 and 2007.

111.    Significantly, some wholesalers paid *lower* net prices after the December 2003 price increase for Norvir than prior to that time.  In fact, some wholesalers paid *lower* net prices after December 2003 than prior to that time.

.[113]  This is an example of why Dr. Singer has not proven that all members of the purported class have even been harmed at all, let alone the amount of the alleged overcharges.

[112]

[113] Because of the significant chargebacks and other discounts on Norvir, and the fact that they vary over time, the average effective price of Norvir did not increase 400 percent in December 2003, as Dr. Singer and plaintiffs repeatedly assert.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES
OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

112.    Similarly, Charts 17 and 18 indicate that the effective changes in the average price of Kaletra varied considerably across direct purchasers, and that the net prices of one purchaser actually decreased ( ▮▮▮▮▮▮▮▮ ).



Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1
2
3
4
5
6
7
8
9
10
11
12
13



14    113.    Thus, even under Dr. Singer's own flawed methodology, which assumes that the entire

15    price increases in Norvir and Kaletra amount to overcharges, some direct purchasers would have

16    been impacted by the challenged conduct and other would not have.  Moreover, for those purported

17    class members that did face price increases, the magnitude of such price increases and, therefore, Dr.

18    Singer's estimate of overcharges, varies significantly across direct purchasers.

19    **C. Determining the prices that direct purchasers would have paid in the but-for world**

20    **would require highly individualized analysis.**

21    114.    Thus, Dr. Singer incorrectly assumes that purported class members paid uniform prices

22    (WAC), or some uniform and constant discount from WAC, in the *actual world*.  But an even more

23    fundamental flaw in Dr. Singer's proposed methodology for assessing antitrust injury and estimating

24    claimed overcharges is his failure to recognize that prices in the *but-for world* also would vary

25    significantly across purported class members.

26
27
28

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1      *1)  The prices each direct purchaser paid before December 2003 varied significantly*
2           *over time and across individual transactions.*

3      115.    Dr. Singer's methodology that the entire increases in the WAC price of Norvir constitute

4   antitrust harm and overcharges implicitly assumes that the price of Norvir but-for the challenged

5   conduct is equal to the price of Norvir before December 2003.  Similarly, he assumes that the price

6   of Kaletra before its increase in June 2005 is the but-for price of Kaletra.  But even assuming that

7   Dr. Singer's assumptions regarding these but-for price are correct, there is not just one price at which

8   Norvir was purchased before December 2003 or that Kaletra was purchased before June 2005.  The

9   average effective Norvir price paid by each wholesaler varied substantially over time before

10  December 2003.  Chart 19 shows the average Norvir price paid by purported class members for each

11  month in 2003.  ███████████████████████████████████████████████

12  ████████    Similarly, Chart 20 shows the monthly average Kaletra price paid by purported class

13  members before the first Kaletra WAC increase in June 2005.  ██████████████████████

14  ██████████████████████████████████████████████████████████

15      116.    Dr. Singer proposes using the pre-December 2003 price of Norvir as the Norvir but-for

16  price, and the pre-June 2005 price of Kaletra as a basis for estimating the but-for price of Kaletra.

17  But he completely avoids the issue that there is no one but-for price according to his methodology.

18  For instance, which month(s) in 2003 are most representative of AmerisourceBergen's but-for prices

19  under Dr. Singer's methodology?  Thus, as discussed in more depth in the following subsection, Dr.

20  Singer proposes no way of assessing what the appropriate but-for price would be under his own

21  methodology.  Determining the appropriate but-for price, even under Dr. Singer's methodology,

22  necessarily would depend on individualized factors.[114]

23

24

―――――――――――――――――――――
25  [114] There are other individualized economic issues under Dr. Singer's proposed methodology.  For
    instance, ██████████████████████████████████  Thus, there is no
26  but-for price according to Dr. Singer's methodology.  This is further complicated by the fact that
    prices for Norvir varied widely across purported class member and, therefore, it would be necessary
27  to assess which purported class member's 2003 Norvir prices are the appropriate estimate of
    ██████████████    but-for Norvir prices.
28

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES
OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

2) *Determining the prices that direct purchasers would have paid in the but-for world would require highly individualized analysis.*

117.    But perhaps the most significant flaw in Dr. Singer's methodology is his assumption that each purported class member's price for Norvir before December 2003 is the Norvir price that would have occurred but-for the challenged conduct.  The implicit assumption in Dr. Singer's methodology for Norvir is that the frequency, magnitude, and distribution of chargebacks and other discounts to purported class members would have stayed exactly the same as in 2003.  But there is no reason to expect that, but-for the challenged conduct, the world in 2004-2007 would have been exactly the same as the world pre-December 2003.  In the but-for world, some direct purchasers would have received more favorable pricing than in 2003, and others would not have.

118.    The essence of assessing antitrust injury and estimating overcharges from an economic perspective is to determine what the world would have been but-for the conduct being challenged— it is not merely to subtract from actual prices the prices before the challenged conduct begun.  To assess the but-for world, it is necessary to account for any extraneous factors that might influence the price of each individual purported class member during the relevant period.  Dr. Singer has avoided this issue entirely.  The precise price distribution of prices in the but-for world requires an analysis of the market circumstances facing a particular direct purchaser in 2003, and how those market circumstances changed in subsequent years.

119.    Determining the prices for Norvir and Kaletra that individual purported class members would have paid in the but-for world requires individualized analysis that cannot be conducted on a class-wide basis.  One important factor that must be taken into account is changes in the mix of customers to which a direct purchaser sells and in the level of discounts those customers negotiate with Abbott.   Again, chargebacks and most other discounts for Norvir and Kaletra are negotiated not by the direct purchasers, but by their customers (GPOs, hospitals, clinics, third-party payors, and government agencies).  Accordingly, the average chargebacks and discounts received by a direct purchaser, and therefore the average price paid, depends on the identity of each direct purchaser's customers and the ability of such customers to bargain for favorable pricing.  But both the customer

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

67

DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES
OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

base of direct purchasers, and the customers' ability to bargain for lower prices, changes

significantly over time.

    120.    The Abbott sales data indicates that for many wholesalers, the share of their sales to

various customers that receive large discounts changes significantly over the relevant time period.

For example, Chart 21 shows

**Winston & Strawn LLP**
**35 W. Wacker Drive**
**Chicago, IL 60601-9703**

[115] For instance, Parkland Prescription Center was receiving a 95 percent discount from WAC from
2004 to 2007.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

121.     Similarly, acquiring or losing a customer with significant negotiated discounts, or an existing customer negotiating different pricing terms, can also change the net price paid by wholesalers for drugs.[116]  For instance, as Chart 15 above shows, after the Norvir price increase in 2003,

122.     Therefore, there is no economic basis for assuming that all chargebacks and discounts given to a particular direct purchaser would have remained the same.  Whether any direct purchaser was injured by higher average prices in the actual world, let alone the amount of that injury, turns on

---

[116] For example, a buying group that increases its number of members may be able to receive higher chargebacks from manufacturers.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1  highly individualized evidence, such as the composition of a direct purchasers' customer base.  This

2  type of analysis cannot be conducted on a class-wide basis because it involves economic evidence

3  that is highly specific to individual purported class members (and specific to their customers).  One

4  cannot assume, as Dr. Singer does for purposes of concluding that class-wide analysis is feasible,

5  that the but-for world would not have differed from the world pre-December 2003.

6      123.    In sum, Dr. Singer has not shown that the impact of the contested actions and associated

7  claimed overcharges can be assessed on a class-wide basis using common evidence.  Individual

8  inquiries would be necessary to determine whether any particular direct purchaser suffered any

9  impact, and for those that may have been impacted individual inquiries would have to be undertaken

10  in order to quantify these alleged overcharges.  Moreover, a formulaic assessment of class-wide

11  damages is not possible because of the many, highly individualized variables that would affect the

12  price any purported class member would pay at any given point in time in the "but-for world."

### D. Individualized analysis would be required to determine whether Norvir was used as a PI booster or a stand-alone PI

15      124.    Dr. Singer's assumption that the entire increase in the price of Norvir constitutes

16  overcharges on all purchases of Norvir is also inconsistent with the fact that Norvir is used both as a

17  PI booster and as a stand-alone PI.  Plaintiffs' liability theory is that the increase in the price of

18  Norvir disadvantaged competitors of PIs that are boosted by Norvir, and monopolized the "Boosted

19  Market."  But, even accepting plaintiffs' claim, the Norvir price increase for patients that were

20  prescribed Norvir as a stand-alone PI could not have had any such anticompetitive effects.

21  According to plaintiffs, Norvir used as a stand-alone PI is neither part of the claimed "Boosting

22  Market" nor the claimed "Boosted Market."  Thus, the increase in the price of Norvir to patients

23  using Norvir as a stand-alone PI is neither the antitrust injury nor the challenged conduct under

24  plaintiffs' own allegations.  Accordingly, such price increases cannot be considered overcharges.

25      125.    Dr. Singer does not propose any methodology for separating sales of Norvir to be used as

26  a PI booster and sales of Norvir as a stand-alone PI.  A significant complication is that it is not

27  possible to identify if a patient is using Norvir as a PI booster or as a stand-alone PI by looking at

28

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1    Abbott's sales data.  In fact, it also may not be possible to determine whether patients are prescribed

2    Norvir as a PI booster or as a stand-alone PI from the sales data of purported class members.  To

3    identify if a patient is using Norvir as a PI booster or as a stand-alone PI, it is necessary to examine a

4    patient's purchase history (*e.g.*, medical records) or the sales history of a pharmacy, hospital, or

5    clinic.  Thus, such an assessment would require analyzing the sales records of retail pharmacies,

6    which are often the customers of purported class members.  Therefore, determining whether Norvir

7    is prescribed as a PI booster or a stand-alone PI would not only require individualized analysis of

8    each direct purchaser, but would also require individualized analysis of the direct purchasers'

9    customers.  Accordingly, it would not be feasible to assess the impact to direct purchasers from the

10   Norvir price increase on a class-wide basis.

11   **IV.    CONCLUSIONS**

12          126.    In sum, Dr. Singer's proposed economic and legal standards for assessing liability in

13   this case highlight the significant conflict of interest between members of the purported class.  In

14   particular, purported class members would have antagonistic economic interests with regard to

15   fundamental issues in this case, including plaintiffs' theory of liability, whether to pursue plaintiffs'

16   "Boosting Market" or "Boosted Market" monopolization claims, and whether to seek lost profits or

17   overcharges.  Moreover, Dr. Singer's proposed "methodologies" for assessing antitrust injury and

18   estimating claimed overcharges do not even attempt to offer a way of dealing with important

19   individualized economic issues.  Assessing antitrust injury and estimating claimed overcharges

20   would require individualized economic analysis that cannot be conducted on a class-wide basis.

21          127.    I declare under penalty of perjury under the laws of the United States of America that

22   the foregoing is true and correct.

23

24                                                                    *Joel Hay*

25   Dated:  June 25, 2008                    By:  _____

26                                                          Joel Hay, Ph.D.

27

28

# Appendix A

4/1/08

CURRICULUM VITA    *JOEL W. HAY*

| Work Address: | |
|---|---|
| | Dept. of Clinical Pharmacy, Pharmaceutical Economics & Policy |
| | Center for the Health Professions CHP 140-J |
| | University of Southern California |
| | 1540 East Alcazar St. |
| | Los Angeles, CA 90089-9004   USA |

| Phone: | Office: | (323) 442-3296 |
|---|---|---|
| | Secretary: | (323) 442-1460 |
| | Telefax: | (818) 337-7370 |

Web Home Page: http://www.usc.edu/schools/pharmacy/faculty_directory/detail.php?id=40

## EDUCATION:

| | | |
|---|---|---|
| B.A. (*Summa cum laude*) | 1974 | Amherst College |
| M.A., Economics | 1975 | Yale University |
| M.Phil., Economics | 1976 | Yale University |
| Ph.D., Economics | 1980 | Yale University |

## EXPERIENCE:

*Principal Appointments:*

March 1992 - present

Associate Professor, Pharmaceutical Economics and Policy; School of Pharmacy

Associate Professor (by courtesy), Department of Economics; University of Southern California, Los Angeles, California.

September 1997 – present

Health Economics Consultant, The Rand Corporation, Health Outcome Research Group Santa Monica, California.

September 1985 - May 1992

Senior Research Fellow, Hoover Institution, Stanford University, Stanford, California.

July 1983 - September 1985

Senior Policy Analyst, Project HOPE, Center for Health Affairs, Millwood, Virginia.

June 1980 - September 1984

Assistant Professor, Department of Behavioral Sciences and Community Health, University Connecticut Health Center, Farmington, Connecticut.
(from 9/81) Assistant Professor, Department of Economics, University of Connecticut Graduate School, Storrs, Connecticut.

June 1978 - June 1980

Assistant Research Professor, Human Resources Research Center, University of Southern California, Los Angeles, California.

*Additional Experience:*

2007
  Leadership Group, International Society for Pharmacoeconomics and Outcomes Research (ISPOR) Disease Management and Prevention Task Force

2007
  Leadership Group, International Society for Pharmacoeconomics and Outcomes Research (ISPOR) Patient Preferences Research Task Force.

2006-Present
  Co-Chair, International Society for Pharmacoeconomics and Outcomes Research (ISPOR) Drug Cost Task Force.

2006
  Chair, Awards Committee; "The 2006 ISPOR Avedis Donabedian Outcomes Research Lifetime Achievement Award." Presented to Prof. George Torrance at the 11'th Annual International Meeting, Philadelphia, PA.

2005
  External Project Reviewer; "The Uninsured and Access to Prescription Drugs in California. The Petris Center on Health Care Markets & Consumer Welfare, University of California, Berkeley.

2005
  External Program Reviewer, Agency for Healthcare Research & Quality, Dept. of Health & Human Services; Developing Evidence to Inform Decisions about Effectiveness: The DEcIDE Network.

2004-Present
  Health Policy Scientific Council, International Society for Pharmacoeconomics & Outcomes Research.

2004-Present
  Executive Board Member, American Society of Health Economics.

2004-Present
  Scientific Advisory Board Member, Disease Management Association of America

2002-2003
  Institute of Medicine, National Academy of Sciences. Commissioned Author "Vaccine Reimbursement Policy in the US."

2001-Present
  Health Economist, UCLA Center for Vaccine Research, UCLA Harbor Medical Cntr., Torrance, CA

2001
  Health Plan Reform Consultant, Hong Kong Hospital Authority. Hong Kong

2000
  External Reviewer, National Institute on Aging, NIH Small Grants Program.

1999
  External Reviewer, National Institutes of Health, National Institute on Aging, Review of Duke University Medicare Data Program Proposal

1999-Present
  Co-Investigator, USC Alzheimer Research Centers of California Research Program, California Dept. of Health Services

1999
  Consultant, University of Michigan Survey Research Center ADAMS/HRS Dementia Project

1999
  External Reviewer, National Institutes of Health, National Institute of Digestive Diseases and Nutrition, Division of Digestive Diseases and Nutrition Hepatitis C Antiviral Long-term Therapy to Prevent Cirrhosis (HALT-C) Ancillary Studies Committee

1999-2000
  Economics Research Consultant, U.S. Agency for Health Research and Quality, Southern California Evidence-Based Medicine Practice Project: Deep Vein Thrombosis Treatment in Trauma Surgery Literature Synthesis and Guideline Development

1999
  Member, Long Range Steering Committee Task Force, Harbor-UCLA Medical Center Research and Education Institution, Torrance, CA.

1998-Present
Rand USC Project Coordinator, U.S. Agency for Health Research and Quality, Southern California Evidence-Based Medicine Practice Project.

1998-2002
Founding Editor-In-Chief, *Value in Health*, Journal of the International Society for Pharmacoeconomics and Outcomes Research.

1998
External Reviewer, California Department of Health Services Alzheimer's Program Research Fund.

1998-present
Member, Pharmacy Practice Research Roundtable,

1998-present
Member, International Working Group on Alzheimer Disease Pharmacoeconomics Research.

1998-2006
Member, Coronary Heart Disease: The Interdisciplinary Council on Reducing the Risk, co-sponsored by the American Heart Association and Bristol-Myers Squibb.  Dallas, TX.

1997-98
Co-Chair:  ISPOR Working Group on Guidelines for Pharmacoeconomic Research.

1997-98
External Reviewer. Asset and Health Dynamics among the Oldest Old- Dementia Survey Supplement.  University of Michigan Institute for Social Research, Ann Arbor, MI.

1996-1998
Co-Chair and Primary Organizer: ISPOR Lipid Pharmacoeconomics Conference.  Orlando, FL. Elected Member Board of Directors, and Founding Member, International Society for Pharmacoeconomics and Outcomes Research (ISPOR), Philadelphia, PA.

1995-2000
Member, Expert Advisory Panel on Drug Utilization Review, United States Pharmacopoeial Convention, Rockville, MD.

1995-96
Research and Graduate Affairs Committee, American Association of Colleges of Pharmacy, Alexandria, VA.

1994-95
Technical Review Study Section, "HIV Costs and Services Utilization Study (HCSUS),"  Agency for Health Care Policy & Research, U.S. Dept. of Health & Human Services, Rockville, MD.

1993-94
Member, Research Advisory Panel for Outcome Studies, Wellpoint Pharmacy Management, Blue Cross of Southern California.

1993-1998
Member, Advisory Committee, American Society of Consultant Pharmacists Research Foundation

1993
Member, Planning Committee, American Society of Consultant Pharmacists Planning Committee for ASCP Foundation Pharmacoeconomics Fellowship in Geriatric Long-Term Care

1992-1993
Technical Review Panelist, Drug Utilization Review Demonstration Project Contracts, Health Care Financing Administration, Baltimore, MD.

1992
Member, Council of Advisors, Geriatric Drug Therapy Research Institute, Arlington, VA.

1992
Access to Health Care Task Force Member, American Heart Association, Washington, D.C.

1992
Judge, Masters of Innovation Software Competition, Zenith Data Systems, Chicago, Illinois.

1991
Advisor, Hungarian Parliament Health Care Reform Committee, Budapest, Hungary.

1991
Chief U.S. consultant, Hungarian health care reform project, Px Ltd., Budapest, Hungary.

1990-91
Visiting Scholar, Hong Kong Centre for Economic Research, Chinese University of Hong Kong, Shatin, New Territories.

1990
Invited outside reviewer, U.S. Congressional Budget Office Long Term Care Policy Statement.

1990
Invited outside expert, California AIDS Leadership Commission Hearings, Los Angeles, CA.

1989
Proposal Review Consultant, The Smith Richardson Foundation.

1989
Invited outside expert, Select panel on HIV/AIDS estimates and projections. U.S. Public Health Service, Centers for Disease Control.

1989
Consultant, The Henry J. Kaiser Family Foundation, Menlo Park, California.

1988
Consultant, General Assistance Program for the Homeless, Office of the County Counsel, County of Sacramento, CA.

1988
Proposal Reviewer, Special Study Section, National Institutes of Health, U.S. Dept. of Health & Human Services.

1988
Issue Development Participant, "Medication Use in the Elderly: A Critical Analysis," Geriatric Pharmacy Institute, Philadelphia College of Pharmacy and Science.

1988
Consultant, Patient Care/Health Service Delivery Subgroup, Executive Task Force on AIDS, U.S. Public Health Service.

1987
Consultant, Cost-benefit analysis of HIB vaccine, U.S. Food and Drug  Administration.

1987
Proposal Reviewer, National Center for Health Services Research, U.S. Dept. of Health & Human Services.

1986, 1989
Proposal Review Consultant, The Henry J. Kaiser Family Foundation, Menlo Park, California.

1984 - 1986
Principal Investigator, Robert Wood Johnson Foundation; An Incentive Reimbursement Plan for Medicaid Home Health Care Services.

1985
Technical Consultant, Research Projects Approval Committee-Economics and Research, The World Bank.

1985
Technical Advisory Panelist, HCFA Contract No. 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; Market Study for Home Health Care Services, Center for Health Policy Studies.

1984
Technical Review Consultant, National Center for Health Services Research, Hospital Care and Utilization Project.

1984
Consultant, County of San Diego; Member of Proposal Review Committee for County Regional Contracts to Provide Care to Medically Indigent Adults.

1983
Visiting Assistant Professor, Institute for Social Sciences, University of Basel, Basel, Switzerland.

1983
Principal Investigator, U.S. Environmental Protection Agency; Mortality and Air Pollution: A Microanalytic Analysis.

1981 - 1982
Principal Investigator, Connecticut Research Foundation; Child Health Status and Cognitive Development.

1981
Visiting Fellow, Institution for Social and Policy Studies, Yale University, New Haven, Connecticut.

1980
Consultant, National Preventive Dentistry Demonstration Project Evaluation Model, American Fund

for Dental Health.

1980
    Consultant, National Health Services Corps Personnel Selection Evaluation, Policy Research Inc.

1979 - 1980
    Principal Investigator, Doctoral Research Grant, National Center for Health Services Research.

1979 - 1980
    Consultant, Cost Benefit Analysis of Outpatient Treatment for Patients from the Psychiatric Ward of L.A. County/USC Medical Center.

1977 - 1978
    Instructor, Department of Economics, Yale University, New Haven, Connecticut.

1976 - 1977
    Teaching Assistant, Department of Economics, Yale University, New Haven, Connecticut.

1974 - 1976
    Research Consultant, National Bureau of Economic Research.

1975
    Bibliographical Research Project (Russian Language) on Works of Academic Leo Kantorovich for Professor Tjalling Koopmans.

## HONORS AND DISTINCTIONS:

Joel Hay was Founding Editor-in-Chief of *Value in Health* the peer-reviewed scientific journal of the International Society for Pharmacoeconomics and Outcomes Research until 2003.  This journal, started in 1998, became Medline-listed in 2002.  In its first impact factor, Value in Health was ranked #1 in two categories for the year 2004, by the ISI Journal Citation Reports® (JCR) with an impact factor of 3.657. Value in Health led all other journals listed both in the Health Care Sciences and Services category in the JCR Science Edition and in the Health Policy & Services category in the JCR Social Sciences Edition.

International Society for Pharmacoeconomics and Outcomes Research Mentor: Best Student Poster Award; Danielle Zammit, 2004: "Preliminary Economic Analysis Of The American Cancer Society Guidelines For Mammography Screening In Average-Risk Women Under 70 Years Of Age." D. Zammit and J. Hay.

International Society for Pharmacoeconomics and Outcomes Research Mentor: Best Student Poster Award; Danielle Zammit, 2003: "Economic Analysis Of The Use Of Angiotensin Converting Enzyme Inhibitors In Patients With Diabetes Mellitus." D. Zammit and J. Hay.

International Society for Pharmacoeconomics and Outcomes Research: Distinguished Service Award, 2002.

International Society for Pharmacoeconomics and Outcomes Research Mentor: Best Student Poster Award; Eric Wu, 2001:"Survival And Nursing Home Free Survival (NHFS) Of Alzheimer's Disease Patients." E. Wu and J. Hay

International Society for Pharmacoeconomics and Outcomes Research Mentor: Best Student Poster Award; Jinmei Li, 2000: "Cost Effectiveness of Retinopathy Screening in Pediatric Patients with Type 1 Diabetes Mellitus." J. Li and J. Hay.

International Society for Pharmacoeconomics and Outcomes Research Mentor: Best Student Poster Award; Nishan Sengupta, 2000: "Cost Effectiveness Analysis Of Tamoxifen in Breast Cancer Risk Reduction." N. Sengupta and J. Hay.

International Society for Pharmacoeconomics and Outcomes Research Mentor: Best Student Poster Award; Michelle Luo, 1999: "Cost Effectiveness Analysis Of Genetic Testing For Breast Cancer."  M. Luo and J. Hay.

International Society for Pharmacoeconomics and Outcomes Research: Research Excellence Award; 1999.

1999 Wallace Lectureship.  Idaho State University College of Pharmacy

USC School of Pharmacy QSAD Centurion Professorship: 1993-99

International Society for Pharmacoeconomics and Outcomes Research Executive Board Recognition Award; 1998

International Society for Pharmacoeconomics and Outcomes Distinguished Service Award; 1998

Outstanding Speaker Award, 1996; American Association for Clinical Chemistry

Reviewer, National Science Foundation,  1982: Economics Section, 1987: Economics Section,  1989: Economics Section

Yale University Fellowship, 1974 - 1978

W.T. Akery Prize for Undergraduate Thesis in Economics, 1974

Elected Phi Beta Kappa, 1974

Joel W. Hay, Ph.D. -- C.V.                    -7-                              4/1/08

**LANGUAGES:**
   French (reading), Russian (reading),
   APL, PL/1, FORTRAN, IBM 370 JCL, TSP, SAS, SPSS/X, STATA, LIMDEP, NLOGIT, QUAIL, BMDP,
MS DOS, LOTUS 123, SPSS/PC, RATS, SST, VAX/VM.

**FIELDS OF GRADUATE TRAINING:**
Econometrics, Money, Labor

**RESEARCH INTERESTS:**
Pharmacoeconomics, Outcomes Research, Pharmaceutical Care, Health Economics, Econometrics

**PROFESSIONAL SOCIETIES:**

Academy of Managed Care Pharmacy
American Association of Colleges of Pharmacy
American Economics Association
American Public Health Association
American Society for Health Economics
Disease Management Association of America
Eastern Economics Association
Econometrics Society
International Health Economics Association
International Society for Pharmacoeconomics and Outcomes Research
International Society for Quality of Life Research
International Society of Technology Assessment in Health Care
Southern Economics Association
Western Economics Association

Joel W. Hay, Ph.D. -- C.V.                    -8-                    4/1/08

## TEACHING:

1976 - 1977
    Teaching Assistant, Department of Economics, Yale University, New Haven, Connecticut.

1977 - 1978
    Instructor, Department of Economics, Yale University, New Haven, Connecticut.

September - November 1980
    Health Economics at the Waterbury Hospital Pediatric Residency Program.

September - November 1980
    Social and Behavioral Sciences Seminar "Cost of Illness and Related Topics," Medical/Dental
student
    Required curriculum, University of Connecticut Health Center.

September 1980 - December 1982
    Social and Behavioral Sciences Lecturer "Issues in Health Care Financing and Delivery,"
    Medical/Dental student required curriculum, University of Connecticut Health Center.

September - November 1981
    Social and Behavioral Sciences Seminar "Competition in the Health Care Delivery System,"
    Medical/Dental student required curriculum, University of Connecticut Health Center.

September - November 1982
    Social and Behavioral Sciences Seminar "HMOs and the Market for Health Care," Medical/Dental
    Student required curriculum, University of Connecticut Health Center.

December 1980 - January 1983
    Introductory Biostatistics Instructor, Medical/Dental student required curriculum, University of
    Connecticut Health Center.

January 1981 - June 1983
    Health Economics, M.P.H. Program, Yale University, Department of Epidemiology and Public
    Health, and Institution for Social and Policy Studies.

Fall Semester 1982
    Graduate Independent Studies Course, Department of Economics, University of Connecticut.

Spring Semester 1982
    Undergraduate Health Economics, University of Connecticut, Department of Economics.

Spring Semester 1983
    Undergraduate Independent Studies Course, Department of Economics, University of Connecticut.

Fall Semester 1992
    The Costs of Drug Abuse, Health Behavior (PSC 439); Economic Assessment of Pharmaceuticals,
    Contemporary Issues (PSC 551); Health Care Organization in the U.S., Public Health and Social
    Pharmacy (PSC 437); Department of Pharmaceutical Economics and Policy, USC

Spring Semester 1993
    Biostatistics and Literature Evaluation (PSC 331): Cotaught with Prof. McCombs; Department of
    Pharmaceutical Economics and Policy, USC

Fall Semester 1993
    The Costs of Drug Abuse, Health Behavior (PSC 439); Health-related Quality of Life Assessment,

Contemporary Issues (PSC 551); U.S. Health Care Finance and Reform, Public Health and Social Pharmacy (PSC 437); Department of Pharmaceutical Economics and Policy, USC

Spring Semester 1994
Biostatistics and Literature Evaluation (PSC 331): Cotaught with Prof. McCombs; Department of Pharmaceutical Economics and Policy, USC

Summer, 1994
Introductory Undergraduate Health Economics (Econ 194BB), University of California, Santa Barbara, Summer Session

Fall Semester 1994
Health Status/Quality of Life Assessment Health Behavior (PSC 439); Contemporary Issues (PSC 551); U.S. Health Care Finance and Reform, Public Health and Social Pharmacy (PSC 437); Department of Pharmaceutical Economics and Policy, USC

Spring Semester 1995
Biostatistics and Literature Evaluation (PSC 331)

Spring Semester 1996
Biostatistics and Literature Evaluation (PSC 331)

Spring Semester 1996
Pharmacoeconomics: Introductory Graduate Course (PMEP 538)

Summer Semester 1996
Pharmacoeconomics: Introductory Graduate Course (PMEP 538)

Spring Semester 1997
Statistics Computer Laboratory (Phar 366)

Summer Semester 1997
Pharmacoeconomics: Introductory Graduate Course (PMEP 538)

Spring Semester 1998
Statistics Computer Laboratory (Phar 366)

Summer Semester 1998
Pharmacoeconomics: Introductory Graduate Course (PMEP 538)

Spring Semester 1999
Statistics Computer Laboratory (Phar 366)

Summer Semester 1999
Pharmacoeconomics: Introductory Graduate Course (PMEP 538)

Spring Semester 2000
Statistics Computer Laboratory (Phar 366)

Spring Semester 2000
Pharmacy Level III Elective: Disease State Management. Pharmacoeconomics (1 Lecture) (Phar 571)

Fall Semester 2000
Pharmacoeconomics Unit on Decision Analysis  (Phar 553)

Summer Semester 2000

Joel W. Hay, Ph.D. -- C.V.                    -10-                                4/1/08

Pharmacoeconomics: Introductory Graduate Course (PMEP 538)

Fall Semester 2001
      Pharmacoeconomics Unit on Decision Analysis  (Phar 553)

Spring Semester 2001
      Pharmaceutical Econometrics:  Graduate Course (PMEP 549)

Summer Semester 2001
      Pharmacoeconomics: Graduate Course (PMEP 538)

Fall Semester 2002
      Pharmacoeconomics Unit on Decision Analysis  (Phar 553)

Spring Semester 2002
      Pharmaceutical Econometrics:  Graduate Course (PMEP 549)

Summer Semester 2002
      Pharmacoeconomics: Graduate Course (PMEP 538)

Spring Semester 2002
      Pharmaceutical Econometrics:  Graduate Course (PMEP 549)

Spring Semester 2003
      Pharmaceutical Econometrics:  Graduate Course (PMEP 549)

Summer Semester 2003
      Pharmacoeconomics: Graduate Course (PMEP 538)

Fall Semester 2003
      Pharmacoeconomics Unit on Decision Analysis  (PHRD 553)

Fall Semester 2003
      Health Care Policy  (PHRD 507)

Spring Semester 2004
      Pharmaceutical Econometrics:  Graduate Course (PMEP 549)

Fall Semester 2004
      Health Care Policy  (PHRD 507)

Fall Semester 2004
      Pharmacoeconomics Unit on Decision Analysis  (PHRD 614)

Summer Semester 2005
      Pharmacoeconomics: Graduate Course (PMEP 538)

Fall Semester 2005
      Health Care Policy  (PHRD 507)

Spring Semester 2006
      Pharmaceutical Econometrics:  Graduate Course (PMEP 549)

Fall Semester 2006
      Health Care Policy  (PHRD 507)

Joel W. Hay, Ph.D. -- C.V.                    -11-                                      4/1/08

Fall Semester 2006
        Research Design – Applied Cost Effectiveness Analysis (PMEP 509)

Summer Semester 2007
        Pharmacoeconomics: Graduate Course (PMEP 538)

Fall Semester 2007
        Health Care Policy  (PHRD 507)

## USC UNIVERSITY SERVICE

| | |
|---|---|
| 2006 - Present | Faculty Merit Review Coordinating Committee, School of Pharmacy |
| 2004-2005 | Chair, Faculty Position Search Committee, Dept. of Pharmaceutical Economics and Policy, School of Pharmacy |
| 2003 - Present | Admissions Committee, School of Pharmacy |
| 2003-2006 | Chair, Advanced Technology Committee, School of Pharmacy |
| 2002-2004 | New Curriculum Development: Course Coordinator, Phar 507: Health Policy for Pharmacists, School of Pharmacy |
| 2002 - Present | Advanced Technology Committee, School of Pharmacy |
| 2002 | Presentation on Human Subjects Review Policy, USC Faculty Senate Retreat |
| 2000-2001 | Computer Committee, School of Pharmacy |
| 2001 | Graduate Teaching Assistantship Program Evaluation Committee |
| 2000 – Present | Faculty Advisor, USC ISPOR Student Chapter |
| 1994 - Present | Pharmacy Student Applicant Interview Committee |
| 1992 - 1997 | Founding Chair, Dept. of Pharmaceutical Economics and Policy, School of Pharmacy |
| 1993 - 1995 | Member, Pharmacy Dean's Search Committee, Office of the Provost. |
| 1992 - 1997 | Member, Dean's Executive Committee, School of Pharmacy |
| 1992 - 1997 | Member, Appointments and Promotions Committee, School of Pharmacy |
| 1993 - 1995 | Economic Advisor, East Los Angeles/USC Project on Managed Care for the Medically Indigent; Pacific Center for Health Policy and Ethics |
| 1995 - 1997 | Member, Quality/Outcomes Subcommittee USC Physicians Office of Clinical Services |
| 1994 - 1997 | Member, Ph.D. Pharmaceutical Economics and Policy Admissions Committee |
| 1994 - 1997 | Member, M.S. Pharmaceutical Economics and Policy Admissions Committee |
| 1993 - 1997 | Member, University Graduate Studies Advisory Committee, USC Graduate School |
| 1993 | Developed Ph.D. Program in Pharmaceutical Economics (Graduate School Approved for Fall 1994) |
| 1993 | Proposal Reviewer, Zumberge Research and Innovation Fund Awards |
| 1993 | Candidate Interviewer, Pharm.D. Admissions Program, School of Pharmacy |
| 1993 | Chair, Graduate Ph.D. Program in Pharmaceutical Economics Curriculum Development, Dept. of Pharmaceutical Economics and Policy, School of Pharmacy |
| 1992/1993 | Chair, Junior Faculty Position Search Committee, Dept. of Pharmaceutical Economics and Policy, School of Pharmacy |
| 1994/1995 | Chair, Junior Faculty Position Search Committee, Dept. of Pharmaceutical Economics and Policy, School of Pharmacy |

## OTHER UNIVERSITY SERVICE

| | |
|---|---|
| 2006` | External Referee, Appointments and Promotions Committee, Department of Medicine, Brigham and Women's Hospital; Harvard Medical School, Boston, MA. |
| 2004 | External Referee, Appointments and Promotions Committee, Department of Pediatrics, Harbor-UCLA Medical Center, UCLA School of Medicine, Los Angeles, CA. |
| 2002 | External Examiner, Chinese University of Hong Kong Graduate School. Shatin, Hong Kong |
| 2001 | External Referee, Appointments and Promotions Committee, College of Pharmacy, University of Iowa |
| 2000 | External Referee, Appointments and Promotions Committee, Department of Pediatrics, Harbor-UCLA Medical Center, UCLA School of Medicine, Los |

Joel W. Hay, Ph.D. -- C.V.                    -13-                                          4/1/08

Angeles, CA.

2000                          External Referee, Appointments and Promotions Committee, Department of
                              Economics, Rice University, Houston, TX.

1997                          External Referee, Appointments and Promotions Committee, School of Dentistry,
                              University of Connecticut, Farmington, CT.

1993                          External Referee, Promotions Committee, Department of Medicine, Baylor
                              College of Medicine, Houston, TX.

1993                          External Referee, Promotions Committee, Department of Medicine, University of
                              California, San Diego, CA..

1993                          External Referee, Promotions Committee,  School of Nursing, University of
                              California, San Francisco, CA.

1993                          External Referee, Promotions Committee,  Department of Economics, University
                              of Hong Kong, Hong Kong.

1992                          External Referee, Promotions Committee,  School of Nursing, University of
                              California, San Francisco, CA.

1988                          External Referee, Tenure and Promotions Committee, Dept. of Economics, Univ.
                              of North Carolina at Chapel Hill, NC.

USC SPONSORED PROJECTS

Sponsor:  NIH, National Institute of Mental Health
**PI:** Kathy Ell, PhD
**J Hay Role:** Co-Investigator
**Title:** Patient Multi-faceted Depression Program for Pregnant Women
**Amount:** $678,000
**Dates:** 9/04 – 8/07


Sponsor:  NIH, National Institute of Mental Health
**PI:** Megan Dwight-Johnson, MD
**J Hay Role:** Co-Investigator
**Title:** Patient Centered Care in the Public Sector
**Amount:** $2,642,000
**Dates:** 7/04 – 6/08


Sponsor: California Dept. of Health Services
**PI:** Lon Schneider, MD
**J Hay Role:** Economist
**Title:** Alzheimer Disease Costs, Quality of Life and Disease Burden
**Amount:** $600,000
**Dates:** 1/01 – 12/04


**Sponsor:** US Centers for Disease Control and Prevention, NIH, Wyeth-Ayerst Pharmaceuticals
**PI:** Ken Zangwill, MD
**J Hay Role:** Sub-grant PI
**Title:** Economic Assessment of Rotavirus Burden of Illness in the Kaiser Southern California Health Plan
**Amount:** $260,000
**Dates:** 11/97 – 12/03


**Sponsor:** US Alzheimer Association, Merck Foundation, Janssen Pharmaceutica
**PI:** Joel Hay, PhD
**J Hay Role:** Economist
**Title:** Alzheimer Disease Global Burden of Illness
**Amount:** $200,000
**Dates:** 6/99 – 12/01


**Sponsor:** US National Institute on Aging
**PI:** Florence Clark, PhD
**J Hay Role:** Project Economist
**Title:** Well Elderly Occupational Therapy Demonstration Project
**Amount:** $1.3 million
**Dates:** 1/96 – 6/98


**Sponsor:** US PHS Agency for Health Care Policy Research
**PI:** Paul Schekelle, MD
**J Hay Role:** USC Project Coordinator
**Title:** Southern California Evidenced-Based Practice Center
**Amount:** $420,000
**Dates:** 3/98 – 9/99


**Sponsor:** Parke-Davis
**PI:** Joel Hay
**J Hay Role:** Economist
**Title:** Economic Assessment of Epilepsy Disease Management Intervention
**Amount:** $60,000
**Dates:** 6/95 9/98


**Sponsor:** US NIH, National Institute on Aging
**PI:** Mary Mittelman, PhD
**J Hay Role:** Sub-Grant Co-PI
**Title:** Economic Evaluation of Alzheimer Disease Caregiver Support Intervention
**Amount:** $190,000
**Dates:** 1/96 – 7/98


**Sponsor:** Bristol Myers Squibb
**PI:** Joel Hay
**J Hay Role:** USC Project Coordinator
**Title:** Pharmacoeconomics Fellowship
**Amount:** $30,000

**Dates:** 6/96

**Sponsor:** Bristol Myers Squibb
**PI:** Joel Hay
**J Hay Role:** USC Project Coordinator
**Title:** Pharmacoeconomics Training
**Amount:** $60,000
**Dates:** 6/96

**Sponsor:** Parke-Davis
**PI:** Joel Hay
**J Hay Role:** Economist
**Title:** Cognitive Function and the Costs of Alzheimer's Disease
**Amount:** $90,000
**Dates:** 6/94 8/96

**Sponsor:** Astra-Merck
**PI:** Phil Rappa
**J Hay Role:** USC Project Coordinator
**Title:** Pharmacoeconomics Training
**Amount:** $90,000
**Dates:** 8/94

**Sponsor:** Allergan
**PI:** Phil Rappa
**J Hay Role:** USC Project Coordinator
**Title:** Pharmacoeconomics Training
**Amount:** $20,000
**Dates:** 8/95

**Sponsor:** Amgen
**PI:** Phil Rappa
**J Hay Role:** USC Project Coordinator
**Title:** Pharmacoeconomics Training
**Amount:** $30,000
**Dates:** 7/94

**Sponsor:** Glaxo-Welcome Pharmaceuticals
**PI:** Phil Rappa
**J Hay Role:** USC Project Coordinator
**Title:** Pharmacoeconomics Training
**Amount:** $140,000
**Dates:** 3/93, 3/94

**Sponsor:** Miles Pharmaceuticals
**PI:** Joel Hay PhD
**J Hay Role:** Economist
**Title:** Economic Assessment of Anti-TNF in Treatment of Septic Shock
**Amount:** $130,000
**Dates:** 4/94 – 3/95

**Sponsor:** Kaiser Permanente Southern California Health Care Plan
**PI:** Jeff McCombs, PhD
**J Hay Role:** Project Economist
**Title:** The Kaiser/USC Pharmaceutical Care Demonstration Project
**Amount:** $860,000
**Dates:** 3/93 – 9/97

**Sponsor:** Syntex Roche Pharmaceuticals
**PI:** Joel Hay PhD
**J Hay Role:** Project Coordinator
**Title:** Pharmacoeconomics Graduate program development
**Amount:** $120,000
**Dates:** 6/92 – 5/93

**PEER-REVIEWED PUBLICATIONS:**

1. Hay, J.: "Public Service Delivery in Chicopee, Massachusetts," in *Student Originated Studies Conference Proceedings*, National Science Foundation, 1973, NSF No. 74-33.

2. Hay, J.: *Occupational Choice and Occupational Earnings: Selectivity Bias in a Simultaneous Logit-OLS Model,* Ph.D. dissertation, Yale University, New Haven, 1980, published by the National Technical Information Service, Rockville, Maryland.

3. Formicola, A., Gottsegan, R., and Hay, J.: "Commentary on 'Periodontal Disease: Assessing the Effectiveness and Costs of the Keyes Technique'," in *Implications of Cost-Effectiveness Analysis of Medical Technology,* Office of Technology Assessment, U.S. Congress, Washington, D.C., 1981.

4. Yett, D., Der, W., Ernst, R. and Hay, J.: "Blue Shield Plan Physician Participation." *Health Care Financing Review,* June, 1981 pp. 9-24.

5. Alvesalo, I., Reisine, S., Hay, J. and Bailit, H.: "Effects of Fluoride and Regular Dental Care on Personal Dental Expenditures of Young Adults in Finland," *Community Dentistry and Oral Epidemiology*, Volume 10 (1982), pp. 15-22.

6. Yett, D., Der, W., Ernst, R. and Hay, J.: "A Model of Physician Pricing, Output, and Health Insurance Reimbursement: Findings from Study of Two Blue Shield Plans' Claims Data."  In *Essays in Health Economics,* edited by Jacques Van der Gaag, William Neenan and Theodore Tsukahara, Praeger Press, New York, 1982, pp. 197-230.

7. Hay, J., Bailit, H., and Chiriboga, D.: "The Demand for Dental Health," *Social Science and Medicine,* Volume 16 (1982), pp. 1285-1289.

8. Hay, J. and Leahy, M.: "Physician-Induced Demand: An Empirical Analysis of the Consumer Information Gap," *Journal of Health Economics,* Volume 1, (December, 1982), pp. 231-244.

9. Hay, J.: "A Simultaneous Econometric Model for Physicians' Specialty Choice and Specialty Income," in *Actes du Dixieme Colloque International D'Econometrie Appliquee: Econometrie de la Sante,* Hospices Civil de Lyon, Lyon, France. February, 1983, pp. 260-270.

10. Hay, J.: "The Impact of Public Health Care Financing Policies on Private Sector Hospital Costs." *Journal of Health Politics, Policy and Law,* Volume 7, No. 4 (1983), pp. 945-952.

11. Yett, D., Der, W., Ernst, R. and Hay, J.: "Physician Pricing and Health Insurance Reimbursement," *Health Care Financing Review,* (December, 1983), pp. 69-80.

12. Hay, J. and Leahy, M.: "Competition Among Health Plans: Some Preliminary Evidence," *Southern Economic Journal* 50,(January 1984), pp. 831-847.

13. Hay, J. and Mandes, G.: "Home Health Care Cost-Function Analysis," *Health Care Financing Review* 5(3), (Spring 1984), pp. 111-116.

14. Hay, J. and Olsen, R.: "Let Them Eat Cake: A Note on Comparing Alternative Models of the Demand for Medical Care," *Journal of Business and Economic Statistics* 2(3), (July 1984), pp. 279-282.

15. Hay, J.: "Occupational Choice and Occupational Earnings: A Method for Dealing with Selection Bias Among Economic Activities," in *Research in Population Economics,* Volume 5, edited by T. Paul Schultz and Kenneth Wolpin, JAI Press, Greenwich, Connecticut (1984) pp. 309-329.

16. Hay, J.: "Variation in Per Capita Pharmaceutical Expenditures: Are Drugs Complements or Substitutes?" In *Pharmaceutical Economics,* Bjorn Lindgren, ed., Liber Forlag Press, Malmo, Sweden, 1985, pp. 21-36.

17. Yett, D., Der, W., Ernst, R. and Hay, J.: "Fee Screen Reimbursement and Physician Fee Inflation," *Journal of Human Resources* 20(2), (Spring, 1985), pp. 278-291.

18. Hay, J. and Hill, W. L.: "Cost-Effectiveness of Two Transdermal Nitroglycerin Controlled-Release Systems," *Clinical Therapeutics,* 8(1), 1985, pp. 35-40.

19. Sloan, F. and Hay, J.: "Medicare Pricing Mechanisms for Physician Services: An Overview of Alternative Approaches," *Medical Care Review,* 43(1), (Spring, 1986), pp. 59-100.

20. Hay, J., and Ernst, R.: "The Cost Effectiveness of Home Intravenous Antibiotics," in *Proceedings: Outpatient Parenteral Antibiotic Therapy Symposium,* J.E. Putnam, Ed., IntraMed, New York, NY, 1987 pp. 7-14.

21. Welch, B., Hay, J., Miller, D., Olsen, R. Rippey, R., and Welch, A.: "The Rand Health Insurance Study: A Summary Critique," *Medical Care,* 25(2), (February, 1987) pp. 148-156.

22. Hay, J., and Daum, R.: "Cost Benefit Analysis of Two Strategies for Prevention of Haemophilus Influenzae Type B Infection," *Pediatrics,* 80(3) (September, 1987) pp. 319-329.

23. Hay, J., Leu, R., and Rohrer, P.: "Ordinary Least Squares and Sample Selection Models of Health Care Demand: Monte Carlo Comparison," *Journal of Business and Economic Statistics,* 5(4) (October, 1987) pp. 499-506.

24. Hay, J., and Ernst, R.: "The Economic Costs of Alzheimer's Disease," *American Journal of Public Health,* 77(9) (September, 1987) pp. 1-7.

25. Hay, J., and Anderson, G.: "The Hospital Services Market: A Disequilibrium Analysis," *Southern Economic Journal,* 54(3) (January, 1988) pp. 656-665.

26. Hay, J., Osmond, D. and Jacobson, M.: "Projecting the Medical Costs of AIDS and ARC in the United States," *Journal of Acquired Immune Deficiency Syndromes,* 1(5) (October, 1988) pp. 466-485.

27. Hay, J.: "Cost-Effectiveness of Three Transdermal Nitroglycerin Controlled-Release Systems," *Clinical Therapeutics,* 10(4), 1988, pp. 450-455.

28. Hay, J.: "Econometric Issues in Modeling the Costs of AIDS," paper presented at the Johns Hopkins University Conference on The Economic Impact of AIDS: Research Methodology. *Health Policy,* 11(2) (April, 1989) pp. 125-145.

29. Hay, J.: "Projecting the Medical Costs of HIV/AIDS: An Update with Focus on Epidemiology." In *New Perspectives on HIV-Related Illness: Progress in Health Services Research--Conference Proceedings.* National Center for Health Services Research, Pub. No. DHHS (PHS) 89-3449. September, 1989, pp. 84-97. Rockville, MD.

30. Hay, J.: "The Health Care Cost Crisis," in L. Holland, ed., *Managed Health Care Strategies for the 1990s: Proceedings of a Symposium for Managed Care Professionals,* IntraMed, New York, 1990 pp. 30-39.

31. Hay, J.: "AIDS Point and Counterpoint." *Priorities;* the American Council on Science and Health, Winter 1990, pp. 35-39.

32. Wittels, E, Hay, J and Gotto, A.: "Medical Costs of Coronary Artery Disease." *American Journal of Cardiology,* February, 1990, Vol. 65, pp. 432-440.

33. Hay, J. and Daum, R.:"Cost-benefit Analysis of Haemophilus influenzae Type B Prevention: Conjugate Vaccination at Eighteen Months of Age," *Ped Inf Dis J,* April 1990, Vol. 9, pp. 246-252.

Joel W. Hay, Ph.D. -- C.V.                    -18-                                4/1/08

34.  Gotto A, LaRosa J, Hunninghake D, Grundy S, Wilson J, Clarkson T, Hay J.: "The Cholesterol Facts: A Summary of the Evidence Relating Dietary Fats, Blood Cholesterol and Coronary Artery Disease" A Joint Statement of The American Heart Association and the National Heart, Lung and Blood Institute. *Circulation,* May, 1990, Vol. 81, No. 5, pp. 1721-1733.

35.  Hay, J.: "Physicians' Specialty Choice and Specialty Income," in G. Duru and J. H. P. Paelinck, eds. *Econometrics of Health Care,* Kluwer Academic Publishers, Amsterdam, Holland, 1990. pp. 95-113.

36.  Hay, J and Robin, E.: "Cost-Effectiveness of Alpha-1 Antitrypsin Replacement Therapy in Treatment of Congenital Chronic Obstructive Pulmonary Disease." *American Journal of Public Health,* April 1991, Vol. 81, No. 4, pp. 427-433.

37.  Hay, J, Wittels, E, and Gotto, A.: "An Economic Evaluation of Lovastatin for Cholesterol Lowering and Coronary Artery Disease Reduction," *American Journal of Cardiology,* April 15, 1991, Vol. 67, No. 9, pp. 789-796.

38.  Hay J.: "Is Hong Kong Ready for Free Market Health Care?" in *Financing Health Care in the 1990s,* Hong Kong Medical Association and Hong Kong Society of Medical Executives, September, 1991, pp. 16-21.

39.  Hay J.: "The Harm They Do to Others: A Primer on the External Costs of Drug Abuse," in E. Lazear and M. Krauss, eds. *Searching for Alternatives: Drug Control Policy in the United States,* Hoover Institution Press, Stanford, CA, November, 1991, pp. 200-225.

40.  Hay J. and Hay A.: "Inflammatory Bowel Disease Costs-of-Illness," *Journal of Clinical Gastroenterology,* 1992, Vol. 14, No. 4, pp. 309-317.

41.  Hay A. and Hay J.: "Inflammatory Bowel Disease Medical Cost Algorithms," *Journal of Clinical Gastroenterology,* 1992, Vol. 14, No. 4, pp. 318-327.

42.  Hay J.: *Health Care in Hong Kong: An Economic Policy Assessment,* Chinese University Press, Hong Kong; 1992, 124pp.  Chinese Language Edition, Chinese University Press, 1993, 114 pp.

43.  Hay, J.: "Pharmacoeconomics in the Hospital," *California Journal of Hospital Pharmacy*, Vol. 5, November, 1993, pg. 7.

44.  Hay, J, and Ernst, R.  A Perspective on the Costs and Benefits of Combination Vaccination for Prevention of Haemophilus Influenzae type B, Diphtheria, Pertussis and Tetanus, *Vaccine Bulletin*. December, 1993,  pp. 1 - 7.

45.  Hay J. and Kizer K.  "Medi-Cal Expenditures for Persons with AIDS," *AIDS and Public Policy Journal*, Vol. 8, No. 2, Summer, 1993, pp. 91-102.

46.  Hay, J.: "Incorporating Pharmacoeconomics into your Business Plan," *Managed Health Care Pharmacy* Vol. 1, No. 4., December, 1993, pp. 11-13.

47.  Hay J. and Wolak F. "A Procedure for Estimating the Unconditional HIV Infection Distribution and Its Variability." *Journal of the Royal Statistical Society, Series C: Applied Statistics*, 1994, Vol. 43, No. 4, pp. 599-624.

46.  Bozzette S., Parker R. and Hay J. "A Cost Analysis of Approved Antiretroviral Strategies in Advanced Human Immunodeficiency Virus Disease," *Journal of AIDS*, Vol. 7, 1994, pp. 355-362.

47.  Ernst R., and Hay J. "The Economic and Social Costs of Alzheimer's Disease Revisited," *American Journal of Public Health*, Vol. 84, No. 8, August, 1994, pp. 1261-64.

48.  DiMasi, J., Mitchell, J., and Hay, J.  "The Cost of Drug Development," *Pharmacy and Therapeutics*, Vol 19,  No. 1, January, 1994, pp. 68-80.

49.  McCombs, J, Nichol M, Johnson, K, Hay, J, Ebin, V, Lawrence G, Schneider, J.  The Health Care Reformation and Pharmaceutical Care: Is Pharmacy's Vision Too Narrow? *American Journal of Health-Systems Pharmacy,* Vol.. 52, June 1, 1995.  pp. 1208-14.

50.  McCombs, J, Cody M, Besinque K, Borok G, Ershoff, D, Groshen, S, Hay, J, et al. "Measuring the Impact of Patient Counseling in the Outpatient Setting:  The Research Design of the Kaiser Permanente/USC Patient Consultation Study," *Clinical Therapeutics*, Vol 17, No. 6, 1995. pp. 1188-1206.

51. Ashraf, TA, Hay, J, Pitt, B, Wittels, E, Crouse, J, Davidson, M, Furberg, C, Radican, L. "Cost Effectiveness of Pravastatin in Secondary Prevention of Coronary Artery Disease" *American Journal of Cardiology* Vol 78, 1996.  pp. 409-414.

52.  Hay, J, Ernst, R, Meissner C.  "Respiratory Syncytial Virus Immune Globulin: A Cost Effectiveness Analysis," *American Journal of Managed Care* Vol 2, No. 2, 1996. pp. 851-861.

53.  Ernst, R, Hay, J, Fenn, C, Tinklenberg, J, Yesavage, J.  "Cognitive Function and the Costs of Alzheimer's Disease: An Exploratory Study," *Archives of Neurology*, Vol. 54, 1997. pp. 687-693.

54.  Ernst, R, Hay, J. "Economic Research On Alzheimer Disease: A Review of The Literature," *Alzheimer Disease and Associated Disorders*,  1997. Vol. 11, Suppl 6, pp. 135-145.

55.  Hay, J. Sano. M., Whitehouse, P.   The Cost and Social Burdens of Alzheimer Disease Alzheimer Disease.  Editorial. *Alzheimer Disease and Associated Disorders*,  1997. Vol. 11, No. 4, pp.1-3.

56.  Clark, F. Azen, S, Zemke, R, Jackson J, Carlson, M, Mandel, D, Hay, J, et al.  Occupational Therapy for Independent-Living Older Adults: A Randomized Controlled Trial.  *JAMA*, . 1997; Vol. 278  pp. 1321-1326.

57.  Hay, J, Yu, W, Ashraf, T.  "Pharmacoeconomics of Lipid-lowering Agents for Primary and Secondary Prevention of Coronary Heart Disease," *Pharmacoeconomics,* 1998; Vol. 15, No. 1, pp.47-74.

58.  Hay, J. and Schwartz, S.  "The ISPOR Lipid Conference," *Value in Health* 1998.  Vol. 1, No. 2.  pp. 95-99.

59.  Hay, J. Ernst, R., Kessler, G. "Cost-effectiveness analysis of alternative factor VIII products in treatment of hemophilia A," *Haemophilia,* 1999, Vol. 5, pp. 191-202.

60.  Hay, J.  "Economic Modeling and Sensitivity Analysis." *Value in Health* 1998; 1(3) pp.187-193.

61.  Hay, J. and Ernst, R.  "A Direction for *Value in Health*," *Value in Health* 1998. Vol 1, No. 3, pp. 149-154.

62.  The International Working Group on Alzheimer's Disease. First International Pharmacoeconomic Conference on Alzheimer's Disease: Report and Summary. *Alzheimer Disease and Associated Disorders,* 1998. Volume 12, No. 4, pp. 266-280.

63.  McCombs JS, Cody M, Parker JP, Johnson KA, Besinque K, Borok G, Ershoff D, Groshen S, Hay J, Nichol MB, Nye MT.  The Kaiser Permanente/USC Patient Consultation Study: Change in Use and Cost of Health Services. *Am J Health-Syst Pharm* 1998. Vol. 55, No. 2, pp. 2485-99.

64.  Hay, J. and Yu, W.  "Drug Patents and Prices, Can We Achieve Better Outcomes?"  in Triplett J, ed. *Measuring the Prices of Medical Treatments*, Brookings Press, Washington, DC. 1999, pp.152-195.

Joel W. Hay, Ph.D. -- C.V.                          -20-                                    4/1/08

65. Hay J, Jackson J. Methodological Issues in Conducting Pharmacoeconomic Evaluations—Modeling Studies. *Value in Health*, 1999.  Vol. 2 (No. 3), pp.78-81.

66. Hay J. "Health Care Costs and Outcomes: How Should We Evaluate Real World Data?" *Value in Health*, 1999.  Vol. 2 (No. 6), 417-20.

67. Hay, J, Yu, W.  Prevalence, Patient Awareness, and Treatment of Dyslipidemia in the Diabetes Mellitus Population.  *Drug Benefit Trends*, 1999.  Suppl  pp. 6-11.

68. Liu, G. and Hay, J. "An Economic Cost Analysis of Oral Ganciclovir Prophylaxis for the Prevention of CMV Disease," *Pharmaceutical Research*. 2000, 17(8): pp. 909-917.

69. Marcy M, Takata G, Chan LS, Shekelle P, Mason W, Wachsman L, Ernst R, Hay JW, Corley PM, Morphew T, Ramicone E, Nicholson C. Management of acute otitis media. *Evid Rep Technol Assess*. 2000 Jun;(15):1-4.

70. Hay J, Yu W. Pharmacoeconomics and Outcomes Research: Expanding the Health Care "Outcomes" Market.  *Value in Health*, 2000.  3(3).  pp. 181-185.

71. Hay J. Commentary: Cost-Effectiveness of Treating Hyperlipidemia in the Presence of Diabetes: Who Should Be Treated?  *Journal of Evidence-Based Healthcare*. 2001.  5(1): pp.  27-29.

72. Hay, J. Pharmacoeconomic Guidelines:  Where do we go from here?" *Value in Health*, 2001.  4(3):211.

73. Clark, F. Azen, S, Carlson, M, Mandel, D, LaBree L, Hay, J, Zemke, R, Jackson J, Lipson L. . Embedding health-promoting changes into the daily lives of independent-living older adults: Long-term follow-up of occupational therapy intervention.  *Journal of Gerontology: Psychological Sciences*, 2001. 56B:60-63.

74. Hay J. "Conjoint Analysis in Pharmaceutical Research." *Journal of Managed Care Pharmacy* 2002; 8(3), pp. 206-209.

75. Hay J, LaBree L, Luo R, Clark, F, Carlson M, Mandel D, et al.  "Cost Effectiveness of Preventive Occupational Therapy for Independent Living Adults." *Journal of the American Geriatrics Society*. 2002 50(8):1381-1388.

76. Hay, J.  Pharmacoeconomics of Lipid Management.  *Managed Care Consultant*, January, 2002.  2(2): 54-64.

77. Boone J, Hay J, Aguanno J, Getzen T, Hortin G.  Are the Correct Economic Factors Influencing Point-of-Care Testing?  *Point of Care*; 2002 Vol. 1, #3, pp.212-221.

78. Hay, J.  Long-term pravastatin treatment has sustained benefits for people with coronary heart disease.  *Evidence-Based Cardiovascular Medicine*, December, 2002; 6:146-47.

79. Hay, J. "Expensive Medical Conditions," *Health Affairs*, November/December 2002: 21(6):271-72.

80. Knapp KK, Ray MD. (for the Pharmacy Research Roundtable, J Hay member).  A pharmacy response to the Institute of Medicine's 2001 initiative on quality in health care. *Am J Health-Syst. Pharm*. 2002;59:2443-50

81. Hay, J. "Recent U.S. Trends in Lipid Medication Use: 1998-2001." *Cardiology Review*, April 2003. 20(4) Suppl: 35-37.  .

82. Chiou C-F; Hay J; Wallace J, Bloom B; Neumann P, Sullivan S, Yu H-T, Keeler E, Henning J, Ofman J. Development and Validation of A Grading System for the Quality of Cost-Effectiveness Studies. *Medical Care* 2003; 41:32–44.

83. Ofman J, Sullivan S, Neumann P, Chiou C-F, Henning J, Hay J. Examining The Value and Quality of Health Economic Analyses: Implications of Utilizing The QHES. *Journal of Managed Care Pharmacy*, 2003; 9(1):53-62.

84. Yuan Y, Hay J, McCombs J. Mortality and Hospitalization Impacts Of Pharmacy Consultation In Ambulatory Care. *American Journal of Managed Care*. 2003; 9(1):101-112.

85. Forrest S, Goetghebeur M, Hay J. "Understanding the Underlying Drivers of Inpatient Cost Growth: A Literature Review. *American Journal of Managed Care*. 2003, 9(S1):S3-S13.

86. Hay J. "Hospital Cost Drivers: An Evaluation of 1998-2001 State-Level Data." *American Journal of Managed Care*. 2003, 9(S1):S14-S24.

87. Etemad L, Hay J. Cost Effectiveness Analysis of Pharmaceutical Care in a Medicare Drug Benefit Program. *Value in Health*. 2003, 6(4):425-435.

88. Hay J. Evaluating the Cost-Effectiveness of Statins. *Journal of Managed Care Pharmacy*. 2004; 10(1): 569-71.

89. Chen L, Hay J. Cost-Effectiveness of Implanted Cardioverter Defibrillator for Sudden Death Prevention in Congestive Heart Failure. *Journal of Cardiovascular Drugs and Therapy*. 2004; 18(2): 161-170.

90. Dwight-Johnson M, Largomarsino I, Aisenberg E, Hay J. "Understanding Depression Treatment Preferences among Low-Income Latinos using Conjoint Analysis". *Psychiatric Services* 2004;55(8):934-37.

91. Purdy K, Hay J, Botteman M, Ward J. "Cost-Benefit Analysis of Selective Strategies for use of Acellular Pertussis Vaccine in Adolescents and Adults." *Clinical Infectious Diseases* 2004; 39:20–28.

92. Hay J. "Evaluation and Review of Pharmacoeconomic Models." *Expert Opinion on Pharmacotherapy*, 2004; 5(9):1867-80.

93. Pharmacy Practice Research Roundtable (J Hay, member). Advancing Pharmacy Practice Through Research: A 2004 Perspective. *J Am Pharm Assoc*. 2004;44:621–628.

94. Narayan S, Hay J. Cost-effectiveness of generic Ritalin® (methylphenidate) versus generic Adderall® (amphetamine/dextroamphetamine mixed salts) for first-line treatment of attention deficit/hyperactivity disorder (ADHD) in children. *Expert Review of Pharmacoeconomics & Outcomes Research*, 2004; 4(6):1-8.

95. Hay J. The Cost Effectiveness of Cardiovascular Medicines. *Current Atherosclerosis Reports,* 2005, 7:79-80.

96. Hay J, Sterling K. "Cost Effectiveness Analysis of Fibrates for Dyslipidemia." *Pharmacoeconomics*. 2005; 23(2):133-141.

97. Letourneau-Wagner J, Hay J. "The Cost Impacts of Vaccination in the United States: An Overview." *Managed Care Consultant* 2005; 4[2]:11-25.

98. Hay J. "Application of Cost Effectiveness and Cost Benefit Analysis to Pharmaceuticals." Chapter 14 in Santoro M, Gorrie T, eds. *The Grand Bargain: Ethics and the Pharmaceutical Industry In the 21st Century*. Cambridge University Press, New York NY, 2005:225-248.

99. Fitzner K, Fox K, Schmidt J, Roberts M, Rindress D, Hay J. Implementation and Outcomes of Commercial Disease Management Programs in the United States: the Disease Management Outcomes Consolidation Survey. *Disease Management Journal 2005;* 8(4):253-64.

Joel W. Hay, Ph.D. -- C.V.                    -22-                            4/1/08

100. Hay J. "Appropriate Econometric Methods for Pharmacoeconometric Studies of Retrospective Claims Data: An Introductory Guide." *J Managed Care Pharmacy*. 2005; 11(4): 344-348.

101. Hay J, Ward J. Economic Considerations For Pertussis Booster Vaccination In Adolescents. *Pediatric Infectious Disease Journal* 2005; 24(6): S127-S133.

102. Hay J, Leahy M. "Cost Effectiveness of Oral Antihistamines in the California Medi-Cal Program." *Value in Health* 2005; 8(4):506-16.

103. Zhang L, Hay J. "Cost Effectiveness Analysis of Rizatriptan and Sumatriptan versus Cafergot in the Acute Treatment of Migraine." *CNS Drugs* 2005; 19(7): 635-642.

104. Forrest S, Goetghebeur M, Hay J. Medicare Part B coverage and reimbursement of outpatient prescription drugs: impact of current policy on clinical practices and health care expenditures. *Applied Health Economics and Health Policy* 2005; 4(1):9-14.
.

105. Hay J. "Where's the Value in Health Care?" *Value in Health*; 2006; 9(2):11-14.

106. Stephens JM, Botteman MF, Hay JW. "Impact of Antidiabetic Medications on Utilization, Costs, and Glycemic Control within Managed Care Organizations: A Review of the Literature." *J Managed Care Pharmacy* 2006; 12(2):130-142.

107. Botteman M, Barghout V, Stephens J, Hay J, Brandman J, Aapro M. Cost effectiveness of bisphosphonates in the management of breast cancer patients with bone metastases. *Annals of Oncology*, July 2006; 17: 1072-1082.

108. Spalding J, Hay J. "The Cost-Effectiveness of Tumor Necrosis Factor Alpha Inhibitors as First-Line Agents in Rheumatoid Arthritis." *Pharmacoeconomics* 2006; Vol. 24 (12): pp. 1221-1232.

109. Hay J. "Comment on Comparing Patient Access to Pharmaceuticals in UK and US. *Applied Health Economics and Health Policy* 2006; Vol. 5 (4): pp. 269-270(2).

110. Botteman MF, Hay JW, van Hout BA, Curry A, Wong R, Luo MP. Cost effectiveness of Adalimumab Therapy vs. Conventional Care in UK Patients with Active Ankylosing Spondylitis (AS). *Rheumatology* 2007 46(8):1320-1328.

111. Hay J, Rindress D, Editors. *Disease Management Principles and Practices: The Current State of the Art*. Disease Management Association of America, Washington, DC. 2007

112. Liou SY, Stephens JM, Carpiuc KT, Feng W, Botteman MF, Hay JW. Economic Burden of Haematological Adverse Effects in Cancer Patients A Systematic Review. *Clinical Drug Investigations* 2007; 27 (6): 381-396.

113. Costanzo MR, Johannes RS, Pine M, Gupta V, Saltzberg M, Hay J, Yancy CW, Fonarow GC. "Effects of intravenous therapies on outcomes of inpatients with acutely decompensated heart failure: A propensity analysis using the ADHERE database." *American Heart Journal*. July, 2007; 154: 267-277.

114. Zeiger Robert, Hay Joel, Contreras Richard, Chen Wansu, Quinn Virginia, Seal Brian, Schatz Michael, "Risk-Stratified Medical Costs for Asthma Patients in a Managed Care Organization (MCO)." In press, *J Allergy and Clinical Immunology* .

115. Yuan Y, Iloeje U, Hay J. Long-Term Cost Effectiveness of Entecavir in Suppressing Viral Replication in Chronic Hepatitis B (CHB) Patients Compared with Lamivudine." In press, *J Managed Care Pharmacy*.

116. Yong Y, Iloeje U, Li H, Hay J, Yao GB. Economic Implications Of Entecavir Treatment In Suppressing Viral Replication In Chronic Hepatitis B (Chb) Patients In China. In press, *Value in Health*.

117. Gabel J, Hay J, Fahlman C, Kletke P, Kang R. Specialty Hospitals, and Ambulatory Surgery Centers, and Their Effect on the Medical Marketplace. Forthcoming, *Health Affairs*.

118. Hay JW, Scranton R, Yucel K, Guo A, Balzer T, Gaziano J. "Cost Impact Of Diagnostic Imaging For Lower Extremity Peripheral Vascular Disease (PVD)." Forthcoming, *Value in Health*.

119. Hay J. "Prices and Innovation in Pharmaceuticals and Biotechnology" in Kent Summers, Irene Farquhar, ed. *The Value of Innovation: Impacts on Health, Life Quality, and Regulatory Research*. Forthcoming book. Emerald Group Publishing Limited, Bingley, U.K.

120. Marschall D, Aidelsburger P, Zammit D, Yuan Y, Hay J. Cost-Effectiveness of Entecavir versus Lamivudine in the Treatment of Patients With HBeAG-Negative Chronic Hepatitis B in the German Health Care System. Submitted.

121. Scranton R, Dhingra R, Lawler E, Hay JW, Yucel K, Guo A, Balzer T, Gaziano J. "Clinical Impact Of Diagnostic Imaging Of Lower Extremity Peripheral Vascular Disease." Submitted.

122. Lescrauwaet B, Zammit D, Yuan Y, Hay, J.The Cost-Effectiveness of Entecavir 0,5 mg in the treatment of Nucleoside-Naïve Chronic Hepatitis B Patients in Belgium. Submitted

123. Hay J, Wentworth C, Kletke P, Kang R, Gabel J, Fahlman C. "Impact of Specialty Hospitals and Ambulatory Surgery Centers on Health Plan Enrollee Medical Costs." Submitted.

124. Hay J, Zammit D, Scheider L. "Stated Preferences and Willingness to Pay for Treatment Attributes Among Alzheimer Disease Caregivers: Validation of the HUI-3 Utility Scale." Submitted.

125. Hay J, Zammit D. "Strategies to Enhance the U.S. Vaccine Market." To be submitted.

**TECHNICAL REPORTS:**

T1. Hay, J. and Wolff, E.: "Educational Screening and Occupational Earnings," National Bureau of Economic Research Working Paper No. 174, New York, 1976.

T2. Hay, J.: "Physician Specialty Choice and Specialty Earnings," Final Report on Doctoral Research Grant #OASH 03150, National Center for Health Services Research, 1980.

T3. Yett, D., Der, W., Ernst, R., and Hay, J.: "Physician Pricing and Health Insurance Reimbursement," Final Report on Contract #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, Health Care Financing Administration, 1982.

T4. Hay, J. and Gareis, J.: "Pollution Dose-Response Curves at the Micro Level," final report on Contract #68-01-0543, Work Assignment #20, U.S. Environmental Protection Agency, 1983.

T5. Hay, J.: "An Introduction to Cost-Benefit and Cost-Effectiveness Analysis of Pharmaceuticals," Final Report to Rescon, Inc., Tysons Corner, Virginia, 1984.

T6. Hay, J., Leu, R., Rohrer, P. and Doppman, R.: "A Monte Carlo Investigation of Sample Selection Models with Application to Health Care Demand Estimation." Hoover Institution Working Papers in Economics, E-85-29, Stanford, CA, December, 1985.

T7. Welch, B., Hay, J., Miller, D., Olsen, R. Rippey R., and Welch, A.: "The Rand Health Insurance Study: A Critique." Hoover Institution Working Papers in Economics, E-86-36, Stanford CA, August, 1986.

T8. Wilensky, G., Garrison, L., Hay, J., Anderson, G., Reynolds, R., Headen, A. Schoenman, J.: Study of the

Impact of Increasing Physician Supply. Final Report, Contract No. HHS-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, Office of the Assistant Secretary for Planning and Evaluation, Department of Health and Human Services, Washington, D.C., March, 1987.

T9.  Hay, J., and Ernst, R.: "The Economic Costs of Alzheimer's Disease." Hoover Institution Working Papers in Economics, E-87-18, Stanford CA, April, 1987.

T10. Hay, J.: "Econometric Issues in Modeling the Costs of AIDS." Hoover Institution Working Papers in Economics, E-88-36, Stanford CA, October, 1988.

T11. Ernst, R. and Hay, J. *Estrogen Replacement Therapy: A Review of the Literature*, Report to Ciba-Geigy, Inc., Summit, NJ, October, 1988.

T12. Hay, J. *Therapeutic Substitution and the Cost-effectiveness of Medication in Treatment of Acute Muscle Spasm Back Injury*. Report to Merck, Sharpe and Dohme, Inc., West Point, PA, October, 1988.

T13. Hay, J.: "Projecting the Medical Costs of HIV/AIDS: An Update with Focus on Political Epidemiology." Hoover Institution Working Papers in Economics E-89-17, Stanford CA, June, 1989.

T14. Hay, J. and Wolak, F. "Bootstrapping HIV/AIDS Projection Models: Back Calculation with Linear Inequality-Constrained Regression." Hoover Institution Working Papers in Economics, E-90-5, Stanford CA, February, 1990.

T15. Hay, A. and Hay, J. "*Urinary Tract Infections: Diagnosis, Treatment and Cost-of-Illness Algorithms*." Report to Abbott Laboratories, Chicago IL, May, 1990.

T16. Hay, J. *Cost Effectiveness of Calcium Channel Blockers,* Report to Lederle Laboratories, Wayne, NJ, February, 1991.

T17. Hay, J., Osmond, D. and Wolak, F. *Projecting the Costs of AIDS and ARC in the United States,* Final Report, Grant No. HS 06092-01, Agency for Health Care Policy and Research, Public Health Service, U.S. Department of Health and Human Services, published by the National Technical Information Service, Springfield, VA, 1991.

T18. Hay, J., Ernst, R. *Alzheimer's Disease Cost of Illness: An Update,* Report to Parke-Davis Division of Warner-Lambert Co., Morris Plains, NJ, May, 1991.

T19. Hay, J., Ernst, R. *Cancer Costs of Illness,* Report to Bristol Meyers Squibb Pharmaceuticals, Evansville, IN, September, 1991.

T20. Hay, J., Max W. *Cost-Effectiveness Evaluation of Alzheimer's Disease Medications,* Report to Hoechst-Roussel Pharmaceuticals, Sommerville, NJ, October, 1991.

T21. Bozzette, S., Hay, J. *Cost-Effectiveness of ddI under Current FDA Marketing Indications,* Report to Bristol Meyers Squibb Pharmaceuticals, Evansville, IN, December, 1991.

T22. Hay, J., and Ernst, R. *Cost-Effectiveness of Ticlopidine vs Aspirin in Stroke Prevention,* Report to Syntex Laboratories, Palo Alto, CA, January, 1992.

T23. Hay, J., and Ernst, R. *Cost-Effectiveness of Oral Keterolac vs Narcotics for Outpatient Analgesia.* Report to Syntex Laboratories, Palo Alto, CA, March, 1992.

T24. Khedheri, S, and Hay, J. *Price Controls: An Interindustry Policy Analysis*, Report to Bristol-Meyers Squibb, Princeton, NJ, March, 1993.

T 25. Hay, J, Ernst, R.  *Cost Effectiveness Analysis of Oral vs. IV Etoposide in Combination Cancer*

*Chemotherapy.* Report to Bristol-Meyers Squibb, Princeton, NJ, October, 1993.

T26. Hay, J., Ernst, R, and Meissner, C. *Cost Effectiveness of Respiratory Syncytial Virus Immune Globulin Prophylaxis.* Report to Medimmune, Gathersburg, MD, November, 1993.

T27. Hay, J., Ashraf, T. *Cost Effectiveness Analysis of Human Erythropoietin Treatment of Chemotherapy-Induced Anemia.* Report to Ortho-Biotech, New Brunswick, NJ, October, 1994.

T28. Hay, J, Ernst, R. *Cost Effectiveness of Alternative Factor VIII Products in Treatment of Hemopilia A.* Report to the American Red Cross, New York, NY, December, 1994.

T29. Schroeder, V., and Hay, J.  "The Pravachol Cost of Care Model:  Technical Summary.  Report to Bristol-Myers Squibb, Plainsboro, NJ, February, 1997.

T30. Ernst, R, Hay, J. Quality of Life in an Alzheimer Caregiver Intervention Demonstration Project.  Final Report. NIH Grant No. 3-RO1-MH42216-08S1.  December, 1998.

T31. Hay, J, Luo, R, Ernst, R.  Cost of Treatment in an Alzheimer Caregiver Intervention Demonstration Project. Final Report. NIH Grant No. 3-RO1-MH42216-08S1. December, 1998.

T32. Hay, J, Ernst, R, Luo, R.  Cost Effectiveness of an Alzheimer Caregiver Intervention Demonstration Project. Final Report. NIH Grant No. 3-RO1-MH42216-08S1. December, 1998.

T33. Hay J.  Retail Pharmacy Pricing Variation in the U.S. and Canada.  Report to Abbott Laboratories, Evanston, IL. June, 2000.

T34. Hay J.  Chemotherapy-Induced Neuropathy: Costs and Quality of Life Impacts.  Report to Aventis Pharmaceuticals, Bridgewater, NJ, 2001.

T35. Hay J.  "Hospital Cost Drivers:  An Evaluation of State-Level Data."  Report to Blue Cross and Blue Shield Association, Chicago, IL, 2002.

T36. Forrest S, Goetghebeur M, Hay J. "Hospital Expenditure Growth in the United States 1990-2002: Findings from the Literature. Report to Blue Cross and Blue Shield Association, Chicago, IL, 2002.

T37. Forrest S, Goetghebeur M, Hay J.  Medicare Part B coverage and reimbursement of outpatient prescription drugs: impact of current policy on clinical practices and health care expenditures. Report to Abbott Laboratories, Abbott Park, IL. June 2003.

T38. Hay J.  Health Economics and Outcomes Research Development Plan for Alzheimer disease and ADHD compound.  Report to Abbott Laboratories, Abbott Park IL.  September 2003.

T39. Hay J, Roberts M, Wentworth C.  Drivers of U.S. health care cost components:2000-2002.  Report to the Blue Cross and Blue Shield Association, Chicago, IL, 2004.

T40. Hay J, Zammit D. "Stated Preferences and Willingness to Pay for Treatment Attributes Among Alzheimer Disease Caregivers:  Validation of the HUI-3 Utility Scale." Report to the State of California Alzheimer Research Centers, Sacramento, CA.  April, 2005.


**OTHER PUBLICATIONS:**

O1. Hay, J. and Buckels, J.: "Cost-Effectiveness: Antimicrobial Prophylaxis in General Surgery," in *Infection: A Complication of Surgery...Preventive and Management Techniques;* MedEd, Ltd., Wilton, CT, 1987.

O2. Hay, J.: "An Introduction to Cost Effectiveness/Cost Benefit Analysis in Hospital Pharmacy Cost

Containment," *Occasional Papers on Topics of Special Interest to Hospitals,* Lederle Laboratories, Wayne, NJ, 1987.

O3. Hay, J.: "Pharmaceutical Cost Benefit/Cost Effectiveness Analysis in the Hospital Setting," *Occasional Papers on Topics of Special Interest to Hospitals, Report #2,* Lederle Laboratories, Wayne, NJ, 1987.

O4. Hay, J.: "AIDS Epidemiology: A View From the Outside," in *The Economics of Health Care: Challenges for the Nineties,* Health Care Section, Center of Domestic and Comparative Policy Studies, Woodrow Wilson School of Public and International Affairs, Princeton University and Bristol-Meyers Squibb Company, 1990, pp.80-84.

O5.  Hay, J.  "Comment: Evaluation of Pharmacoeconomics Studies," *Annals of Pharmacotherapy*, April, 1994, Vol. 28, pp. 539-40.

O6.  Hay, J. "Incorrectly Framing Pharmacoeconomics." Letter; *American Journal of Hospital Pharmacy,* June, 1994, Vol 51, # 11, pp. 1473-74.

O7.  Gotto, A., Hay, J "Costs of Lipid-Lowering Statin Drugs,"  Readers' Comments, *American Journal of Cardiology*, January 15, 1996, Vol. 77, pp. 225-226.

O8.  Hay, J. "Commentary: The Scope of the AIDS Epidemic in the United States," *JAMA HIV/AIDS Journal Scan* Website, January, 1996.

O9. McCombs, J, Nichol M, Johnson, K, Hay, J, Ebin, V, Lawrence G, Schneider, J. La Visione del Futuro della Farmacia è troppo limitata?  *Pro Pharmacopœa Supplemento Redazionale a L'Informatore Farmacuetico-Aggiornamento*  Vol. 3 # 1, 1996;  pp. 17-24.

O10.  Ernst, R, Hay, J, Fenn, C, Tinklenberg, J, Yesavage, J.  "Reply:  Cognitive Function and the Costs of Alzheimer's Disease: An Exploratory Study," *Archives of Neurology*, Vol. 55, 1998.

O11. Gotto,A, Grundy, S, et al. Lowering LDL Cholesterol:Questions From Recent Meta-Analyses and Subset Analyses of Clinical Trial Data Issues From the Interdisciplinary Council on Reducing the Risk for Coronary Heart Disease, Ninth Council Meeting.  *Circulation*. 1999;99:E1-E7.

O12. Interdisciplinary Council on Reducing the Risk (J Hay member).  Highlights from the 10th Anniversary Meting: A New Look at Primary Prevention.  December, 1999.

O13. Hay, J, Yu, W, Ashraf, T.  "Pharmacoeconomics of Lipid-lowering Agents for Primary and Secondary Prevention of Coronary Heart Disease," In: Prakash A, editor. *Preventing coronary heart disease.* Auckland: Adis International Ltd, 2000: pp. 49-77

O14. Hay, J.  "Pharmacist Medication Review Study Design Concerns,"  Rapid Response Letter, *BMJ*, January 28, 2005. (http://bmj.bmjjournals.com/cgi/eletters/bmj.38338.674583.AEv2).

O15. Hay, J. "The Author's Reply to Comment on "Where's the Value in Health Care?" Value in Health 10 2007.


**BOOK REVIEWS, OP-EDS & LETTERS, ETC.:**

Hay, J.: "Comment on: The Influence of Economic Instability on Health:  Proceedings," edited by J. John, D. Schwefel, and H. Zollner. *Kyklos,* Vol. 37, No. 2 (1984), pp. 322-323.

Hay, J. and Ricardo-Campbell, R.: "The Rand Health Insurance Study," Letter to the Editor, *The Lancet,* Vol. II:8498 (7/12/86), pg. 106.

Hay, J.: "Vouchers Take the Catastrophe out of Catastrophic Care," Editorial Page, Camden Courier, May 1, 1987.

Hay, J.: "Time to Try to Bridge Gaps in Health Care for the Elderly," Editorial Page, Hartford Courant, May 13, 1987.

Bernstam, M., Hay, J. and Swan, P.: "Minimum Wage: Bulwark of the Privileged," Editorial Page, Wall Street Journal, June 15, 1987.

Hay, J. and Bernstam, M.: "Raising Minimum Wage Hurts Teens, Minorities," Point of View, San Francisco Chronicle, August 17, 1987.

Bernstam, M. and Hay, J.: "At the Minimum, Wage Law Will Reduce Jobs for Youth," Editorial Page, Orange County Register, December 23, 1987.

Bernstam, M. and Hay, J.: "California Panel Opens a Pandora's Box on Minimum Wage," Editorial Page, San Diego Union, February 14, 1988.

Hay, J.: "Trojan Horse: Dukakis' Health Plan is a Disaster," Editorial Page, San Jose Mercury News, August 11, 1988.

Hay, J.: "The 'Dream' That Will Break Massachusetts: Dukakis' Health-Care Plan No Way to Help the Poor," Editorial Page, Los Angeles Herald Examiner, August 28, 1988.

Hay, J. and Ricardo-Campbell, R.: "A Health Plan to Make Business Sick," Editorial Page, Hartford Courant, October 30, 1988.

*Oncology,* "Commentary: Government Estimates on AIDS Too High," (adapted from J. Hay) Volume 2, Number 11, (November 1988), pg. 34.

Hay, J.: "Let's Not Exaggerate the Costs of AIDS," Editorial Page, Newsday, February 9, 1989.

Hay, J.: "AIDS Won't Break the Health-Care System," Editorial Page, Omaha World-Herald, February 12, 1989.

Hay, J.: "AIDS Isn't Bankrupting our Health-care System," Editorial Page, Sacramento Bee, February 13, 1989.

Hay, J.: "AIDS Costs Will Not Sink Health Budget," Editorial Page, San Jose Mercury News, March 8, 1989.

Hay, J.: "The Battle Against AIDS: Some of the Earlier Assumptions are Overdue for Reexamination," Editorial Page, San Diego Union, April 9, 1989.

Hay, J.: "The Good News About AIDS," Viewpoints, New York Newsday, May 18, 1989.

Hay, J.:"AIDS Infection Data Difficult to Refute," Letters to the Editor, Wall Street Journal, June 28, 1989.

Hay, J.:"Is Too Much Being Spent on AIDS?" Editorial Page, Wall Street Journal, October 3, 1989.

Hay, J.:"AIDS Epidemic: Falling Short of Projections?" Editorial, Texas Tribune, Austin, TX, November 9, 1989.

Hay, J.:"Crossings Dangerous," Letters to the Editor, Peninsula TimesTribune, December 3, 1989.

Hay, J.: "American Medicine: Should We Save Lives or Dollars?" *The Commonwealth*, The Weekly

Newsletter of the Commonwealth Club of California, April 2, 1990; pp. 186-189.

Hay, J.: "Healthcare Policy Directions," The Executive Speaker, Vol. 11, No. 8 (August, 1990); pg. 2.

Hay, J.: "Is Hong Kong Ready for Free Market Health Care?" HKCER Letters, Hong Kong Center for Economic Research, (November, 1990), pp. 1-4.

Hay, J.: "Cocaine Abuse is Not a Victimless Crime," Editorial, The Los Angeles Daily Journal, Los Angeles, CA, and The San Francisco Daily Journal, San Francisco, CA, January 8, 1991.

Hay, J.: "Commentary: Cost-Effectiveness of Strategies for Detecting Diabetic Retinopathy," *Diabetes Spectrum,* Vol 5(2), March/April, 1992, pp. 109-110.

Hay, J:  "World Bank's Loan Won't Cure Hungary," The Wall Street Journal, Europe, July 15, 1992.

Hay, J.  "Amid Lofty Goals Lie Plethora Of Health-Care Myths," Los Angeles Daily News, September 26, 1993.

Hay, J. "Bitter pill: One reason prescription drugs cost more in California,"  Opinion, San Jose Mercury News, February 6, 2002.

Hay, J. "Allergy Drug-Cost Fight Carries Potential Risks,"  Letter to the Editor, Wall Street Journal, May 23, 2003.

Hay, J. "Buying in Canada Won't Cut Drug Costs," Editorial, Los Angeles Times, August 31, 2004.

**EDITORIAL BOARDS**

| | |
|---|---|
| The Open Health Services & Policy Journal | 2007-present |
| Expert Review of Clinical Pharmacology | 2007-present |
| CORE Evidence | 2005-present |
| Journal of Managed Care Pharmacy | 2004-present |
| Journal of Cardiovascular Pharmacology and Therapeutics | 1995-present |
| Value in Health    Founding Editor in Chief   1998-2002 | |
| JAMA HIV/AIDS Web Site Editorial Review Panel 1995-2001 | |
| PharmacoEconomics | 1992-1999 |
| Annals of Pharmacotherapy: | 1992-1997 |
| Pharmaceutical Research: | 1992-1997 |

**JOURNAL REFEREE:**

AIDS, American Journal of Cardiology, American Economic Review, American Heart Journal, American Journal of Public Health, Annals of Pharmacotherapy, Archives of Pediatrics and Adolescent Medicine, Cardiovascular Drugs and Therapy, Chest, Clinical Pharmacokinetics, Clinical Therapeutics, CNS Drugs, Consultant, Drugs and Aging, Eastern Economic Journal, Econometric Reviews, Epilepsia, Evaluation and the Expert Opinion on Pharmacotherapy, Health Professions, Gerontology, Health Affairs, Health Care Financing Review, Health Economics, Health and Quality of Life Outcomes, JAMA, Journal of Applied Econometrics, Journal of Econometrics, Journal of Environmental Management, Journal of Epidemiology and Community Health, Journal of Gerontology: Social Sciences, Journal of Health Politics, Policy and Law, Journal of Human Resources, Journal of Medical Education, Journal of Public Economics, Journal of Public Health Dentistry, Journal of the American Medical Association, Journal of the American Statistical Association, Journal of Epidemiology & Community Health, Journal of Managed Care Pharmacy, Medical Care, Medical Decisionmaking, Milbank Memorial Fund Quarterly, Nature Reviews Drug Discovery, New England Journal of Medicine, Obstetrics & Gynecology, Pediatric Drugs, Pediatrics, PharmacoEconomics, Priorities, Research in Population Economics, Review of Economics and Statistics, Social Science and Medicine, Southern Economic Journal, Topics in Hospital Pharmacy Management, Vaccine.

**BOOK MANUSCRIPT REFEREE:**

2006

Lisa Gordon
Editorial Assistant
Jones and Bartlett Publishers
lgordon@jbpub.com

**SCIENTIFIC CONFERENCE ORGANIZATION AND DEVELOPMENT**

2007

American Society of Health Economics Meeting Organizer, Duke University, Durham, NC.

2005

Scientific Advisory Committee, Third NIMH Pharmacoeconomics Workshop: MMA03 and Psychotropic Medications

2004-2005

Scientific Track Evaluation Panel; Disease Management Association of America Annual Conference.  Orlando, FL.

2001-2003

International Health Economics Association 4th World Congress, San Francisco; Local Organizing Committee Member

1996-1998

Co-Chair and Primary Organizer: ISPOR Lipid Pharmacoeconomics Conference.  Orlando, FL.

Joel W. Hay, Ph.D. -- C.V.                              -31-                                       4/1/08

## MEDIA APPEARANCES

October, 1989    Time Magazine: "A Recount of AIDS Carriers." Article about J Hay's back calculation model for estimating the number of people infected with HIV (the AIDS virus).  October 9, 1989; pg. 103.

June, 1992    "Should Marijuana be Legalized for Medicinal Purposes?" The Dr. Dean Show, NBC, San Francisco.

November, 1992 "Prescription Drug Price Inflation: What Should Be Done?"  Seniors Speak Out, KPBS, San Diego.

September, 1993 "Health Care Reform:  Access and Cost"  syndicated Public Television show.

June, 1994    "Heterosexual AIDS," Diane Crowe/Chuck Whitten Show, KAVL, Lancaster, CA.

September, 1994 "Heterosexual AIDS,"  The Dennis Praeger TV Show, Los Angeles, CA.

October, 1994    "Bias in Official Government Projections of HIV/AIDS," FOX Television News Service, New York, NY.

January - March, 1995    "**Clinicoeconomics**"  *Annenberg Center at Eisenhower* Three Part Television Series written by and featuring Joel W. Hay, Ph.D., Producer, Chuck Cox.  Part 1: Principles of Clinicoeconomics; Part 2: The Outcomes Revolution--Measuring Health Related Quality of Life; Part 3: Practice Variation and Medical Guidelines Development.  Rancho Mirage, CA.

September, 2000  "Cost Effectiveness of Statins." International Task Force for Prevention of Coronary Heart Disease. Consensus on Statins Conference Webcast: www.chd-taskforce.com

May, 2001  "Economic Considerations in Moving Second-generation Antihistamines from Prescription to OTC Status,"  CNN Headline News interview.

May, 2001  "Economics of RU-481."  Los Angeles Times interview.

April, 2002  "Pharmacy Workforce Effects of Converting from the California to the National Pharmacy Licensure Examination."  San Jose Mercury News interview.

December, 2002  ""National Issues Briefing To Examine Rising Hospital Costs," Washington Press Club Seminar covered by CSPAN http://www.kaisernetwork.org/healthcast/usnews/bcbs/02dec2002 .

October, 2005. "Drug Safety in the Aftermath of Vioxx."  Investors Business Daily interview.

January, 2007. "Democratic Medicare drug plan poised to pass House," McClatchy Newspapers, http://www.mercurynews.com/mld/mercurynews/news/politics/16393085 htm.

January, 2007. "House Passes Bill to Require Medicare Part D Price Negotiations".  Lou Dobbs Show, CNN.

January, 2007. "House Passes Bill to Require Medicare Part D Price Negotiations". Business & Media Institute (http://www.businessandmedia.org/articles/2007/20070112164308.aspx).

January, 2007.  "Pharmaceutical Industry Profitability, "  Investors Business Daily interview.

Joel W. Hay, Ph.D. -- C.V.                    -32-                              4/1/08

**PUBLIC HEARING TESTIMONY AND PRESENTATIONS:**

December 1985. "The cost implications of adding Ranitidine to the Medi-Cal Drug Formulary," Medi-Cal Drug and Therapeutics Advisory Commission Hearings, California Department of Health Services, Sacramento, CA.

April 1987. "Cost-Benefit evaluation of Haemophilus influenzae type b capsular polysaccharide vaccine" FDA Workshop on Haemophilus b Polysaccharide Vaccine, US Food and Drug Administration, Rockville, MD.

January 1990. "AIDS Case Projections for California," California AIDS Leadership Committee, California Department of Health Services, Los Angeles County, CA.

August 1990. "A Comparative Analysis of CDC and Other HIV/AIDS Projections and Recent (1990) Regional Cost Projections for California," Northern California Integrated Planning Project: HIV Epidemiology Task Force, Sacramento AIDS Foundation, Sacramento, CA.

September 1991. "Cost-Effectiveness Issues in Cholesterol Treatment of Coronary Artery Disease," Panel on Adult Treatment Guidelines for Established Coronary Artery Disease; the National Institutes of Health, National Heart, Lung and Blood Institute and the American Heart Association, Washington, D.C.

July 1992.  "Research and Demonstration Waiver Request for Kaiser-Permanente Enhanced Pharmacy Services Project,"  California State Board of Pharmacy, Burlingame, CA.

January 1994.  "The Impact of the Clinton Health Care Reforms on Small Business,"  Congressional Testimony held at Diamond Bar, California at the invitation of Hon. Jay Kim, U.S. House of Representatives.

November 1996. "The cost effectiveness of Pravastatin and the Medi-Cal Drug Formulary," Medi-Cal Drug Program, California Department of Health Services, Sacramento, CA.

May 2001. "Economic Considerations in Moving Second-generation Antihistamines from Prescription to OTC Status," presentation to the US Food and Drug Administration Committee on Non-Prescription Drugs, Gaithersburg, MD.

March 2002.  "Pharmacy Workforce Effects of Converting from the California to the National Pharmacy Licensure Examination."  Presentation to the California Assembly on AB 2165, Sacramento, CA.

Joel W. Hay, Ph.D. -- C.V.                    -33-                                    4/1/08

**RECENT CONFERENCES AND PRESENTATIONS:**

February, 1998.  "Methodological Issues in Conducting Pharmacoeconomic Evaluation—Modeling Studies" Panel Co-Chair.  ISPOR Pharmacoeconomic Guidelines Consensus Development Conference. Crystal City, VA.

May, 1998.  "Lipid Therapy Cost Effectiveness: Are All Statins Equivalent?"  Invited Plenary Session, Association of Managed Care Pharmacy Annual Meeting, Philadelphia, PA.

May, 1998. "Alzheimer Disease Pharmacoeconomic Issues," Invited Session, Association of Managed Care Pharmacy Annual Meeting, Philadelphia, PA.

May, 1998. "Hong Kong Health Care Reform," Harvard School of Public Health, Cambridge, MA.

June, 1998. "Mortality and Hospital Utilization Differences in the Kaiser/USC Pharmaceutical Care Intervention Study," University of Florida College of Pharmacy, Gainesville, FL.

July, 1998. "Alzheimer Disease Pharmacoeconomics," Invited Session, First International Conference on Alzheimer Disease Pharmacoeconomics, Amsterdam, Netherlands.

October, 1998.  "The Future of Pharmacy," Pharmacy Practice Research Roundtable Conference, San Diego, CA.

October, 1998.  "Lipid Therapy Cost Effectiveness," Calif. Society Health Systems Pharmacy, Anaheim, CA.

December, 1998.  "The US Pharmacoeconomic Methods Consensus Guidelines," ISPOR First Annual European Conference, Cologne, Germany.

March, 1999  "Lipid Therapy Costs and Outcomes," New York University Department of Cardiology Grand Rounds, New York, NY.

April, 1999  "Drug Patents and R&D Protection."  The Wallace Lectureship, Idaho State University School of Pharmacy. Pocatello, ID.

April, 1999  "Survival and Hospitalization in the Kaiser/USC Pharmaceutical Care Demonstration Project." The Wallace Lectureship, Idaho State University School of Pharmacy. Boise, ID.

May, 1999  "Cost Effectiveness Analysis of Occupational Therapy for Independent Living Elderly," ISPOR Annual Meeting, Podium Presentation. Washington, DC.

September, 1999  "Rotavirus Cost of Illness," Rotavirus Vaccine Advisory Panel, Wyeth-Ayerst, Radnor, PA.

October, 1999.  "The Cost of Lipid Therapy: A Systems Approach," Interdisciplinary Council on Cardiovascular Risk Reduction, Washington, DC.

October, 1999.  "Survival and Hospital Utilization in the Kaiser/USC Pharmaceutical Care Study,"  Kaiser Permanente Research and Evaluation Dept Seminar., Pasadena, CA.

November, 1999.  "The High Cost of Drugs and What to Do About It," Univ. of California Riverside Life Society Extension Program, Riverside, CA.

November, 1999. "Pharmacoeconomics of Epilepsy Medications," American Epilepsy Society, Orlando, FL.

February, 2000. "Rotavirus Costs of Illness," Vaccine Research Center, Harbor-UCLA Medical Center, Torrance, CA.

February, 2000. "Pharmaceutical Expenditure Growth and Medicare Outpatient Drug Benefits," Mid-Valley Independent Practice Association, Portland, OR.

April, 2000. "Alzheimer Disease Cognition Measures and Economic Costs," Invited presentation. 2nd International Alzheimer Disease Pharmacoeconomic Conference, Stockholm, Sweden.

April, 2000. "Pharmacoeconomics of Antibiotic Treatment Strategies," 10th Congress of the International Society for Infectious Disease, Buenos Aires, Argentina.

April, 2000.  "Economic Research Issues in Alzheimer Disease." State of California Alzheimer Research Centers Site Visit. Los Angeles, CA.

September, 2000.  "Cost Effectiveness of Statin Therapy." International Task Force for Prevention of Coronary Heart Disease.  Consensus on Statins Conference.  Invited Presentation.  Paris, France.

September, 2000.  "Cost Effectiveness of Statin Therapy." Interdisclipinary Council on Coronary Heart Disease.  Invited Presentation.  New York, NY.

November, 2000. "Pharmacy Retail Price Variation," Pharmaceutical Economics Seminar, UCLA School of Public Health. Westwood, CA.

March, 2001. "Choicecare: A Health Insurance Market Plan for Hong Kong. Invited Seminar, Hong Kong Hospital Authority; Hong Kong.

May, 2001. "Cost Effectiveness Considerations in Adult/Adolescent Pertussis Vaccination Strategies," Vaccine Health Advisory Group Conference, La Romana, Dominican Republic.

July, 2001.  "China's Health Care Reform,"  International Health Economics Association Meeting, York, UK.

September, 2001.  "Cost Effectiveness of Statins: Implications for the National Cholesterol Education Panel Recommendations."  Washington, DC.

November, 2001.  "Chemotherapy-Induced Neuropathy In Ovarian Cancer Cost Effectiveness."  ISPOR European Conference, Cannes, France.

March, 2002. "Conjoint Analysis of Alzheimer Disease Treatment Preferences: Preliminary Results." CCH/HSRC Methods Seminar, UCLA/NPI Center for Community Health and Health Services Research Center, Westwood, CA.

March, 2002.  "Ethics and Economics in Health Care Decision-making." USC Health Sciences Campus Seminar on Moral and Spiritual Issues in Health Care, Los Angeles, CA.

April, 2002.  "Current Status of Health Economics Checklists and Guidelines."  Academy of Managed Care Pharmacy Annual Convention, Podium Presentation, Salt Lake City, UT.

May, 2002. "Quality of life effects of chemotherapy-induced neuropathy in ovarian cancer (Abst 886)." "Neuropathy in Chemotherapy: Results of an Oncology Nurse Survey (Abst 2618)." Poster Presentations, American Society of Clinical Oncology Annual Meeting. Orlando, FL.

May, 2002. "Vaccine Reimbursement Policy in the United States: Issue Development." Institute of Medicine, National Academy of Sciences.  Washington, DC.

September, 2002. "Recent Trends in U.S. Lipid Medication Use: 1998-2002. Interdisciplinary Council on Coronary Heart Disease.  Invited Presentation.  New York, NY.

September, 2002. "Drugbusters: How to Manage your Medicine Cabinet."  Invited Roundtable Presentation. Los Angeles Times Festival of Fitness and Health.  Los Angeles, CA.

Joel W. Hay, Ph.D. -- C.V.                    -35-                                    4/1/08

October, 2002. "Recent Drivers of Hospital Inpatient Expenditure Growth." Media presentation
        sponsored by the Blue Cross Blue Shield Association, Chicago, IL.

November, 2002. "Rising Hospital Costs in California." Panel Discussion sponsored by Blue Shield of
        California, Univ. of California, Berkeley, CA.

December, 2002. "National Issues Briefing To Examine Rising Hospital Costs," Panel Discussion
        sponsored by U.S. News & World Report.  Washington, DC.

January, 2003. "What's Behind the Rise in Health Care Costs" Invited Keynote Presentation,
        Washington Business Group on Health Employer Summit.  New York, NY.

March, 2003. "High Tide for Benefits Budgets: Rising Healthcare Costs." Invited Keynote Presentation,
        BlueCross BlueShield of Illinois National Accounts Conference, San Diego, CA.

April, 2003. "Current trends and future directions of Health-Systems (Hospitals) in the US," Health
        Economics and Outcomes Research Invited Presentation, Abbott Laboratories, Evanston, IL.

May, 2003.  "U.S. Health Care Expenditure Growth:  Issues and Solutions." St. Louis Civic
        Entrepreneurs Organization, St. Louis, MO.

June, 2003. "U.S. Pharmaceutical Expenditure Growth:1999-2002" Paper presented at the International
        Health Economics Association 4'th World Congress, San Francisco, CA.

June, 2003. "Medical Market Failures and Intellectual Property" Paper presented at the International
        Health Economics Association 4'th World Congress, San Francisco, CA.

August, 2003.  "Determinants of Survival and Nursing Home Placement for AD Patients."  Paper
        presented at the International Psychogeriatrics Association Annual Meetings, Chicago, IL.

December, 2003. "Claritan's Shift to OTC Status: A Lesson for the HMOs." Paper presented at
        Pharmaceutical  Economics And Policy Seminar, UCLA Schl of Public Health, Westwood, CA.

April, 2004. "Pharmacoeconomics and Biotech."  Invited presentation at PDL, Inc. Fremont, CA.

July, 2004. "Cost Effectiveness Of Pertussis Vaccine In Adults And Adolescents." Invited presentation,
        Pediatric Vaccine Workshop, New York, NY.

November, 2004. "Vaccine Costs and Benefits." Invited presentation, GSK Pediatric Vaccine Advisory
        Board., Scottsdale, AZ.

February, 2005.  "Patents, Drug R&D and Protection of Intellectual Property,"  Invited Panel
        Presentation: International Trade in Pharmaceuticals, The International Law Society Meetings,
        Costa Mesa, CA.

May, 2005 "Dually Eligible Mentally Ill Population" Session Chair; Third NIMH Pharmacoeconomics
        Workshop: MMA03 and Psychotropic Medications, NIMH, Bethesda, MD.

May, 2005  "How Should Intellectual Property be Rewarded and Protected in the Global Pharmaceutical
        Industry?" Panel Discussion, USC Law School Intellectual Property Institute, Second Annual
        Conference.  Beverly Hills, CA.

May, 2005  "Modeling: Structure and Design of a Pharmacoeconomic Model." With Marc Botteman and
        Ben Van Hout.  ISPOR Short Course presented at the 10th Annual International Meeting of the
        International Society for Pharmacoeconomics and Outcomes Research, Washington, DC.

June, 2005  "Implementation and Outcomes of Commercial Disease Management Programs in the United
           States: the Disease Management Outcomes Consolidation Survey."  Nationwide Teleconference
           presentation with Mark Roberts.

October, 2005  "Using Conjoint Analysis to Assess DM Intervention Attributes: Application to
           Alzheimer's Disease Caregivers."  Paper presented at the Disease Management Association of
           America Annual Meeting, San Diego, CA.

October, 2005  "Conjoint Analysis Validation Of The Hui-3 Utility Scale In An Alzheimer Disease
           Caregiver Population."  Abstract 1216 presented at the International Society of Quality of Life
           Research, San Francisco, CA.

November, 2005 "Economic Implication Of Hepatitis B Viral (HbV) Load Reduction For Entecavir In
           Hepatitis B E Antigen-Positive Chronic Hepatitis B (CHb) Patients"  Presented at the 8'th
           ISPOR European Conference, Florence, Italy.

January, 2006. "Methods for Selection Bias Adjustment: Propensity Scores, Instrumental Variables and
           the Heckman Method.  Invited Grand Rounds Presentation, Maveric, Dept. of Veterans Affairs
           and Harvard Medical School, Boston, MA.

March, 2006. "Cost Effectiveness of Entecavir for Chronic Hepatitis B Disease in China."  Presented at
           the ISPOR Asian Conference, Shanghai, China.

March, 2006. "Adjusting for Selection Bias in Administrative Health Care Databases." Invited
           Presentation, China Center for Pharmacoeconomics and Outcomes Research, Peking University,
           Beijing, China.

April, 2006. "Stated Preference Theory (Conjoint Analysis) is the Best Way to Assess Health-Related
           Quality of Life for Economic Assessment of Drugs and Medical Interventions: An Application
           in Alzheimer Disease" Invited International Teleconference Presentation, ISPOR Student
           Chapter Network.

October, 2006.  "The Value of Biomedical Innovation." Invited Seminar, AstraZeneca Pharmaceuticals,
           Alderly Park, Cheshire, UK.

October, 2006. "Cost Effectiveness of Magnetic Resonance Angiography versus Digital Subtraction
           Angiography for Peripheral Vascular Disease." Presentation at the 9'th European ISPOR
           Conference, Copenhagen, Denmark.

January, 2007. "Stated Preference Theory in Assessing Health-Related Quality of Life for Economic
           Assessment in Alzheimer Disease.  Invited Seminar; Medical University of South Carolina.

February, 2007. "Stated Preference Theory in Assessing Health-Related Quality of Life for Economic
           Assessment in Alzheimer Disease.  Invited Seminar; Tulane University School of Public Health.

October, 2007. "Risk-Stratified Medical Costs for Asthma Patients in a Managed Care Organization
           (MCO)." Presentation at the 10'th European ISPOR Conference, Dublin, Ireland.

October, 2007. "Stated Preference Theory in Assessing Health-Related Quality of Life for Economic
           Assessment in Alzheimer Disease.  Invited Seminar; National University of Ireland, Galway,
           Ireland.

January, 2008. "How Should Drug Prices be Measured?"  Invited Seminar, School of Public Health,
           University of California Los Angeles, Los Angeles, CA.

February, 2008. "How Not to Use Health Economics Data: Lessons from the U.S. Health Care Sector" invited presentation at the Hong Kong Hospital Authority Conference "Use of Health Economics Data in the Health Care Environment of Hong Kong  The Way Forward."  Hong Kong SAR, China.

March 2008. "Cost Effectiveness of Statins and Other Lipid Therapies." Invited presentation at the 3rd International Symposium on Healthy Aging: Meeting the Challenges of an Aging Population, Hong Kong SAR, China.

Court Cases that Joel Hay has provided reports, depositions or testimony since 2002:

These cases include:

Connetics Corporation and Connetics Australia Pty. Ltd., Plaintiffs,-against-Agis Industries (1983) Ltd., Civil Action No. 05-CV-5038 (HAA). United States District Court, District Of New Jersey. I filed a report in this case.

Leoda Anderson et al., v. Merck & Co., Inc., JCCP No. 4247; consolidated complaint filed August 31, 2005, Los Angeles Superior Court. I filed a report in this case.

James Weiss, individually and on behalf of all others similarly situated, v. Astrazeneca Pharmaceuticals LP; and Zeneca, Inc., No. BC 323107; October 18, 2004, Los Angeles Superior Court. I filed a report in this case and was deposed.

Abbott Labs Norvir Antitrust Litigation Case No. C-04-1511 CW, United States District Court. Northern District Of California, Oakland Division. I filed two reports in this case, and I was deposed twice.

Astellas Pharma US, Inc. and Astellas US, LLC (collectively referred to as "Astellas") and King Pharmaceuticals Research and Development, Inc., (referred to as "King"), v. SICOR INC. and SICOR PHARMACEUTICALS, INC., Civil Action No. 05-337-SLR. U.S. District Court, Wilmington DE. I filed a report in this case, I was deposed and I was qualified as an expert witness and testified in court 2/27/07.

GlaxoSmithKline Holdings (Americas) Inc. vs. Internal Revenue Service, Nos. 5750-04,6959-05. U.S. Tax Court, DC. (T.C. filed Jan. 6, 2004); I filed a report in this case. Case was settled.

TJH Aids Healthcare Foundation v. GlaxoSmithKline PLC et al., No. 03-02792, (C. D. Cal., filed April 21, 2003); I filed a report in this case and was deposed. Case was settled.

Biofem, Inc. v. Radiant Research et . al., No. 03CC 08274 (Cal. Super. Ct. filed June 28, 2004); draft report completed before case settlement. Case was settled.

James Prather And Charles Will Sr. v. Pfizer Inc. and Warner-Lambert Company Inc., No. 02-L-480 (Ill. Cir. Ct.). I filed a report in this case. Case was settled.

# Appendix B

# Documents Relied Upon

**Legal Pleadings**

*John Doe 1 and John Doe 2 on behalf of Themselves and All Other Persons Similarly Situated, v. Abbott Laboratories,* First Amended Class Action Complaint, Northern District of California.

*Service Employees International Union Health and Welfare Fund, on Behalf of Itself and All Other Similarly Situated, vs. Abbott Laboratories,* Class Action Complaint, Northern District of California.

*In Re Abbott Laboratories Norvir Antitrust Litigation* , Expert Report and Exhibits of Douglas F. Greer, Ph.D.

*Meijer, Inc. and Meijer Distribution, Inc., on Behalf of Itself and All Other Similarly Situated, vs. Abbott Laboratories* , Consolidated Amendment Complaint, Jury Trial Demand, Northern District of California.

*Meijer, Inc. and Meijer Distribution, Inc., on Behalf of Itself and All Other Similarly Situated, vs. Abbott Laboratories* , Declaration of Joel Hay, Ph.D. in Support of Abbott Laboratories' Motion to Compel Production of Documents and Interrogatory Responses, Northern District of California.

*Meijer, Inc. and Meijer Distribution, Inc., on Behalf of Itself and All Other Similarly Situated, vs. Abbott Laboratories* , Abbott Laboratories' Reply in Support of its Motion to Compel Production of Documents and Interrogatory Responses, Northern District of California.

*Meijer, Inc. and Meijer Distribution, Inc., on Behalf of Itself and All Other Similarly Situated, vs. Abbott Laboratories* , Supplemental Declaration of Supplemental Declaration of Joel Hay, Ph.D. in Support of Abbott Laboratories' Reply in Support of its Motion to Compel Production of Documents and Interrogatory Responses, Northern District of California.

*Meijer, Inc. and Meijer Distribution, Inc., on Behalf of Itself and All Other Similarly Situated, vs. Abbott Laboratories* , Class Certification Declaration of Hal Singer, Ph. D., Northern District of California.

Opposition of Plaintiffs Meijer, Inc., Meijer Distribution, Inc., Rochester Drug Cooperative, Inc., and Louisiana Wholesale Drug Company, Inc. to Defendant Abbott Laboratories' Motion to Compel Production of Documents and Interrogatory Responses.

**Depositions**

Deposition of Joe Fiske, August 15, 2007.

**Other Documents**

2007 Specialty Marketing Brand Plan Development.

2008 Virology Plan, August 29, 2007.

2008 Virology Plan, J. Tyree Brand Review, August 15, 2007.

Abbott 2007 Virology Plan Overview.

Abbott, "Mission Critical," July 2004.

# Appendix B

**Other Documents**

Cardinal Wholesale Supply Agreement with CVS Pharmacies, August 2000, available at http://www.sec.gov/Archives/edgar/data/721371/000095015200006483/l83475aex10-30.txt.

*Cascade Health Solutions (f/k/a McKenzie Williamette Hospital) v. PeaceHealth* , No. 05-35627.

Clinical Study ACTG 5142: A head-to-head comparison of two DHHS recommended HIV therapies in ARV-naïve patients: KALETRA and efavirenz, 2007.

Derived Importance: Weighted Share at Initiation & Switch.

HIV Franchise Review:  Kaletra and Beyond, October 4, 2002.

HIV in the USA, 1Q 2007 Data.

HIV Market Research Monthly Report, April 2007.

HIV Market Research Monthly Report, August 2006.

HIV Market Research Monthly Report, August 2007.

HIV Market Research Monthly Report, December 2004.

HIV Market Research Monthly Report, July 2006.

HIV Market Research Monthly Report, July 2007.

HIV Market Research Monthly Report, June 2007.

HIV Market Research Monthly Report, May 2007.

HIV Market Research Monthly Report, November 2006.

HIV Market Research Monthly Report, October 2006.

HIV Market Research Monthly Report, September, 2006.

HIV Monthly Package Dec 2004.ppt.

Kaletra First  Model Call Training, January 2007.

Kaletra First – Perinatal Guidelines Flashcard Selling Framework, 2006.

Kaletra First – Resistance in ARV-Naïve Patients Flashcard Selling  Framework, 2006.

Kaletra First: Differentiating Strategy, April 2006.

Kaletra Promotional Material, "What's on your list of therapies?" 2007.

Kaletra WCBA opportunity - Marketing Messaging, 2006.

Letter from John Leonard (Abbott Laboratories Vice President of Global Pharmaceutical Development) to Care Providers, January 12, 2004.

Luque, Amneris E., "Strategies for Initial Therapy for the HIV-Infected Patient."

Synovate Healthcare, HIV in the USA, 1Q 2007.

Synovate Update 2Q 2006, HIV in the US, September 20, 2006.

T1-07 HIV February Splinter Meeting Kaletra First Model Calls Workbook Representative Copy, 07A-036-S609-1.

# Appendix B

**Other Documents**

Virology Pricing, October 22, 2003.

*Weyerhaeuser v. Ross-Simmons Hardwood Lumber*, 127 S. Ct. 1069 (2007).

ARV Historical Pricing Data

Medi-Cal Data (January 2002 - December 2002)

Medical Marketing Data (Med Mktg 2006.2007 budget by focus.xls)

Promotional Marketing Data, 2006 and 2007 Prof Promo PI NNRTI Budget Split.xls

TRX Data.xls

Abbott Sales Data (2003-2007).

**Publicly Available Documents**

"Approved Medications to Treat HIV Infection."
(http://aidsinfo.nih.gov/other/cbrochure/english/05_en.html, accessed on August 16, 2005)

Bartlett, John G., Guide to Adult HIV/AIDS Treatment: Companion Guide to Primary Care of People with HIV, U.S. Department of Health and Human Services.

Bloomberg Financial Data (2008).

Boffito, Marta "Double-Boosted Protease Inhibitors for the Treatment of HIV," Medscape CME Program June 1, 2006. (http://www.medscape.com/viewprogram/5437_pnt, accessed October, 2007)

Boffito, Marta, Michael Kurowski, Guido Kruse, Andrew Hill, et al., "Atazanavir enhances saquinavir hard-gel concentrations in a ritonavir-boosted once-daily regimen," AIDS 2004.

Britt, Russ. "Growing share of 'Big Three' gets federal attention", MarketWatch.com, May 30, 2007, http://www.marketwatch.com/news/story/growing-share-big-three-drug/story.aspx?guid=%7B9F3862C1-7E3A-4D82-94B7-A8E4AE5DAE6A%7D.

Clavel, François and Allan J. Hance, "HIV Drug Resistance," *The New England Journal of Medicine*, March 4, 2004.

Combination Therapy, A Simple FactSheet from the AIDS Treatment Data Network.
(http://aegis.com/factshts/network/simple/combo.html, accessed on August 15, 2005)

Congressional Budget Office, *How Increased Competition from Generic Drugs has Affected Prices and Returns in the Pharmaceutical Industry*, July 1998, pp. 24-25.

"Considerations for women with HIV", November 2006. (http://kaletra.com/)

Department of Health and Human Services, "Guidelines for Using Antiretroviral Agents Among HIV-1-Infected Adults and Adolescents, Recommendations of the Panel on Clinical Practices for Treatment of HIV," November 10, 2003.

Dunehew, Allen, "A Guide to Understanding Common Prescription Drug Pricing Terms", *Academy of Managed Care Pharmacy*, Appendix B.

# Appendix B

**Publicly Available Documents**

DHHS, "Guidelines for Using Antiretroviral Agents Among HIV-Infected Adults and Adolescents, Recommendations of the Panel on Clinical Practices for Treatment of HIV," April 7, 2005.

Dunehew, Allen. "Changing dynamics in the pharmaceutical supply chain: A GPO perspective," American Journal of Health-System Pharmacy (2005)

FDA Postmarketing Study Commitments.

Federal Trade Commission and The Department of Justice, "Improving Health Care: A Dose of Competition*,* " July 2004.

Follow The Pill: Understanding the U.S. Commercial Pharmaceutical Supply Chain, The Kaiser Family Foundation, March 2005, p. 18.

Food and Drug Administration, "Inside Clinical Trials Testing Medical Products in People." (http://www.fda.gov/fdac/features/2003/503_trial.html, accessed on August 9, 2005)

Food and Drug Administration, "Postmarketing Study Commitments FAQ".

Frank, Richard G., Prescription Drug Prices: Why Do Some Pay More Than Others Do?, *Health Affairs* , March/April 2001.

Frank, Richard and David Salkever, "Generic Entry and the Pricing of Pharmaceuticals," *Journal of Economics & Management Strategy,* Vol. 6 No. 1, Spring 1997, pp. 75-09.

Hanna, George. "Bioequivalence of Pilot Tablet Formulations of Ritonavir (RTV) to the Marketed Soft gel Capsule (SGC) at a Dose of 100 mg." presentation at 14th CROI Conference on Retroviruses and Opportunistic Infections Los Angeles, California Feb 25- 28, 2007. (http://www.natap.org/2007/CROI/croi_54.htm, accessed October 2007)

Hill, R. Carter, William E. Griffiths, George G. Judge, Undergraduate Econometrics, John Wiley & Sons, New York, NY (2d ed. 2001).

HIV Patient Education Series, Resistance: The Silent Side Effect, Abbott Virology.

HIV/AIDS, 2006 Report, "Researchers Are Testing 77 Medicines and Vaccines for HIV and Opportunistic Infections."

Hoffmann, Christian, HIV Medicine 2003, Overview of Antiretroviral Drugs.

Krattenmaker, Thomas G., and Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price* , 96 Yale L. J. 209 (1986)

Letter from John Leonard (Abbott Laboratories Vice President of Global Pharmaceutical Development) to Care Providers, January 12, 2004.

Levy, Roy, "The Pharmaceutical Industry," FTC Bureau of Economics Staff Report, Washington D.C. 1998.

Medicines in Development for HIV / AIDS, 2005 Report. (http://www.phrma.org/files/2005%20HIV-AIDS%20survey.pdf)

# Appendix B

**Publicly Available Documents**

Medicines in Development for HIV / AIDS, 2006 Report.
(http://www.phrma.org/files/AIDS%202006.pdf)

*Merck's Experimental AIDS Vaccine Fails* , Associated Press, Linda Johnson, Sept. 22, 2007.
(http://ap.google.com/article/ALeqM5gLCTkY4dHmXWHR-SKFi-4GeRDajg, accessed October, 2007)

Morse, Howard M., "Product Market Definition in the Pharmaceutical Industry", 71 Antitrust Law Journal No. 2, 2003.

National ADAP Monitoring Project Annual Report, The Kaiser Family Foundation, March 2006.

"One New Drug = $500 million and 12-15 years of R&D," PhRMA publications/Quick Facts, January 3, 2001.

Prices for Brand-Name Drugs Under Selected Federal Programs, Congressional Budget Office, June 2005.

Reekie, W. Duncan, "Price and Quality Competition in the United States," *Drug Industry Journal of Industrial Economics* 3, 223-237 (1978).

Rosenthal, Meredith, et al., "Promotion of Prescription Drugs to Consumers," *New England Journal of Medicine,* Vol. 346, Feb. 14, 2002.

The Pharmaceutical Research and Manufacturers Association (PhRMA), Research and Development Overview.

Treatment for Adult HIV Infection: 2006 Recommendations of the International AIDS Society–USA Panel, August 16, 2006.

U.S. Department of Health and Human Services Guidelines for the Use of Antiretroviral Agents in HIV-1-Infected Adults and Adolescents, issued October 10, 2006.

U.S. Food and Drug Administration, "Drugs Used in the Treatment of HIV Infection."

*United States v. Grinnell Corp* . 384 U.S. 563, 571 (1966).

von Oehsen, William H., III, Pharmaceutical Discounts Under Federal Law:  State Program Opportunities, May 2001.

Werber, Yaron, "HIV Drug Market," Nature Reviews, Drug Discovery, July 2003.

**Web sites**

AIDSmeds.com (www.aidsmeds.com).

Clinical Trails studying HIV/AIDS (www.aidsinfo.nih.gov/ClinicalTrials).

Drug Topics (www.drugtopics.com).

Health Affairs (www.healthaffairs.org).

CVS (http://www.cvs.com/corpInfo/about/index.html).