EXHIBIT 2

Joseph J. Tabacco, Jr. (75484)
Christopher T. Heffelfinger (118058)
**BERMAN DEVALERIO PEASE TABACCO
  BURT & PUCILLO**
425 California Street, Suite 2100
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382

Richard R. Wiebe (121156)
**LAW OFFICE OF RICHARD R. WIEBE**
425 California Street, Suite 2025
San Francisco, CA 94104
Telephone: (415) 433-3200

**Counsel for Plaintiff John Doe 1**

Hollis Salzman (HS-5994)
Michael W. Stocker (179083)
Kellie Safar Lerner
**LABATON SUCHAROW & RUDOFF, LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

**Counsel for Plaintiff Service Employees
International Union Health and Welfare Fund**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE ABBOTT LABORATORIES NORVIR ANTITRUST LITIGATION | No. C-04-1511 CW<br><br>**EXPERT REPORT OF<br>DOUGLAS F. GREER, PH.D.** |

[C-04-1511 CW] EXPERT REPORT OF DOUGLAS F. GREER, PH.D.

> All that a highly elastic supply curve implies is that the reseller can increase sales with no significant increase in costs. That will often be true for retailers and wholesalers because they can typically buy larger quantities at the same price (or, with volume discounts, a lower price). (Harris and Sullivan, p. 290)

This situation prevails for Norvir, indicating full pass through in this case.

227. <u>Competitive Conditions at Wholesale and Retail</u>: As explained by Harris and Sullivan, competitive conditions at wholesale and retail levels are especially conducive to pass through. (pp. 277-297) They summarize: "The irony of monopoly power at two levels [manufacturer and downstream reseller] is that whereas the competitive reseller is forced by market pressures to pass on all or most of the price increase, the profit-maximizing monopolist-reseller may rationally absorb a part of the overcharge first imposed by the cartel or monopolist at a higher level." (Harris and Sullivan, pp. 295-297)

228. Pass through prevails in this case because of reseller competition. According to Professor Hay, Abbott's economic expert, "The wholesaler and pharmacy markets are competitive markets in which firms compete on price as well as other attributes such as service." (Hay Declaration, January 16, 2007, p. 37) I agree.

229. <u>Direct Costs Versus Overhead Costs at Wholesale and Retail Level</u>: As explained by Harris and Sullivan:

> "The more the overcharge affects direct cost [as opposed to overhead or fixed cost], the sooner the pass on will occur, and the higher the rate of passing on will be. At the limit, direct costs will be reflected immediately, as in the case of retailers or wholesalers that price items as they arrive to reflect the actual cost of that stock of merchandise." (Harris and Sullivan, pp. 317-318)

230. The resellers in this case are wholesalers and retailers whose main direct costs are their cost of goods sold, including Norvir and other drug products.

231. <u>Markup Pricing at Wholesale and Retail Levels</u>: As explained by Harris and Sullivan, when down-stream resellers practice markup pricing, pass through prevails. Moreover, wholesalers and retailers practice markup pricing:

> Markup pricing is based upon the facts that, for wholesalers and retailers, the direct cost of a product is its invoice cost and few additional expenses can be

73

directly attributed to any specific product category. The resale price is determined by a more or less standard markup over the invoice cost, which markup is intended to cover a reasonable portion of the indirect costs of the firm and also to yield a reasonable profit. (Harris and Sullivan, p 304)

232.  In short, all relevant economic conditions in this market lead one to expect that all of Abbott's overcharges on Norvir were passed through to health insurers, patients, and other class members who in the end paid the higher prices. Moreover, all the available empirical evidence on Norvir prices supports this conclusion.

233.  One of the largest drug wholesalers in the United States, AmerisourceBergen supplied plaintiffs' counsel with Norvir price data both before and after December 4, 2003. Those data reveal prices paid by AmerisourceBergen to Abbott that match the wholesale acquisition cost that is in Abbott's documents. (See Exhibit 127, NOR 00097156) More importantly, AmerisourceBergen's prices to retail buyers reflect the 400% price increase exactly, as indicated by the following examples of unit prices for sales of Norvir item #330787 (100 mg capsules, 120 count):

| AB Region | Before 12/4/03 | After 12/4/03 | % change |
|---|---|---|---|
| Sacramento | $205.33 | $1,028.71 | 401% |
| Montgomery | $200.39 | $1,001.96 | 400% |
| Raleigh | $203.17 | $1,015.86 | 400% |
| Nashville | $204.51 | $1,022.54 | 399% |
| Williamston | $199.77 | $998.88 | 400% |
| St. Louis | $199.96 | $998.80 | 399% |
| Hawaii | $199.77 | $998.88 | 400% |
| Phoenix | $202.76 | $1,013.79 | 399% |
| Salt Lake City | $203.68 | $1,018.42 | 400% |
| San Jose | $205.74 | $1,028.21 | 400% |
| Dallas | $199.77 | $998.88 | 400% |
| Seattle | $199.77 | $998.88 | 400% |
| Boston | $203.28 | $1,010.71 | 397% |

(Source: AmerisourceBergen)

234.  Additional empirical evidence shows full pass through at retail level as well. Exhibit 128 (SEIU 000583-585) shows Norvir prices paid by SEIU, the health insurance provider who is a plaintiff in this case, over 2003-2006. The total amount paid for Norvir 100 mg capsules in 240 quantity units, or 120 units multiplied by 2 (ID# 74663322) are sampled as follows:

| Date | Amount Paid by SEIU |
|---|---|
| 7/1/2003 | 434.88 |
| 7/31/2003 | 434.88 |
| 9/24/2003 | 429.88 |
| 11/10/2003 | 429.88 |
| 6/2/2004 | 2,193.67 |
| 8/3/2004 | 2,193.67 |
| 1/28/2005 | 2,214.62* |
| 7/5/2005 | 2,213.62* |
| 11/8/2005 | 2,213.62* |
| 3/6/2006 | 2,213.62* |
| 9/12/2006 | 2,213.62* |

*price of 120 units multiplied by two
(Source: Columns 3 and 6 of Exhibit 128, SEIU 000583-585)

235. According to these data, the average cost of Norvir (100mg) to SEIU <u>before</u> the price increase was $432.38 for 240 capsules. <u>After</u> the price increase, SEIU's average cost is $2,208.06. The percentage increase in this series averages 410%. (The same comparison using "total ingredient cost paid" or "total drug cost" is somewhat lower, but still reflects essentially full pass through.)

236. Pass through is corroborated in the deposition testimony of Abbott's Joseph Fiske (August 15, 2007):

> Q. Okay. And then is it fair to say that sometime after December 3, wholesalers began purchasing Norvir at a WAC price that incorporated that 400 price increase?
> A. Yes. That's correct.
>
> ...
>
> Q. So did there come a point in time when you learned that pharmacies had marked up the price of Norvir by roughly 400 percent at some point following Abbott's price increase for Norvir of 400 percent?
> ...
> A. I don't know that I specifically heard that but I would have expected that they've done something like that. (Joseph Fiske Deposition, August 15, 2007, p. 56-57)

237. In short, the overcharges estimated earlier -- $370.7 million -- were passed from Abbott through wholesalers and retailers to members of the class ($359.6 million if Ohio and Indiana are excluded). Given that an ultimate buyer is a member of the class as defined (excluding Medicaid, ADAP, and non-boosting patients), that buyer's overcharges would be

75

fairly estimated by multiplying that buyer's expenditures on Norvir after December 4, 2003 by 0.8.

## VII. COMPENSATION

238. I am being compensated by plaintiffs for my work in preparing this report and testifying at trial at the rate of $300 per hour for preparation time and $300 per hour for time spent testifying. My compensation is not contingent in any way on the content of my testimony or the outcome of the litigation or the outcome of any particular issue in the litigation.

Dated: September 26, 2007

_____
Douglas F. Greer, Ph.D.