1   Joseph R. Saveri (SBN 130064)
    *jsaveri@lchb.com*
2   Brendan Glackin (SBN 199643)
    *bglackin@lchb.com*
3   Jordan Elias (State Bar No. 228731)
    *jelias@lchb.com*
4   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
    Embarcadero Center West
5   275 Battery Street, 30th Floor
    San Francisco, CA 94111-3339
6   Telephone: (415) 956-1000
    Facsimile: (415) 956-1008
7
    *Class Counsel*
8
    [Additional Counsel Listed on Signature Page]
9

10                      UNITED STATES DISTRICT COURT

11                   NORTHERN DISTRICT OF CALIFORNIA

12                          (OAKLAND DIVISION)

13

14   MEIJER, INC., et al., on behalf of themselves       Case No. C 07-5985 CW
15   and all others similarly situated,
                                                          CONSOLIDATED CASE
16                      Plaintiffs,
                                                          **REPLY BRIEF IN FURTHER
17        v.                                              SUPPORT OF PLAINTIFFS'
                                                          MOTION FOR CLASS
18   ABBOTT LABORATORIES,                                 CERTIFICATION**
19                      Defendant.
                                                          **Date:        August 7, 2008**
20                                                        **Time:        2:00 p.m.**
                                                          **Location:    Courtroom 2**
21
                                                          **Hon. Claudia Wilken**
22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................1

II.   ARGUMENT........................................................................................................................3

    A.    Abbott's Asserted Class Conflicts Are Without Merit ...........................................3

        1.    Abbott's Purported "Downstream" Conflicts Are Not Cognizable............4

        2.    Purported Conflicts Relating to "Norvir-Only" and "Kaletra-Only"
             Purchasers Are Not Cognizable..................................................................6

             a.    No Conflict Between "Kaletra-Only" and "Norvir-Only"
                  Purchasers Regarding Plaintiffs' Boost*ing* Market
                  Monopolization Claim ....................................................................6

             b.    No Conflict Between "Kaletra-Only" and "Norvir-Only"
                  Purchasers Regarding the Boost*ed* Monopolization Claim ............7

             c.    Purported "Lost Profits" Conflicts Are Not Cognizable ................8

    B.    Abbott's Challenge to the Predominance of Common Issues Fails......................10

    C.    Class Certification Remains the Superior Means to Adjudicate this Case ............14

    D.    Abbott's Challenge to Meijer's Standing Is Without Merit ..................................14

III.  CONCLUSION...................................................................................................................15

1

**TABLE OF AUTHORITIES**

2

Page

3

**CASES**

4

*Abbott Labs. Norvir Antitrust Litig.,*
   2007 U.S. Dist. LEXIS 44459 (N.D. Cal. Jun. 11, 2007)..........................................1

5

6

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.,*
   247 F.R.D. 156 (C.D. Cal. 2007)...................................................................13

7

*Alpert v. U.S. Indus.,*
   59 F.R.D. 491 (C.D. Cal. 1973).....................................................................10

8

9

*Amchem Prods., Inc. v. Windsor,*
   521 U.S. 591 (1997)...................................................................................14

10

*Blackie v. Barrack,*
   524 F.2d 891 (9th Cir. 1975) ....................................................................3, 5

11

12

*Bogosian v. Gulf Oil Corp.,*
   561 F.2d 434 (3d Cir. 1977) ......................................................................11

13

*Cummings v. Connell,*
   316 F.3d 886 (9th Cir. 2003) ......................................................................5

14

15

*Eisen v. Carlisle & Jacquelin,*
   417 U.S. 156 (1974)...................................................................................14

16

*Free World Foreign Cars, Inc. v. Alfa Romeo, S.p.A.,*
   55 F.R.D. 26 (S.D.N.Y. 1972).....................................................................9

17

18

*Gardner v. Equifax Information Servs.,*
   2007 WL 2261688 (D. Minn. Aug. 6, 2007) ...............................................9

19

*Howard Hess Dental Labs., Inc. v. Dentsply Int'l Inc.,*
   424 F.3d 363 (3d Cir. 2005) ......................................................................9

20

*Illinois Brick Co. v. Illinois,*
   431 U.S. 720 (1977).....................................................................................1

21

22

*In re Cardizem CD Antitrust Litig.,*
   200 F.R.D. 297 (E.D. Mich. 2001) .............................................................9

23

*In re Graphics Processing Units Antitrust Litig.,*
   2008 WL 2788089 (N.D. Cal. Jul. 18, 2008) ...........................................12

24

*In re Jackson Nat'l Life Ins. Co. Premium Litig.,*
   209 F.R.D. 134 (W.D. Mich. 2002)............................................................9

25

26

*In re K-Dur Antitrust Litig.,*
   2008 WL 2699390 (D.N.J. Apr. 14, 2008)........................................1, 4, 9

27

28

1

## TABLE OF AUTHORITIES

2

Page

3

*In re NASDAQ Market-Makers Antitrust Litig.*,
  169 F.R.D. 493 (S.D.N.Y. 1996) ........................................................................................14

4

*In re Rubber Chems. Antitrust Litig.*,
  232 F.R.D. 346 (N.D. Cal. 2005) .........................................................................................6

5

6

*In re Scrap Metal Antitrust Litig.*,
  527 F.3d 517 (6th Cir. 2008) .............................................................................................14

7

*In re Wellbutrin SR Direct Purchaser Antitrust Litig.*,
  2008 WL 1946848 (E.D. Pa. May 2, 2008) ................................................................4, 5, 15

8

9

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*,
  225 F.R.D. 208 (S.D. Ohio 2003) ...................................................................................5, 10

10

*Lukenas v. Bryce's Mountain Resort, Inc.*,
  66 F.R.D. 69 (W.D. Va. 1975) ..............................................................................................9

11

12

*Meijer, Inc. v. Abbott Labs.*,
  __ F.R.D. __, 2008 WL 2503007 (N.D. Cal. Jun. 18, 2008) ....................................passim

13

*Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*,
  246 F.R.D. 293 (D.D.C. 2007) ...................................................................................4, 5, 15

14

15

*Mullane v. Central Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950) ...........................................................................................................10

16

*National Info. Servs. v. TRW Inc.*,
  1992 U.S. Dist. LEXIS 22497 (D. Or. Sept. 9, 1992) .........................................................9

17

18

*Phillips Petroleum, Co. v. Shutts*,
  472 U.S. 797 (1985)............................................................................................................10

19

*Phillips v. Klassen*,
  502 F.2d 362 (D.C. Cir. 1974)............................................................................................10

20

21

*RBS Asset Fin., Inc. v. Bravo*,
  2006 U.S. Dist. LEXIS 45745 (E.D. Mich. Jul. 6, 2006) ..................................................15

22

## OTHER AUTHORITIES

23

ABA Section of Antitrust Law, PROVING ANTITRUST DAMAGES
  (1996)....................................................................................................................................9

24

## RULES

25

Rule 23 ........................................................................................................................passim

26

27

28

1  I.    **INTRODUCTION AND SUMMARY OF ARGUMENT**

2      Although Abbott opposes Plaintiffs'[1] Motion for Class Certification,[2] it does not dispute

3  the numerosity, commonality, and typicality requirements of Rule 23(a). Abbott also concedes,

4  by its silence, that proving the underlying antitrust violation poses predominantly common

5  questions of fact and law. Furthermore, Abbott simply fails to mention, let alone distinguish, the

6  multitude of cases Plaintiffs cited in which courts granted class certification in direct purchaser

7  pharmaceutical antitrust cases *just like this one* – cases where the challenged conduct similarly

8  involved impeded competition from rival drugs, thereby causing artificial price inflation.[3] Abbott

9  also disregards this Court's prior findings that "class actions play [an important role] in the

10 enforcement of antitrust laws," and that a class of *indirect* purchasers in a similar case –

11 presenting far more difficult and complex questions – merited certification. *See In re Abbott*

12 *Labs. Norvir Antitrust Litig.,* 2007 U.S. Dist. LEXIS 44459, at *11 (N.D. Cal. Jun. 11, 2007).

13     Instead, Abbott makes two principal arguments in opposition to class certification: (1) that

14 a grab bag of conflicts exists within the class; and (2) that impact is not susceptible to classwide

15 proof because Abbott, like most drug manufacturers, gives discounts to certain of its direct

16 customers on some of its sales. As to the first, this Court has already effectively rejected most of

17 Abbott's conflicts argument, having ruled that the supposed conflicts are not cognizable under the

18 Supreme Court's decisions in *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977) and its progeny.

19 *See Meijer, Inc. v. Abbott Labs.,* __ F.R.D. __, 2008 WL 2503007 (N.D. Cal. Jun. 18, 2008)

20 ("*Downstream Order*"). Moreover, to the extent certain of the conflict arguments relate to

21 "upstream" effects (*i.e.,* effects on purchase price) and not legally irrelevant "downstream" effects

22 (*i.e.,* net benefit or loss due to effects on resale prices and volumes), the purported "conflicts" are

23 ---

[1] Plaintiffs include Meijer Inc., Meijer Distribution, Inc. (collectively, "Meijer"), Rochester Drug
24 Co-operative, Inc. ("RDC"), and Louisiana Wholesale Drug Co., Inc. ("LWD") (collectively,
"Plaintiffs").

25 [2] *See* Direct Purchaser Class Plaintiffs' Notice of Motion and Motion for Class Certification,
(describing overcharge claims), D.E. Nos. 62 & 64, Case No. C 07-5985 CW (N.D. Cal.)
26 ("Mot."), and the supporting Class Certification Declaration of Hal Singer, Ph.D., D.E. No. 63,
Case No. C 07-5985 CW (N.D. Cal.) ("Singer Decl.").

27 [3] *See* Mot. at 2-3 & n.2 (collecting cases); *see also In re K-Dur Antitrust Litig.,* 2008 WL
2699390 (D.N.J. Apr. 14, 2008).
28

1   based on sheer speculation, misconstrue Plaintiffs' claims, and do not withstand even cursory

2   analysis. In sum, there are no conflicts that would prevent Plaintiffs – each of whom has been

3   appointed as a class representative in multiple analogous pharmaceutical antitrust cases on behalf

4   of essentially the same class of wholesalers and retailers (Mot. at 2-3 & n.2 (collecting cases)) –

5   from satisfying the adequacy requirement of Rule 23(a)(4) here.

6        As to Abbott's second argument, the pricing and purchase pattern analysis of Abbott's

7   expert, Prof. Joel Hay, *confirms* the findings of Dr. Hal Singer, Plaintiffs' economist, on the

8   availability of classwide evidence of impact. Prof. Hay's analysis confirms Dr. Singer's findings

9   that the very same common evidence demonstrating that the list (or "WAC") prices of Norvir and

10  Kaletra went *up* – evidence no party disputes – also establishes that all or nearly all class

11  members paid higher prices on at least some (if not most) of their purchases. Prof. Hay's own

12  analysis specifically demonstrates that (a) nearly ███ of all class purchases of these drugs were at

13  list price, and, importantly, (b) all class members purchased at least some Norvir and/or Kaletra at

14  the inflated list price. *See* Rebuttal Declaration of Hal J. Singer, Ph.D., Jul. 23, 2008, at ¶¶ 7-11

15  ("Singer Reb."), citing Declaration of Joel Hay, Ph.D., Jun. 25, 2008, at ¶¶ 99-101 ("Hay Decl.").

16  *Thus, Prof. Hay himself shows that the list price increases caused all the class members to pay*

17  *more on at least some of their purchases, thereby demonstrating that if the challenged conduct*

18  *inflated the list price, all class members suffered some antitrust impact.*

19       Furthermore, even regarding those purchases on which class members received discounts,

20  Prof. Hay's analysis confirms Dr. Singer's finding of common proof of impact. Increases in list

21  prices raised the baseline from which direct purchasers received discounts. Singer Decl. at ¶¶ 35-

22  38, 46; Singer Reb. ¶¶ 8, 11-12. Indeed, confirming this central point, Prof. Hay concludes that

23  ████████████████████████████████████████████████████, on average,

24  after the 400% price hike than before. That, by itself, is proof that the challenged conduct, if

25  proven, had a classwide impact. And Prof. Hay's analysis goes further. He explains that, absent

26  some customer shifts that had nothing to do with the challenged conduct, even these █████

27  supposed outliers ████████████████████████████████ than

28  before. *See* Singer Reb. at ¶¶ 7-8, 14-15, citing Hay Decl. at ¶¶ 120-21. Ironically, then, in

1    attempting to refute Dr. Singer, Prof. Hay confirms Dr. Singer's classwide analysis by showing

2    that all class members did, in fact, pay more after the challenged conduct.

3      For these and other reasons, Plaintiffs' motion for class certification should be granted.

4    **II.  ARGUMENT**

5      **A.  Abbott's Asserted Class Conflicts Are Without Merit**

6      In its opposition brief ("Opp."), Abbott asserts three speculative supposed class conflicts

7    that purportedly render the Plaintiffs inadequate under Rule 23(a)(4). They are: (a) because

8    certain unnamed class members supposedly benefit in a net economic sense from Abbott's

9    inflated prices on Norvir and Kaletra, the prosecution of Plaintiffs' lawsuit might cause Abbott to

10   lower prices and thus eliminate the supposed "benefits" of higher prices for certain absent class

11   members ("downstream conflicts") (Opp. at 14-16); (b) Plaintiffs' claims for overcharges on

12   Norvir somehow conflict with Plaintiffs' claims for overcharges on Kaletra (Opp. at 10-13); and,

13   (c) certain class members would allegedly benefit from pursuing "lost profits" instead of the

14   overcharges Plaintiffs are seeking (Opp. at 13-14). Each argument is without merit. The Court

15   has already explicitly rejected the first as contrary to settled law in its order denying downstream

16   discovery; the second is grounded entirely on a misreading of Plaintiffs' claims; and, the third

17   lacks factual support and legal foundation. There are no cognizable class conflicts. Each Plaintiff

18   is an adequate class representative.

19     Preliminarily, Abbott misstates the law on intra-class conflicts in several key ways. First,

20   as pointed out in Plaintiffs' brief opposing downstream discovery,[4] in this Circuit (and most

21   others) "courts have generally declined to consider conflicts, particularly as they regard damages,

22   sufficient to defeat class action status at the outset unless the conflict is ***apparent, imminent, and***

23   ***on an issue at the very heart of the suit***;" conflicts cannot be "potential" and as yet "unforeseen."

24   *Blackie v. Barrack*, 524 F.2d 891, 909 (9th Cir. 1975).[5] Thus, certification cannot be denied

25   

---

26   [4] *See* Opposition of Plaintiffs to Defendant Abbott Laboratories' Motion to Compel Production of
    Documents and Interrogatory Responses, D.E. No. 78, at 13, Case No. C 07-5985 CW (N.D. Cal.)
27   ("Plfs.' Downstream Opp."). Plaintiffs incorporate the entirety of this brief by reference.
    [5] All emphases are added unless otherwise noted.
28

based on speculative or "possible" conflicts.  Second, so long as Plaintiffs, who are direct buyers of both drugs, are seeking to effectuate and maximize the relief sought (here, overcharges on Norvir and Kaletra), there is no class conflict.[6]  Third, the Court is right to be "skeptical of defenses to class certification based on conflicts between the proposed class members" because denial would benefit Abbott, leaving its monopolistic profits in its pocket.[7]

## 1.    Abbott's Purported "Downstream" Conflicts Are Not Cognizable

Most of Abbott's purported class conflicts – which arise out of speculative hypotheticals due to purported differences in "downstream" effects of the challenged conduct between Plaintiffs and the class (Opp. at 14-16) – contradict this Court's ruling on downstream discovery.[8] Some class members, Abbott asserts, may have benefitted from the higher prices Abbott was able to charge as part of and as a result of its wrongdoing.  Thus, Abbott claims, some class members would want Plaintiffs to fail so as to perpetuate high Norvir and Kaletra prices.  *Id.*

This does not create an intra-class conflict for three reasons.  *First*, the Court has already correctly held *in this case* that, even if some class members benefit in a net economic sense from the challenged conduct, these facts do not present a cognizable class conflict.  As this Court stated, "whether an overcharge has conferred a financial benefit on a direct purchaser" is legally irrelevant to class certification.  *Downstream Order* at *2; *see also K-Dur*, 2008 WL 2699390, at *9 ("Defendants' arguments that the Big Three otherwise benefited . . . are ***irrelevant as a matter of law***, and cannot serve to demonstrate that a conflict exists between the Plaintiffs' interests and those of the Big Three with respect to this litigation."); *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 303 (D.D.C. 2007) ("*Ovcon*") (same); *see also J.B.D.L. Corp. v.*

---

[6] *See* Mot. at 13; Plfs.' Downstream Opp. at 4 & n.6; *K-Dur*, 2008 WL 2699390, at *8 ("Because all members of the putative class in this case will be entitled to the same measure of damages if successful – the amount of the overcharge – there can be no conflict within the putative class on the issue of damages").

[7] *In re Wellbutrin SR Direct Purchaser Antitrust Litig.*, 2008 WL 1946848, *5 n.14 (E.D. Pa. May 2, 2008) (internal citation and quotes omitted); *see also* Plfs.' Downstream Opp. at 19-20.

[8] While Abbott is correct that this was a discovery order, as this Court knows, Abbott had sought discovery of class member profits and benefits *precisely because of their purported relevance to class certification and specifically class conflicts, and this Court rejected that argument.  See* Downstream Order at *1.

1   *Wyeth-Ayerst Labs., Inc.*, 225 F.R.D. 208, 217 (S.D. Ohio 2003) (no conflict even if some class

2   members profited from alleged misconduct); *Wellbutrin*, 2008 WL 1946848, at *6 (no conflict

3   even if some class members experience net benefit and others had a net loss).  Injury to a direct

4   purchaser is complete "when the defendant sells at the illegally high price," and thus the "true

5   import of the *Hanover Shoe* rule [is] that a direct purchaser may recover the full amount of the

6   overcharge, *even if he is otherwise benefitted*[.]"  *Downstream Order* at *3, quoting *Ovcon*, 246

7   F.R.D. at 304.  Moreover, as discussed below, if a class member decided it did not wish to

8   recover overcharges as part of this suit, it could simply opt out.  *See id.* at *5 (and discussion *infra*

9   at 9-10).  Abbott's argument here is made further untenable because the "Big Three" national

10  wholesalers – the entities Abbott had speculated would be disadvantaged by lower prices – have

11  explicitly disclaimed such a potential conflict. *See Downstream Order* at *5 n.6.[9]

12      *Second*, Abbott's claim that there are intra-class "conflicts" is entirely based on

13  speculation about what Abbott *might* do in reaction to Plaintiffs' pursuit of supposed alternate

14  approaches to antitrust liability. Opp. at, *e.g.*, 14. Given that Plaintiffs do not seek injunctive

15  relief, and are not the only ones pursuing Abbott for the same challenged conduct (and thus, by

16  themselves, are unlikely to be the but-for cause of Abbott's future pricing practices), determining

17  Abbott's hypothetical future reaction to the legal strategy Plaintiffs pursue in this case is

18  inherently speculative, and thus, cannot create a cognizable class conflict.[10]

19      *Third*, the premise of Abbott's argument – that there may be a theory of liability that

20  would entitle Plaintiffs to recovery of illegal overcharges on Norvir or Kaletra *but* "would not

21  curtail Abbott's ability to maintain or increase its current prices for Norvir or Kaletra" (Opp. at

22  15) – is false.  Indeed, as Dr. Singer explains, logically, there can be no plausible theory that

23  would both allow for recovery of illegal overcharges *and* which would imply that Abbott could

24

---

25  [9] In fact, many of Abbott's asserted conflicts impermissibly would examine class members' net
    benefits and/or downstream evidence.  For instance, Abbott's asserted conflicts regarding

26  "Norvir-Only" and "Kaletra-Only" purchasers involve class members' net revenues going
    forward, depending on the outcome of the litigation or Abbott's reaction to it.

27  [10] *See Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003) (rejecting "speculative conflict"
    that some class members *might* prefer different remedy); *Blackie*, 524 F.2d at 909 ("potential
    conflicts" not enough).

28

1    raise prices to avoid future liability. This is because the necessary *premise* of Plaintiffs' claim for

2    illegal overcharges – or *any* claim for anticompetitive overcharges – is that the prices would be

3    lower on both products in the but-for world. Singer Reb. at ¶¶ 20 & n.22, 25-27. If there are

4    overcharges, the but-for world – *i.e.*, a world in which Abbott does not act illegally – *must have*

5    lower prices. Thus, Plaintiffs' pursuit of illegal overcharges on both products necessarily implies

6    that the only way for Abbott to avoid liability is to lower their prices on both products.

7        Furthermore, Prof. Hay offers only speculation about what Abbott "may" find "profit-

8    maximizing" were Plaintiffs to succeed on one of their theories challenging Abbott's conduct. *See*

9    Hay Decl. at, *e.g.*, ¶¶ 46-49. But, as Dr. Singer explains, Plaintiffs' liability theories (a) do *not*

10   conflict, and (b) if successful, would *not* rationally cause Abbott to react by doing anything other

11   than *lowering* prices for both Norvir *and* Kaletra. *See* Singer Reb. at ¶¶ 18-20; 22-28. As Dr.

12   Singer points out, Plaintiffs' success under any or all of their theories would incentivize Abbott to

13   revert to the *lower*, profit-maximizing prices that existed prior to the December 2003 400% price

14   hike – and Prof. Hay offers no reason to believe otherwise. *Id.* at ¶¶ 20-27. This purported

15   conflict is therefore speculative, legally irrelevant, and a figment of Abbott's imagination.

16   2.    <b><u>Purported Conflicts Relating to "Norvir-Only" and "Kaletra-Only"<br>Purchasers Are Not Cognizable</u></b>

17

18       Abbott also erroneously asserts that the interests of a handful of class members who

     purchase only Kaletra conflict with the interests of another handful who only purchase Norvir.
19
     Opp. at 10-13. Even if there were such a conflict, ███ of all class purchases of Norvir and
20
     Kaletra were made by entities, like the named Plaintiffs, that purchased both products. Singer
21
     Reb. at ¶ 20. Thus, the issue is much ado about very little, and there is no conflict. *See, e.g., In*
22
     *re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 351 (N.D. Cal. 2005) (finding no conflict and
23
     certifying class where named plaintiffs and class members were injured in the same manner).
24

25   a.    <b><u>No Conflict Between "Kaletra-Only" and "Norvir-Only"<br>Purchasers Regarding Plaintiffs' Boost*ing* Market<br>Monopolization Claim</u></b>

26
         Abbott asserts that Plaintiffs' claim of monopolization of the Boost*ing* Market is
27
     detrimental to "Kaletra-Only" purchasers, who can only recover for Abbott's monopolization of
28

1   the Boost*ed* Protease Inhibitor ("PI") market. Opp. at 10-12. Abbott's point appears to be that,

2   by arguing that Abbott's Norvir monopoly was obtained illegally, Plaintiffs are somehow making

3   their claims for monopolization of the Boost*ed* market more difficult to prove.

4       This argument is nonsensical. For purposes of Plaintiffs' claim that Abbott leveraged its

5   Boost*ing* Monopoly to gain an unfair advantage in the Boost*ed* Market, what matters is that

6   Abbott has monopoly power in the Boosting Market – not whether such power was obtained

7   legally or illegally. *See* Singer Reb. ¶¶ 3, 18-19, 22-24. Abbott has repeatedly conceded – even

8   "boasted" – that it has monopoly power in the Boosting Market.[11] There is nothing about arguing

9   that Abbott *improperly* obtained (or maintained) its Boosting monopoly that somehow expunges

10  Abbott's admission that it has a Boosting Monopoly.    Thus, Plaintiffs' claim for illegal

11  monopolization of the Boost*ing* Market makes it neither harder nor easier to prove Plaintiffs'

12  Boost*ed* Market claim. Plaintiffs' pursuit of this theory cannot create a conflict.

13  b.    **No Conflict Between "Kaletra-Only" and "Norvir-Only" Purchasers Regarding the Boost*ed* Monopolization Claim**

14      Abbott also claims there is a conflict between Norvir-only and Kaletra-only purchasers on

15  the ground that Norvir-only purchasers would purportedly have an easier time proving their

16  leveraging theory if Kaletra's price were low relative to the price of Norvir, whereas Kaletra-only

17  purchasers would want Kaletra prices to be higher in order to maximize overcharge damages on

18  Kaletra. Opp. at 12-13. This argument fails for at least three reasons.

19      *First*, Plaintiffs' claim for overcharge damages on Norvir flows from the same leveraging

20  claim that entitles Plaintiffs to recover overcharges on Kaletra. Plaintiffs can recover substantial

21  overcharges on Norvir only if the 400% price hike (or part of it) is considered a violation of the

22  antitrust laws because it was part of an illegal scheme to monopolize the Boosted Market. Singer

23  Reb. at ¶¶ 22-24. Put differently, Norvir-only and Kaletra-only purchasers recover overcharges

24  under the exact same theory of antitrust violation, and benefit from the exact same proof showing

25  that the 400% price hike constituted improper exclusionary conduct because the price hike's

26

27  [11] *See, e.g.,* Notice of Motion and Motion of Abbott Laboratories to Dismiss Plaintiffs' Consolidated Amended Complaint, Case 4:07-cv-05985-CW, Jan. 31, 2008, at 6.

28

1   effect on competition in the Boosted Market. *Id.*

2        *Second*, Plaintiffs' claims for overcharges on both Norvir and Kaletra are predicated on

3   the fact that both drugs are priced too *high,* and that the prices of *both* would be lower but for

4   Abbott's 400% Norvir price hike. The price of Norvir is too high because it constitutes a penalty

5   for those who buy a Boosted drug from someone other than Abbott (*i.e.*, a Kaletra rival), and

6   allowed Abbott to maintain or enhance its monopoly power in the Boosted Market. Singer Decl.

7   ¶¶ 7, 23-34; Singer Reb. at ¶ 23, 25-27. The price of Kaletra is too high because the price hikes

8   only became possible and profitable due to the success of the leveraging scheme. Singer Decl. at

9   ¶¶ 7, 23, 44-46; Singer Reb. at ¶ 23, 25-27. Thus, absent the scheme, the prices for both would

10  have moved in the same direction: *down*. Singer Reb. at ¶¶ 20, 25-28. Hence, the optimal

11  economic approach to maximizing recovery of overcharges on either product is exactly the same

12  whether a class member bought 100% Norvir, or 100% Kaletra, or a mixture of the two. *Id.* at ¶

13  20 n.22.

14       *Third*, this purported conflict relates *not* to prices in the future, but rather to the supposed

15  disparate interests of class members in the *historical* price of Kaletra being high or low. But the

16  historical price of a drug is an objective fact, not an argument that one group of Plaintiffs would

17  assert to the detriment of the other. Whether or not one group "wants" the historical price of

18  Kaletra to be "high" or "low" is irrelevant. Kaletra prices in the past will not change because it is

19  in the interest of one group that it be different than what it was. Thus, there can be no conflict.

20              c.    **Purported "Lost Profits" Conflicts Are Not Cognizable**

21       Finally, Abbott argues that some class members might be better off seeking "lost profits"

22  rather than the overcharges that Plaintiffs claim here. Opp. at 13-14. *First*, as with the other

23  purported conflicts, this is sheer speculation. *See* Hay Decl. ¶ 73 (guessing lost profits "*may be*

24  *greater* than any potential overcharges on the purchase of Kaletra"); *id.* ¶ 75. This argument is

25  therefore not cognizable *on its face*. *See supra* at 5 & n.10. *Second*, it is extremely unlikely that

26  any class member would be better off pursuing damages measured by "lost profits" rather than

27  overcharges. Abbott cannot point to a single example of any direct purchaser who has *ever*

28

1  preferred "lost profits" to a simple overcharge measure of damages in *any* direct purchaser suit.

2  Indeed, the opt-out direct purchasers *in this case* (the retail chains) have chosen to seek

3  overcharges, *not* lost profits. This is because "the standard method of measuring damages in

4  price enhancement cases is overcharge, not lost profits." *Howard Hess Dental Labs., Inc. v.*

5  *Dentsply Int'l Inc.*, 424 F.3d 363, 374 (3d Cir. 2005); *In re Cardizem CD Antitrust Litig.*, 200

6  F.R.D. 297, 310 (E.D. Mich. 2001) ("it is standard practice for purchasers to recover

7  overcharges" – the "basic measure of damages"); ABA Section of Antitrust Law, Proving

8  Antitrust Damages, at 172 (1996) (excerpt attached as Ex. A to Declaration of Jordan Elias

9  ("Elias Decl.")). "Lost profits damages are disfavored" because they are notoriously difficult to

10  prove, and therefore can "practically deny recovery" in direct purchaser cases.[12]  Abbott does not

11  – and cannot – explain how or why any absent class member "*might* want to pursue" or "*might*

12  argue" (Opp. at 13) for a theory of damages that would "practically deny [them] recovery," or

13  how such a theory could possibly yield a better outcome than seeking overcharges. Such

14  "conflicts are purely hypothetical and, thus, insufficient to defeat class certification." *K-Dur*,

15  2008 WL 2699390, at *10; *see also Cummings*, 316 F.3d at 896.

16       *Third*, as with Abbott's other purported conflicts, any conceivable class member

17  preferences can be protected through the opt-out device of Rule 23(c)(2). *Downstream Order* at

18  *4. Although Abbott disagrees with the Court's decision (Opp. at 16-18), the Court has already

19  ruled on this point, and Abbott did not move for reconsideration.[13]  Permitting class members to

20  _____

21  [12] *Dentsply*, 424 F.3d at 374-75; *see also National Info. Servs. v. TRW Inc.*, 1992 U.S. Dist.
    LEXIS 22497 (D. Or. Sept. 9, 1992); *Cardizem*, 200 F.R.D. at 310.

22  [13] Moreover, none of Abbott's citations disapproves of using the opt-out device to deal with the
    kind of questionable and speculative supposed conflicts at issue here, where, *e.g.*, Abbott has put
    forward no evidence that any class member would likely be better off not recovering overcharges

23  as part of the class in this case. *E.g., Gardner v. Equifax Information Servs.*, 2007 WL 2261688,
    at *5 (D. Minn. Aug. 6, 2007) (acknowledging "opt-out mechanism as a viable method to avoid

24  *some* conflict within a class") (emphasis in original). Abbott cites to cases, which unlike here,
    present actual, and proven, fundamental conflicts. *E.g., Lukenas v. Bryce's Mountain Resort,*

25  *Inc.*, 66 F.R.D. 69, 71 (W.D. Va. 1975) ("by plaintiffs' own estimation only approximately 190 of
    the 610 purchasers would desire to remain within the class"); *In re Jackson Nat'l Life Ins. Co.*

26  *Premium Litig.*, 209 F.R.D. 134, 142 (W.D. Mich. 2002) (defendant submitted affidavits from
    absent class members who opposed class claims); *Free World Foreign Cars, Inc. v. Alfa Romeo,*

27  *S.p.A.*, 55 F.R.D. 26, 29 (S.D.N.Y. 1972) (conflict "appears real rather than fanciful" because
    class claims would force defendant, upon whom franchisee plaintiffs relied, out of business).

28  *Footnote continued on next page*

1  opt-out, after receiving a well-crafted notice, would ameliorate any conceivable class conflicts of

2  this kind. *Downstream Order* at *5. Doing so is especially suitable in this case, where, as Abbott

3  admits,[14] class members are all corporate entities, typically represented by their own counsel. *Id.*

4  This is more than adequate to protect these class members' due process rights.[15]

## B. Abbott's Challenge to the Predominance of Common Issues Fails

6  Without mentioning, let alone distinguishing, the dozens of analogous direct purchaser

7  class certification decisions cited by Plaintiffs – including the ten recent analogous

8  pharmaceutical antitrust cases in which courts certified essentially the same direct purchaser (*see*

9  Mot. at 2-3 & n.2)[16] – Abbott argues that Plaintiffs have not satisfied the predominance

10  requirement of Rule 23(b)(3). Opp. at 18-24. Abbott implicitly concedes that proof of the

11  antitrust violation (including monopoly power, relevant market, and underlying theory of

12  exclusionary conduct) is classwide. Abbott instead focuses its challenge on Plaintiffs' ability to

13  prove antitrust impact (the fact of damages) and the amount of damages using predominantly

14  classwide evidence. Abbott's argument is based, almost exclusively, on the commonplace notion

15  that class members get a variety of discounts, although here those discounts adhere only to a

16  small percentage of purchases (████████, according to Prof. Hay). Hay Decl. at ¶ 99.

17  Abbott's challenge to predominance fails. Indeed, the analysis of *Abbott's own expert*,

18  Prof. Hay, demonstrates that classwide proof is available to prove fact-of-impact, and *bolsters* Dr.

19  Singer's findings regarding the predominance of common evidence here. *See* Singer Decl. at ¶¶

20  *Footnote continued from previous page*

21  Abbott then points to scenarios where class members would be exposed to counterclaims merely by remaining in the class. *E.g., Phillips v. Klassen*, 502 F.2d 362, 367 (D.C. Cir. 1974); *Alpert v.

22  U.S. Indus.*, 59 F.R.D. 491, 499 (C.D. Cal. 1973). Nor has Abbott pointed to a viable form of relief which Plaintiffs have surrendered, rendering its remaining citations irrelevant. Opp. at 18.

23  [14] *E.g.,* Opp. at 24-25 (describing class members as "sophisticated corporations" which have "hired large law firms."); *id.* at 7 n.1 ("class members are identifiable, sophisticated entities").

24  [15] *See* Plfs.' Downstream Opp. at 19 & n.18. Notice acts to protect due process rights by "appris[ing] interested parties of the pendency of the action and afford[ing] them an opportunity

25  to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *Phillips Petroleum, Co. v. Shutts*, 472 U.S. 797, 810-11 (1985) (explaining how notice

26  and opt-out mechanisms satisfy due process).

27  [16] *See, e.g., J.B.D.L.*, 225 F.R.D. 208 (certifying class of direct purchasers of brand-name prescription drug in a Section 2 case and finding predominance of common proof of impact

28  despite variability of purchase prices).

1  34-48; Singer Reb. at ¶¶ 5-15. Furthermore, while individual issues regarding proof of the

2  *amount* of damages would not warrant denial of class certification (Mot. at 21-22 (citing cases)),

3  Plaintiffs will be able to quantify damages with predominantly classwide proof. Singer Decl. at ¶¶

4  50-28; Reb. Decl. ¶¶ 16-17.

5       Prof. Hay's analysis confirms the availability of classwide proof of impact in two

6  important ways:

7       **(1)** *Hay Confirms that All Class Members Buy Some Units at Inflated List Prices.* The

8  challenged conduct involved the 400% price increase in the list price of Norvir in December

9  2003, which Plaintiffs allege, enhanced Abbott's monopoly power in the Boosted Market and

10  enabled Abbott to increase the list price of Kaletra beginning in June 2005. Singer Decl. at ¶¶ 3-4;

11  23-33. Recognizing that proving the fact of Abbott's inflation of its list prices will not vary by

12  class member, Prof. Hay argues that the predominance requirement is not met because class

13  members receive discounts on about ▮▮▮▮ of their purchases. Hay Decl. at ¶ 99 ("▮▮▮▮▮

14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15  ▮▮▮▮▮▮▮"). But, not only does Prof. Hay concede that nearly ▮▮▮ of all class member

16  purchases were at (the inflated) list prices, but his analysis of Abbott's sales database also reveals

17  that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Singer Reb. at ¶

18  11 (analyzing Hay Decl. at ¶ 99 & n.99). Given that Plaintiffs need only show that classwide

19  evidence is available to prove that class members paid artificially inflated prices *on at least some*

20  *purchases of the affected products* (*i.e.*, that most have non-zero damages), if all class members

21  bought at least some units at WAC, then proof of impact would not involve questions unique to

22  individual class members. *See* Mot. at 18-19 (citing cases showing that common impact

23  requirement established merely by showing that "*some purchases* at the higher price").[17] And

24  Prof. Hay has effectively *confirmed* Dr. Singer's view that all class members pay WAC (or some

25  price related to WAC) on some, if not most, of their purchases. Singer Reb. at ¶¶ 9-12 (discussing

26  Hay's admission). Accordingly, Prof. Hay himself shows that evidence of list price inflation,

---

[17] *E.g, Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 455 (3d Cir. 1977).

1    which is common to the class, establishes some impact on all class members.[18]

2    　　　**(2) *Hay Confirms that All or Nearly All Class Members Paid More After the List Prices***

3    ***for Norvir and Kaletra Were Inflated Than Before*.** Dr. Singer has concluded that there is

4    common evidence available to show that all or nearly all class members paid more for Norvir and

5    Kaletra due to the challenged conduct. Singer Decl. at ¶¶ 34-48.[19] Abbott responds with a non-

6    sequitur, arguing that "███████████████████████████████████████████████████████████

7    ███████████████████████████████████████████████████████████████████████████████████████

8    ████████████████████." Opp. at 19. Notwithstanding this evidence of discounts, however, Hay

9    concludes that ██████ of class members paid more, on net, *after* Abbott raised the list price of

10   Norvir and Kaletra than before, *bolstering* Dr. Singer's finding that common evidence of list price

11   inflation constitutes classwide proof that all or nearly all class members paid more due to the

12   challenged conduct. Singer Reb. at ¶ 13 (noting that Prof. Hay finds only ████████ class

13   members who appear to pay less, on average, after the price increases). *See* Mot. at 18.

14   　　　Furthermore, neither Abbott nor Prof. Hay provides any reason to expect that the

15   challenged conduct would have caused the net prices paid by any class member for either drug to

16   go *down*. The conduct, after all, involved a massive price increase on Norvir, and no discounting.

17   Singer Decl. at ¶ 36; Singer Reb. at ¶¶ 8, 11-12. And, Prof. Hay's own analysis shows that ██████

18   ██████████████████████████████████████████████████████████████████████████████████████████

19   ██████████████████████████. Singer Reb. at ¶¶ 13-14. These ██████ outliers *appeared* to pay

20   less, on average, for the drugs at issue after the list price hikes in question. As Prof. Hay

21   recognizes, however, the *average* price went down only because of ███████████████ *wholly*

22

---

23   [18] Hence, the recent decision in *In re Graphics Processing Units Antitrust Litig.*, 2008 WL
     2788089 (N.D. Cal. Jul. 18, 2008), is inapposite because, unlike here, "the vast majority of [GPU]

24   sales" resulted from "customized negotiations" performed "without any regard to a price list." *Id.*
     at *14. Moreover, *GPU* involved "hundreds if not thousands of GPU products," *id.* at *15, but

25   this case involves only two.

     [19] Abbott falsely implies that Dr. Singer's methodology for proving impact and damages ignores

26   discounts, rebates, and chargebacks. Opp. at 21 (implying that Plaintiffs would need to "revise
     their methodology" to incorporate net prices). That is false. Dr. Singer's methodology for

27   proving classwide impact explicitly accounts for "sales that are affected by chargebacks . . .,
     discounts or rebates." *E.g.*, Singer Decl. at ¶¶ 36, 38. *See also* Singer Reb. at ¶ 12.

28

1  *unrelated to the challenged conduct. Id.* (discussing Hay Decl. at ¶¶ 120-21).



3  . Singer Reb. at ¶ 14. But,

4  as Dr. Singer explains, what matters here are effects related to the challenged conduct (if the

5  changes are unrelated, they would have happened anyway). *Id.* at ¶¶ 7-8, 14. Indeed, once one

6  removes the unaffected purchases (at the governmental prices), the anomalous results vanish:

8  , *and would have paid less on their affected purchases (i.e., non-governmental*

9  *purchases) absent the list price inflation – just as Dr. Singer had predicted. Id.* [21]

10     In sum, as long as each class member either purchased some affected units at WAC (as

11  all did) or at a price closely correlated with WAC, all paid more on at least some units when the

12  WAC price was inflated. Thus, Prof. Hay's analysis confirms that Dr. Singer was correct: the

13  same common evidence linking the challenged conduct to higher list prices constitutes common

14  evidence that *all* class members paid at least some overcharges, thereby establishing the

15  availability of common evidence of impact.[22]

16  ─────────────────────

17  [20] As Abbott itself explains, "[o]ne important reason why the size of discounts and chargebacks varies over time is that the largest discounts are negotiated between Abbott and third-party payors

18  or retailers, [and] the price each direct purchaser pays for each unit of Norvir and Kaletra depends on the customer to which the direct purchaser sells that unit." Opp. at 20-21.

19  [21] *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*, 247 F.R.D. 156, 168 (C.D. Cal. 2007), does not support Abbott's argument. *See* Opp. at 22-23. In that case, in stark contrast

20  to this one, the challenged conduct involved "***giving [purchasers] discounts off list prices*** in return for their commitment to buy specified percentages of [defendants' products]." *Id.* at 168.

21  Here, of course, the challenged conduct involved a massive price increase on Norvir (essentially, the opposite of a discount), leading to large price increases on Kaletra. Not even Prof. Hay has

22  argued that the conduct here could conceivably have caused any class member to pay less. Thus, Abbott provides no reason to doubt Dr. Singer's analysis that classwide evidence is available to

23  prove impact (and the amount of damages) on all or nearly all class members, thereby satisfying the predominance requirement of Rule 23(b)(3).

24  [22] Abbott also argues that common proof of impact is deficient because some class members "may" have sold Norvir "only" for use as a standalone PI (Opp. at 24), but that is not standard

25  medical practice. Abbott's speculation about what some class members "may" have done cannot defeat certification. Also, Abbott itself has noted that "Norvir is primarily used . . . at low doses

26  of 100mg to 200mg in combination with other protease inhibitors" (Elias Decl., Ex. B, at ABL-IL-0031740), so it unreasonable to believe that there are any class members – mainly pharmacies

27  and wholesalers – that sell Norvir only as a standalone PI. Abbott offers no reason to suspect that the distribution of patients who used Norvir this way would affect class members unequally.

28

1    Abbott's arguments regarding damages (Opp. at 21-22) similarly fail.  First, Dr. Singer's

2    methodology is sufficient at this stage unless it is "so insubstantial that it realistically amounts to

3    no method at all."  *See* Mot. at 21.  Second, as discussed above, Abbott has conceded that the

4    variability in prices is attributable to shifts in class members' customer bases, which have no

5    bearing on the ability to compute class members' damages.  Singer Reb. ¶¶ 7-10, 14.  Third, Dr.

6    Singer's method involves computing overcharges in the aggregate.  Singer Decl. at ¶¶ 49-50, 68;

7    Singer Reb. at ¶ 16.  This well-accepted method does not involve examining issues relating to any

8    individual class members. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 523 (6th Cir.

9    2008); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 525-26 (S.D.N.Y. 1996).

10    Also, individualized questions as to damages are no bar to certification.  *See* Mot. at 21-22.

11    **C.    Class Certification Remains the Superior Means to Adjudicate this Case**

12    Without distinguishing the multiple cases Plaintiffs have cited showing that class

13    certification is the superior means of adjudicating this case (Mot. at 24-25), Abbott recites the

14    shopworn argument that certification should be denied because a few class members have large

15    claims. Opp. at 24-25.  However, "Rule 23(b)(3) does not exclude from certification cases in

16    which individual damages run high."[23]  And, due to the expense and complexity of antitrust

17    litigation, the only way smaller claimants could recover is through certification.  Mot. at 24-25.

18    Abbott's approach would leave scores of class members without an effective remedy, and

19    multiply inefficiencies and expenses for no sound reason.[24]

20    **D.    Abbott's Challenge to Meijer's Standing Is Without Merit**

21    Abbott argues that *one* of the three proposed class representatives, Meijer, as an assignee

22    of the claims of Frank W. Kerr, Co. ("Kerr"), lacks standing to sue.  Abbott's contention is

23    without merit.  Two courts recently rejected this very argument in certifying Meijer as an

24

25    [23] *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617 (1997); s*ee also* Mot. at 24 (citing cases).

26    [24] Abbott (at Opp. at 25) also impermissibly seeks to turn this certification motion into "a
preliminary inquiry into the merits." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974).

27    Both of Abbott's citations are to decisions on dispositive motions decided before class
certification, but here, the Court has already denied: (1) Abbott's motion to dismiss; (2) motions
for summary judgment in the end-payors' case; and (3) motions for § 1292 interlocutory appeals.

28

775174.3
REPLY BRIEF IN SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C 07-5985 CW

1   appropriate class representative in analogous pharmaceutical antitrust cases.[25]  Abbott argues that

2   Meijer has not alleged or shown that it purchased Norvir or Kaletra from Kerr.  Opp. at 8.  But,

3   *first*, Meijer's complaint alleges that it is, through its assignment, a direct purchaser of both

4   Norvir and Kaletra.  *Second*, Meijer has produced data showing that Meijer purchased well over

5   ████████ of Norvir and Kaletra from Kerr (Elias Decl., Ex.C).  *Third*, Abbott's own transactional

6   data confirms ██████████████████████  *Fourth*, Meijer's assignment is the same

7   assignment that was before the courts in *Ovcon* and *Wellbutrin*, and those courts recently

8   approved Meijer as a class representative.[26]  Contrary to Abbott's representations, neither Meijer,

9   nor its assignor, Kerr, was required to give Abbott written notice of the assignment.  The clause

10   Abbott references is in the contract between Abbott and Kerr, ████████████████████

11   ████████████████████, by which time Kerr and Meijer had been paying

12   overcharges for ████.  Also, the contract between Abbott and Kerr concerns ██

13   ████████████████████.  While such material terms are not assignable,

14   this in no way limits the assignability of separate antitrust claims.  *Finally*, contrary to Abbott's

15   contention that the assignment lacks consideration, it explicitly states that it is "██

16   ████████████████████████████████████

17   ████████████"  Meijer Assig. at 1; *see, e.g.*, *RBS Asset Fin., Inc. v.*

18   *Bravo*, 2006 U.S. Dist. LEXIS 45745, at *12-13 (E.D. Mich. Jul. 6, 2006) (express statement of

19   adequate consideration must be accepted).  Indeed, Abbott's own contract with Kerr, which

20   Abbott relies on here, uses (nearly) verbatim language.  Thus, Abbott's arguments are without

21   merit, and Meijer should be approved here as it has been by every other court in which it has

22   petitioned to be certified as a class representative.

23   **III.  CONCLUSION**

24       For the foregoing reasons and those set forth in Plaintiffs' initial motion, Plaintiffs'

25   Motion for Class Certification should be granted.

26

27   [25] *See Wellbutrin*, 2008 WL 1946848, at *4-5; *Ovcon*, 246 F.R.D. at 301; *see also* Mot. at 14 n.9.
    [26] *See Wellbutrin*, 2008 WL 1946848, at *5; *Ovcon*, 246 F.R.D. at 302.

28

1     Dated: July 23, 2008           Respectfully submitted,

2

3                             By: _____ */s/ Joseph R. Saveri*_____

4                         Joseph R. Saveri (State Bar No. 130064)
Email: jsaveri@lchb.com

5                         Brendan Glackin (State Bar No. 199643)
Email: bglackin@lchb.com

6                         Jordan Elias (State Bar No. 228731)
Email: *jelias@lchb.com*

7                         LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
Embarcadero Center West

8                         275 Battery Street, 30th Floor
San Francisco, CA 94111 3339

9                         Telephone: (415) 956 1000
Facsimile: (415) 956 1008

10                       ***Class Counsel for Direct Purchaser Class Plaintiffs***

11                       Linda P. Nussbaum, *Pro Hac Vice*
Email: lnussbaum@kaplanfox.com

12                       John D. Radice, *Pro Hac Vice*
Email: jradice@kaplanfox.com

13                       KAPLAN FOX & KILSHEIMER, LLP
850 Third Avenue, 14th Floor

14                       New York, NY 10022
Telephone: (212) 687-1980

15                       Facsimile: (212) 687-7714

16                       Daniel Berger
Email: danberger@bm.net

17                       Eric L. Cramer, *Pro Hac Vice*
Email: ecramer@bm.net

18                       Daniel C. Simons, *Pro Hac Vice*
Email: dsimons@bm.net

19                       BERGER & MONTAGUE, P.C.
1622 Locust Street

20                       Philadelphia, PA 19103
Telephone: (215) 875-3000

21                       Facsimile: (215) 875-4604

22                       Bruce E. Gerstein, *Pro Hac Vice*
Email: bgerstein@garwingerstein.com

23                       Noah H. Silverman, *Pro Hac Vice*
Email: nsilverman@garwingerstein.com

24                       GARWIN GERSTEIN & FISHER, LLP
1501 Broadway, Suite 1416

25                       New York, NY 10036
Telephone: (212) 398-0055

26                       Facsimile: (212) 764-6620

27                       ***Co-Lead Counsel for Direct Purchaser Class Plaintiffs***

28

1    David P. Smith, *Pro Hac Vice*
Email: dpsmith@psfllp.com

2    W. Ross Foote, *Pro Hac Vice*
Email: rfoote@psfllp.com

3    PERCY SMITH & FOOTE, LLP
720 Murray Street

4    P.O. Box 1632
Alexandria, LA  71309

5    Telephone: (318) 445-4480
Facsimile: (318) 487-1741

6    John Gregory Odom, *Pro Hac Vice*
Email: greg@odrlaw.com

7    Stuart E. Des Roches, *Pro Hac Vice*
Email: stuart@odrlaw.com

8    John Alden Meade, *Pro Hac Vice*
Email: jmeade@odrlaw.com

9    ODOM & DES ROCHES, LLP
Suite 2020, Poydras Center

10    650 Poydras Street
New Orleans, LA  70130

11    Telephone: (504) 522-0077
Facsimile: (504) 522-0078

12

***Executive Committee for Direct Purchaser Class Plaintiffs***

13

Andrew E. Aubertine, *Pro Hac Vice*

14    Email: aa@adr-portland.com
AUBERTINE DRAPER ROSE, LLP

15    1211 S.W. Sixth Avenue
Portland, OR  97204

16    Telephone: (503) 221 4570
Facsimile: (503) 221 4590

17

Joshua P. Davis (State Bar No. 193254)

18    Email: davisj@usfca.edu
LAW OFFICES OF JOSHUA P. DAVIS

19    437A Valley Street
San Francisco, CA 94131

20    Telephone: (415) 422-6223
Joseph M. Vanek, *Pro Hac Vice*

21    Email: jvanek@vaneklaw.com
David P. Germaine, *Pro Hac Vice*

22    Email: dgermaine@vaneklaw.com
VANEK, VICKERS & MASINI, P.C.

23    111 South Wacker Drive, Suite 4050
Chicago, IL  60606

24    Telephone: (312) 224-1500
Facsimile: (312) 224-1510

25

26

27

28

-17-

REPLY BRIEF IN SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
CASE NO. C 07-5985 CW

1

2

3

4

                Charles M. Kagay (SBN 073377)
                Email: cmk@slksf.com
                SPIEGEL, LIAO & KAGAY
                388 Market Street, Suite 900
                San Francisco, CA  94111
                Telephone:  (415) 956 5959
                Facsimile:  (415) 362 1431

5

6

7

8

9

                Tucker Ronzetti, *Pro Hac Vice*
                Email: tr@kttlaw.com
                Adam Moskowitz, *Pro Hac Vice*
                Email: amm@kttlaw.com
                KOZYAK TROPIN & THROCKMORTON
                2800 Wachovia Financial Center
                200 South Biscayne Boulevard
                Miami, FL  33131 2335
                Telephone: (305) 372 1800
                Facsimile: (305) 372 3508

10

11

12

13

                Paul E. Slater, *Pro Hac Vice*
                Email: pes@sperling-law.com
                SPERLING & SLATER
                55 West Monroe Street, Suite 3200
                Chicago, IL  60603
                Telephone: (312) 641 3200
                Facsimile: (312) 641 6492

14

15

                ***Other Class Counsel***

16

17        **Pursuant to General Order 45, Part X-B, the filer attests that concurrence in the**

18  **filing of this document has been obtained from Eric L. Cramer, Linda Nussbaum, and**

19  **Bruce Gerstein.**

20

21

22

23

24

25

26

27

28