**EXHIBIT A**

Case 4:07-cv-05985-CW   Document 130-2   Filed 08/14/2008   Page 1 of 12

James F. Hurst (*Admitted Pro Hac Vice*)
David J. Doyle (*Admitted Pro Hac Vice*)
Samuel S. Park (*Admitted Pro Hac Vice*)
Stephanie S. McCallum (*Admitted Pro Hac Vice*)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Telephone:   312-558-5600
Facsimile:   312-558-5700
Email: jhurst@winston.com; ddoyle@winston.com;
spark@winston.com; smccallum@winston.com

Jeffrey I. Weinberger (SBN 56214)
David M. Rosenzweig (SBN 176272)
Grant A. Davis-Denny (SBN 229335)
MUNGER, TOLLES & OLSON LLP
355 Grand Avenue
Los Angeles, CA  90071-1560
Telephone:  (213) 683-9100
Facsimile:   (213) 687-3702
Email: jeffrey.weinberger@mto.com;
david.rosenzweig@mto.com;
grant.davis-denny@mto.com

Nicole M. Norris (SBN 222785)
WINSTON & STRAWN LLP
101 California Street, Suite 3900
San Francisco, CA  94111-5894
Telephone:   415-591-1000
Facsimile:   415-591-1400
Email: nnorris@winston.com

Michelle Friedland (SBN 234124)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA  94105-2907
Telephone:  (415) 512-4000
Facsimile:   (415) 512-4077
Email: michelle.friedland@mto.com

Charles B. Klein (*Admitted Pro Hac Vice*)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C.  20007
Telephone:   202-282-5000
Facsimile:   202-282-5100
Email: cklein@winston.com

Attorneys for Defendant
ABBOTT LABORATORIES

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| MEIJER, INC. & MEIJER DISTRIBUTION, INC., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ABBOTT LABORATORIES,<br><br>Defendant. | **Case No. C 07-5985 CW**<br><br>*Related Per October 31, 2007 Order to Case No. C 04-1511 CW*<br><br>CONSOLIDATED CASE<br><br>**ABBOTT LABORATORIES' SUR-REPLY TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:  August 19, 2008<br>Time:  2:00 p.m.<br>Courtroom:  2 (4th Floor)<br>Judge:  Hon. Claudia Wilken |

Acknowledging the deficiencies in their opening papers, Plaintiffs propose for the first time in their reply a brand new monopolization theory—that Abbott acted illegally simply by raising the price of its patented drug Norvir® irrespective of the price it charged for Kaletra®. Until now, Plaintiffs—like all the plaintiffs in the related cases before them—had claimed that Abbott's anticompetitive conduct consisted of raising the price of Norvir while keeping the price of Kaletra constant. Plaintiffs' brand new monopolization theory, however, is not legally cognizable and, like their previous theory, fails to satisfy the predominance requirement of Rule 23.

## I. Plaintiffs' New Monopolization Theory Fails To Cure The Conflict Between Kaletra Purchasers and Norvir Purchasers.

Until now, Plaintiffs in this case could not have been clearer in their allegations that Abbott monopolized the Boosted Market by raising the price of Norvir without also increasing the price of Kaletra. For example, they asserted in their complaint that "Abbott raised the price of Norvir only when it is used to boost a non-Abbott PI," which "drastically increased the cost of regimens using Norvir to boost competing PIs." (Cons. Am. Compl. at ¶ 24). "However, Abbott did not raise the price of Kaletra, which incorporates Norvir." *Id*. They reiterated these allegations in opposition to Abbott's motion to dismiss. (*See* Opp'n to MTD at 6-7 ("In direct response to the introduction of these competitor drugs, in 2003, Abbott—overnight, on December 3, 2003—raised the price of Norvir by 400%. Abbott did not raise the price of Kaletra, however. As a result of this price increase, rival boosted drugs were put at a severe disadvantage.")). And Plaintiffs continued to focus on the relative prices of Norvir and Kaletra even in their motion for class certification, stating that Abbott "raised the price of Norvir by 400%," but "did not similarly impose a massive spike in the price of ritonavir when sold as part of Kaletra." (Mot. at 5).

As Abbott demonstrated in its opposition to class certification, however, any theory of recovery that depends on showing that the price of Norvir was too high relative to the price of Kaletra presents a fundamental conflict of interest between putative class members that primarily bought Norvir and those that primarily bought Kaletra. This is because putative class members that would seek Norvir overcharges would have an incentive to prove that Kaletra was priced *too low*,

while those whose recoveries would be greater under a Kaletra overcharge theory would have an incentive to prove that Kaletra was priced *too high*.  (Opp'n at 12-13).

In response to Abbott's opposition, Plaintiffs completely changed their theory of the case. Relying on the declaration of their expert Dr. Hal Singer, they argued for the very first time in their reply that the increase in the price of Norvir was anticompetitive *regardless of the price of Kaletra*. In his expert declaration, Singer explains this new theory:

> Professor Hay repeatedly states that the challenged conduct is a 400-percent increase in the price of Norvir *without a concomitant increase in the price of Kaletra*.  This is a misleading description of the conduct challenged in this case.  Putting aside the allegations regarding the monopolization of the Boosted Market, the challenged conduct is simply the unilateral 400-percent increase in the price of Norvir.

(Singer Rebuttal Decl. ¶ 19 (emphasis in original)).  In other words, Plaintiffs now claim that Abbott monopolized the Boosted Market by charging more for Norvir, regardless of the price of Kaletra.

Through this change, Plaintiffs implicitly concede that their previous theory of liability fails to support class certification.[1]  Their new theory, however, fares no better because it fails both to state a cognizable antitrust theory and to provide a methodology for determining the fact of injury or amount of damages on a class-wide basis.[2]

---

[1]  Plaintiffs also suggest in their reply that even if there is a conflict between Norvir-only and Kaletra-only purchasers, the Court should simply overlook the conflict because "▬ of all class purchases of Norvir and Kaletra were made by entities, like the named Plaintiffs, that purchased both products." (Reply at 6).  However, a full ▬ of all purchases were made by only ▬ direct purchasers. (Hay Supp. Decl. ¶ 4).  The remaining ▬ of purchases are spread among ▬ different purchasers, and it is the interests of these small purchasers that class actions were intended to vindicate.  *Id*. at ¶ 5; *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (holding that class actions are designed to vindicate "the rights of groups of people who individually would be without effective strength to bring their opponents into court at all") (internal quotations omitted). Moreover, ▬ class members—none of which are in the top ▬ purchasers—purchased only Norvir or only Kaletra. (Hay Supp. Decl. ¶ 5).  Plaintiffs, in essence, ask this Court to ignore the interests of these ▬ putative class members—more than ▬ of the proposed class—in order to advance Plaintiffs' own interests and those of the largest purchasers.  The Court cannot do so without ignoring its obligations under Rule 23 and undermining the purpose of this class action.

[2]  If this Court certifies the proposed class based on this new monopolization theory, it should, at a minimum, preclude Plaintiffs from subsequently reverting to their previous theory.  Simply put, Plaintiffs may not prevail at the liability stage under a theory that could not support class certification.  *See Pehr v. University of Chicago*, 799 F. Supp. 862, 869 (N.D. Ill. 1992); *Illinois State Rifle Ass'n v. State of Ill*., 717 F. Supp. 634, 639 (N.D. Ill. 1989).

## II. Plaintiffs' New Theory Fails To State A Claim.

As Abbott argued in its opposition, class certification cannot be granted when the underlying legal theory of the case is entirely without merit. *See, e.g., Pehr*, 799 F. Supp. at 869 (denying class certification where "the plaintiff's own individual claim appeared from the outset to be wholly without merit even in facial terms"); *Illinois State Rifle Ass'n*, 717 F. Supp. at 639 (denying certification when "this Court viewed the Complaint as facially suspect in more than one respect that appeared incurable"). This is true of Plaintiffs' new monopolization theory.

While this Court held that Plaintiffs' previous theory of liability stated a claim under *Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997), it has not had occasion to consider Plaintiffs' new theory of Boosted Market monopolization based solely on the price of Norvir. This Court has, however, stated in the related Doe/SEIU litigation that Plaintiffs cannot simply complain about Abbott "charging too much" for Norvir. (07/06/06 Order at 10). Plaintiffs did not attempt to defend such a theory in the motion to dismiss context and have cited no case disputing the Court's conclusion.

Plaintiffs' theory is also internally inconsistent and conflicts with basic antitrust principles. In his rebuttal expert declaration, Dr. Singer explains how, under Plaintiffs' new theory, Abbott's pricing had an anticompetitive effect, contending that "the price of Norvir was increased by Abbott to penalize customers who bought a Boosted PI from one of Abbott's competitors. This penalty price allowed Abbott to extend its monopoly power into the Boosted Market." (Singer Rebuttal ¶ 23). But even taking this new theory at face value, it requires consideration of the price of Kaletra because a higher price for Norvir could "penalize" rival boosted PIs only if the price of Kaletra was not increased commensurately.

Accordingly, because the Court has already found that Plaintiffs' new theory based on Abbott's "charging too much" for Norvir is not cognizable, and because Plaintiffs have implicitly conceded that their previous theory presents a fundamental intra-class conflict, the Court should deny certification of the proposed class.

### III. Under Plaintiffs' New Theory, Like Their Old One, Any Determination Of The Fact Of Injury Or The Amount Of Damages Would Turn On Individualized Issues.

Even if their new theory were legally cognizable, Plaintiffs cannot provide a methodology under that theory for showing either the fact of injury or the amount of damages with common evidence, as required under Rule 23(b)(3). *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001). As Abbott showed in its opposition, the methodology Plaintiffs proffered in their motion erroneously assumed that every class member paid the Wholesale Acquisition Cost ("WAC") or some fixed, constant percentage of WAC. (*See* Opp'n at 18-24). In reality, as Abbott demonstrated, not all direct purchasers paid WAC, different direct purchasers paid different net prices, the net prices many direct purchasers paid changed over time, and those price changes varied by direct purchaser. As a result, without making individualized inquiries into the circumstances of each class member's purchases, there is no way to determine whether each class member paid more in the actual world than it would have paid in the but-for world, let alone the amount of any purported overcharges.

Plaintiffs' new monopolization theory fails to resolve these concerns. Plaintiffs do not dispute that they must provide a methodology for showing both the fact of injury and amount of damages on a class-wide basis. As the Central District of California has held, the relevant inquiry for both compares "what each purchaser paid in the actual world, relative to what that purchaser would have paid in the but-for world." *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*, 247 F.R.D. 156, 167 (C.D. Cal. 2007).[3] If the calculation of these two prices requires individualized evidence, Plaintiffs cannot meet their burden under Rule 23.

---

[3] Plaintiffs attempt to distinguish *Allied* in a footnote, claiming that that case involved giving purchasers discounts off of list price, while this case involves "a massive price increase on Norvir." (Reply at 13 n.21). This is a false distinction. Both cases involved allegations that the defendant's conduct led to higher prices than class members would have paid otherwise, and both involve markets in which different direct purchasers receive varying discounts from list price. In *Allied*, the court concluded that individual issues predominated because in the but-for world, "some purchasers would have had available more favorable pricing, and others would not." *Allied,* 247 F.R.D. at 168. The present case raises precisely the same issue. For example, if Abbott would have taken even small annual price increases on Norvir in the but-for world, then direct purchasers that sold to entities that "were wholly or largely unaffected by the December 2003 price hike" (Singer Decl. ¶ 36 n.39) would have paid more in the but-for world. If Abbott had charged the "independent monopoly

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

4
CASE NO. C 07-5985 CW - ABBOTT LABORATORIES' SUR-REPLY TO DIRECT
PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

### A. Plaintiffs' Proposed Methodology Is Based Upon Erroneous Assumptions And An Incorrect Legal Standard.

Plaintiffs have abandoned their erroneous contention that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (known as the wholesale acquisition cost ("WAC")) set by Abbott." (Mot. at 19). They do not contest the conclusions of Abbott's expert that the net prices paid by direct purchasers were often less than the Wholesale Acquisition Cost ("WAC"), and that different direct purchasers paid different net prices. Instead, they claim that (1) they need only show that each class member made a single purchase of either Norvir or Kaletra at an inflated price; (2) any "discounts adhere only to a small percentage of purchases (about ▮▮ according to Prof. Hay)" and related solely to "discounted government prices" that can simply be removed from the analysis; (3) "each class member bought at least some Norvir and/or Kaletra at WAC," and (4) all or nearly all class members paid more after the list prices for Norvir and Kaletra were inflated than before. (Reply at 10-13). Plaintiffs are wrong on each of the first three points, and their final point fails to provide common evidence of injury or damages under their own new theory.

*First*, Plaintiffs must show more than that each class member made a single purchase of either Norvir or Kaletra at an inflated price. As *Allied* explained in nearly identical circumstances, Plaintiffs must show that "common, class-wide proof exists to show that all purchasers of Tyco consumables paid more in the actual world than they would have in a 'but-for' world . . . for purchases made during the class period." *Allied*, 247 F.R.D. at 165. The relevant inquiry is therefore not whether a particular class member made a single purchases at a higher price, but rather whether each class member suffered a net overcharge—actual injury—over the course of the entire class period. Notably, the court did not permit the plaintiffs to cherry-pick only those purchases by class members at higher prices, as Plaintiffs here seek to do. Instead, it analyzed the putative class members' purchases "over the course of the class period." *Id*. The *Allied* plaintiffs failed to satisfy the predominance requirement because there was no common evidence to show that all class

---

price," as Dr. Singer admits that it could have done lawfully, even more putative class members would have paid higher prices in the but-for world than they actually paid.

members paid more for their purchases over the entirety of the class period than they would have paid absent the allegedly illegal conduct. *Id.* at 175. Likewise, Plaintiffs here must show that each member of the proposed class paid more in total or on average for their purchases than they would have paid in the but-for world.

*Second*, the fact tha █████████ of purchases were made at below the WAC is not relevant to the class certification inquiry. █████████ of the members of the proposed class made at least one purchase below WAC. (*See* Hay Initial Decl. at ¶ 100). Plaintiffs cannot simply sweep these purchases and proposed class members under the rug. To the contrary, "class certification is precluded where plaintiffs have not shown that the fact of injury element can be proven *for all class members* with common evidence." *Allied*, 247 F.R.D. at 165 (emphasis added).

Plaintiffs and their expert also erroneously suggest that any significant discounts would have occurred regardless of Abbott's conduct and are attributable to purchases at government prices that can simply be removed from the equation. As Prof. Hay explains, however, Abbott's sales records show that the magnitude of discounts increased dramatically after the price increases for Norvir and Kaletra, suggesting that such levels of discounting would not have occurred in the but-for world. For example, ███████████████████████████████████ ███████████████████████████████████ (Hay Supp. Decl. ¶ 11). Another wholesaler mentioned by Dr. Singer, ███████████████████████████████████ ███████████████████████████████████ *Id*.

Moreover, there is no economic or legal basis for excluding discounted purchases, and Plaintiffs' expert does not offer one, stating merely that "I was instructed to exclude purchases made at prices designed to blunt the impact of the 400-percent-price increase to government purchasers." (Singer Rebuttal Decl. ¶ 15). Contrary to Dr. Singer's contention, however, discounts were not limited to purchases for resale to participants in government programs, and it is not possible without individualized proof to identify whether and when a particular putative class member made purchases at a significant discount. (Hay Supp. Decl. ¶¶ 6-11).

*Third*, contrary to Plaintiffs' and their expert's claims, a substantial percentage of the class never made *any* purchases at the allegedly inflated WAC prices. As the accompanying

1  Supplemental Hay Declaration shows, ■ purported class members purchased either Norvir after
2  2003 or Kaletra after May 2005[4] that produced sufficient data to allow the calculation of discounts
3  from the WAC price. *Id*. at ¶ 3. Of those ■ proposed class members, at leas ■
4  ■ made no purchases of either Norvir at WAC from 2004 to 2007 or Kaletra at WAC
5  between June 2005 and the end of 2007. *Id*. In other words, at least ■ members of the proposed
6  class made no purchases at the allegedly inflated WAC prices for either Norvir or Kaletra.

*Fourth*, the fact that all or nearly all direct purchasers may have paid more after December 2003 than before does not prove fact of injury even under Plaintiffs' new monopolization theory. Rather, "proof of fact of injury requires much more than a simple showing that the plaintiffs purchased an item in a world where average prices were inflated." *Allied,* 247 F.R.D. at 166 (citing *Continental Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater New York, Inc.*, 198 F.R.D. 41, 46 (E.D.N.Y. 2000)). Instead, Plaintiffs must show that each class member paid more overall or on average than they would have in the but-for world.

In explaining Plaintiffs' new monopolization theory, Dr. Singer acknowledges for the first time in his rebuttal expert report that "Plaintiffs do not dispute that Abbott's patent over Norvir grants Abbott the right to charge the independent monopoly price for Norvir."[5] (Singer Rebuttal Decl. ¶ 24). He explains that Plaintiffs now contend that "it is anticompetitive for Abbott to use an increase in the price of Norvir *above its independent monopoly price* as part of a scheme to monopolize the Boosted Market." *Id*. (emphasis added). Under this new theory, a putative class member was injured only if it paid more than the "independent monopoly price," which Singer defines as "the price that a profit-maximizing monopolist would choose if the patented drug were not sold pursuant to a bundle." *Id*. at 11 n. 22.

---

[4] Plaintiffs do not claim that Abbott overcharged for Kaletra until June 2005. (Mot. at 6 ("From December 2003 until June 2005, Abbott waited to see if it had accomplished its goal of impairing the growth of its boosted rivals, and thus kept Kaletra's price steady.")).

[5] Plaintiffs merely concede the obvious. Because Norvir is a patented drug, Abbott is entitled to charge a profit-maximizing price for Norvir. *See, e.g., Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1218 n.11 (9th Cir. 1997) ("Kodak is entitled to reap monopoly profits from the sale or licensing of" its patented products).

1    Neither Plaintiffs nor their expert, however, have put forth any methodology for determining
2    this profit-maximizing but-for price on a class-wide basis. Instead, Dr. Singer merely assumes that
3    the pre-December 2003 prices had to be the profit-maximizing prices or "else Abbott would not have
4    chosen those prices." *Id*. at ¶ 27. By definition, however, to be the profit-maximizing price, the
5    ███████████████████████████████ of Norvir must, at the very least, be more profitable than
6    the ██████████████████████ (Hay Supp. Decl. ¶ 14). This is true only if Abbott would
7    have sold so much more Norvir at the ███ price that it would overcome the loss of higher profits
8    from selling Norvir at the ███ price. *Id*. Specifically, Abbott would have to sell at least five times
9    as much Norvir at the ███ price as at the ███ price. *Id*. But the evidence simply does not bear
10   this out. To the contrary, sales of Norvir *increased* following the price increase, thus defeating any
11   suggestion that ███ was a profit-maximizing price. *Id*.

12   The fact that all or nearly all direct purchasers paid more after December 2003 than before is
13   not enough to answer the critical question of whether any of them suffered injury or damages. In
14   their own reply, Plaintiffs tacitly concede that a putative class member may not have been
15   overcharged merely by paying more than the pre-December 2003 price, noting that "Plaintiffs can
16   recover substantial overcharges on Norvir only if the 400% price hike (*or part of it*) is considered a
17   violation of the antitrust laws." (Reply at 7 (emphasis added)). The relevant question, which
18   Plaintiffs and their expert fail to address, is whether each class member paid more than it would have
19   had Abbott charged it the "independent monopoly price." As discussed below, a serious attempt to
20   answer this question, which Plaintiffs have not undertaken, requires individualized evidence.

21   **B.    Plaintiffs' New Monopolization Theory Precludes A Determination Of The But-**
22   **       For Price On A Class-Wide Basis.**

23   Because Plaintiffs cannot simply point to the pre-December 2003 price as the but-for price
24   that any direct purchaser would have paid under Plaintiffs' new monopolization theory, they must
25   provide a methodology for calculating that price on a class-wide basis. This they fail to do.
26   Plaintiffs' new theory contends that the but-for price should be the so-called "independent
27   monopoly price"—*i.e.*, the price Abbott would have charged if it did not sell ritonavir pursuant to a
28   bundle. (Singer Rebuttal Decl. ¶ 24 & n.22). Not only have Plaintiffs failed to provide a method for

determining such an "independent monopoly price" for any particular class members but they have also ignored the fact that a profit-maximizing price for Norvir would not be uniform across class members. This additional fact alone precludes certification.

As in *Allied*, the "clear standard in the market" for sales of Norvir and Kaletra is to charge a range of prices to different direct purchasers. *Allied,* 247 F.R.D. at 167. Economic theory and experience in the pharmaceutical industry demonstrate that Abbott maximizes its profits by charging an array of prices depending on the individual elasticities of demand of direct purchasers—itself a function of the particular basket of customers to which each direct purchaser resells the product it buys from Abbott. (Hay Supp. Decl. ¶ 15). As demonstrated in Abbott's Opposition, the evidence establishes that Abbott employed just such differentiated pricing to direct purchasers both before and after the price increase to varying degrees. (*See, e.g.*, Opp'n at 19-21).

Under these circumstances, there is no basis for believing that Abbott would maximize its profits by charging a single price to all direct purchasers. Thus, as with Plaintiffs' previous theory, determining the proper but-for price would require, among other things, an understanding of each putative class member's (or more precisely, their customers') elasticity of demand to determine the price at which Abbott would have maximized its profits. Plaintiffs cannot solve this dilemma by relying on the average of all individual "independent monopoly prices" Abbott would have charged to direct purchasers, as this is precisely the methodology that was rejected by the Central District of California in *Allied*. 247 F.R.D. at 167 (rejecting plaintiffs' and expert's methodology because it addressed only "what each purchaser paid in the actual world, relative to the *average price* . . . in the but-for world.").

\* \* \* \* \*

In sum, Plaintiffs' proposed methodology for showing class-wide injury and damages under their new monopolization theory is based on a series of flawed assumptions. Even aside from these flaws, their new theory precludes class-wide treatment because the "independent monopoly price" cannot be determined without individualized evidence. Indeed, under Plaintiffs' new theory (as with their previous theory), both of the relevant prices—*i.e.*, "what each purchaser paid in the actual world" and "what that purchaser would have paid in the but-for world," *Allied*, 247 F.R.D. at 167—

require individualized evidence. Accordingly, Plaintiffs fail to meet the predominance requirement of Rule 23.

## CONCLUSION

For the foregoing reasons, Abbott respectfully requests that the Court deny Plaintiffs' Motion for Class Certification.

Dated: August 14, 2008          WINSTON & STRAWN LLP


By:   /s/ James F. Hurst
      James F. Hurst
      jhurst@winston.com
      Attorneys for Defendant
      ABBOTT LABORATORIES

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

10
CASE NO. C 07-5985 CW - ABBOTT LABORATORIES' SUR-REPLY TO DIRECT
PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION