**EXHIBIT B**

1  James F. Hurst (*Admitted Pro Hac Vice*)          Jeffrey I. Weinberger (SBN 56214)
   David J. Doyle (*Admitted Pro Hac Vice*)          David M. Rosenzweig (SBN 176272)
2  Samuel S. Park (*Admitted Pro Hac Vice*)          Grant A. Davis-Denny (SBN 229335)
   Stephanie S. McCallum (*Admitted Pro Hac Vice*)   MUNGER, TOLLES & OLSON LLP
3  WINSTON & STRAWN LLP                              355 Grand Avenue
   35 W. Wacker Drive                                Los Angeles, CA  90071-1560
4  Chicago, IL 60601-9703                            Telephone:  (213) 683-9100
   Telephone:    312-558-5600                        Facsimile:   (213) 687-3702
5  Facsimile:    312-558-5700                        Email: jeffrey.weinberger@mto.com;
   Email: jhurst@winston.com; ddoyle@winston.com;    david.rosenzweig@mto.com;
6  spark@winston.com; smccallum@winston.com          grant.davis-denny@mto.com

7  Nicole M. Norris (SBN 222785)                     Michelle Friedland (SBN 234124)
   WINSTON & STRAWN LLP                              MUNGER, TOLLES & OLSON LLP
8  101 California Street, Suite 3900                 560 Mission Street, 27th Floor
   San Francisco, CA  94111-5894                     San Francisco, CA  94105-2907
9  Telephone:    415-591-1000                        Telephone: (415) 512-4000
   Facsimile:    415-591-1400                        Facsimile:  (415) 512-4077
10 Email: nnorris@winston.com                        Email: michelle.friedland@mto.com

11 Charles B. Klein (*Admitted Pro Hac Vice*)
   WINSTON & STRAWN LLP
12 1700 K Street, N.W.
   Washington, D.C.  20007
13 Telephone:    202-282-5000
   Facsimile:    202-282-5100
14 Email: cklein@winston.com

15 Attorneys for Defendant
   ABBOTT LABORATORIES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| MEIJER, INC. & MEIJER DISTRIBUTION, INC., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ABBOTT LABORATORIES,<br><br>Defendant. | **Case No. C 07-5985 CW**<br><br>*Related Per October 31, 2007 Order to Case No. C 04-1511 CW*<br><br>CONSOLIDATED CASE<br><br>**SUR-REPLY DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES' OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br>Date:         August 19, 2008<br>Time:         2:00 p.m.<br>Courtroom: 2 (4th Floor)<br>Judge:        Hon. Claudia Wilken |

**A. Assignment**

1. I filed a declaration in this matter on June 25, 2008.[1] Plaintiffs' expert Dr. Hal Singer subsequently submitted a reply declaration.[2] I have been asked by counsel to respond specifically to four erroneous assertions in the Singer Rebuttal Declaration: 1) all members of the purported class made some purchases of Norvir or Kaletra at WAC; 2) purchases by entities who bought exclusively Norvir or Kaletra are insignificant; 3) large discounts on Norvir are limited to government purchasers and thus are not relevant and can simply be excluded from the analysis of harm to purported class members; and 4) Abbott's "independent monopoly price" for Norvir represents a viable means of assessing injury to all direct purchasers on a class-wide basis.[3]

**B. Many Purported Class Members Never Paid The Allegedly Inflated WAC Prices.**

2. Dr. Singer claims that every member of the purported class "purchased at least some Norvir or Kaletra (or both) at the inflated WAC price."[4] According to Dr. Singer, this implies that all purported class members were harmed by the challenged conduct. Dr. Singer's assertion, which is founded on a flawed interpretation of the analysis presented in Charts 5 and 6 of my original declaration, is simply factually incorrect.[5] If Dr. Singer had examined Abbott's transactional sales data and my own data programs, which I understand were produced to plaintiffs, he would have found numerous examples of purported class members who never made a single purchase of Norvir or Kaletra at allegedly "inflated" WAC prices. Accordingly, impact cannot be proven on a classwide basis.

---

[1] Declaration of Joel Hay, Ph.D. in Support of Abbott Laboratories' Opposition to Direct Purchaser Class Plaintiffs' Motion for Class Certification, June 25, 2008 ("Hay Declaration").

[2] Rebuttal Declaration of Hal J. Singer, Ph.D., July 23, 2008 ("Singer Rebuttal Declaration").

[3] Although I do not address all aspects of the Singer Rebuttal Declaration, this should not be taken to mean that I do not find numerous additional flaws in Dr. Singer's reasoning and conclusions.

[4] Singer Rebuttal Declaration, p. 6.

[5] Dr. Singer ignores important selection criteria I used to determine which direct purchasers to analyze individually in Charts 5 and 6. For example, the analysis depicted in those charts only includes wholesalers and capsule and tablet formulations of Norvir and Kaletra (*i.e.,* does not include liquid formulations)

1

CASE NO. C 07-5985 CW - SUR-REPLY DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

3.      Specifically, examination of the transactional sales data reveals at least ▮ purported class members that never purchased Norvir or Kaletra at the allegedly inflated WAC prices. In other words, all of these purported class members' purchases were for *less* than the allegedly inflated Norvir and Kaletra WAC prices. There were ▮ purported class members identified in the Hay Declaration that purchased either Norvir or Kaletra from 2004 to 2007.[6] Of these, ▮ had sufficient data to determine the drug formulation (*e.g.,* liquid or capsule) and package size (*e.g.,* 30-capsule package).[7] ▮ of these purchasers bought Norvir or Kaletra after the drugs' WAC increases in December 2003 and June 2005 respectively. Of this group, ▮ always paid less than WAC for Norvir but did not purchase Kaletra after June 2005, ▮ always paid less than WAC for Kaletra but did not purchase Norvir after December 2003, and ▮ purchasers bought both Norvir and Kaletra, but made no purchases at the WAC price for either drug.[8] In total, ▮ purported class members ▮ never made a purchase at the allegedly inflated WAC prices for Norvir and Kaletra. This simple fact alone refutes Dr. Singer's conclusion that all purported class members were harmed by the challenged conduct because all purchased at least some product at WAC.

**C. The Majority of Purported Class Members Did Not Purchase Both Norvir and Kaletra.**

4.      In my original declaration, I explained that purported class members that purchased entirely (or primarily) Norvir and those that purchased entirely (or primarily) Kaletra would have antagonistic economic interests with respect to plaintiffs' fundamental theory of liability, including whether to pursue plaintiffs' distinct and separate claims—the "Boosted Market" monopolization claims or the "Boosting Market" monopolization claims. Dr. Singer does not dispute that this conflict does indeed exist. He trivializes the conflict, however, by claiming that "▮ percent of all class member direct purchases of Norvir and Kaletra are made by entities that purchase both

---

[6] Hay Declaration, p. 19, Chart 1.

[7] This information is needed in order to appropriately compare transaction prices to WAC prices and determine the discount on each transaction.

[8] This calculation excludes credits, reverse chargebacks, and transactions with non-positive revenue or quantity. July 23, 2005 is omitted due to data irregularities.

products."[9] He claims that this minimizes purported class members' conflicting interests as to which fundamental theory of liability to pursue.

5. The fact that most Norvir and Kaletra is purchased by large wholesalers that purchase both of these drugs is not surprising. Abbott's transactional sales data show ▮▮▮▮▮ (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ accounted for almost ▮▮ of all Norvir purchases during the period 2004 to 2007. In fact, the top ▮ direct purchasers accounted for ▮▮ of purchases, and all of these large direct purchasers bought both Norvir and Kaletra.

6. The class proposed by plaintiffs is not limited to these ten direct purchasers, but appears to include ▮ other entities. Of the ▮ direct purchasers, ▮ bought only Norvir or Kaletra but not both.[10] Dr. Singer seems to suggest that most of these direct purchasers are not significant to the class certification analysis because they make up a small share of total purchases of Norvir and Kaletra. But, if these other purported class members' purchases are insignificant, as Dr. Singer implies, it is unclear what the benefits of certifying a class comprised mostly of such entities are. I understand that class certification requires that the economic interests of all purported class members, and not just those of the few members that made the largest share of purchases, be aligned. Dr. Singer's claim that the interests of the majority of the purported class do not matter is an implicit admission that such purchasers have antagonistic interests from those of the largest direct purchasers.

### D. Substantial Discounts Were Not Limited to Sales to Government Programs.

7. Dr. Singer's entire methodology for dealing with the differential pricing across direct purchasers is to exclude "deeply discounted" government purchases. Dr. Singer provides no economic basis for this approach. Rather, he states merely that he "was instructed to exclude purchases made at prices designed to blunt the impact of the 400-percent-price [sic] increase to governmental purchasers."[11] In particular, he appears to claim that if a direct purchaser resold the drug to an indirect purchaser who was covered by a government program, that purchase should be

---

[9] Singer Rebuttal Declaration, p. 11.

[10] Hay Declaration, p. 19, Chart 1.

[11] Singer Rebuttal Declaration, p. 8.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

excluded from the analysis of alleged harm to the direct purchaser.  However, as I describe below, this approach is economically flawed and inconsistent with the facts regarding discounts for Norvir and Kaletra.  Accordingly, Dr. Singer's proposed "methodology" for dealing with highly differential pricing for Norvir and Kaletra cannot rescue his unsupported conclusion that all direct purchasers were harmed by the challenged conduct.

8. Dr. Singer seems to suggest that government purchases can easily be identified and excluded.  While it is feasible to identify government entities that are direct purchasers of Norvir and Kaletra, it is not easy (or even feasible) to identify *indirect* purchases that are associated with a government program or other public assistance program.[12]  For instance, the indirect purchaser data shows that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ made many purchases that were heavily discounted.  But to determine which of these purchases are part of a government or patient assistance program, one would have to analyze the details of each individual purchase.  Determining which transactions are associated with a government program therefore would require highly individualized analysis of each direct purchaser.  In fact, such a determination may require discovery and individualized analysis of the *indirect* purchasers to which each direct purchaser sold.  This is because Abbott's transactional sales data provide only the name of the indirect purchaser, not complete and detailed information about the individual patient and the third-party payor that may have negotiated discounts and chargebacks with Abbott.

9. Additionally, contrary to Dr. Singer's claim that all discounts are related to government programs, Abbott's transactional sales data show many instances of discounts and chargebacks that are apparently unrelated to government purchases.  For example, ▮ different indirect purchaser entities bought Norvir capsules from ▮▮▮▮▮▮▮▮ and ▮▮▮▮ through contracts with ▮▮▮▮▮▮▮▮▮▮▮▮ at a price equal to ▮ of WAC (*i.e.*, at an ▮ discount).  Dr. Singer offers no methodology for dealing with non-government discounts and chargebacks.

---

[12] The analysis of the Abbott Sales Data contained in the Hay Declaration excludes *direct* purchasers that are known government entities, since these are not members of the purported class. (Hay Declaration, p. 11, note 10).

10.     More importantly, even if one could identify government purchases, it is incorrect to exclude these transactions from the analysis.  To the extent that direct purchasers paid lower prices for Norvir and Kaletra in the actual world than they would have in the but-for world as a result of the discounts negotiated between their customers and Abbott, these lower prices should be deducted from purchases in which the wholesaler supposedly paid higher prices.  Dr. Singer's methodology of ignoring all purchases related to government programs incorrectly keeps all the transactions in which the direct purchaser may have paid a higher Norvir price and eliminates all the transactions in which the purchaser paid a lower price than they would have in the but-for world.  This "cherry-picking" leads to a biased estimation of both the alleged harm and the magnitude of damages.

11.     Finally, Dr. Singer erroneously argues that all discounts can be ignored because they are unrelated to the alleged anticompetitive conduct and thus would exist in the but-for world.  To the contrary, Abbott's transactional sales data show that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉  For example, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.  Another wholesaler mentioned by Dr. Singer, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.[13]  In fact, Dr. Singer acknowledges that many of the discounts were intended to lessen the impact of the price increases to certain purchasers, which is entirely inconsistent with his claim that the discounts were unrelated to the alleged anticompetitive conduct.[14]

**E. Dr. Singer's Claim that the December 2003 Price of Norvir is the "Independent Monopoly Price" for all Purported Class Members is Flawed.**

12.     The Singer Rebuttal Declaration states that "it is anticompetitive for Abbott to use an increase in the price of Norvir above its independent monopoly price as part of a scheme to monopolize the Boosted Market."[15]  Dr. Singer further states that the profit-maximizing price for

---

[13] Hay Declaration, p. 60, Charts 13 and 14.

[14] Singer Rebuttal Declaration, p. 8.

[15] Singer Rebuttal Declaration, p. 12.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1    Norvir is the ███████████████████████████ capsule).[16]  His sole basis for this

2    assertion appears to be that "Abbott would not have chosen those prices" if it was not.[17]  However,

3    any attempt by plaintiffs to use ███ as a but-for price of Norvir is economically flawed for at least

4    two reasons.

5        13.    First, there is no economic basis for assuming the ███████████ profit-maximizing

6    price for Norvir is necessarily the profit-maximizing price that would have prevailed during the

7    alleged class period in the but-for world.  Dr. Singer ignores several economic factors which would

8    be expected to impact Abbott's profit-maximizing price for Norvir.  As I have described previously,

9    the demand for Norvir increased significantly because its use as a PI booster became more

10   widespread.  This increase in demand was accelerated by the introduction of Reyataz and Lexiva.  At

11   the same time, the daily dose of Norvir used as a PI booster decreased significantly. These changes

12   would be expected to impact the profit-maximizing price considerably.

13       14.    Dr. Singer's unsupported assertion that ████████████████████████████████

14   ████████████ that would have existed for another 4.5 years is contradicted by the market

15   evidence.  Profit maximization implies that a firm will increase price to the point at which losses in

16   sales outweigh the gains from a higher price.  However, the fact that prescriptions of Norvir kept

17   rising rapidly despite the Norvir price increase, indicates that a price increase clearly was profitable

18   for Abbott. A simple calculation also indicates that the Norvir price in December 2003 was

19   significantly below the profit-maximizing price of Norvir.  For the ████████████████ to

20   be more profitable than revised Norvir price of ███ it would be necessary that Abbott's sales of

21   Norvir would have increased by at least fivefold had it kept Norvir's price unchanged.  This fivefold

22   increase in prescriptions would have been necessary to maintain revenues from Norvir at the same

23   level as revenues after the price increase.[18]  But a fivefold increase in Norvir prescriptions is simply

24   unrealistic.  For instance, it would imply that prescriptions of Norvir would comprise ███ of all

---

[16] Singer Rebuttal Declaration, p. 14.

[17] Singer Rebuttal Declaration, p. 14.

[18] In fact, greater than a fivefold increase in sales would have been necessary for the ███ price to be more profitable than the revised ███ price of Norvir because additional sales have associated costs.

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

1  HIV drug prescriptions in 2007. Given that Norvir is now almost always used as a booster to other PIs, it would also imply that Norvir, and the PIs boosted by Norvir, would comprise over ▮ of all HIV drug prescriptions.[19]

15. Moreover, it is neither meaningful nor feasible to use a uniform ▮ price as the but-for price that all purported class members would have paid in the but-for world. As a matter of economics, there will be various profit-maximizing prices for different Norvir customers. This is because individual direct purchasers will have varying elasticities of demand for Norvir. In studying pharmacoeconomics for more than 25 years, I cannot recall a single example where a brand name manufacturer maintains only one price for all of its customers. The fact that prices for Norvir and Kaletra in the actual world varied widely indicates that price in the but-for world also would have varied widely.

16. The fact that Abbott would have found it profitable to raise the price of Norvir in the but-for world, and that the profit-maximizing price would have varied across purported class members, indicates that one cannot simply assume, as Dr. Singer does, that any direct purchasers that bought at least some units of Norvir and Kaletra at WAC were harmed. Many purported class members likely paid lower prices on many of their purchases as a result of the challenged conduct, and such gains would have to be deducted from any alleged higher prices paid on other purchases. For instance, in the actual world, Abbott increased the price of Norvir by 400% to some customers but not at all to others (or even a price decrease).[20] In the but-for world, however, customers that did not face a Norvir price increase in the actual world may have faced some price increase (*e.g.,* 100%). At the very least, these purchasers may have faced some inflationary increase consistent with other HIV drugs. The evidence indicates that many members of the purported class likely were not harmed by the challenged conduct, even accepting plaintiffs' theories of harm.

17. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

---

[19] Sources: NOR 00433040_Confidential IMS TRx NPA Data UPD.xls; 080727 Proportion of PIs boosted with Norvir.xls; Declaration of Jeffrey Devlin, March 24, 2006, p. 4.

[20] Hay Declaration, pp. 61-64, Charts 15-18.

7

CASE NO. C 07-5985 CW - SUR-REPLY DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

Dated: August 14, 2008        By: _____
                                  Joel Hay, Ph.D.

8

CASE NO. C 07-5985 CW - SUR-REPLY DECLARATION OF JOEL HAY, PH.D. IN SUPPORT OF ABBOTT LABORATORIES OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703