IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MEIJER, INC., et al. & MEIJER
DISTRIBUTION, INC.,                          No. C 07-5985 CW

        Plaintiffs,                      ORDER GRANTING
                                             PLAINTIFFS' MOTION FOR
    v.                                     CLASS CERTIFICATION

ABBOTT LABORATORIES,

        Defendant.

_____/

    Plaintiffs Meijer, Inc., Meijer Distribution, Inc., Rochester
Drug Cooperative, Inc. and Louisiana Wholesale Drug Company, Inc.
move for class certification pursuant to Rule 23 of the Federal
Rules of Civil Procedure.  Defendant Abbott Laboratories opposes
Plaintiffs' motion.  The matter was heard on August 19, 2008.
Having considered oral argument and all of the papers filed by the
parties, the Court grants Plaintiffs' motion.

BACKGROUND

    Protease inhibitors (PIs) are considered the most potent class
of drugs to combat the HIV virus.  In 1996, Abbott introduced
Norvir as a stand-alone PI with a daily recommended dose of 1,200
milligrams (twelve 100-mg capsules a day), priced at approximately
eighteen dollars per day.  Norvir is the brand name for a patented
compound called ritonavir.

    After Norvir's release, it was discovered that, when used in

United States District Court

For the Northern District of California

small quantities with another PI, Norvir would "boost" the anti-viral properties of that PI.  Not only did a small dose of Norvir -- about 100 to 400 milligrams per day -- make other PIs more effective and decrease the side effects associated with high doses, but it also slowed the rate at which HIV developed resistance to the effects of those PIs.  The use of Norvir as a "booster" has enabled HIV patients to live longer.  But the use of Norvir as a booster, and not a stand-alone PI, has also meant that the average daily price of Norvir has plummeted since Norvir was first introduced, because patients need a much smaller daily dose of Norvir when it is used as a booster compared to when it is used as a stand-alone PI.  By 2003, the average price for a daily dose of Norvir was $1.71.

In 2000, Abbott introduced Kaletra, a single pill containing the PI lopinavir as well as ritonavir, which is used to boost the effects of lopinavir.  Although effective and widely used, Kaletra causes some patients to experience significant side effects.

In 2003, two new PIs, Bristol-Myers Squibb's Reyataz and GlaxoSmithKline's Lexiva, were about to be introduced to the market.  Studies showed that, when boosted with Norvir, the new PIs were as effective as Kaletra, and were more convenient.  In July, 2003, Reyataz was successfully introduced to the market.  As a result, Kaletra's market share fell more than Abbott had anticipated.  The average daily dose of Norvir also fell.  Before Reyataz's release, the most common boosting dose of Norvir ranged from 200 milligrams to 400 milligrams a day.  Clinical trials, however, showed that a Norvir dose of only 100 milligrams a day

2

**United States District Court**
For the Northern District of California

1   effectively boosted Reyataz.

2       On December 3, 2003, Abbott raised the wholesale price of

3   Norvir by 400 percent while keeping the price of Kaletra constant.

4   Abbott contends that it did this so that the price of Norvir would

5   be more in line with the drug's enormous clinical value.

6   Plaintiffs contend that the Norvir price increase was an illegal

7   attempt to achieve a monopoly in the "boosted market," which they

8   define as the market for those PIs, such as Reyataz, Lexiva and

9   Kaletra, that are prescribed for use with Norvir as a booster.

10  Under Plaintiffs' theory, Abbott unlawfully leveraged its monopoly

11  over the "boosting market," which is comprised solely of Norvir, to

12  ensure that Kaletra was the only economically viable choice for

13  consumers in the boosted market, thereby giving Abbott a monopoly

14  over that market.

15      In addition, Plaintiffs allege that in June, 2005, after

16  Abbott had succeeded in "neutralizing its boosted rivals' ability

17  to compete on price," it began inflating the price of Kaletra.

18  Pls.' Mot. at 6.  By October, 2007, Abbott had raised the price of

19  Kaletra by twenty-five percent.  Plaintiffs maintain that Abbott

20  would not have been able to charge such a high price for Kaletra

21  absent its unlawful monopoly over the boosted market.

22      On these bases, Plaintiffs assert claims under § 2 of the

23  Sherman Act for monopolization and attempted monopolization of the

24  boosted market.  They also assert a Sherman Act claim for

25  monopolization of the boosting market, even though Abbott possesses

26  patents that ostensibly entitle it to a monopoly over that market.

27  This claim is based on a theory that Abbott "unlawfully maintained

28                                  3

its monopoly power in the boosting market by deliberately inducing potential competitors in the boosting market into relying on Norvir as the de facto boosting agent, thereby impeding the development of potential rivals to Norvir and/or delaying the development of technologies that would have permitted Norvir to be used in substantially smaller amounts." Id. at 4.

Plaintiffs bring this action on behalf of themselves and a putative class consisting of:

> All persons or entities in the United States that purchased Norvir and/or Kaletra directly from Abbott or any of its divisions, subsidiaries, predecessors, or affiliates during the period from December 3, 2003 through such time as the effects of Abbott's illegal conduct have ceased, and excluding federal governmental entities, Abbott, and Abbott's divisions, subsidiaries, predecessors, and affiliates.

Compl. ¶ 47.

LEGAL STANDARD

Plaintiffs seeking to represent a class must satisfy the threshold requirements of Rule 23(a) as well as the requirements for certification under one of the subsections of Rule 23(b). Rule 23(a) provides that a case is appropriate for certification as a class action if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Rule 23(b) further provides that a case may be certified as a class action only if one of the following is true:

4

United States District Court
For the Northern District of California

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b).

A plaintiff seeking class certification bears the burden of demonstrating that each element of Rule 23 is satisfied, and a district court may certify a class only if it determines that the plaintiff has borne its burden.  General Tel. Co. v. Falcon, 457 U.S. 147, 158-61 (1982); Doninger v. Pac. Nw. Bell, Inc., 564 F.2d

**United States District Court**
For the Northern District of California

1  1304, 1308 (9th Cir. 1977).  In making this determination, the

2  court may not consider the merits of the plaintiff's claims.

3  <u>Burkhalter Travel Agency v. MacFarms Int'l, Inc.</u>, 141 F.R.D. 144,

4  152 (N.D. Cal. 1991).  Rather, the court must take the substantive

5  allegations of the complaint as true.  <u>Blackie v. Barrack</u>, 524 F.2d

6  891, 901 (9th Cir. 1975).  Nevertheless, the court need not accept

7  conclusory or generic allegations regarding the suitability of the

8  litigation for resolution through class action.  <u>Burkhalter</u>, 141

9  F.R.D. at 152.  In addition, the court may consider supplemental

10  evidentiary submissions of the parties.  <u>In re Methionine Antitrust</u>

11  <u>Litig.</u>, 204 F.R.D. 161, 163 (N.D. Cal. 2001); <u>see also</u> <u>Moore v.</u>

12  <u>Hughes Helicopters, Inc.</u>, 708 F.2d 475, 480 (9th Cir. 1983) (noting

13  that "some inquiry into the substance of a case may be necessary to

14  ascertain satisfaction of the commonality and typicality

15  requirements of Rule 23(a)"; however, "it is improper to advance a

16  decision on the merits at the class certification stage").

17  Ultimately, it is in the district court's discretion whether a

18  class should be certified.  <u>Burkhalter</u>, 141 F.R.D. at 152.

19                                DISCUSSION

20      As a preliminary matter, Abbott does not dispute Plaintiffs'

21  assertion that this action satisfies the numerosity and commonality

22  requirements of Rule 23(a)(1) and (2), and the Court finds that it

23  does.  <u>See</u> 1 Alba Cone & Herbert B. Newberg, <u>Newberg on Class</u>

24  <u>Actions</u> § 3.3 (4th ed. 2002) (where "the exact size of the class is

25  unknown, but general knowledge and common sense indicate that it is

26  large, the numerosity requirement is satisfied"); <u>Hanlon v.</u>

27  <u>Chrysler Corp.</u>, 150 F.3d 1011, 1019 (9th Cir. 1998) ("All questions

28                                    6

of fact and law need not be common to satisfy [Rule 23(a)(2)].  The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.")

Defendants' opposition to class certification is based on two broad arguments: 1) Plaintiffs cannot meet the typicality requirement of Rule 23(a)(3) because the class is composed of members in fundamentally different positions, and cannot protect the interests of all class members as required by Rule 23(a)(4) because of fundamental intra-class conflict; and 2) the requirements of Rule 23(b) are not met.  Abbott also argues that Meijer lacks standing to sue, which goes to its ability to represent class members adequately.

I.   Meijer's Standing to Sue

Implicit in Rule 23 is the requirement that the class representatives be members of the class.  Westways World Travel, Inc. v. AMR Corp., 218 F.R.D. 223, 230 (C.D. Cal. 2003); see also General Tel., 457 U.S. at 156 (holding that "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members").  Further, standing "is a jurisdictional element that must be satisfied prior to class certification." Nelsen v. King County, 895 F.2d 1248, 1249-50 (9th Cir. 1990).  As the Eleventh Circuit explains, it is "well-settled that prior to the certification of a class, and technically speaking before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative has Article III standing to raise each class

United States District Court
For the Northern District of California

subclaim." <u>Wooden v. Bd. of Regents of Univ. Sys. of Ga.</u>, 247 F.3d 1262, 1287-88 (11th Cir. 2001).[1]

Abbott argues that Meijer lacks standing to sue, and therefore may not serve as a class representative.  Abbott's argument is based on the fact that Meijer is not a direct purchaser, but rather is the assignee of a direct purchaser, Frank W. Kerr Co.  The assignment agreement states in relevant part:

> Kerr hereby conveys, assigns and transfers to Meijer all rights, title and interest in and to all causes of action and any resulting proceeds Kerr may have under the antitrust laws of the United States . . . arising out of or relating to Kerr's purchase of any pharmaceutical products which were subsequently resold to Meijer . . . .

Klein Dec. Ex. 1.  Abbott does not argue that, generally speaking, an indirect purchaser assignee such as Meijer lacks standing to sue in the shoes of the direct purchaser.  Rather, Abbott argues that Meijer may not rely on this particular assignment for three reasons.

First, Abbott argues that Meijer has not shown that it purchased Norvir or Kaletra from Kerr.  But Meijer has produced data demonstrating such purchases, and Abbott did not refute this information at oral argument.

Second, Abbott argues that the assignment is invalid because Kerr's purchases of Norvir and Kaletra from Abbott after January 1, 2006 are governed by an agreement between Kerr and Abbott that provides:

---

[1]Because Meijer is not the only named Plaintiff, whether it has standing is not dispositive of the appropriateness of class certification.  Nonetheless, the Court will address Abbott's arguments.

United States District Court
For the Northern District of California

8

**United States District Court**
For the Northern District of California

> Assignment. Neither party shall have the right to assign
> this Agreement to a third party without the prior written
> consent of the other party, which consent shall not be
> unreasonably withheld. For purposes of this Agreement, a
> substantial change in ownership or control of Wholesaler
> shall be deemed an event of assignment requiring the
> prior written consent of Abbott if this Agreement is to
> be assumed by the new entity. Any permitted assignee
> shall assume all obligations of its assignor under this
> Agreement. No assignment shall relieve any party of
> responsibility for the performance of any obligations
> which have accrued prior to such assignment.

Ex. to Sergio Dec. at 17. This provision, however, does not

encompass the assignment upon which Meijer relies. Kerr did not

purport to assign to Meijer any of the rights guaranteed to it by

its agreement with Abbott. Rather, it assigned to Meijer its

rights under the federal antitrust laws. Abbott's consent was not

required.[2]

Third, Abbott maintains that the assignment agreement lacks

consideration. However, the agreement states that it is made "in

consideration of the mutual covenants contained herein, and for

other good and valuable consideration." Klein Dec. Ex. 1. Abbott

has not shown that, under Michigan law, which it claims applies to

the agreement, this recital is insufficient to establish the

element of consideration.

II.  Conflicts Within the Class

Rule 23(a)(4) of the Federal Rules of Civil Procedure

establishes as a prerequisite for class certification that "the

representative parties will fairly and adequately protect the

interests of the class." This can only be done if the named

---

[2]The Court notes also that the agreement with Abbott would, in
any event, apply only to sales after January, 2006, long after
Meijer allegedly began paying overcharges.

plaintiffs do not have conflicts of interest with other class members. <u>Hanlon</u>, 150 F.3d at 1020. However, the mere potential for a conflict of interest is not sufficient to defeat class certification; the conflict must be actual, not hypothetical. <u>See Cummings v. Connell</u>, 316 F.3d 886, 896 (9th Cir. 2003) ("[T]his circuit does not favor denial of class certification on the basis of speculative conflicts."); <u>Soc. Servs. Union, Local 535 v. County of Santa Clara</u>, 609 F.2d 944, 948 (9th Cir. 1979) ("Mere speculation as to conflicts that may develop at the remedy stage is insufficient to support denial of initial class certification."); <u>Blackie</u>, 524 F.2d at 909 (noting that class members might have differing interests at later stages of litigation, but that "potential conflicts" do not present a valid reason for refusing to certify a class).

In addition, Rule 23(c)(2) of the Federal Rules of Civil Procedure requires that class members be notified of the action and given an opportunity to opt out of the class or to enter an appearance. While not a failsafe, this mechanism minimizes the potential for fundamental intra-class conflict. <u>Roberts v. Heim</u>, 670 F. Supp. 1466, 1491 (N.D. Cal. 1987) ("Court[s] have long recognized the use of the 'opt out' mechanism to ameliorate class conflicts."); <u>Lerwill v. Inflight Motion Pictures, Inc.</u>, 582 F.2d 507, 512 (9th Cir. 1978) ("While a right to withdraw from a class action is not always a complete answer to an alleged conflict among class members, in these circumstances that option fairly protected the interests of any dissident employees." (citation omitted)).

The Court has previously found that, in this particular case,

10

there is little risk that direct purchasers whose interests are not served by the lawsuit will remain in the class.  As Abbott's customers, members of the proposed class are easily identifiable. They are also sophisticated business entities that are not likely to fail to appreciate the potential effects of this litigation. Notice is therefore presumptively an effective means of protecting their interests.  See Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd., 247 F.R.D. 253, 268-69 (D. Mass. 2008) ("[S]hould any fundamental conflict arise, a ready mechanism exists to protect it -- the opt-out provision. . . . Sophisticated players such as distributors and large hospitals can determine for themselves whether a fundamental conflict exists within the class.").

Nonetheless, Abbott argues that the class representatives cannot adequately protect the interests of all class members because the class is inherently composed of factions whose interests necessarily conflict.  Abbott has identified four specific conflicts, which the Court will address in turn.

A.    Conflict Between Kaletra-Only Purchasers and Other Class Members

As noted above, Plaintiffs assert a claim based on Abbott's monopolization of the boosting market, which consists solely of Norvir.  Abbott maintains that such a claim is antithetical to the interests of those class members who purchased Kaletra, but not Norvir.  Because these class members did not make purchases in the boosting market, they may pursue only claims for monopolization of the boosted market.

Abbott's argument seems to be that it is not in the interest

11

of Kaletra-only purchasers for Plaintiffs to pursue their boosting-market claim, because in order to prevail on that claim, Plaintiffs must demonstrate that Abbott's patents do not give it a legal monopoly over the boosting market. According to Abbott, Plaintiffs' boosted-market claims require them to demonstrate the opposite: that Abbott's patents do give it a legal monopoly over the boosting market -- a monopoly which Abbott was able to leverage to gain a monopoly over the boosted market. But this statement, upon which Abbott's argument appears to be premised, is incorrect. The monopoly leveraging theory upon which Plaintiffs rely for their boosted market claims does not depend on whether Abbott's monopoly over the boosting market is legal or illegal; Plaintiffs must simply show that Abbott has such a monopoly.

Because Plaintiffs' pursuit of their boosting-market claim does not weaken their boosted-market claim, there is no intra-class conflict on this basis.

B.    Conflict Between Kaletra-Only Purchasers and Norvir-Only Purchasers

Abbott correctly notes that Plaintiffs' claim for monopolization of the boosted market depends on showing that, compared to the combination of Norvir and another boosted PI, Kaletra is priced low enough to make it the only attractive option for most consumers, thereby giving Abbott a monopoly over the boosted market. Abbott argues that there is a conflict between Norvir-only and Kaletra-only purchasers because the former purportedly have an incentive to demonstrate that the price of Kaletra is "too low," i.e., that it is low enough to give Abbott a

12

monopoly over the boosted market, whereas the latter purportedly have an incentive to demonstrate that the price of Kaletra is "too high," so that they can obtain damages for overcharges.

Abbott's posited conflict is false. Plaintiffs assert that the price of Kaletra is low enough so as not to jeopardize Abbott's alleged monopoly (or near-monopoly) over the boosted market; above a certain price, customers would presumably switch to another product, despite the high cost of Norvir. At the same time, Plaintiffs allege that the price of Kaletra is higher than it would be if Abbott were forced to compete on a level field, where the price of Norvir did not render prohibitively high the effective cost of PIs competing with Kaletra. Contrary to Abbott's assertion, Plaintiffs can argue that both the price of Norvir and the price of Kaletra are supracompetitive; as long as the price of Kaletra is not so high as to make the combination of Norvir with another boosted PI a viable alternative to Kaletra, there is no tension between the two arguments.

C.    Conflict Arising From Plaintiffs' Choice Not to Pursue Damages for Lost Profits

Plaintiffs seek damages for overcharges incurred in connection with their purchases of Norvir and Kaletra. They do not seek damages for lost profits. Abbott argues that this may be contrary to the interests of some class members, who may prefer to seek damages for lost profits rather than for overcharges.

"[T]he standard method of measuring damages in price enhancement cases is overcharge, not lost profits. . . . Lost profits damages are disfavored, at least in part because they are

13

**United States District Court**
For the Northern District of California

more difficult to prove than overcharge damages." <u>Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.</u>, 424 F.3d 363, 375 (3d Cir. 2005). While it is theoretically possible that some class members may wish to pursue damages for lost profits rather than for overcharges, given the difficulties of proof involved and the consequent potential that a class member would be denied recovery, it is not likely. <u>See id.</u> (citing Roger D. Blair & William H. Page, <u>"Speculative" Antitrust Damages</u>, 70 Wash. L. Rev. 423, 433-34 (1995)). In the absence of any evidence suggesting that any class member would benefit more from recovering lost profits than from recovering overcharges, and given the opt-out mechanism provided by Rule 23(c)(2), Abbott's posited conflict is too speculative to warrant denying class certification.

D.  Conflict Between the Economic Interests of Class Members

Abbott maintains that certain members of the putative class have benefitted from the increase in the wholesale price of Norvir because they re-sell Norvir and Kaletra to pharmacies and other retailers on a cost-plus basis, <u>i.e.</u>, at a price equal to their wholesale acquisition cost (WAC) plus a set percentage mark-up. Because these class members' profits from the sale of Norvir and Kaletra increase proportionally with the WAC of those drugs, Abbott argues, they profit more from the higher prices and would face harm if this action were to result in a judgment that forces Abbott to lower the price of either drug.[3]

---

[3]Although Plaintiffs do not seek an injunction, in order to avoid future liability for overcharges, it is reasonable to assume that Abbott would restructure its pricing in some way if Plaintiffs prevailed in this lawsuit.

14

**United States District Court**
For the Northern District of California

In its order denying Abbott's motion to compel production of information concerning "downstream" sales by direct purchasers, the Court discussed case law identifying the practical difficulty of determining whether and to what extent a party benefits from one pricing structure as opposed to another.  The question of whether certain class members benefitted from the Norvir and Kaletra price increases is not as straightforward as Abbott portrays it to be. It is not simply a matter of comparing the change in their profits from the sale of the two drugs before and after the price increases; the "ripple effect" on sales of other drugs must also be taken into account.  But any such analysis is unlikely to provide a definitive resolution of the matter.  See Ill. Brick Co. v. Illinois, 431 U.S. 720, 731-32 (1977).

Moreover, the question of whether certain class members benefitted from the Norvir and Kaletra price increases is still several steps removed from the appropriate inquiry: whether it might be in the interest of some class members to continue operating under Abbott's current pricing structure rather than the pricing structure following any changes Abbott makes to it as a consequence of this lawsuit.  Even accepting that some class members sell drugs on a cost-plus basis while others do not, answering this question would require a great deal of speculation. This fact alone negates the possibility that there is a present and apparent fundamental conflict between class members.

III. Rule 23(b)(3) Requirements

Plaintiffs assert that this action falls under the ambit of Rule 23(b) because common issues will predominate over any

15

**United States District Court**
For the Northern District of California

individualized issues and because a class action is the superior
method of adjudicating this matter.  "The Rule 23(b)(3)
predominance inquiry tests whether proposed classes are
sufficiently cohesive to warrant adjudication by representation."
Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997).  "When
common questions present a significant aspect of the case and they
can be resolved for all members of the class in a single
adjudication, there is clear justification for handling the dispute
on a representative rather than an individual basis."  Hanlon, 150
F.3d at 1022 (internal quotation marks omitted).

In order to determine whether the predominance requirement is
satisfied, "courts must identify the issues involved in the case
and determine which are subject to 'generalized proof,' and which
must be the subject of individualized proof."  In re Dynamic Random
Access Memory (DRAM) Antitrust Litig., 2006 WL 1530166, at *6 (N.D.
Cal.).  Here, it is clear that many issues will be subject to
generalized proof, in that the focus of the lawsuit is on Abbott's
conduct generally, not on Abbott's conduct with respect to
individual class members or on the conduct of class members
themselves.  Abbott argues, however, that the both the existence of
a class-wide antitrust injury and the appropriate amount of damages
cannot be proven with common evidence, but rather will require a
tremendous amount of individualized proof.

To proceed as a class action, Plaintiffs must be able to
establish, predominantly with generalized evidence, that all (or
nearly all) members of the class suffered damage as a result of
Abbott's alleged anti-competitive conduct.  See id. at *7.

16

**United States District Court**
For the Northern District of California

However, as the court in <u>DRAM</u> stated:

> [D]uring the class certification stage, the court must simply determine whether plaintiffs have made a sufficient showing that the evidence they intend to present concerning antitrust impact will be made using generalized proof common to the class and that these common issues will predominate. The court cannot weigh in on the merits of plaintiffs' substantive arguments, and must avoid engaging in a battle of expert testimony. Plaintiffs need only advance a plausible methodology to demonstrate that antitrust injury can be proven on a class-wide basis.

<u>Id.</u> at *9 (citations and internal quotation marks omitted).

Plaintiffs have submitted declarations from their expert, Dr. Singer, stating that Plaintiffs intend to demonstrate an antitrust injury to the class by relying upon the following categories of class-wide evidence:

> (1) governmental and academic studies demonstrating the economic effects of competition between therapeutically similar branded drugs; (2) internal projections performed by Abbott; (3) standard economic theory and models regarding monopoly pricing, monopoly leveraging, and bundling; and (4) Abbott's own transactional database and other sources of marketwide data on pharmaceutical pricing and sales . . . reflecting actual marketplace behavior before and after the December 2003 Norvir price increase. This evidence can then be used to show that all class members would have paid less for Norvir and Kaletra in the but-for world.

Singer Dec. ¶ 34. <u>Cf.</u> <u>JBDL Corp. v. Wyeth-Ayerst Labs. Inc.</u>, 225 F.R.D. 208, 217 (S.D. Ohio 2003) (granting class certification where plaintiffs' expert proposed demonstrating class-wide injury to direct purchasers based on same four categories of evidence).

Abbott characterizes Dr. Singer's methodology as flawed because it allegedly assumes that all direct purchasers pay the list price for Norvir and Kaletra. In fact, Abbott contends, approximately twenty percent of all sales of these drugs involve

17

discounts or chargebacks to the direct purchasers, lowering their net price. Abbott asserts that, because not all direct purchasers paid the same net price for the drugs, and because the net price paid by individual class members has varied over time, individualized evidence must be taken into account. Dr. Singer, in rebuttal, states that discounts and chargebacks are irrelevant to the issue of class-wide impact. Even if some class members paid less than the list price on some purchases, he argues, the net amount that was paid still went up when list prices were increased.

Abbott's argument is identical to the argument made by defendants in numerous other cases:

> The heart of defendants' argument is that the individual questions of fact and law predominate over the general questions of law and fact because the price paid by each class member was determined through an elaborate system of individualized negotiations, contract and rebates. To determine any classwide impact, argue the defendants, you must first prove the impact, if any, on each of the class members. Because pricing in the industry is allegedly so individualized, the plaintiffs will be unable to show any consistent classwide relationship between the acts of the defendants and the prices paid by class members. Or at the very least, argue the defendants, proving such impact will require infinite mini-trials concerning the price actually paid by each class member.

In re Cardizem CD Antitrust Litig., 200 F.R.D. 297, 318 (E.D. Mich. 2001) (quoting In re Commercial Tissue Prods., 183 F.R.D. 589, 595 (N.D. Fla. 1998)).

Abbott's position has uniformly been rejected by the courts. In Cardizem, the court observed:

> The fact that Defendants' expert disagrees with Plaintiffs' expert's analysis and conclusions concerning common impact is neither surprising nor relevant at this stage of the litigation. At the class certification stage, the Court, without trenching on the merits, must consider only whether [P]laintiffs have made a threshold

United States District Court
For the Northern District of California

showing that what proof they will offer will be
sufficiently generalized in nature that the class action
will provide a tremendous savings of time and effort.

Id. at 319 (internal quotation marks and citations omitted); see
also In re Catfish Antitrust Litig., 826 F. Supp. 1019, 1042 (N.D.
Miss. 1993) ("Whether or not [the plaintiffs' expert] is correct in
his assessment of common impact/injury is for the trier of fact to
decide, at the proper time."); In re NASDAQ Market-Makers Antitrust
Litig., 169 F.R.D. 493, 523 (S.D.N.Y. 1996) ("Neither a variety of
prices nor negotiated prices is an impediment to class
certification if it appears that plaintiffs may be able to prove at
trial that . . . the price range was affected generally.");
Blackie, 524 F.2d at 906 ("The fact that a defendant may be able to
defeat the showing of causation as to a few individual class
members does not transform the common question into a multitude of
individual ones; plaintiffs satisfy their burden of showing
causation as to each by showing materiality as to all.")  The Court
finds that Plaintiffs intend to prove the fact of injury to the
class by evidence that is predominantly generalized.  In addition,
Dr. Singer's conclusion that class members paid more, not the same
or less, for at least some purchases of Norvir and Kaletra
following Abbott's price increases, is eminently plausible.

    Abbott also claims that the amount of damages due to the class
will be dominated by an individualized inquiry, and argues that
class certification is inappropriate on this basis as well.  But as
the court stated in In re Potash Antitrust Litigation, 159 F.R.D.
682 (D. Minn. 1995):

    Antitrust plaintiffs have a limited burden with respect

19

to showing that individual damages issues do not predominate. Plaintiffs do not need to supply a precise damage formula at the certification stage of an antitrust action. Instead, in assessing whether to certify a class, the Court's inquiry is limited to whether or not the proposed methods are so insubstantial as to amount to no method at all.

159 F.R.D. at 697.

Plaintiffs have proffered methods for calculating aggregate damages for overcharges paid by class members, based on average market prices. The validity of those methods "will be adjudicated at trial based upon economic theory, data sources, and statistical techniques that are entirely common to the class." NASDAQ, 169 F.R.D. at 521. Abbott, while disputing that those methods are appropriate and arguing that individualized evidence must be considered, has not shown that the methods are "so insubstantial as to amount to no method at all." Potash, 159 F.R.D. at 697. While Abbott's arguments "may be properly used to attack the merits of [Dr. Singer's] damages methodologies and computations at trial, they are insufficient to demand a finding that individual issues predominate at the certification stage." DRAM, 2006 WL 1530166 at *10. Furthermore, "even if some individual issues may arise in calculating damages, this fact alone does not defeat class certification." Id.

For these reasons, the Court finds that common issues predominate over any questions affecting only individual class members. The Court also finds that resolution of Plaintiffs' claims through a class action is superior to other available methods -- in particular, to Abbott's preferred method of notifying class members of the litigation and allowing them to intervene if

United States District Court
For the Northern District of California

they so desire.  In antitrust cases such as this one, the damages of at least some individual class members are likely to be too small to justify litigation.  A class action offers those with small claims the opportunity for meaningful redress.  The difficulties raised by Abbott are manageable, and do not stand in the way of class certification.

CONCLUSION

For these reasons, Plaintiffs' motion for class certification (Docket No. 64) is GRANTED.  This case will proceed on behalf of a class of all persons or entities in the United States that purchased Norvir and/or Kaletra directly from Abbott or any of its divisions, subsidiaries, predecessors, or affiliates during the period from December 3, 2003 through such time as the effects of Abbott's illegal conduct have ceased, and excluding federal governmental entities, Abbott, and Abbott's divisions, subsidiaries, predecessors, and affiliates.

IT IS SO ORDERED.

Dated: 8/27/08

_____
CLAUDIA WILKEN
United States District Judge

United States District Court
For the Northern District of California

21