1

2 LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
3 Joseph R. Saveri (State Bar No. 130064)
jsaveri@lchb.com
4 Embarcadero Center West
275 Battery Street, 30th Floor
5 San Francisco, CA 94111-3339
Telephone:     (415) 956-1000
6 Facsimile:     (415) 956-1008

7 *Attorneys for Plaintiffs*

8 [additional counsel listed on signature page]

9                UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11                 SAN FRANCISCO DIVISION

12

13 MEIJER, INC. & MEIJER                          Case No. 07-5985
DISTRIBUTION, INC., on behalf of
14 themselves and all others similarly situated,   Consolidated Case

15            Plaintiffs,                          **SECOND AMENDED CLASS ACTION
                                                   COMPLAINT**
16 v.
                                                   **JURY TRIAL DEMAND**
17 ABBOTT LABORATORIES,

18            Defendant.

19

20                        **NATURE OF THE ACTION**

21          Plaintiffs Meijer, Inc., Meijer Distribution, Inc., Rochester Drug Cooperative, Inc.,

22 and Louisiana Wholesale Drug Co., Inc. (collectively "Plaintiffs") bring this class action on

23 behalf of themselves and all others similarly situated challenging defendant Abbott Laboratories'

24 unlawful monopolization of the markets for Boosting and Boosted protease inhibitors drugs used

25 to treat medical disorders caused by the human immunodeficiency virus ("HIV"). Defendant

26 Abbott Laboratories ("Abbott" or "Defendant"), is the sole provider of Norvir, a protease

27 inhibitor ("PI") that is used to boost the therapeutic effects of other protease inhibitors, and has

28 unlawfully disadvantaged its competitors and restricted competition in the closely related Boosted

PI market.  Abbott's anticompetitive scheme has resulted in a suppression of competition in the Boosted PI market and the PI-Boosting market and has caused Plaintiffs and other direct purchasers to pay artificially inflated prices for the relevant drugs.

**PARTIES**

1.     Plaintiffs Meijer, Inc. and Meijer Distribution, Inc. (collectively, "Meijer") are a pharmaceutical retailer and wholesaler, respectively.  They are corporations organized under the laws of the State of Michigan, with their principal place of business located at 2929 Walker Avenue, NW, Grand Rapids, Michigan 49544.  During the period of time covered by this Complaint, Meijer is the assignee of the claims of the Frank W. Kerr Co., which, during the class period, as defined below, purchased Norvir and Kaletra directly from Abbott and suffered antitrust injury as a result of Abbott's anticompetitive conduct alleged herein.

2.     Plaintiff Rochester Drug Cooperative, Inc. ("RDC") is a pharmaceutical wholesaler located at 50 Jet View Drive, Rochester, New York 14624.  During the relevant period, Plaintiff purchased Norvir and Kaletra directly from Abbott, and was injured as a result of Defendant's anti-competitive conduct alleged herein.

3.     Plaintiff Louisiana Wholesale Drug Company, Inc. ("LWD") is a pharmaceutical wholesaler and corporation organized under the laws of the State of Louisiana and is located at 20851-49 South Service Road, in Sunset, Louisiana 70584. During the relevant period, LWD purchased Norvir and Kaletra directly from Abbott, and suffered antitrust injury as a result of the anti-competitive conduct alleged herein.

4.     Defendant Abbott is a corporation organized and existing under the laws of the State of Illinois and having its headquarters and principal place of business at 100 Abbott Park Road, Abbott Park, Illinois.  Abbott is engaged in the development, manufacture and sale of pharmaceutical and nutritional products.  Abbott has facilities in at least 14 states, including at least 3 in this District.

- 2 -
SECOND AMENDED CLASS ACTION COMPLAINT

1

**JURISDICTION AND VENUE**

2     5.      This action arises under section 2 of the Sherman Act, 15 U.S.C. § 2, and

3  sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  The Court has subject-matter

4  jurisdiction pursuant to 28 U.S.C. 1331 and 1337(a).

5     6.      Venue is proper in this Court pursuant to section 12 of the Clayton Act, 15

6  U.S.C. § 22, and Local Rules of the United States District Court for the Northern District of

7  California 3-2 because Abbott is an inhabitant of this District or is found or transacts business

8  there and because a substantial part of the events giving rise to Plaintiff's claims occurred in this

9  District.  Venue is also proper pursuant to 28 U.S.C. § 1391.

10     7.      Intradistrict assignment is proper in the San Francisco/Oakland Division,

11  pursuant to L.R. 3-2(c) & (d), because a substantial part of the events which give rise to the claim

12  occurred in Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Napa, San

13  Francisco, San Mateo and Sonoma counties.

14

**TRADE AND COMMERCE**

15     8.      The pharmaceutical products at issue in this case are sold in interstate

16  commerce, and the unlawful activities alleged in this Complaint have occurred in, and have had a

17  substantial effect upon, interstate commerce.

18

**FACTUAL BACKGROUND**

19     9.      PIs are considered the most powerful treatment in the medical battle

20  against HIV and the disorders it causes, including acquired immune deficiency syndrome

21  ("AIDS").  These drugs work by blocking the action of protease, an enzyme needed for HIV to

22  reproduce and infect other cells.

23     10.      Although PIs present an effective treatment, they have several

24  impediments, including: pill burden, dietary requirements, and severe side effects.  Each PI

25  presents different degrees of impediment and efficacy.  In addition, patients develop resistance to

26  certain PIs—a significant challenge to the treatment of HIV—as the disease progresses

27     11.      There are several PIs currently on the market, including Norvir (a Boosting

28  drug), manufactured by Abbott and introduced in 1996, and Kaletra, also manufactured by Abbott

1    and introduced in 2000.  Kaletra is a combination drug consisting of Norvir and another Abbott

2    PI, whose chemical or generic name is lopinavir (a Boosted drug).  As explained below, while

3    Norvir was introduced as a stand-alone treatment, its principal use today is to boost the

4    therapeutic effects (and reduced the required dosage) of other PIs.

5            12.    Abbott developed Norvir with the assistance of a National Institute of

6    Health grant and spent only about $15 million of its own funds on pre-approval clinical trials for

7    the drug.  By the end of 2001, Norvir had generated cumulative sales for Abbott of more than $1

8    billion.

9            13.    After Norvir's release, it was discovered that, when used in small quantities

10   with another PI, Norvir would boost the anti-viral effects of the other PI.  Not only did a small

11   dose of Norvir make other PIs more effective and decrease side effects associated with high

12   doses, but it also slowed down the rate at which HIV developed resistance to the effects of PIs.

13   Norvir is the only PI known to have such properties and, as a result, for such "boosting" purposes,

14   there is no substitute for Norvir.  In addition to its direct therapeutic benefits, a regimen

15   consisting of a PI boosted by Norvir improves convenience for patients in comparison to an

16   unboosted regimen by reducing the required dosage of the PI and lessening food restrictions, both

17   important factors in ensuring adherence to HIV antiviral therapy.

18           14.    Recent research has also shown significant benefits from the use of

19   Boosted PI regimens, especially for patients who experience failure of treatment regimens

20   combining PIs with other anti-HIV drugs.  Such treatment failures are marked by the emergence

21   of drug-resistant mutations that limit the benefits of other drugs in the future, because of cross-

22   resistance among HIV medications.

23           15.    Abbott has never sought to use its intellectual property to prevent other

24   manufacturers from creating and selling Boosted PIs that rely on Norvir's use.  Indeed, Abbott

25   has disclaimed such a use from the exclusionary scope of its patent rights. *See In re Abbott*

26   *Laboratories Norvir Antitrust Litig.,* 442 F. Supp.2d 800, 807-10 (N.D. Cal. 2007).   Abbott

27   profited by licensing competitors the right to market PIs to be co-administered with Norvir.

28   Abbott licensed—both explicitly and implicitly—competitors the right to market PIs to be co-

administered with Norvir.  Based on Abbott's course of conduct, Abbott knowingly created the conditions for Norvir to become the *de facto* standard boosting agent.

16.     As noted above, Abbott also markets Kaletra, which consists of Norvir and another Abbott PI, lopinavir, combined in a single pill, *i.e.*, Kaletra is lopinavir boosted by the active ingredient in Norvir.  Although effective and widely used, Kaletra has significant side effects, including hyperlipidemia, which renders patients more vulnerable to heart attacks and strokes.

17.     Thus, in the "Boosting Market," Norvir is the only product available, while in the "Boosted Market," Kaletra competes with other PIs, each of which is prescribed, dispensed and taken in conjunction with Norvir.  This creates a situation in which the same firm participates in two closely related markets, with the product sold in one of the two markets being an input or component of the product sold in the other market.  If such a firm lacks competition in the market for sales of the input or component product, it may be able to use its monopoly position in that market to disadvantage its competitors in the related market, dampen competition in the related market, and monopolize or attempt to monopolize the related market.  That is exactly what Abbott has done here.

18.     Abbott's anticompetitive conduct involves both of these markets.  First, Abbott has abused its monopoly position (100% dominance) in the Boosting Market to disadvantage its competitors and impede competition in the Boosted Market.  And second, by improperly impeding the development of potential rivals to Norvir (and/or by delaying the development of technologies that would have permitted Norvir to be used as a PI-Boosting drug in substantially lesser amounts far earlier and thus effectively brought lower prices to purchasers earlier) in the Boosting Market, Abbott artificially maintained and/or enhanced and exploited Norvir's monopoly position in the Boosting Market.

## ABBOTT'S ANTICOMPETITIVE CONDUCT

19.     Prescriptions for Kaletra rose steadily from its introduction in September 2000 through mid-2003, at which point it enjoyed approximately a 75% share of the Boosted PI market.  However, Kaletra's dominance of the Boosted PI Market was about to be threatened.

20.     In 2001 (or earlier), Abbott came to realize that Kaletra's domination of the Boosted PI Market would soon be challenged by new Boosted PIs that were then expected to be coming to market imminently.

21.     During 2002 (or earlier), Abbott became increasingly concerned about the competitive threat to Kaletra posed by soon-to-be-introduced Boosted PIs, and began to formulate plans to thwart the impact on Kaletra of those new products.  Abbott considered various strategies for using its Norvir dominance to impair Kaletra's rivals, including, *e.g.*: (a) removing Norvir from the market as a stand-alone product, and (b) raising Norvir's price substantially in order to make it prohibitively expensive for patients to use rivals' boosted products.

22.     In June 2003, Bristol-Myers Squibb Co. ("BMS") introduced Reyataz, a PI designed to be boosted by Norvir.  In November 2003,  GlaxoSmithKline ("GSK") introduced Lexiva, another PI designed to be boosted by Norvir.  Studies showed that, when boosted with Norvir, the new PIs were as effective as Kaletra, and were more convenient.  This caused concern at Abbott that Kaletra's market share would be threatened by these new Boosted PI competitors.  And, in fact, Kaletra's share of the boosted market began to decline.

23.     Beginning in the second half of 2003, Reyataz began to make steady inroads into Kaletra's share of the Boosted PI market and Abbott knew that GSK was preparing to launch Lexiva into the Boosted PI market.

24.     Abbott was well aware of the competitive threat posed by Reyataz and Lexiva and acted quickly to suppress it.  On December 3, 2003, as part of the monopolization scheme alleged herein, Abbott raised the wholesale price of Norvir by approximately 400%, from $205.74 to $1,028.71 for a 120-count bottle of 100 mg capsules.  However, Abbott did not raise the price of Kaletra, which incorporates Norvir.  In effect, Abbott raised the price of Norvir only when it is used to boost a non-Abbott PI.  By instituting this enormous price hike, Abbott drastically increased the cost of regimens using Norvir to boost competing PIs.  The annual cost of Norvir needed in such a regimen increased by $6,258 per year for PIs such as Lexiva requiring twice-daily dose of Norvir.  For Aptivus (tipranavir), a new PI marketed by Boehringer Ingelheim, the optimal Norvir booster dose increased by more than $12,000 per year.

25.     Faced with the prospect of new competitors to Abbott's boosted PI, Kaletra—*i.e.*, two new PIs from GSK (Lexiva) and BMS (Reyataz)—Abbott declined to engage in legal and procompetitive, but potentially ineffective, approaches to defending against a loss of market share, such as lowering the price of Kaletra.   Instead, Abbott formulated an anticompetitive monopolization scheme using Abbott's control of the Boosting-PI market (Norvir) to impede rivals of Kaletra in the Boosted PI market, and thereby artificially insulate Kaletra from competition.  Abbott was well-aware that Abbott had facilitated the use of Norvir as a boosting drug and caused its competitors to rely on the availability of Norvir – through Abbott's past course of conduct and formally through licensing its competitors to promote their PIs with Norvir.  Abbott executives realized that if Abbott could make Norvir unavailable or less desirable when paired with its competitors' PIs—by actually pulling it from the market or by manipulating its price—then its competitors' products in the Boosted Market, which by that time almost always relied on Norvir for boosting due to Abbott's prior conduct, would be impaired, and could not become a significant competitive threat to Kaletra's market share.

26.     As reported in the *Wall Street Journal*, internal Abbott documents reveal, among other things, that: (a) Abbott understood the illegal nature of the price-increase scheme and contemplated other strategies, like ceasing sales of Norvir, to "minimize any federal investigations regarding price increases in the US"; (b) Abbott understood the adverse consequences of the scheme, including that it would "tarnish" the reputation of Abbott's CEO, "[p]osition [Abbott] as [a] big, bad, greedy pharmaceutical company," "[f]uel[] perception[s] regarding lack of Abbott commitment to HIV," and create a "[b]acklash from [the] advocacy community, legislators, [and] physicians"; and (c) Abbott floated pretextual rationales for the price increase but worried about its "[e]xposure on price if forced to open [its] books." Furthermore, removing Norvir from the U.S. market entirely would potentially expose Abbott to the significant financial risk that the NIH would use its "march-in" rights under the Bayh-Dole Act to grant licenses to numerous competitors to allow rivals to manufacture ritonavir and/or to co-formulate their Boosted PIs with ritonavir in a single pill or capsule.

27.     According to internal Abbott emails and other documents released by the Wall Street Journal, one Abbott executive explained Abbott's concern in the following manner: Abbott could not "continue to trade a prescription of Kaletra for a prescription of Norvir at 100 mg."  Rather than rely on any competitive advantage in the medicinal characteristics of Kaletra, or lowering Kaletra's price so that it was more attractive to patients, this executive outlined alternative anticompetitive plans that had been discussed among Abbott management and warned other senior Abbott employees not to be "stunned by the outcome of the thought process."

28.     But the emails are stunning.  First, they outlined two potential scenarios for increasing the price of Norvir in an effort artificially to decrease demand for its competitors' PIs. In both scenarios, they suggested leaving the price of Kaletra unchanged, thus giving Abbott a huge price advantage for PIs boosted by Norvir.  They outlined a "rationale" for the proposed Norvir price increase, suggesting that Abbott mislead the public into believing that "it is no longer feasible for Abbott to provide a production line of Norvir capsules at the current price." The emails, however, frankly admit the "weakness" of this "rationale", i.e., its falsity.

29.     Even more cynically, the Abbott emails suggested an alternative approach to the price increase: withdraw Norvir capsules from the market entirely, leaving HIV patients only with a liquid form of Norvir that Abbott's own executives admit "taste[s] like someone else's vomit."  Other materials reveal that Abbott planned to make up a justification for this withdrawal.  Executives considered misleading the public into believing that Abbott was diverting the capsules for humanitarian efforts in "the developing world (i.e. Africa)."

30.     An Abbott slide presentation created around the time of these emails further illustrates the anticompetitive and illegitimate motives behind Abbott's price hike.  The presentation reveals, for example, that Abbott sought to "[p]osition Kaletra as a more economical option for boosted ARV [anti-retroviral] therapy."  Abbott acknowledged the illegitimacy of its plan, but Abbott still found it easier to mislead the public regarding an anticompetitive price increase than to try to explain a complete withdrawal of Norvir capsules from the market.

31.     Abbott further attempted to manage the fallout from its Norvir price increase by publishing misleading comparisons of PI prices.  In promotional and informational

materials about Norvir after the price increase, Abbott represented that Norvir was the lowest-priced PI on the market.

32.     The Department of Health & Human Services ("DHHS") responded with a Warning Letter to Abbott about such materials, calling Abbott's price comparison chart "false or misleading in violation of section 502(a) of the Federal Food, Drug, and Cosmetic Act (Act) (21 U.S.C. 352(a))." Specifically, DHHS stated that the price chart was misleading because it compared a "subtherapeutic dose of Norvir (100 mg once daily) to the labeled dosing regimens of other antiretroviral agents" and it "implies that Norvir may be used other than in combination therapy, when it is not labeled for such use." Abbott did not contest the FDA letter, choosing instead to send a letter to healthcare providers retracting and "clarifying" its false statements.

33.     Internal Abbott documents state Abbott's intentions: the huge price increase for the PI-Boosting drug, Norvir, would insulate Kaletra from competition in the separate Boosted market. Abbott's December 3, 2003 price increase was an attempt to abuse its monopoly position in the Boosting Market in order to disadvantage competitors and maintain its dominant position in the boosted market. The attempt succeeded.

34.     At the same time that Abbott was planning to limit Norvir's availability (by either physically removing it from the market or raising its price to make it effectively unavailable), Abbott was approaching BMS, GSK, and other actual and potential Boosted PI competitors to induce them to take licenses from Abbott for the right to label and market their PIs to be boosted by, or co-administered with, Norvir. In 2001, Abbott approached GSK to demand that GSK secure a license from Abbott to allow GSK to promote GSK's existing PIs, as well as PIs it had under development, with Norvir. Abbott and GSK continued to negotiate over such a license during 2001 and 2002 until GSK ultimately acquiesced to this demand, procuring a license from Abbott in December 2002. Under the license, GSK paid substantial sums of money and other valuable consideration in exchange for the right to promote the use and administration of its PIs with Norvir.

35.     Abbott negotiated similar licenses with its competitors during 2001 and 2002, even as Abbott was simultaneously secretly considering limiting Norvir's availability.

1    Abbott never disclosed to GSK and other licensees and potential licensees that Abbott might

2    either remove Norvir from the market or raise its price to make it financially unavailable to many

3    patients. When GSK entered into the Norvir license with Abbott in December 2002, GSK relied

4    on Abbott's good faith not to materially deviate from its prior course of conduct with regard to

5    selling and pricing Norvir.  Up until that point, Abbott had never increased Norvir's price by

6    more than 4% per year.  The largest price increase in HIV therapies had been a 10.4% increase

7    for the price for Combivir and Trizivir in January 2002.  Abbott's overnight 400% price increase

8    for Norvir was unprecedented and—especially when considering Abbott's prior conduct of

9    encouraging and facilitating licensing of Norvir for use in the Boosted market—totally

10   unexpected.

11          36.    By mandating that its competitors enter into licensing agreements for the

12   sale of Norvir – agreements which covered the vast majority of its competitors in the Boosted PI

13   market - Abbott created a framework within which Norvir would remain on the market for co-

14   administration with competing Boosted PIs.   Abbott also created an expectation that Abbott

15   would deal in accordance with its past conduct and continue to implement incremental price

16   increases on Norvir.

17          37.    Competitors, such as GSK, reasonably relied upon Abbott's prior pricing

18   pattern and course of conduct as the basis upon which Norvir would be available.

19          38.    Prior to Norvir's launch in 1996, Abbott was aware of Norvir's boosting

20   properties as a use for Norvir.  By the time Kaletra had launched in 2000, it was well-established

21   and Abbott knew that Norvir had become the industry standard of care for boosting agents,

22   Norvir had been regularly co-prescribed and co-administered with various PIs, including those

23   designed and developed by Abbott's competitors, Norvir was used almost exclusively as a

24   boosting agent as opposed to a stand-alone treatment, that the daily average consumption of the

25   drug was reduced significantly since 1996, and that its revenues per prescription were continually

26   decreasing as Norvir's predominant use steadily shifted to boosting other PIs.  Shortly after

27   Kaletra's launch, Kaletra gained a dominant share in the Boosted PI market.  Abbott boasted that

28   Kaletra was the #1 selling boosted PI in the world.  After the launch of Kaletra and years before

1   the December 2003 price increase, Abbott was aware of additional and significant market

2   changes, *e.g.*, the impending launch of PIs that would compete with Kaletra.   Knowing all of this,

3   Abbott, nevertheless, and over the course of seven years, continued its course of conduct by

4   implementing incremental price increases on Norvir and by opening the market through license

5   agreements with competitors.

6          39.     Faced with increasing competition in the Boosted Market through the

7   introduction of Reyataz and Lexiva and recognizing that it had underestimated the competitive

8   impact of Reyataz and Lexiva, Abbott abandoned its prior course of conduct and planned to

9   change direction in how it would make Norvir available.   Abbott's change in direction was

10  narrowed to two options: remove Norvir from the United States market or dramatically increase

11  the price of Norvir.   In choosing the 400% price increase, Abbott went from encouraging the

12  promotion of Norvir with its competitors' PIs that had existed for years, to imposing an

13  anticompetitive price increase on Norvir.

14         40.     Abbott's exclusionary conduct has unlawfully caused the Boosted PI

15  Market to standardize on Norvir for boosting purposes and has significantly retarded the advent

16  of alternatives to Norvir in the United States, thereby enabling Abbott to sell Norvir at artificially

17  inflated prices.  But for Abbott's illegal conduct, multiple other avenues for providing, or

18  obviating the need for, boosting functionality would have been invested in and pursued, resulting

19  in a much lower demand, and therefore profitably sustainable price, for Norvir.

20         41.     In reliance on the expectation that Abbott would act in good-faith, and

21  because Abbott concealed its strategy to reduce Norvir's availability and/or dramatically raise its

22  prices, one or more PI manufacturers materially delayed developing, testing, and/or launching

23  other potential Boosted PIs that could be effective with substantially less Norvir (and thus be less

24  susceptible to impairment by a Norvir price increase) or could be used by another Boosting drug

25  entirely, *i.e.*, not Norvir.  As a result of Abbott's conduct, no currently available PI has been

26  approved for co-administration with any other booster except Norvir.

27         42.     In addition, Abbott's competitors devoted substantial resources to the

28  development of PIs that could be boosted with Norvir and to proving the safety and efficacy of

1   boosting its PIs with Norvir.  For example, had GSK  known that Abbott was planning to

2   substantially reduce Norvir's availability, (either by raising its prices to prohibitive levels or

3   pulling it from the market entirely,) GSK  would not have delayed or postponed efforts to develop

4   alternative Boosted PI drugs that did not depend upon using 200 mg of the Norvir product as a

5   booster.   Due to Abbott's misconduct as described above, GSK was delayed in receiving FDA

6   labeling approval for the use of its Boosted PI Lexiva with only 100 mg of Norvir per day, rather

7   than 200 mg of Norvir per day to achieve the same clinical results.  Lexiva, with only 100 mg. of

8   Norvir per day, entered the market, belatedly, in October 2007.  A result of this new FDA

9   approval for use of Lexiva with only 100 mg. of Norvir is that the cost to purchasers of boosting

10  Lexiva with Norvir dropped by one-half.   Because GSK (and potentially others) delayed

11  development, testing and FDA-approval of Boosted PIs that would be effective with lower

12  amounts of Norvir: (a) purchasers in the Boosted market paid more for Norvir than they otherwise

13  would have; and (b) GSK's rival Boosted PI products were rendered more expensive (and

14  therefore less of a competitive threat to Kaletra).

15          43.     Abbott's pricing of Norvir and its effects on competition are exacerbated

16  by the complex pricing rules that govern the price of AIDS drugs which are paid for by

17  government programs.  More than half of the PIs (and other AIDS drugs) sold in the United

18  States are paid for by governmental payers (e.g., Medicaid, the Public Health Service, AIDS Drug

19  Assistance Programs and others).  The prices paid by these payers are controlled under complex

20  pricing and rebate rules.   As a result of these rules, Abbott's price increase did not affect

21  government payers.

22          44.     These rules, however, also require that if a firm lowers its price to private

23  purchasers, it must also implement a price reduction to government purchasers.  Consequently,

24  other manufacturers who marketed PIs for use with Norvir in competition with Kaletra (such as

25  GSK and BMS,) were at a pricing disadvantage because, in order to counteract the effect of the

26  Norvir price increase, GSK and other firms that compete with Abbott only with respect to the

27  lopinavir component of Kaletra, would have had to lower their prices for both private purchasers

28

1  and government purchasers.  Abbott took advantage of those rules to help stifle a competitive

2  response to the Kaletra price in the Boosted Market.

3        45.    Abbott's anticompetitive scheme effectively halted the decline in market

4  share of Kaletra.  By 2006, Kaletra's share of the boosted PI market had risen to approximately

5  the same dominant share it had held prior to the introduction of Reyataz.  This change was due to

6  the competitive disadvantage imposed on non-Abbott PIs by the December 2003 price increase on

7  Norvir.

8        46.    By abusing its monopoly power in the boosting market to impair rivals in

9  the Boosted PI market, Abbott's 400% Norvir price increase not only impeded competition by

10  inflating the costs of using rivals' Boosted PI products, but also caused its Boosted PI competitors

11  to forego responding to Abbott's conduct by lowering price.  After December 2003, Abbott's

12  boosted competitors knew that any price reductions they took could immediately be undercut by

13  further Norvir price *increases*.  In other words, by abusing its monopoly in the boosting market,

14  Abbott could react to price cuts by its boosted PI rivals not with price reductions of its own on its

15  Boosted PI product as one would expect in a competitive market, but rather with price increases

16  on a different product.  In this way, Abbott's Boosted PI rivals had little incentive to get into a

17  competitive battle with Abbott in the Boosted Market given that Abbott controlled the Boosting

18  market.  By undermining competitors' incentives to price compete, Abbott's conduct reduced

19  price competition as a whole in the Boosted PI market.  Consequently, the December 2003 Norvir

20  price increase not only raised the costs of using rivals' products, but also reduced the overall

21  degree of price competition in the Boosted PI market, thereby further reducing competitive

22  pressure on Abbott to reduce Kaletra's prices.

23        **DUTY TO DEAL IN THE BOOSTING MARKET**

24        47.    Abbott has a duty to deal, *i.e.*, to continue to sell Norvir as a stand-alone

25  product at a reasonable price rather than merely as a component of Kaletra, in accordance with a

26  continuing course of conduct over several years. Abbott's prior course of conduct with

27  competitors and consumers included (a) voluntarily taking incremental price increases over many

28  years even as market conditions changed; (b) encouraging manufacturers of other PIs to market

their products for use in conjunction with Norvir; (c) licensing competitors to market other Boosted PIs for use in conjunction with Norvir; and (d) taking steps to ensure that Norvir became the standard PI booster in the United States.

48.     Abbott violated that duty to deal by radically changing its course of conduct through the 400% Norvir price increase, thereby creating an effective refusal to deal that compromised competitors' ability to offer competitive alternatives to Kaletra in the Boosted PI Market.  The change in conduct stifled effective entry of medically superior Boosted PIs at a lower price, and disrupted competitors' ability to market its new Boosted PIs during the critical launch period.

## PRICING IN THE BOOSTED MARKET BELOW
## AN APPROPRIATE MEASURE OF COSTS

49.     If the penalty a purchaser would pay on the required dosage of Norvir for buying a Boosted PI from a supplier other than Abbott were subtracted from the imputed price of the Boosted PI portion of Kaletra, then the resulting price would be below Abbott's average variable costs relating to the Boosted PI portion of Kaletra.

50.     Abbott sells ritonavir at a much higher price when it is sold as a stand-alone product (Norvir) than when it is sold as part of Kaletra.  Because of the size of the December 2003 price increase on Norvir, in conjunction with the decision to leave the price of Kaletra unchanged, Abbott's December 2003 price increase on Norvir resulted in Abbott's selling lopinavir below its average variable cost.

51.     Given that Abbott's post-December 2003 pricing of Norvir and Kaletra brought the imputed or effective price of lopinavir below Abbott's average variable costs, equally efficient competitors could not effectively compete with Abbott after December 2003.  The government rules that apply to the pricing of AIDS drugs compounded the effects of Abbott's pricing and made such competition even more difficult.  In order to offer a price that was equivalent to the effective or imputed price of lopinavir, an equally efficient competitor of Abbott's would have had to sell its competing Boosted PI below average variable cost and also would have had to forgo millions of dollars in revenue from government programs purchasing

AIDS drugs, even though such competitor was not at a pricing disadvantage in competing for government sales.  Thus, any attempt by Abbott's competitors to match Abbott's post-December 2003 pricing of Kaletra would have been even more difficult than in a market without the unusual government pricing rules that apply to AIDS drugs.

52.     As a direct and proximate result of Abbott's unlawful conduct, Plaintiffs and other similarly situated direct purchasers have been deprived of the benefit of free and open competition in both the Boosting and Boosted PI markets and have been injured in their businesses and properties by paying more for the relevant Abbott drugs than they would have in the absence of Abbott's unlawful, anticompetitive conduct.

## RELEVANT MARKETS

53.     There are two product markets relevant to Plaintiffs' antitrust claims: the Boosting Market, which consists of Norvir alone, and the Boosted Market, which consists of Kaletra and a number of non-Abbott PIs, each of which is prescribed, dispensed and used in conjunction with Norvir.  The relevant geographic market is the United States.  With respect to both product markets, a firm that was the only seller of such products in the United States would have the ability to profitably sell those products at a price substantially above the competitive level without losing significant sales.

54.     At all relevant times, Abbott has had a 100% share of the Boosting market and a dominant share of the Boosted market.  At all relevant times, Abbott possessed monopoly power—the ability to profitably raise price significantly above competitive level without losing significant sales—in both relevant markets.

55.     There are barriers to entry in both the market for PI boosters and the market for Boosted PIs.   The products in these markets require millions of dollars and years to design, develop, and distribute.  Compounding these barriers to entry, both markets require government approvals to enter and may be covered by patents and other forms of intellectual property.  Thus, competitors or potential market entrants lack the capacity to increase output in the short run.

1    56.    The unlawful actions alleged above were taken for the purpose of

2    maintaining Abbott's dominant share of the Boosted market.

3                          **CLASS ACTION ALLEGATIONS**

4    57.    Plaintiffs bring this action on their own behalf and under Fed. R. Civ. P.

5    23(a) & (b)(3), as representatives of a class (the "Class") defined as follows:

6             All persons or entities in the United States that purchased Norvir
              and/or Kaletra directly from Abbott or any of its divisions,
7             subsidiaries, predecessors, or affiliates during the period from
              December 3, 2003 through such time as the effects of Abbott's
8             illegal conduct have ceased, and excluding federal governmental
              entities, Abbott, and Abbott's divisions, subsidiaries, predecessors,
9             and affiliates.

10   58.    On information and belief, hundreds of entities in the United States have

11   purchased Norvir and/or Kaletra directly from Abbott.  Thus, members of the Class are so

12   numerous that joinder is impracticable.

13   59.    Plaintiffs' claims are typical of those of the Class.

14   60.    Plaintiffs and all members of the Class were damaged by the same conduct

15   of the Defendant.

16   61.    Plaintiffs will fairly and adequately protect and represent the interests of

17   the Class. The interests of the Plaintiffs are not antagonistic to the Class.

18   62.    Plaintiffs are represented by counsel who are experienced and competent in

19   the prosecution of complex class action antitrust litigation.

20   63.    Questions of law and fact common to the members of the Class

21   predominate over questions, if any, that may affect only individual members because Defendant

22   has acted and refused to act on grounds generally applicable to the entire Class.  Such generally

23   applicable conduct is inherent in the Defendant's exclusionary and anticompetitive conduct in

24   monopolizing and attempting to monopolize the Boosted PI market and in monopolizing the

25   Boosting PI market, as more fully alleged herein.

26   64.    Questions of law and fact common to the Class include:

27             a.    whether the Defendant intentionally and unlawfully impaired or

28   impeded competitors the Boosting and/or Boosted Markets;

1               b.     whether Abbott unlawfully attempted to monopolize the Boosting

2 and/or Boosted Market during the Class Period;

3               c.     whether Abbott engaged in anticompetitive conduct in order to

4 unlawfully disadvantage its competitors and obtain, maintain, or extend its monopoly in the

5 Boosting Market;

6               d.     whether Abbott had a duty to deal in the Boosting Market.

7               e.     whether the geographic market for both protease inhibitor boosters

8 and boosted protease inhibitors is the United States;

9               f.     whether Abbott has monopoly power in a relevant market defined

10 as the Boosting Market;

11              g.     whether Abbott intended to monopolize the Boosted Market or to

12 maintain or extend an existing monopoly on the Boosted Market, and in fact maintained or

13 extended monopoly power in the Boosted market;

14              h.     whether there was and is a dangerous probability that Abbott would

15 succeed in monopolizing the Boosted Market;

16              i.     whether Abbott had pro-competitive reasons for its conduct;

17              j.     the effects of Abbott's attempted monopolization on prices of

18 boosted protease inhibitors;

19              k.     whether Plaintiff and other members of the Class have been

20 damaged by paying more for the relevant drugs as a result of Defendant's unlawful behavior; and,

21              l.     the proper measure of damages.

22       65.     Class action treatment is a superior method for the fair and efficient

23 adjudication of the controversy, in that, among other things, such treatment will permit a large

24 number of similarly situated persons to prosecute their common claims in a single forum

25 simultaneously, efficiently, and without the unnecessary duplication of effort and expense that

26 numerous individual actions would engender.  The benefits of proceeding through the class

27 mechanism, including providing injured persons or entities with a method for obtaining redress

28

1  for claims that might not be practicable for them to pursue individually, substantially outweigh

2  any difficulties that may arise in management of this class action.

3  66.  Plaintiffs know of no difficulty to be encountered in the maintenance of

4  this action as a class action.

5  **FIRST CAUSE OF ACTION**
**Monopolization of the Boosted PI Market (15 U.S.C. § 2)**

6

7  67.  Plaintiff incorporates by reference the allegations contained in paragraphs 1

8  through 66 above.

9  68.  At all relevant times, Abbott has had monopoly power in the Boosting

10  Market and Boosted Market and, in the alternative, a dangerous probability of achieving

11  monopoly power in the Boosted Market.

12  69.  Abbott has willfully maintained its monopoly power in the Boosted Market

13  through exclusionary and anticompetitive means.  As described in more detail above, Abbott

14  induced competitors in the Boosted Market to rely upon Norvir, then virtually overnight raised

15  the price of Norvir by approximately 400% in December 2003, and maintained that inflated price

16  to the present day.  Norvir is sold at a much lower price when used as one component of Abbott's

17  own boosted PI, Kaletra.  By engaging in this conduct, and instituting such a price increase,

18  Abbott has gained an artificial competitive advantage and unfairly impeded and impaired its

19  competitors in the Boosted Market.  The purpose and effect of Abbott's conduct have been to

20  suppress rather than promote competition on the merits.

21  70.  There is no procompetitive justification for Abbott's conduct.

22  71.  Plaintiffs have been injured in their businesses and properties by reason of

23  Abbott's unlawful monopolization.  Plaintiffs' injuries consist of paying higher prices to purchase

24  the relevant products than they would have paid absent Abbott's conduct.  Plaintiffs' injuries are

25  of the type the antitrust laws were designed to prevent and flow from that which makes Abbott's

26  conduct unlawful.

27  **SECOND CAUSE OF ACTION**
**Attempt to Monopolize the Boosted PI Market (15 U.S.C. § 2)**

28

72.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 71 above

73.     At all relevant times, Abbott has had monopoly power in the Boosting Market and, in the alternative, a dangerous probability of achieving monopoly power in the Boosted Market.

74.     Abbott has attempted to monopolize the Boosted Market through exclusionary and anticompetitive means.  As described in more detail above, Abbott induced competitors in the Boosted Market to rely upon Norvir, then overnight raised the price of Norvir by approximately 400% in December 2003, and maintained that inflated price to the present day.  Norvir is sold at a much lower price when used as one component of Abbott's own boosted PI, Kaletra.  By engaging in this conduct, and instituting such a price increase, Abbott has gained an artificial competitive advantage and unfairly impeded and impaired its competitors in the Boosted Market.  The purpose and effect of Abbott's conduct have been to suppress rather than promote competition on the merits.

75.     At all relevant times, Abbott has had the specific intent to monopolize the Boosted Market.

76.     There is no procompetitive justification for Abbott's conduct.

77.     Plaintiffs have been injured in their businesses and properties by reason of Abbott's unlawful attempt to monopolize.  Plaintiffs' injuries consist of paying higher prices to purchase the relevant products than they would have paid absent Abbott's conduct.  Plaintiffs' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Abbott's conduct unlawful.

### THIRD CAUSE OF ACTION
### Monopolization of the Boosting Market (15 U.S.C. § 2)

78.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 77 above.

79.     Abbott has willfully enhanced and maintained its monopoly power in the Boosting PI Market through exclusionary and anticompetitive means. As described in more detail

1    above, Abbott deceptively induced rivals to forego developmental alternatives and instead

2    standardize around the use of Norvir for boosting purposes. Given that competitors were induced

3    to lock in to using Norvir, Abbott exercised its monopoly power in the Boosting Market by

4    raising the price of Norvir approximately 400% in December 2003. Abbott has maintained that

5    inflated price to the present day. The purpose and effect of Abbott's conduct has been to suppress

6    rather than promote competition on the merits.

7            80.     There is no pro competitive justification for Abbott's conduct.

8            81.     Plaintiffs and the Class have been injured in their businesses and properties

9    by reason of Abbott's unlawful monopolization. Plaintiffs' injuries consist of paying higher prices

10   to purchase the relevant products than they would have paid absent Abbott's conduct. These

11   injuries to Plaintiffs' businesses and properties are of the type the antitrust laws were designed to

12   prevent and flow from that which makes Abbott's conduct unlawful.

13

14                              **PETITION FOR RELIEF**

15          WHEREFORE, Plaintiffs petition that:

16          a.      The Court determine that this action may be maintained as a class

17   action pursuant to Fed. R. Civ. P. 23, that Plaintiffs be appointed class representatives, and that

18   Plaintiffs' counsel be appointed as counsel for the Class;

19          b.      The conduct alleged herein be declared, adjudged and/or decreed to

20   be unlawful under Section 2 of the Sherman Act, 15 U.S.C. § 2;

21          c.      Plaintiffs and the Class recover their overcharge damages, trebled,

22   and the costs of the suit, including reasonable attorneys' fees as provided by law; and

23          d.      Plaintiffs and the Class be granted such other, further, and different

24   relief as the nature of the case may require or as may be determined to be just, equitable and

25   proper by this Court.

26                              **JURY TRIAL DEMAND**

27          Plaintiffs demand a trial by jury of all issues so triable.

28

1    Dated: August 13, 2009

2                                      GARWIN GERSTEIN & FISHER, LLP

3
                                       By: _/s/ Joseph Opper _____
4                                      Joseph Opper, Pro Hac Vice
                                       *jopper@garwingerstein.com*
5
                                       Bruce E. Gerstein, *Pro Hac Vice*
6                                      *bgerstein@garwingerstein.com*
                                       Noah H. Silverman, *Pro Hac Vice*
7                                      1501 Broadway, Suite 1416
                                       New York, New York 10036
8                                      Tel: (212) 398-0055
                                       Fax: (212) 764-6620
9

10                                     KAPLAN FOX & KILSHEIMER LLP
                                       Linda P. Nussbaum, Admitted *Pro Hac Vice*
11                                     John D. Radice, Admitted *Pro Hac Vice*
                                       850 Third Avenue, 14th Floor
12                                     New York, NY 10022
                                       Telephone:    (212) 687-1980
13                                     Facsimile:    (212) 687-7714
                                       Email: rkaplan@kaplanfox.com
14                                     lnussbaum@kaplanfox.com
                                       garenson@kaplanfox.com
15
                                       BERGER & MONTAGUE, P.C.
16                                     Daniel Berger
                                       *danberger@bm.net*
17                                     Eric L. Cramer, Admitted *Pro Hac Vice*
                                       *ecramer@bm.net*
18                                     David F. Sorensen, Admitted *Pro Hac Vice*
                                       *dsorensen@bm.net*
19                                     1622 Locust Street
                                       Philadelphia, PA 19103
20                                     Telephone:    (215) 875-3000
                                       Facsimile:    (215) 875-4604
21

22                                     ODOM & DES ROCHES, LLP
                                       John Gregory Odom, *Pro Hac Vice*
23                                     Stuart E. Des Roches, *Pro Hac Vice*
                                       John Alden Meade, *Pro Hac Vice*
24                                     Suite 2020, Poydras Center
                                       650 Poydras Street
25                                     New Orleans, LA 70130
                                       Tel: (504) 522-0077
26                                     Fax: (504) 522-0078

27

28

1    SMITH FOOTE LAW FIRM
     David P. Smith, *Pro Hac Vice*
2    W. Ross Foote, *Pro Hac Vice*
     720 Murray Street
3    P.O. Box 1632
     Alexandria, LA 71309
4    Tel: (318) 445-4480
     Fax: (318) 487-1741
5
     *Co-Lead Counsel for Direct Purchaser Plaintiffs*
6

7    LIEFF, CABRASER, HEIMANN &
     BERNSTEIN, LLP
8
     Joseph R. Saveri (State Bar No. 130064)
9    *jsaveri@lchb.com*
     Embarcadero Center West
10   275 Battery Street, 30th Floor
     San Francisco, CA 94111-3339
11   Telephone:    (415) 956-1000
     Facsimile:    (415) 956-1008
12
     *Local Counsel for Plaintiffs*
13

14   *Additional Counsel for Plaintiffs*

15   KOZYAK TROPIN & THROCKMORTON
     Tucker Ronzetti, *Pro Hac Vice*
16   Adam Moskowitz, *Pro Hac Vice*
     2800 Wachovia Financial Center
17   200 South Biscayne Boulevard
     Miami, Florida 33131-2335
18   Telephone: (305) 372-1800
     Telecopier: (305) 372-3508
19
     AUBERTINE DRAPER ROSE, LLP
20   Andrew E. Aubertine, *Pro Hac Vice*
     aa@adr-portland.com
21   1211 SW Sixth Avenue
     Portland, Oregon 97204
22   Telephone:    (503) 221-4570
     Facsimile:    (503) 221-4590
23
     LAW OFFICES OF JOSHUA P. DAVIS
24   Joshua P. Davis (State Bar No. 193254)
     *davisj@usfca.edu*
25   437A Valley Street
     San Francisco, CA 94131
26   Telephone:    (415) 422-6223

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VANEK, VICKERS & MASINI, P.C.
Joseph M. Vanek, Admitted *Pro Hac Vice*
David P. Germaine, Admitted *Pro Hac Vice*
111 South Wacker Drive, Suite 4050
Chicago, IL 60606
Telephone:     (312) 224-1500
Facsimile:     (312) 224-1510
Emails:jvanek@vaneklaw.com
dgermaine@vaneklaw.com

SPERLING & SLATER
Paul E. Slater, Admitted *Pro Hac Vice*
55 West Monroe Street, Suite 3200
Chicago, Illinois 60603
Telephone:     (312) 641-3200
Facsimile:     (312) 641-6492
Email: pes@sperling-law.com

## <u>CERTIFICATE OF ECF FILING</u>

I, Joseph Opper, declare that I am over the age of 18 years, and that on August 13, 2009, I filed via the ECF filing system in the Northern District of California, Oakland Division, in Case No. C07-5985 (CW), the following documents:

1.      The Direct Purchaser Class Second Amended Complaint

2.      The Stipulation for Filing the Direct Purchaser Class Second Amended Complaint

I declare under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct.

August 13, 2009

*/s/ Joseph Opper*_____
Joseph Opper